UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: INTEREST RATE SWAPS ANTITRUST LITIGATION | MDL No. 2704 Master Docket No. 16 MD 2704 (PAE) |
| This Document Pertains To: *ALL CASES* | |

**DEALER DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**<u>THEIR RENEWED JOINT MOTION TO DISMISS ALL CLAIMS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ............................................................................................................. 5

    A.    Interest rate swaps trading ................................................................. 6

    B.    The Dodd-Frank regulatory regime ..................................................... 9

        1.    Clearing regulation ..................................................................... 10

        2.    Trading regulation ...................................................................... 10

        3.    Competition and other regulation ............................................... 13

    C.    The allegations of the complaints ...................................................... 14

        1.    Pre-2013 allegations .................................................................... 14

        2.    Post-2013 allegations .................................................................. 17

ARGUMENT ................................................................................................................. 22

I.    PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE ANTITRUST
    CONSPIRACY. ................................................................................................. 22

    A.    Standards for pleading an antitrust conspiracy. .................................. 22

    B.    Plaintiffs' pre-2013 allegations fail to state a plausible antitrust claim. ............... 24

        1.    The Project Fusion allegations fail to state a plausible claim. .................. 24

        2.    The OTCDerivNet allegations fail to state a plausible claim. .................. 27

        3.    The remaining pre-2013 allegations fail to state a plausible claim. ......... 30

    C.    Plaintiffs' post-2013 allegations fail to state a plausible antitrust claim. ............. 31

        1.    Plaintiffs do not adequately allege a market-making boycott. .................. 32

        2.    Plaintiffs do not adequately allege an FCM clearing boycott. .................. 36

        3.    Plaintiffs' "bifurcation" and "name give-up" allegations do not
            support their claims. .................................................................... 39

    D.    Plaintiffs fatally rely on impermissible group pleading. ......................... 42

    E.    Plaintiffs' allegations about other markets do not salvage their claims ............... 46

i

II.    CLASS PLAINTIFFS LACK ANTITRUST STANDING. ............................................... 48

    A.    Legal standard. ....................................................................................... 49

    B.    Class Plaintiffs' alleged injury is indirect and remote. ......................... 50

        1.    The allegations of the Class Complaint show an attenuated chain of causation between the alleged conduct and Class Plaintiffs' injury. ........ 50

        2.    Second Circuit precedent confirms that Class Plaintiffs' alleged injuries are not legally cognizable. ............................................. 51

    C.    More efficient enforcers exist and have already sought to enforce the antitrust laws. ...................................................................................... 53

    D.    Class Plaintiffs' damages are highly speculative. .................................. 54

    E.    Apportioning damages would be prohibitively complex. ....................... 57

III.    THE COMMODITY EXCHANGE ACT AND THE DODD-FRANK ACT IMPLICITLY PRECLUDE PLAINTIFFS' POST-DODD-FRANK CLAIMS. .............. 57

    A.    All four *Billing* factors weigh in favor of implied preclusion. ............. 58

        1.    Within the heartland of regulation. ......................................... 59

        2.    Clear agency authority to regulate. ......................................... 60

        3.    Ongoing agency regulation. .................................................... 60

        4.    Risk of conflict. ....................................................................... 61

    B.    Dodd-Frank's savings clause does not apply. ....................................... 68

IV.    CLASS PLAINTIFFS' PRE-2013 CLAIMS FAIL TO ALLEGE INJURY-IN-FACT. ................................................................................................................ 70

V.    CLASS PLAINTIFFS' PRE-2012 CLAIMS ARE TIME-BARRED. ........................... 71

    A.    Class Plaintiffs fail to plead "ignorance" of their pre-2012 claims. .................... 72

        1.    Class Plaintiffs had actual notice of their pre-2012 claims ...................... 72

        2.    Class Plaintiffs were on inquiry notice of their pre-2012 claims ............. 74

    B.    Class Plaintiffs fail to plead due diligence with particularity. ............... 75

    C.    Class Plaintiffs fail to plead concealment with particularity. ............... 77

VI.     PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED. ...........................79

        A.      Tera and Javelin fail to state a Donnelly Act claim. .............................................79

        B.      Tera and Javelin fail to state a tortious interference claim. ...............................80

        C.      The complaints fail to state an unjust enrichment claim......................................82

CONCLUSION ........................................................................................................................84

# TABLE OF AUTHORITIES

CASES                                                                      Page(s)

*131 Maine St. Assocs. v. Manko,*
179 F. Supp. 2d 339 (S.D.N.Y. 2002)..............................................................72, 75

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,*
881 F.2d 1396 (7th Cir. 1989) .........................................................................38

*AD/SAT, a Div. of Skylight, Inc. v. Associated Press,*
885 F. Supp. 511 (S.D.N.Y. 1995) ..................................................................38

*AD/SAT, a Div. of Skylight, Inc. v. Associated Press,*
181 F.3d 216 (2d Cir. 1999)..............................................................................42

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
2011 WL 3878200 (S.D. Ind. 2011) ................................................................68

*Alaska Elec. Pension Fund v. Bank of America Corp.,*
175 F. Supp. 3d 44 (S.D.N.Y. 2016)..........................................................47, 54

*Andrews v. Metro N. Commuter R.R. Co.,*
882 F.2d 705 (2d Cir. 1989)..............................................................................30

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983)............................................................................................53

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)................................................................................. *passim*

*Burtch v. Milberg Factors, Inc.,*
662 F.3d 212 (3d Cir. 2011)........................................................................23, 32

*Butala v. Agashiwala,*
916 F. Supp. 314 (S.D.N.Y. 1996) ..................................................................79

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
996 F.2d 537 (2d Cir. 1993)..............................................................................31

*Carvel Corp. v. Noonan,*
3 N.Y.3d 182 (N.Y. 2004) ................................................................................82

*Chamilia, LLC v. Pandora Jewelry, LLC,*
2007 WL 2781246 (S.D.N.Y. 2007)................................................................82

*Commercial Data Servers, Inc. v. Int'l Bus. Mach. Corp.,*
166 F. Supp. 2d 891 (S.D.N.Y. 2001)..............................................................81

*Concord Assocs., L.P. v. Entm't Props. Trust*,
 2014 WL 1396524 (S.D.N.Y. 2014) ..................................................................43

*Cordes & Co. Fin. Serv., Inc. v. A.G. Edwards & Sons, Inc.*,
 502 F.3d 91 (2d Cir. 2007) ...............................................................................71

*CourtAlert.com, Inc. v. e-Law, LLC*,
 2013 WL 4754819 (S.D.N.Y. 2013) ..................................................................83

*Credit Suisse Sec. (USA) LLC v. Billing*,
 551 U.S. 264 (2007) ................................................................................. *passim*

*de Atucha v. Commodity Exch., Inc.*,
 608 F. Supp. 510 (S.D.N.Y. 1985) ....................................................................52

*Diario El Pais, S.L. v. Nielsen Co.*,
 2008 WL 4833012 (S.D.N.Y. 2008) ..................................................................81

*Donahue v. Pendleton Woolen Mills, Inc.*,
 633 F. Supp. 1423 (S.D.N.Y. 1986) ..................................................................72

*Elec. Trading Grp., LLC v. Banc of Am. Secs. LLC*,
 588 F.3d 128 (2d Cir. 2009) ..................................................................... *passim*

*Friedman v. Salomon/Smith Barney, Inc.*,
 313 F.3d 796 (2d Cir. 2002) ..............................................................................66

*Garber v. Legg Mason, Inc.*,
 347 F. App'x 665 (2d Cir. 2009) .........................................................................5

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
 711 F.3d 68 (2d Cir. 2013) ....................................................................... *passim*

*Gelboim v. Bank of America Corp.*,
 823 F.3d 759 (2d Cir. 2016) ..................................................................... *passim*

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
 201 F. Supp. 2d 236 (S.D.N.Y. 2002) ...............................................................79

*Gordon v. N.Y. Stock Exch.*,
 422 U.S. 659 (1975) ..........................................................................................69

*Great Atl. & Pac. Tea Co. v. Town of E. Hampton*,
 997 F. Supp. 340 (E.D.N.Y. 1998) ...................................................................79

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
 998 F.2d 391 (7th Cir. 1993) .............................................................................49

*Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp.*,
2013 WL 395096 (S.D.N.Y. 2013) ....................................................................81

*GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*,
580 F. Supp. 2d 321 (S.D.N.Y. 2008) ..............................................................73

*H-Quotient, Inc. v. Knight Trading Grp., Inc.*,
2005 WL 323750 (S.D.N.Y. 2005) ....................................................................80

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009) .........................................................71, 77

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
708 F. Supp. 2d 348 (S.D.N.Y. 2010) ..............................................................43

*Icebox-Scoops, Inc. v. Disney Enters., Inc.*,
520 F. App'x 3 (2d Cir. 2013) ...........................................................................83

*In re Actos End Payor Antitrust Litig.*,
2015 WL 5610752 (S.D.N.Y. 2015) ..................................................................82

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4277510 (S.D.N.Y. 2014) .............................................................31, 52

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4743425 (S.D.N.Y. 2014) ..................................................................83

*In re Aluminum Warehousing Antitrust Litig.*,
2016 WL 5818585 (S.D.N.Y. 2016) ..................................................................48

*In re Aluminum Warehousing Antitrust Litig.*,
95 F. Supp. 3d 419, 437 (S.D.N.Y. 2015) .........................................................31

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
261 F. Supp. 2d 188 (E.D.N.Y. 2003) ...............................................................78

*In re Credit Default Swaps Antitrust Litig.*,
2014 WL 4379112 (S.D.N.Y. 2014) ...............................................46, 53, 54, 69

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012) ...............................................................29

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) ...............................................................53

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) .......................................................................*passim*

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   2016 WL 5108131 (S.D.N.Y. 2016) ........................................................54

*In re Foreign Exch. Benchmark Rates Antitrust Litigation*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015) .....................................................47

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) .............................................4, 24, 33, 34

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
   768 F. Supp. 2d 961 (N.D. Iowa 2011) ................................................37

*In re JP Morgan Auction Rate Sec. Mktg. Litig.*,
   867 F. Supp. 2d 407 (S.D.N.Y. 2012) ....................................................5

*In re Late Fee & Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007) ..................................................33

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   — F. Supp. 3d —, 2016 WL 5794777 (S.D.N.Y. 2016) .........................54

*In re Magnesium Oxide Antitrust Litig.*,
   2011 WL 5008090 (D.N.J. 2011) ..........................................................77

*In re Merrill Lynch Ltd. P'ships Litig.*,
   154 F.3d 56 (2d Cir. 1998) ...................................................................76

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ...........................................22, 31, 32, 45

*In re Optical Disk Drive Antitrust Litig.*,
   2011 WL 3894376 (N.D. Cal. 2011) .....................................................38

*In re Processed Egg Prods. Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................29

*In re Processed Egg Prods. Antitrust Litig.*,
   2012 WL 6645533 (E.D. Pa. 2012) .......................................................75

*In re Publ'n Paper Antitrust Litig.*,
   2005 WL 2175139 (D. Conn. 2005) .................................................76, 79

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ...........................................27, 41, 43

*Jurgensen v. Felix Storch, Inc.*,
   2012 WL 2354247 (S.D.N.Y. 2012) ......................................................83

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...................................................................26, 27, 29, 31

*Kramer v. Pollock-Krasner Found.*,
    890 F. Supp. 250 (S.D.N.Y. 1995) ...................................................................................82

*Laydon v. Mizuho Bank, Ltd.*,
    2014 WL 1280464 (S.D.N.Y. 2014)...........................................................................55, 83

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014)...................................................................................................50

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................................................................71

*Masters v. Wilhelmina Model Agency, Inc.*,
    2003 WL 1990262 (S.D.N.Y. 2003)........................................................................75, 76

*Mayor of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013).................................................................................. *passim*

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
    676 F. Supp. 486 (S.D.N.Y. 1987) ...............................................................................56

*MMC Energy, Inc. v. Miller*,
    2009 WL 2981914 (S.D.N.Y. 2009).............................................................................82

*Moll v. U.S. Life Title Ins. Co. of N.Y.*,
    700 F. Supp. 1284 (S.D.N.Y. 1988).............................................................................78

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
    323 F. Supp. 2d 559 (S.D.N.Y. 2004).........................................................................58

*New York v. Hendrickson Bros.*,
    840 F.2d 1065 (2d Cir. 1988)......................................................................................77

*Newport Serv. & Leasing, Inc. v. Meadowbrook Distrib. Corp.*,
    18 A.D.3d 454 (N.Y. App. Div. 2005) .......................................................................82

*Nirvana, Inc. v. Nestle Waters N. Am. Inc.*,
    123 F. Supp. 3d 357 (N.D.N.Y. 2015).....................................................................80, 81

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
    2012 WL 6082387 (S.D.N.Y. 2012)............................................................................43

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006)................................................................................. *passim*

*PKG Grp., LLC v. Gamma Croma, S.p.A.*,
    446 F. Supp. 2d 249 (S.D.N.Y. 2006).................................................................80, 81

*Poindexter v. EMI Record Grp. Inc.*,
    2012 WL 1027639 (S.D.N.Y. 2012)..................................................................30, 37

*Reading Indus., Inc. v. Kennecott Copper Corp.*
    631 F.2d 10 (2d Cir. 1980).................................................................................52, 56

*Ross v. Am. Exp. Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014)........................................................................27

*Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*,
    523 F. Supp. 2d 376 (S.D.N.Y. 2007)......................................................................83

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) ................................................................33, 39

*Sebelius v. Cloer*,
    133 S. Ct. 1886 (2013).............................................................................................70

*Shady Records v. Source Enters., Inc.*,
    351 F. Supp. 2d 74 (S.D.N.Y. 2004)........................................................................84

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010).....................................................................................22

*Stephens v. Trump Org. LLC*,
    2016 WL 4702437 (E.D.N.Y. 2016).........................................................................81

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015).....................................................................................23

*United States v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    422 U.S. 694 (1975)....................................................................................63, 64, 69

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)...........................................................................................64, 70

*Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015)........................................................................5

*Westwood v. Cohen*,
    838 F. Supp. 126 (S.D.N.Y. 1993) .............................................................................6

*Williams v. Citigroup, Inc.*,
    2009 WL 3682536 (S.D.N.Y. 2009).....................................................................26, 34

ix

*Woori Bank v. Merrill Lynch*,
    923 F. Supp. 2d 491 (S.D.N.Y. 2013) ............................................................73, 74

*Yong Ki Hong v. KBS Am., Inc.*,
    951 F. Supp. 2d 402 (E.D.N.Y. 2013) ..............................................................83

**STATUTES AND REGULATIONS**

7 U.S.C. § 1a ............................................................................................................10

7 U.S.C. § 2 ..........................................................................................................9, 10

7 U.S.C. §§ 6b-1 ....................................................................................................14

7 U.S.C. § 6s ............................................................................................... *passim*

7 U.S.C. § 7a-1 ......................................................................................................68

7 U.S.C. § 7b-3 .......................................................................................... *passim*

7 U.S.C. § 12a ........................................................................................................60

7 U.S.C. § 19 ............................................................................................... *passim*

7 U.S.C. § 25 ..........................................................................................................64

12 U.S.C. § 5303 ....................................................................................................68

15 U.S.C. § 1 ..........................................................................................38, 47, 68, 69

15 U.S.C. § 15b ......................................................................................................71

15 U.S.C. § 77p ......................................................................................................69

15 U.S.C. § 8231 ....................................................................................................70

15 U.S.C. § 8323 ....................................................................................................67

Fed. R. Civ. P. 9(b) ......................................................................................71, 78, 79

17 C.F.R. § 23.605 ..................................................................................................64

17 C.F.R. § 37.3 ......................................................................................................10

17 C.F.R. § 37.9 ..........................................................................................10, 11, 61

17 C.F.R. § 37.10 ....................................................................................................10

17 C.F.R. § 37.200 ..................................................................................................61

17 C.F.R. § 37.203 ................................................................................................. 61

17 C.F.R. § 37.1100 ..........................................................................................13, 61

17 C.F.R. § 40.5 ................................................................................................... 10

17 C.F.R. § 40.6 ................................................................................................... 10

75 Fed. Reg. 63,732 (Oct. 18, 2010)................................................................9, 61, 67

77 Fed. Reg. 42,560 (July 19, 2012)................................................................... 10

77 Fed. Reg. 44,441 (July 30, 2012)................................................................... 8

77 Fed. Reg. 74,284 (Dec. 13, 2012) ...........................................................7, 8, 10

78 Fed. Reg. 33,476, 33,477 (June 4, 2013) ................................................ *passim*

## OTHER AUTHORITIES

Areeda & Hovenkamp, *Antitrust Law* Vol. VI (3d ed. 2010)....................................35

S. Rep. 111-176 (2010)..........................................................................................10

The twelve groups of financial institution defendants ("Dealers")[1] respectfully submit this memorandum in support of their motion to dismiss the Second Consolidated Amended Class Action Complaint ("SCAC") and the Javelin and TeraExchange Plaintiffs' Second Consolidated Amended Complaint ("SJTC").

## PRELIMINARY STATEMENT

Plaintiffs in the proposed class action ("Class Plaintiffs") are three "buy-side" entities that allegedly purchased interest rate swaps ("IRS") from one or more Dealers. Plaintiffs in the individual action are TeraExchange ("Tera") and Javelin, two entities that launched electronic trading platforms that sought to replace traditional "dealer-to-client" trading of IRS with "all-to-all" exchange-style trading. Plaintiffs accuse the Dealers of conspiring to boycott Tera, Javelin, and another electronic trading platform, TrueEx, in order to preserve the profits that the Dealers earn through dealer-to-client trading.

The size and scope of the alleged conspiracy is extraordinary. According to Plaintiffs, thirty-nine distinct entities affiliated with twelve different Dealers have participated in a sprawling, nine-year conspiracy running from 2007 through the present. Moreover, these thirty-nine purported conspirators allegedly secured the participation or acquiescence of numerous additional entities including a leading financial clearinghouse, leading electronic trading platforms, several respected trade associations, and *all* of the major interdealer brokers that serve the swap markets. Plaintiffs face an enormous challenge in attempting to plead a conspiracy that plausibly unites these myriad actors in a massive, nine-year boycott scheme. For several overarching reasons, they have not met that challenge.

---

[1]    The Dealers are the undersigned affiliates of Bank of America, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, and UBS.

First, Plaintiffs' own complaints reveal that, in direct conflict with their boycott allegations, many of the Dealers actually *supported* one or more all-to-all trading platforms. Second, although many of the Dealers allegedly declined to support certain startup platforms such as Tera and Javelin, the complaints provide obvious, non-conspiratorial explanations for that conduct:  those new platforms had far less buy-side support than their competitors, and the Dealers allegedly would have been cannibalizing their own trading profits if they had shifted business to the new platforms.  Third, whereas most antitrust claims involve a conspiracy based on the alleged *actions* of the defendants, Plaintiffs here attempt to plead a conspiracy based largely on the alleged *inaction* of the defendants.  Specifically, Plaintiffs attempt to conjure a conspiracy from allegations that the Dealers for the most part simply continued to trade IRS pursuant to traditional trading conventions, rather than working to replace those conventions with new and untested "all-to-all protocols" offered by Tera and Javelin.  As the Supreme Court recognized in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), no inference of conspiracy should be drawn from allegations that defendants merely continued with business as usual.

Finally, Plaintiffs' allegations are at odds with important market realities evident from both the complaints and the governing regulatory framework.  As Plaintiffs recognize in their complaints, "clearing" of IRS through central clearinghouses is a prerequisite to all-to-all trading, and buy-side firms generally began clearing their IRS only when the CFTC required them to do so in 2013.  Plaintiffs nevertheless allege that the Dealers began conspiring to boycott all-to-all trading *in 2007*, six full years before buy-side firms were prepared to clear their trades. In addition, Plaintiffs attempt to divine a conspiracy from the simple fact that "all-to-all" trading has not overtaken request-for-quote or "RFQ" trading—in which a party wishing to trade sends requests for price quotations to potential counterparties—as the predominant form of IRS

trading.  These allegations ignore the fact that, based in part on a widespread *buy-side* preference

for RFQ trading, the CFTC expressly declined to mandate all-to-all trading in regulations issued

in 2013.

For these reasons and others, the complaints should be dismissed on each of the

following grounds:

1.      Plaintiffs have not pled a plausible antitrust conspiracy under *Twombly*.  Although

Plaintiffs assert over and over again that the Dealers "agreed" and "conspired" to boycott all-to-

all IRS trading, they never identify any direct evidence of a conspiratorial agreement.  Instead,

Plaintiffs urge this Court to infer such an agreement from allegations that the Dealers declined in

parallel to support all-to-all trading.  *See, e.g.*, SCAC ¶¶ 18, 202, 208; SJTC ¶¶ 16, 128.

These allegations fall far short of stating a plausible conspiracy claim.  As an initial

matter, when Plaintiffs' conclusory allegations are stripped away, their remaining factual

allegations do not even allege parallel conduct by the Dealers.  To the contrary, the complaints

identify numerous instances in which Dealers supported the very all-to-all trading platforms that

they supposedly were conspiring to destroy.  In addition, according to Plaintiffs' own allegations,

those Dealers that did decline to deal with certain all-to-all trading platforms had unilateral, self-

interested reasons to do so:  the platforms at issue were attempting to destroy those Dealers'

trading profits.  *See* SCAC ¶¶ 103, 203, 319; SJTC ¶¶ 1, 6, 14, 276.  Plaintiffs' claims therefore

fail as a matter of law under *Twombly*, which "makes clear that a claim of conspiracy predicated

on parallel conduct should be dismissed if . . . the facts alleged in the complaint itself, show that

independent self-interest is an obvious alternative explanation for defendants' common

behavior." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010);[2] *accord In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (parallel conduct allegations "do not constitute plausible grounds to infer an agreement" where allegations are "just as much in line with a wide swath of rational and competitive business strategy").[3]

      2.     Class Plaintiffs' claims should be dismissed for lack of antitrust standing.  Second Circuit law limits antitrust standing to "efficient enforcers" of the antitrust laws.  *See Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 78 (2d Cir. 2013).  Here, the efficient enforcers are firms like Tera and Javelin that allegedly were the *direct* victims of the purported conspiracy to boycott all-to-all trading platforms.  Class Plaintiffs, by contrast, are not efficient enforcers because their alleged injuries are indirect, remote, and speculative.

      3.     The doctrine of implied preclusion requires dismissal of all of Plaintiffs' claims relating to conduct post-dating the Dodd-Frank Wall Street Financial Reform and Consumer Protection Act of 2010 ("Dodd-Frank").  The Supreme Court has held that the antitrust laws are implicitly precluded when allowing antitrust claims would give rise to potential conflicts with an expert agency's regulatory authority.  *See Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264 (2007).  The potential for such conflicts plainly exists here because under Dodd-Frank, the CFTC actively regulates the very features of the IRS market about which Plaintiffs complain.  In addition, the CFTC balances competition concerns against other considerations both in promulgating regulations of the swap markets and in enforcing the special antitrust prohibitions that Dodd-Frank imposes on those markets.  Permitting Plaintiffs' claims to proceed would deter

---

[2]    Unless otherwise noted, all emphasis is added, and citations and internal quotations are omitted.

[3]    The non-conspiratorial explanation for the Dealers' conduct that appears on the face of the complaints, together with the absence of adequate allegations of parallel conduct by the Dealers, easily distinguishes these actions from other recent cases in which antitrust claims have survived motions to dismiss.  *See infra* at 46-47.

market participants from engaging in market activity that the CFTC deliberately permits or encourages.  For all these reasons, Plaintiffs' claims create precisely the situation that the implied preclusion doctrine is intended to prevent:  permitting "different nonexpert judges and different nonexpert juries" to override the "nuanced" judgments of the expert regulatory agency, thereby "threaten[ing] serious harm to the efficient functioning of the [swap] markets."  *Id*. at 281, 283.

4.      Class Plaintiffs' claims relating to the pre-2013 period should be dismissed for failure to allege injury-in-fact because their complaint fails to allege that essential prerequisites to all-to-all trading existed before 2013 at the earliest.

5.      Class Plaintiffs' claims relating to the pre-2012 period are time-barred under the applicable four-year statute of limitations.  Class Plaintiffs' pre-2012 allegations are based on news articles and other publicly available information.  If those allegations satisfy *Twombly* (and they do not), then Class Plaintiffs were on notice of their pre-2012 claims many years ago and failed timely to assert them.

6.      The state-law claims asserted in the complaints should be dismissed because Plaintiffs fail to plead essential elements of those claims.

## BACKGROUND

The following background statement is based on the allegations of the complaints, the materials referenced and relied upon in the complaints, and matters of public record, all of which may be considered in ruling on a motion to dismiss.[4]

---

[4]      *See, e.g.*, *Twombly*, 550 U.S. at 568 n.13 (holding that "the District Court was entitled to take notice of the full contents of the published articles" quoted in the complaint); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (courts "may consider matters of which judicial notice may be taken," including "press articles and SEC filings"); *Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (courts can consider "newspaper articles, documents publicly filed with the SEC or FINRA, . . . [and] documents filed with governmental entities and available on their official websites"); *In re JP Morgan Auction Rate Sec. Mktg. Litig.*, (continued)

A.      **Interest rate swaps trading**

Interest rate swaps are financial derivative contracts that permit investors to "protect themselves from future changes in interest rates or to speculate on the movement of interest rates." SCAC ¶ 3. They consist of any "agreement between two parties to exchange interest-rate cash flows on a specific notional amount of principal for a fixed period of time." *Id.* ¶ 2. IRS are "almost infinitely variable in their terms" and thus are "far less fungible" than the types of instruments that typically trade on all-to-all exchanges.[5]

"The IRS market is sometimes described as bifurcated into 'wholesale' (dealer-to-dealer) and 'retail' (dealer-to-client) divisions." SCAC ¶ 310 n.134. Although Plaintiffs suggest that this "bifurcation" is the product of an antitrust conspiracy (*id.* ¶ 21), the complaints recognize that distinct dealer-to-dealer and dealer-to-client trading venues developed well before the alleged conspiracy began.[6] Dealer-to-dealer trading has long been dominated by interdealer brokers, or "IDBs," who arrange dealer-to-dealer "wholesale" trades of basic types of IRS. *Id.* ¶¶ 84-85. In contrast, dealer-to-client trading historically involved more customized "retail" forms of IRS that clients obtained directly from dealers, without relying on brokers. *Id.* ¶¶ 6, 76, 317-18.

---

867 F. Supp. 2d 407, 413 n.1 (S.D.N.Y. 2012) (taking judicial notice of public disclosures cited and relied on in complaint); *Westwood v. Cohen*, 838 F. Supp. 126, 130 n.8 (S.D.N.Y. 1993) (relying on "other portions of the *Wall Street Journal* article" cited in complaint).

5      *See* Ex. 26, CFTC Commissioner J. Christopher Giancarlo, *Pro-Reform Reconsideration of the CFTC Swaps Trading Rules: Return to Dodd-Frank*, at 7 (Jan. 2015) ("Giancarlo CFTC White Paper"). All references to "Ex." are to the exhibits accompanying the Declaration of John S. Playforth dated Jan. 19, 2017.

6      *See* SCAC ¶ 5 (conspiracy allegedly began in 2007); *id.* ¶¶ 11, 79 (ICAP launched a dealer-to-dealer electronic IRS platform in 2003); *id.* ¶ 80 (acknowledging that dealer-to-client and dealer-to-dealer trading took "very different developmental paths"); *id.* ¶ 87 (acknowledging that dealer-to-dealer trading has existed "for years"); *id.* ¶ 159 ("Many IDBs" operated dealer-only platforms at the time the conspiracy allegedly began); *id.* ¶ 319 (Dealers allegedly "colluded to *maintain* an artificial bifurcation of the IRS market").

These early differences between dealer-to-dealer and dealer-to-client trading were reinforced when dealers—but not their buy-side clients—began voluntarily clearing their IRS trades through clearinghouses.  In a non-cleared IRS trade, the parties to the trade face each other directly, and each party therefore bears the risk that its counterparty will default on its obligations.  SCAC ¶¶ 12, 91, 95.  In a cleared trade, by contrast, a clearinghouse stands between the parties to the trade and guarantees each side's full performance of the trade, "thus effectively eliminating the risk [that] the other counterparty may default."  *Id*. ¶¶ 91, 94-95.  In the absence of such clearing arrangements, parties must make "case-by-case creditworthiness assessments" of their trading partners, and anonymous all-to-all trading becomes impossible.  *Id.*

According to Plaintiffs, dealers first began clearing some of their IRS trades in 2000, and "the majority of interdealer IRS trades were cleared by the mid-2000s."  SCAC ¶ 12.  The buy-side, on the other hand, began clearing significant volumes of IRS only when the Dodd-Frank clearing mandates went into effect in 2013.[7]  As the CFTC has recognized, clearing of IRS involves substantial costs associated with payment of clearing fees, posting of collateral to secure cleared trades, and investment in new infrastructure and technology.[8]  Buy-side firms generally

---

[7]     *See, e.g.*, Clearing Requirement Determination Under Section 2(h) of the CEA, 77 Fed. Reg. 74,284, 74,327 (Dec. 13, 2012) ("Clearing Requirements Rule") (estimating that the vast majority of new IRS clearing volume mandated by Dodd-Frank would come from the buy-side); Ex. 1, cited in SCAC ¶ 174 n.69 & SJTC ¶ 343 n.136 (Peter Norman, *The Risk Controllers: Central Counterparty Clearing in Globalised Financial Markets* 287 (2011) (noting that when the Federal Reserve tried to obtain buy-side support for voluntary clearing in 2010, "[i]t ran up against concerns that the possible added costs of clearing would be incompatible with asset managers' and hedge funds' fiduciary duties to obtain the best possible returns for their clients")); *Handbook of Fixed-Income Securities* 329, 356 (Pietro Veronesi ed., 2016) (noting that dealer-to-client transactions accounted for only four percent of the volume of IRS cleared by the leading clearinghouse in January 2013).

[8]     *See, e.g.*, Clearing Requirements Rule at 74,323 ("In order to comply with required clearing under this adopting release, market participants are likely to face certain startup and ongoing costs relating to technology and infrastructure, new or updated legal agreements, ongoing fees from service providers, and costs related to collateralization of their positions."); *see also* SCAC ¶¶ 96, 212 (acknowledging that collateral must be posted to secure cleared trades).

declined to incur these costs until the Dodd-Frank clearing mandates forced them to do so.[9]

Indeed, based in part on buy-side pleas for additional time to cope with the "overwhelming"

burdens associated with clearing,[10] the CFTC delayed implementation of the clearing mandates

until 2013, three years after the enactment of Dodd-Frank.[11]

Plaintiffs acknowledge that traditional dealer-to-client trading was the only option for

buy-side firms until they were ready and willing to clear their trades.  SCAC ¶¶ 12, 91, 95.[12]

According to the complaints, however, dealer-to-client trading should have been supplanted by

all-to-all trading soon after the buy-side adopted clearing.  SCAC ¶¶ 10-13, 90, 101.  Although

the complaints assert that IRS contracts are sufficiently "liquid" to support all-to-all trading, *see

id.*, they offer no specifics regarding the actual *numbers* of IRS that trade on a daily basis.

Plaintiffs' reluctance to provide these numbers is understandable:  a 2012 study by the Federal

Reserve concluded that "the vast majority of IRS contracts traded only once during the three-

month period studied" and that "no single instrument in the IRS data set traded more than 150

---

[9]     *See supra* at 7 n.7.

[10]    *See* Futures Indus. Ass'n et al. Comment Letter on 76 Fed. Reg. 58,186, RIN 3038-AD60, at 8-9 (Nov. 4, 2011) (describing the burden on buy-side firms as "overwhelming" and explaining that buy-side entities would have to prepare thousands of legal documents to implement clearing); Coal. for Derivatives End-Users Comment Letter on 76 Fed. Reg. 58,186, RIN 3038-AD60, at 1, 4 (Nov. 4, 2011) (warning that more time would be required to put in place the "technological connections" and legal agreements necessary to effectuate clearing); Inv. Co. Inst. Comment Letter on 76 Fed. Reg. 58,186, RIN 3038-AD60, at 2, 4 (Nov. 4, 2011) (stating that the CFTC's initial scheduling proposal "significantly underestimate[d] the time needed for the swap market to transition to the new framework" and that "[t]hese time periods are woefully insufficient"); Fin. Servs. Roundtable Comment Letter on 76 Fed. Reg. 58,186, RIN 3038-AD60, at 5 (Nov. 4, 2011) ("establishing clearing arrangements is resource-intensive").

[11]    *See* Clearing Requirements Rule at 74,320; Swap Transaction Compliance and Implementation Schedule, 77 Fed. Reg. 44,441, 44,456 (July 30, 2012).

[12]    *See also* Consolidated Am. Compl., Dkt. 113 ("CAC") ¶ 77 n.14 (acknowledging that buy-side firms were limited to trading "exclusively" with dealers until they were ready to clear their trades).

times per day."[13]  By contrast, stocks and other financial instruments that typically trade on exchanges "trade several thousand times a day on several venues."[14]  IRS contracts thus occupy the "opposite pole" from the types of instruments that trade on exchanges:  they are "less liquid instruments, typically much bigger tickets, and [have] more customized trade terms."[15]

### B.      The Dodd-Frank regulatory regime

Congress enacted Dodd-Frank in 2010 to "reduce risk, increase transparency, and promote market integrity within the financial system."[16]  Title VII of Dodd-Frank amended the Commodity Exchange Act ("CEA") to "establish a comprehensive new regulatory framework for swaps,"[17] and vested the CFTC with "exclusive jurisdiction" to implement that framework, 7 U.S.C. §§ 2(a)(1)(A), 2(h).  The CFTC, in turn, has issued sweeping regulations governing all aspects of the swap markets, including clearing, trading, and competition.

---

[13]     Ex. 26, Giancarlo CFTC White Paper, *supra* note 5, at 9 & n.23 (citing Michael Fleming et al., *An Analysis of OTC Interest Rate Derivatives Transactions: Implications for Public Reporting*, Federal Reserve Bank of New York, Staff Report No. 557, at 14 (Mar. 2012; rev. Oct. 2012)).

[14]     *See* Ex. 2, cited in SCAC ¶ 310 n.131 & SJTC ¶ 237 n.57 (Robert Mackenzie Smith, *Bank Swaps Headlock Slips as Chicago Prop Firms Join Sefs*, Risk, at 5 (Aug. 6, 2015) (noting that a centralized exchange for interest rate swaps "might only see 150 to 200 trades on an average day, while equities and foreign exchange products trade several thousand times a day")).

[15]     Ex. 27, cited in CAC ¶ 291 n.117 & Javelin & Tera Am. Compl., Dkt. 114 ("JTC") ¶ 310 n.116 (E. Paul Rowady, Jr., *OTC Interest Rate Swaps and Beyond: The Path to Electronic Markets*, Tabb Group, at 11 (2010) ("Tabb Report")); *see also id.* (noting that even the most frequently traded IRS contracts "do not get traded back and forth . . . like stocks or futures"); Ex. 26, Giancarlo CFTC White Paper, *supra* note 5, at 9-10 (contrasting the "episodic nature of swaps liquidity" with "exchange-traded markets" where "tens of thousands of trades take place each day," including "generally small-sized orders for a more limited range of highly fungible instruments based on standard characteristics"); SCAC ¶¶ 315-18 (noting the large ticket sizes and highly customized nature of IRS); SJTC ¶¶ 366-69 (same).

[16]     Requirements for DCOs, DCMs, and SEFs Regarding the Mitigation of Conflicts of Interest, 75 Fed. Reg. 63,732, 63,732 (Oct. 18, 2010) ("Proposed Conflicts Rule").

[17]     Core Principles and Other Requirements for SEFs, 78 Fed. Reg. 33,476, 33,477 (June 4, 2013) ("SEF Rule").

### 1.       Clearing regulation

Congress believed that the risk of defaults on non-cleared swaps "played an important role in freezing up credit markets" during the 2008 financial crisis.  S. Rep. 111-176, at 30 (2010).  Dodd-Frank therefore granted broad authority to the CFTC to mandate clearing of swaps.  *See* 7 U.S.C. § 2(a)(1)(A).  The CFTC responded by requiring clearing of many types of swaps effective in 2013, but exempted many other types of swaps and certain swaps "end-users" from the new requirements.[18]

### 2.       Trading regulation

Dodd-Frank also requires that certain types of swaps be traded on "swap execution facilities," or "SEFs."  SEFs are trading platforms "in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants."  7 U.S.C. § 1a(50).  Subject to certain exceptions, swaps must trade on SEFs if they are subject to the CFTC's mandatory clearing rules and have been "made available to trade," or "MAT," by a registered SEF with the consent of the CFTC.[19]

Under CFTC regulations issued in 2013, trading on SEFs may occur through either an order book or an RFQ system.[20]  In order-book trading, offers to buy and sell are entered into a matching system and matched either manually or by automated algorithm.  *See generally* 17

---

[18]     *See* Clearing Requirements Rule at 74,300-14; End-User Exception to the Clearing Requirement for Swaps, 77 Fed. Reg. 42,560, 42,590-91 (July 19, 2012).

[19]     *See* 7 U.S.C. § 2(h)(8); 17 C.F.R. §§ 40.5-40.6; *see also* 17 C.F.R. § 37.10 (factors to consider for a MAT determination).  Swaps subject to the SEF mandate may alternatively be traded on designated contract markets ("DCMs"), regulated boards of exchange that have many of the same powers and duties as SEFs.  *See Trading Organizations*, Commodity Futures Trading Comm'n, http://www.cftc.gov/IndustryOversight/TradingOrganizations/index.htm.

[20]     *See* 17 C.F.R. § 37.9(a)(2).  RFQ trading must be offered "in conjunction with an Order Book," *i.e.*, in transmitting responses to an RFQ in connection with a potential trade, the SEF must also furnish any relevant quotes resting in its order book.  *See* 17 C.F.R. § 37.9(a)(3)(i).

C.F.R. § 37.3(a).  In RFQ trading, by contrast, "a customer can send a price request to a number of counterparties in a particular swap tenor, the prices are relayed back to the customer, and the customer then has a time window in which to execute."[21]  Customers who engage in RFQ trading must send requests to trade to a minimum of three recipients.  *See* 17 C.F.R. § 37.9(a)(3).

In electing to authorize RFQ trading, the CFTC sided with a large majority of the *buy-side* comments submitted on its proposed rules.  Although a few buy-side comments favored mandatory all-to-all order-book trading—most prominently, comments submitted by a group of high-frequency trading firms[22]—many more comments expressed a preference for RFQ trading and a strong aversion to a proposed requirement that RFQs be sent to a minimum of five recipients.[23]

---

[21]    *See* Dale Brandon, *RFQ vs. CLOB—The Battle So Far*, Tabb Forum (May 27, 2015), http://tabbforum.com/opinions/rfq-vs-clob-the-battle-so-far-dot.

[22]    *See* Joanna Mallers Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 3-4 (Mar. 21, 2011); *see also* Allston Holdings Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 2 (Feb. 28, 2013) (submitted on behalf of "many of the same firms" as the Mallers letter).  Apart from the letters submitted on behalf of high-frequency trading firms, only one other buy-side comment advocated mandatory order-book trading.  *See* Indus. Energy Consumers of Am. Comment Letter on Proposed Rule, 76 Fed. Reg. 1,214, RIN 3038-AD18, at 3 (May 24, 2011).

[23]    Out of eleven buy-side comments that addressed RFQ trading, eight supported such trading and argued for lowering the five-participant minimum.  *See, e.g.*, Am. Benefits Council et al. Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 2, 6 (Mar. 8, 2011) ("ABC Comment Letter") (supporting RFQ trading and objecting that a five-recipient minimum may "raise rather than lower transaction costs"); Coal. for Derivatives End-Users Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 5, 7 (Mar. 8, 2011) (stating on behalf of the U.S. Chamber of Commerce, the Business Roundtable, and the National Association of Corporate Treasurers that "[o]verly prescriptive SEF rules" could hamper end-users' access to efficient hedging and that end-users "should be able to determine how many swap dealers should be included in any given request for quote"); Freddie Mac Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 1 (Mar. 8, 2011) (the five-participant minimum may "significantly raise transaction costs, increase market risks, and have other negative consequences for the market as a whole"); Asset Mgmt. Grp. of the Sec. Indus. and Fin. Mkts. Ass'n (SIFMA) Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 5 (Mar. 8, 2011) ("AMG Comment Letter") (arguing that a "minimum five-market participant requirement will result in significantly more expensive hedging to the original counterparty—*i.e.*, end users—due to the signaling of trading strategies to the market, whether or not the trade is a block trade");

(continued)

Buy-side comments generally supported RFQ trading on the ground that it improves prices and liquidity in the swap markets.  For example, a leading trade association representing pension funds commented that "it is important that the rules do not force SEFs to operate an Order Book or any system that resembles an Order Book for Required Transactions, as an Order Book system is only well suited for liquid markets."[24]  Similarly, a trade association representing asset management firms advocated "highly flexible RFQ systems" and warned that more restrictive trading formats could "restrict, rather than promote, liquidity" and "raise costs for end users."[25]  Finally, a survey of buy-side entities regarding the proposed requirement that RFQs be sent to a minimum of five recipients found that over 80 percent of respondents expected that such a requirement would have an adverse impact on prices.[26]

After considering these concerns, the CFTC not only authorized RFQ trading in its final rules, but also reduced the minimum number of RFQ recipients from five to three.[27]  According to materials cited in the complaints, RFQ trading has proven much more popular than all-to-all

---

BlackRock Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 4 (Mar. 8, 2011); Managed Funds Ass'n Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 2 (Mar. 8, 2011).

[24]   ABC Comment Letter, *supra* note 23, at 6.

[25]   *See* AMG Comment Letter, *supra* note 23, at 4-6.

[26]   SIFMA Asset Management Group, ISDA, and MFA Joint Survey of Buy-Side Members on Request for Quotes (Mar. 1, 2013), http://www.cftc.gov/idc/groups/public/@swaps/documents/ dfsubmission/dfsubmission_030113_2064_0.pdf; *see also* MetLife Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 3 (Mar. 8, 2011) (expressing concern that the proposed five-recipient minimum could "result in a material widening of bid-ask spreads and increase hedging costs").

[27]   SEF Rule at 33,497-99 (finding that the lower minimum "appropriately balances the benefits of pre-trade price transparency" with commenters' concerns about potential "increased trading costs and information leakage"); *see also id.* at 33,496-97 & n.270 (declining to require the "RFQ-to-all" model found in futures markets); Ex. 27, Tabb Report, *supra* note 15, at 12 ("The RFQ model is currently best suited for IRS . . . because it effectively accommodates existing product conventions while respecting the relational dynamics between dealers and end-users.").

order-book trading because, just as many buy-side comments predicted, "pricing is perceived to be better using that method."[28]

### 3.      Competition and other regulation

Competition is yet another aspect of the swap markets that is expressly regulated by Dodd-Frank and the CEA.  For example, the CEA requires the CFTC, in issuing regulations, to "take into consideration the public interest to be protected by the antitrust laws" and to weigh those concerns against other factors including "efficiency," market "integrity," and the "protection of market participants and the public."  7 U.S.C. § 19.  In addition, Dodd-Frank contains special antitrust prohibitions that bar SEFs, swap dealers, and other market participants from "tak[ing] any action that results in any unreasonable restraint of trade" or "impos[ing] any material anticompetitive burden" on swap trading, "[u]nless necessary or appropriate" to achieve the purposes of the CEA.  *See* 7 U.S.C. §§ 6s(j)(6), 7b-3(f)(11); *see also* 17 C.F.R. § 37.1100.

These special antitrust provisions are reinforced by Dodd-Frank's requirement that SEFs must provide all market participants with "impartial access" to their trading facilities.  *See* 7 U.S.C. § 7b-3(f)(2)(B)(i).  Congress imposed this requirement "to prevent a SEF's owners or operators from using discriminatory access requirements as a competitive tool" against particular market participants.  SEF Rule at 33,508 (noting that SEFs cannot, for example, limit access to dealers).  Buy-side firms are therefore free to trade on so-called "dealer-to-dealer" trading

---

[28]      Ex. 3, cited in SCAC ¶ 209 n.90 & SJTC ¶ 129 n.22 (Peter Madigan, *Buy-side Firms Slam Broker Sefs Over Lack of Anonymity*, Risk, at 3 (Oct. 24, 2014); *accord* Ex. 4, cited in SJTC ¶ 240 n.60 (Ivy Schmerken, *Swap Markets Debate Anonymous Trading in SEFs*, Wall St. & Tech., at 1 (Jan. 5, 2015) ("If you look at a separate dealer-to-dealer market and a dealer-to-customer market, most of the clients tell us they actually get arguably better pricing by virtue of showing who they are to one of their liquidity partners")); Ex. 5, cited in SCAC ¶ 370 n.187 (Helen Bartholomew, *Swaps Market Structure Changes Create Fragility*, Int'l Fin. Rev. (Sept. 24, 2015) ("many larger clients find that even the most aggressive CLOB prices, don't compete with their RFQ expectations")).

platforms if they wish, and some have done so.[29]  Most, however, have found that their needs are better met through dealer-to-client RFQ trading.  *See supra* at 12-13 & n.28.

Finally, Dodd-Frank requires SEFs, swap dealers, and "major swap participants" to register with the CFTC and abide by an extensive set of "duties" and "core principles."  *See, e.g.*, 7 U.S.C. §§ 6s(a), 6s(j)(6), 7b-3(f).  The CFTC has broad authority over these entities and the swap markets in general, including the authority to investigate and punish unlawful conduct.  *See, e.g.*, 7 U.S.C. §§ 6b-1, 9(4)(A), 13b.

### C.    The allegations of the complaints

Plaintiffs accuse the Dealers of carrying out a massive conspiracy to "jointly boycott" any trading platform that offered all-to-all IRS trading.  SCAC ¶ 18.  Although Plaintiffs allege a single continuous conspiracy running from 2007 to the present (SCAC ¶¶ 5, 14, 112, 182; SJTC ¶¶ 23, 284), the complaints allege distinct types of conduct before and after 2013.

#### 1.    Pre-2013 allegations

Although Plaintiffs allege that the Dealers began conspiring to boycott all-to-all trading in 2007 (SCAC ¶ 5; SJTC ¶ 23), the complaints identify two threshold obstacles to Plaintiffs' pre-2013 allegations.  First, none of the all-to-all trading platforms that the Dealers supposedly boycotted began operating until 2013, when the Dodd-Frank clearing mandates took effect.  *See infra* at 17 n. 34.  Second, the complaints acknowledge that clearing is a prerequisite to all-to-all trading (*supra* at 8), and they do not allege that buy-side firms were ready or willing to clear their IRS trades before Dodd-Frank forced them to do so in 2013.

---

[29]    Ex. 6, cited in SCAC ¶ 171 n.67 & SJTC ¶ 261 n.86 (Robert Mackenzie Smith, *Interdealer Brokers Need to Change, Say Critics*, Risk, at 6 (Sept. 14, 2015) ("dozens of non-banks [have] registered" with ICAP, "but most of them don't trade")); Ex. 2, cited in SCAC ¶ 310, n.131 (Smith, *supra* note 14, at 3 (Citadel was "active" on "three interdealer platforms," including ICAP)); Ex. 3, cited in SCAC ¶ 209 n.90 & SJTC ¶ 129 n.22 (Madigan, *supra* note 28, at 3 ("I've never called up a [SEF] and been told I cannot join the platform")).

Unable to allege that there was any all-to-all trading to be boycotted in 2007, Plaintiffs

resort to alleging that the Dealers began conspiring in 2007 through two joint ventures:

"OTCDerivNet" and "Project Fusion."  SCAC ¶¶ 15, 175; SJTC ¶¶ 284, 286, 344.  The

complaints make clear, however, that both of those joint ventures helped modernize and promote

competition in IRS trading.

OTCDerivNet.  OTCDerivNet was formed in October 2000 by a group of leading

derivatives dealers.  SCAC ¶ 177.  That same month, OTCDerivNet partnered with the London

Clearinghouse to develop SwapClear, the very first IRS clearinghouse.  *Id.* ¶ 179.  OTCDerivNet

provided all of the funding for SwapClear in exchange for a share of the profits.  *Id.* ¶ 180.[30]

According to materials cited in the complaints, "SwapClear represented a revolutionary step

forward in clearing OTC derivatives."[31]  Moreover, in the wake of the 2008 financial crisis,

SwapClear launched an IRS clearing product designed specifically for the buy-side.  SCAC

¶ 189.  Although the product was not widely used until the Dodd-Frank clearing mandates took

effect in 2013, the new product offered buy-side firms the opportunity to clear their IRS trades

without becoming members of a clearinghouse.[32]

Despite these "revolutionary" contributions to IRS clearing, Plaintiffs allege that the

Dealers entered into OTCDerivNet only so that they could "take control" of SwapClear and

---

[30]   *See also* Ex. 7, cited in SCAC ¶ 179 n.71 & SJTC ¶ 348 n.138 (International Monetary Fund, *United Kingdom: Observance by LCH CLEARNET LIMITED of the CPSS-IOSCO Recommendations for Central Counterparties Detailed Assessment of Observance*, at 40 (July 2011) ("LCH has entered into a commercial arrangement with OTCDerivNET (OTCD) whereby OTCD provide 100 percent funding for the development of the Interest Rate Swap clearing product (SwapClear), in return for a profit share and representation in the governance of SwapClear.")).

[31]   Ex. 1, cited in SCAC ¶ 174 n.69 & SJTC ¶ 343 n.136 (Norman, *supra* note 7, at 168-69).

[32]   *See* Ex. 1, cited in SCAC ¶ 174 n.69 & SJTC ¶ 343 n.136 (Norman, *supra* note 7, at 313); Press Release, LCH.Clearnet, *LCH.Clearnet launches buy-side clearing for global OTC Interest Rate Swaps* (Dec. 17, 2009), http://secure-area.lchclearnet.com/media_centre/press_releases/2009-12-17.asp.

"prevent buy-side access to IRS clearing."  SCAC ¶¶ 175-79; SJTC ¶ 344.  According to the complaints, however, the Dealers acquired "control" of SwapClear at the time they originally funded it in 2000, a full seven years before the conspiracy allegedly began.  SCAC ¶¶ 177-80; SJTC ¶¶ 346-49.

Project Fusion.  Project Fusion was a joint venture launched by defendant Tradeweb and seven of the Dealers.[33]  SCAC ¶ 118; SJTC ¶ 288.  Tradeweb, a subsidiary of Thomson Reuters, operates electronic trading platforms that originally focused on fixed-income securities.  SCAC ¶ 100; SJTC ¶ 273.  In October 2007, in an effort to expand these platforms into new asset classes, Tradeweb and the participating dealers entered into Project Fusion, which required the dealers to invest $280 million in Tradeweb and to begin making markets on its platforms in several new asset classes.  SCAC ¶¶ 118-120; SJTC ¶¶ 288-90.  According to the complaints, the resulting expansion of Tradeweb's electronic platforms into IRS and other new asset classes should have been good for competition:  electronic trading allegedly "increase[s] competition" in financial trading markets.  SCAC ¶¶ 326, 330 n.153; SJTC ¶ 84.

Plaintiffs nevertheless characterize Project Fusion as a nefarious scheme to "take control" of Tradeweb and prevent it from launching an all-to-all IRS platform (as opposed to an RFQ platform).  SCAC ¶ 114; SJTC ¶ 286.  Plaintiffs assert that blocking all-to-all IRS trading was the motive for Project Fusion even though that project launched *in 2007* (SCAC ¶ 15), many years before buy-side firms were ready and willing to clear their trades through clearinghouses.  Moreover, Plaintiffs never allege that Project Fusion was an unattractive investment opportunity, or that only an antitrust conspirator would have wanted to invest in such a venture.

---

[33]    Plaintiffs do not allege that BNPP or HSBC participated in Project Fusion at any time or that BNPP or HSBC had any involvement in Tradeweb.  *See* SCAC ¶ 17.

### 2.    Post-2013 allegations

In 2013, the Dodd-Frank clearing mandates went into effect, and several electronic trading platforms began offering all-to-all trading of IRS.  SCAC ¶ 202.  Accordingly, in the post-2013 period, Plaintiffs shift their approach and assert that the Dealers conspired to boycott trading platforms that "sought to provide all-to-all trading protocols to the buy-side."  SJTC ¶ 5; SCAC ¶ 207.  Plaintiffs allege that the Dealers boycotted these new trading platforms in two distinct capacities:  as market-makers and as providers of clearing services.

### a)    Market-making allegations

Plaintiffs' market-making allegations assert that the Dealers refused to make markets (*i.e.*, readily quote prices) on three new startup platforms that offered all-to-all IRS trading: Tera, Javelin, and TrueEx.  SCAC ¶ 208.  All three platforms began operating in 2013, contemporaneous with the implementation of Dodd-Frank.[34]  By that time, however, competing electronic trading platforms such as those offered by Tradeweb and Bloomberg already had been operating for years.  According to sources cited in the complaints, these incumbent platforms enjoyed tremendous advantages over their startup competitors:  the incumbents already had a large and loyal customer base; their trading fees were extraordinarily low; and customers needed no new technology or systems in order to trade on the platforms.[35]  In the face of this formidable

---

[34]    According to Plaintiffs, TrueEx launched in 2013 (SCAC ¶ 279; SJTC ¶ 220), Javelin was "nearing launch" in late 2013 (SCAC ¶ 248; SJTC ¶ 146), and Tera obtained temporary CFTC registration in late 2013, connected to a clearinghouse in June 2013, and executed its only IRS trade in June 2014 (SCAC ¶¶ 25, 212 & n.96, 219; SJTC ¶ 122).

[35]    *See* Ex. 8, cited in SCAC ¶ 280 n.106 & SJTC ¶ 221 n.41 (Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, Institutional Investor, at 3 (July 21, 2015) (explaining that incumbent firms like "ICAP, Tradition, Bloomberg and Tradeweb" had "entered the SEF era with existing client bases and established strengths")); *id.* (noting that TrueEx's founder "knew that legacy players—the IDBs, Bloomberg and Tradeweb—would dominate trading in the most-liquid swaps"); Ex. 9, cited in SCAC ¶ 370 n.189 (Daniel O'Leary, *SEF Sector Participants Look Beyond Short Term Hitches*, GlobalCapital, at 13 (July 7, 2014) ("We asked end users what is the optimal number of SEFs they (continued)

17

competition, TrueEx has achieved a moderate amount of success, but Tera and Javelin never achieved significant trading volumes.  SCAC ¶¶ 236, 278, 284-86; SJTC ¶¶ 182, 218, 224-25.

Plaintiffs do their best to suggest that Tera and Javelin would have been successful if not for the alleged conspiracy.  They note, for example, that Tera and Javelin invested "millions of dollars" in their trading platforms, and that a modest number of buy-side firms—out of the "thousands" of firms that allegedly participate in the IRS market—expressed some level of early interest in Tera and Javelin.  SCAC ¶¶ 23, 220, 251, 267, 386; SJTC ¶¶ 12, 113, 194.  Plaintiffs never allege, however, that Tera and Javelin generated anywhere near as much buy-side interest as Tradeweb or Bloomberg; nor do they allege that Tera and Javelin invested anywhere near as much capital as their rivals.[36]  Plaintiffs nonetheless assert that Tera and Javelin failed only because the Dealers boycotted those platforms in an effort to prevent the platforms from "disintermediating" the Dealers.  SCAC ¶¶ 5, 208; SJTC ¶¶ 128, 275.

Although the rhetoric and innuendo in the complaints imply that all twelve Dealers acted in lockstep to boycott Tera, Javelin, and TrueEx, the actual facts alleged in the complaints tell a different story.  For example, with respect to TrueEx, the complaints allege that only *six* of the twelve Dealers have "declined to use" that platform, implicitly acknowledging that the other six

---

would choose to do business with and overwhelmingly the response was one to three SEFs which they already had strong relationships with."); Ex. 10, cited in SCAC ¶ 161 n.54 & SJTC ¶ 331 n.122 (Kim Hunter, *Growing Pains*, Markit, at 33 (Winter 2014) ("And how can you compete with Bloomberg when its $10 trading fee is below cost?")); Ex. 11, cited in SCAC ¶ 207 n.87 & SJTC ¶ 130 n.25 (Mike Kentz, *SEF Start-ups Face Obstacles*, Int'l Fin. Rev., at 1 (July 26, 2013) (quoting buy-side trader as explaining that, "unless a firm addresses a specific need or challenge for me I don't really have any reason to sign up with a new platform"; "the advantage goes to who is already on my desktop")); *id.* (Tera and Javelin "may be hard-pressed to weather the coming storm, according to buy- and sell-side traders").

[36]    *Cf.* SCAC ¶ 120; SJTC ¶ 290 (alleging $280 million investment in Tradeweb); Ex. 9, cited in SCAC ¶ 370 n.189 (O'Leary, *supra* note 35, at 16 (incumbent firms "already have an existing relationship and . . . for some of the start-up SEFs, they probably had the working capital when they started but . . . it took so long for the rules to come out that working capital has now diminished")).

are trading on TrueEx.  *See* SCAC ¶ 283; SJTC ¶ 222-23.  The complaints also cite published reports confirming that (i) no fewer than seventeen dealers are trading on TrueEx, (ii) JPMorgan supported TrueEx from its launch, and (iii) TrueEx is enjoying "record volumes" and "on good days it handles as much as 38 percent of trading" in its markets.[37]

Plaintiffs' allegations are even weaker as to Tera.  Although Plaintiffs assert that "not a single Dealer Defendant has agreed to provide liquidity to TeraExchange's platform" (SCAC ¶ 224), they elsewhere admit that Tera never even *recruited* any Dealers to its platform.  Instead, Tera made a deliberate decision to bypass traditional dealers and "focus[] on attracting non-traditional liquidity providers to make markets on its platform."  SJTC ¶ 190.  Tera decided not to "focus[] on dealer recruitment" because it thought that "non-dealers" would offer better prices. SCAC ¶¶ 213-15, 223; SJTC ¶¶ 190-92.  Tera's novel strategy of bypassing the dealers that allegedly account for "almost all of the liquidity in the IRS market" did not prove successful: Tera conducted only a single IRS trade before abandoning the IRS market and repositioning itself as a bitcoin derivatives platform.  SCAC ¶¶ 233, 236, 244, 276; SJTC ¶ 218.

---

[37]    *See* Ex. 8, cited in SCAC ¶ 280 n.106 & SJTC ¶ 221 n.41 (Timms, *supra* note 35, at 1-2, 4); Ex. 12, cited in SCAC ¶ 284 n.109 & SJTC ¶ 224 n.44 (Ivy Schmerken, *Start-Up SEF Taking the Fight to Incumbents*, Tabb Forum, at 1 (Feb. 26, 2015) ("In the last week of February, for example, TrueEx captured 22% of the share of the client-facing execution business.")); Ex. 13, cited in SCAC ¶ 23 n.7 & SJTC ¶ 6 n.2 (Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, Reuters, at 1 (Mar. 10, 2015) ("JPMorgan Chase & Co, one of the world's top swaps dealing banks, [] has joined trueEX.")); *see also* Ex. 14, cited in SCAC ¶ 280 n.104 & SJTC ¶ 221 n.39 (Glen Fest, *TrueEx Takes Early Lead in Building Rate Swaps Exchange*, Am. Banker, at 2 (Apr. 1, 2013) (UBS is "in talks with trueEx to deliver its client volume to the exchange."); *UBS and trueEX form liquidity alliance for Interest Rate Swaps*, TrueEx Media (Aug. 8, 2013), https://www.trueex.com/media/51 (UBS and TrueEx formed a "liquidity alliance" in which UBS was "providing markets" and "routing client flows" to the platform).  The complaints allege that dealers often trade "bespoke" swaps on TrueEx (SCAC ¶ 285; SJTC ¶ 225), reflecting TrueEx's deliberate "flanking strategy" in which it became "a specialist at executing nonstandard, especially non-U.S. dollar, swaps with unusual dates and coupons."  Ex. 8, cited in SCAC ¶ 280 n.106 & SJTC ¶ 221 n.41 (Timms, *supra* note 35, at 3).

Finally, as to Javelin, the complaints make clear that despite a low level of buy-side interest in Javelin's platform, RBS made markets on the platform from 2013 through 2015.  *See* SCAC ¶¶ 273, 277; SJTC ¶¶ 153, 159-61.  UBS, moreover, "partner[ed]" with Javelin, and facilitated the very first trade on that platform, by enabling buy-side firms to trade on Javelin using UBS's Neo price-aggregation service, which according to Plaintiffs, increased the "all-to-all liquidity" available to the buy-side.[38]  Taken together, Plaintiffs' allegations thus confirm that at least some dealers supported Javelin, that over a dozen dealers supported TrueEx, and that Tera never even attempted to recruit any dealers to its platform.

### b)   Clearing services allegations

Plaintiffs also accuse the Dealers of conspiring to deprive all-to-all IRS platforms of access to certain clearing services provided by affiliates of the Dealers.  SCAC ¶ 191; SJTC ¶¶ 16, 132.  Each Dealer has an affiliated business unit known as a "Futures Commission Merchant" or "FCM" that offers services including relaying the IRS trades of other parties into clearinghouses.  SCAC ¶¶ 191-92; SJTC ¶¶ 134-35.  According to the complaints, the Dealers

---

[38]   *See* SCAC ¶ 269; SJTC ¶ 179; Ex. 15, cited in SCAC ¶ 301 n.119 & SJTC ¶ 247 n.69 (Mike Kentz, *New Dawn as Non-Bank Enters Interdealer Order Book*, Int'l Fin. Rev., at 2 (July 18, 2014) (announcing first Javelin trade through Neo platform and stating that Javelin is "very excited to have UBS as a partner")).  Plaintiffs attempt to dismiss as "pretextual" several Dealers' expressions of skepticism about the level of buy-side participation on Javelin's platform (SCAC ¶ 271-72; SJTC ¶ 183-84), but they allege no *facts* indicating that the statements were other than genuine.  Sources cited in the complaints confirm that Javelin indeed was struggling to gain traction in the market, and that it seriously antagonized both the buy-side and the sell-side when it prematurely asked the CFTC to mandate SEF-trading of the entire IRS curve.  *See* Ex. 16, cited in SCAC ¶ 28 n.11 (Jesse Collin, *SEF NY Interview: Michael Koegler, Managing Director, Javelin Capital Markets*, Total Asset, at 2 (Aug. 18, 2014) (Javelin managing director admitting in August 2014 that "the buy-side has not yet fully embraced electronic trading"); Ex. 13, cited in SCAC ¶ 23 n.7 & SJTC ¶ 6 n.2 (Levinson, *supra* note 37, at 3 (newcomers such as Javelin "have failed to gain any traction")); Ex. 17, cited in SCAC ¶ 278 n.103 (Mike Kentz, *Cawley Exit Signals SEF Troubles*, Int'l Fin. Rev., at 1 (May 9, 2014) (noting that "the industry uproar was so powerful" that Javelin retracted its overbroad MAT submission)); Ex. 18, cited in SJTC ¶ 156 n.34 (Silla Brush, *CFTC Said Ready to Push Interest-Rate Swaps to Trade Venues*, Bloomberg, at 2 (Jan. 9, 2014) ("Javelin narrowed its plans after swap *buyers* said the original version would cause too many types of trades to occur on the platforms.")).

pressured their FCM affiliates to deny these clearing services to "IRS trading platforms that utilize all-to-all trading protocols." SCAC ¶¶ 191, 194-95; SJTC ¶¶ 16, 132, 138.

Although the complaints use broad rhetoric to describe this so-called "clearing boycott" (*id.*), their concrete factual allegations are narrow. As an initial matter, the complaints admit that the Dealers' FCMs are *not* the only FCMs that clear IRS trades. SCAC ¶ 191 n.77. In addition, the complaints confirm that Tera and Javelin *are* the only all-to-all platforms that allegedly had difficulties with FCMs: TrueEx, Bloomberg, and Tradeweb had no such difficulties even though each offered all-to-all trading (in addition to RFQ trading) beginning in 2013.[39]

Even as to Tera and Javelin, Plaintiffs' clearing allegations are sharply limited. For example, although the complaints purport to identify instances in which the Dealers' FCMs declined to clear trades for Tera and Javelin, most of those allegations relate to the period *before* Tera and Javelin allegedly connected to a "credit hub" that could facilitate credit checks for FCMs. Under CFTC regulations, FCMs must conduct credit checks to "confirm that their customers are sufficiently creditworthy to execute and clear any given trade *before* the trade takes place." SCAC ¶ 196; SJTC ¶ 139 (emphasis in original). Tera and Javelin allegedly connected to a credit hub in 2014 to facilitate these credit checks,[40] but a large majority of

---

[39]   *See, e.g.*, SCAC ¶¶ 279, 303 n.122; SJTC ¶¶ 220, 254 n.80 (alleging that TrueEx, Bloomberg, and Tradeweb offer anonymous all-to-all order books); SJTC ¶ 208 (no clearing difficulties at Bloomberg or Tradeweb); Ex. 12, cited in SCAC ¶ 284 n.109 & SJTC ¶ 224 n.44 (Schmerken, *supra* note 37, at 1 (TrueEx enjoys the support of at least "12 clearing firms")).

[40]   *See* SCAC ¶¶ 212, 256; SJTC ¶¶ 120, 163; *see also* Press Release, Traiana, *TeraExchange Certifies with Traiana for Pre-Trade Credit Checking of Swap Trades* (Jan. 28, 2014), http://www.traiana.com/teraexchange-certifies-with-traiana-for-pre-trade-credit-checking-of-swap-trades. Before Tera and Javelin connected to the Traiana credit hub, the Dealers' FCMs would have had to build costly direct data connections to Tera and Javelin to interact with those platforms. *See* SJTC ¶ 172 (discussing the "untenably high cost" of such a "direct data connection"). In addition, it was only through Traiana's credit hub that Tera and Javelin allegedly acquired the ability to conduct real-time "ping" credit checks, in which a trading platform "will 'ping' an FCM on a per-trade basis to confirm if a customer has sufficient credit to conduct that trade." SCAC ¶ 196 n.79; SJTC ¶ 139 (continued)

Plaintiffs' FCM allegations pre-date that 2014 connection.  *E.g.*, SCAC ¶¶ 227-32; SJTC ¶¶ 197-201.  Moreover, as to Javelin, there are no alleged instances of clearing difficulties with respect to *eight* of the Dealers' FCMs (Bank of America, Barclays, BNPP, Citi, Credit Suisse, HSBC, RBS, and UBS).  As to Tera, there are no alleged instances of clearing difficulties with respect to *six* of the FCMs (Barclays, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, and RBS) after Tera finally connected to a credit hub.

## ARGUMENT

## I.   PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE ANTITRUST CONSPIRACY.

### A.   Standards for pleading an antitrust conspiracy.

A plaintiff attempting to plead an antitrust conspiracy must allege a conspiracy that is not just "conceivable," but "plausible."  *Twombly*, 550 U.S. at 570.  To allege such a conspiracy, a complaint must include more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Id.* at 555.  Rather, the complaint must allege "enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at 556.  For purposes of a motion to dismiss, "[t]he ultimate existence of an 'agreement' under antitrust law [] is a legal conclusion, not a factual allegation."  *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013).  Antitrust plaintiffs therefore "must plead evidentiary facts," including "who, did what, to whom (or with whom), where, and when."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).[41]

---

n.30.  Pre-Traiana, Tera and Javelin assert only that they could support crude "push" credit checks that fail to consider whether a party wishing to trade on a given platform has already drawn on its credit with an FCM on another trading platform.  *See id.*; SJTC ¶¶ 111, 120.

[41]   In some instances, detailed allegations of parallel conduct can be substituted for allegations of the "specific time, place, or person" involved in an alleged conspiracy.  *See Starr v. Sony BMG* (continued)

There are two main ways in which a plaintiff may attempt to satisfy these requirements. First, a plaintiff may allege "direct evidence" of conspiracy. *Citigroup*, 709 F.3d. at 136. "Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011). Such "smoking gun" evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Citigroup*, 709 F.3d at 136.

Second, a plaintiff may attempt to plead an antitrust conspiracy on the basis of "parallel conduct" by the defendants if such conduct is "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557; *Citigroup*, 709 F.3d at 136. Parallel conduct alone is insufficient because it "could be the result of 'coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (quoting *Twombly*, 550 U.S. at 556 n.4). Thus, to state an antitrust conspiracy claim on the basis of parallel conduct, a plaintiff must allege facts indicating that the conduct "flowed from a preceding agreement rather than from [defendants'] own business priorities." *Citigroup*, 709 F.3d at 137-38.

These principles bar any inference of conspiracy when defendants are accused only of parallel conduct that is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550

---

*Music Entm't*, 592 F.3d 314, 323-25 (2d Cir. 2010) (sustaining detailed allegations that "all defendants raised wholesale prices" from 65 cents to 70 cents per song in May 2005 and enforced the increase through most-favored-nation clauses); *see also Twombly*, 550 U.S. at 556 n.4. Plaintiffs have not made such allegations here.

U.S. at 554.  Nor may an inference of conspiracy be drawn where the alleged parallel conduct "made perfect business sense," *Citigroup*, 709 F.3d at 138, where "there are obvious alternative explanations for the facts alleged," *In re Ins. Brokerage*, 618 F.3d at 322-23, or where the alleged facts "suggest competition at least as plausibly as [they] suggest anticompetitive conspiracy," *In re Elevator*, 502 F.3d at 51.

Plaintiffs' allegations founder on these principles.  None of Plaintiffs' allegations identifies any "direct evidence" of conspiracy, and all of the parallel conduct that Plaintiffs purport to identify is, at worst, fully consistent with the conclusion that each Dealer acted independently based on "common perceptions of the market." *Twombly*, 550 U.S. at 554.

**B.     Plaintiffs' pre-2013 allegations fail to state a plausible antitrust claim.**

In a strained attempt to expand the alleged damages period, Plaintiffs assert that the Dealers began conspiring to boycott all-to-all IRS trading all the way back in 2007.  SCAC ¶ 5; SJTC ¶ 23.  Yet Plaintiffs' own complaints reveal that there was essentially nothing to boycott before 2013 at the earliest:  no all-to-all IRS platforms even began operating until 2013; clearing is an admitted prerequisite to all-to-all trading; and buy-side firms did not equip themselves to clear their trades until Dodd-Frank forced them to do so in 2013.  Plaintiffs nonetheless assert that the Dealers began conspiring in 2007 through Project Fusion and OTCDerivNet, but those allegations fall far short of alleging a plausible conspiracy.

**1.     The Project Fusion allegations fail to state a plausible claim.**

Plaintiffs' pre-2013 allegations are directed first and foremost at the Project Fusion joint venture.  SCAC ¶¶ 111-50; SJTC ¶¶ 283-319.  Although it was only through Project Fusion that Tradeweb successfully expanded its trading platforms into IRS and other new asset classes, Plaintiffs contend that Project Fusion was merely an attempt to co-opt Tradeweb and turn it into

24

"the principal forum" for "coordinat[ing]" the alleged conspiracy.  SCAC ¶¶ 14, 151; SJTC ¶ 320.  These allegations are defective for several reasons.

*First*, as a threshold matter, there are no allegations that two of the Dealers—BNPP and HSBC—ever participated in Project Fusion or invested in Tradeweb.  SCAC ¶ 15; SJTC ¶ 294. Plaintiffs nowhere explain how BNPP and HSBC supposedly participated in the purported conspiracy despite their absence from the so-called "principal forum" of the alleged conspiracy.

*Second*, all of Plaintiffs' *factual* allegations are fully consistent with the conclusion that the participants in Project Fusion simply made a non-conspiratorial decision to invest in a promising joint venture.  Plaintiffs never allege that Project Fusion was an unattractive investment opportunity such that only a participant in an antitrust conspiracy would have wanted to invest.  To the contrary, Plaintiffs expressly allege that non-conspiratorial IRS dealers would have been looking for opportunities to "obtain[] an equity share" in newly-emerging electronic trading platforms.  SCAC ¶ 344.  That is exactly what occurred in Project Fusion:  several leading securities dealers invested in a cutting-edge electronic trading platform and obtained an equity share in exchange.  *Supra* at 16.  *Twombly* therefore bars any inference of conspiracy from the Dealers' participation in Project Fusion:  such participation is at least as consistent with "rational and competitive business strategy" as with a far-flung antitrust conspiracy.  *See Twombly*, 550 U.S. at 554; *Citigroup*, 709 F.3d at 138.

*Third*, the Project Fusion allegations consist of bald assertions of "conspiracy" that make no economic sense.  Plaintiffs' core allegation is that the Dealers organized Project Fusion in 2007 because they feared that Tradeweb was planning to launch all-to-all IRS trading.  SCAC ¶¶ 14, 16; SJTC ¶ 24.  Yet, as Plaintiffs recognize, clearing is a prerequisite to all-to-all trading, and buy-side firms began clearing their IRS trades only when Dodd-Frank compelled them to do

so in 2013. *Supra* at 7-8. Thus, if Tradeweb had launched an all-to-all trading platform in

2007—six full years before buy-side firms were even prepared to clear their trades—the platform

could not possibly have succeeded. It is therefore unsurprising that Plaintiffs plead no

"evidentiary facts" to support their conclusory assertion that Tradeweb was planning to launch

all-to-all trading long before such trading was viable. *See Kendall*, 518 F.3d at 1047 (plaintiffs

"must plead not just ultimate facts . . . but evidentiary facts"). Furthermore, Plaintiffs admit that

Tradeweb *did* launch all-to-all trading in 2013, when Dodd-Frank required it to do so.[42] That is

precisely when Tera, Javelin, TrueEx, and Bloomberg, launched *their* all-to-all platforms, *supra*

at 17, 21, and Plaintiffs never suggest that there was anything conspiratorial about the timing of

*those* launches.

    *Finally*, Plaintiffs lack any plausible explanation of what Tradeweb specifically *did* to

further an alleged pre-2013 conspiracy. Plaintiffs criticize Tradeweb for waiting until 2013 to

launch its all-to-all IRS platform (SCAC ¶ 125), but *no one* in the market attempted to launch

all-to-all IRS trading before 2013, reflecting a widespread recognition that such trading was not

possible before that date. *See supra* at 8. In any event, a bare assertion that Tradeweb was slow

to pursue an alleged expansion opportunity will not support an inference of conspiracy. No such

inference is permissible because "[f]irms do not expand without limit and none of them enters

every market that an outside observer might regard as profitable, or even a small portion of such

markets." *Twombly*, 550 U.S. at 567-69 (declining to infer conspiracy from allegations that

defendants declined to pursue "attractive business opportunities"); *see also Williams v.*

---

[42]    Plaintiffs' circular and conclusory assertion that Tradeweb's all-to-all platform is "effectively" unavailable to the buy-side "as a result of Defendants' conspiracy" (SCAC ¶ 304 n.123) is addressed *infra* at 39-40.

*Citigroup, Inc.*, 2009 WL 3682536, at *4 (S.D.N.Y. 2009) ("not pursu[ing] one avenue of profit . . . does not plausibly suggest an agreement").[43]

For all these reasons, Plaintiffs' allegations that the Dealers participated in a narrow and lawful joint venture to expand an electronic trading platform provide no basis for inferring the existence of a broad and unlawful antitrust conspiracy. *See, e.g.*, *Kendall*, 518 F.3d at 1048 (declining to infer conspiracy from participation in a lawful joint venture); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 369-70 (S.D.N.Y. 2016) (allegations that defendants participated in a narrow and lawful agreement "cannot support the broad [antitrust conspiracy] alleged"); *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (refusing "to read evidence of [a] benign agreement as evidence of a separate, illegal agreement"), *aff'd* 630 F. App'x 79 (2d Cir. 2015).

## 2.    The OTCDerivNet allegations fail to state a plausible claim.

In their most recent round of amended complaints, Plaintiffs belatedly attempt to come to grips with the fact that buy-side firms were not even prepared to clear their IRS trades—much less to engage in all-to-all exchange-style trading—before the Dodd-Frank clearing mandates took effect in 2013.  Plaintiffs try to address that inconvenient reality by adding to their complaints a newly-minted set of allegations that the Dealers conspired through OTCDerivNet to deny buy-side access to the SwapClear clearinghouse.  *See* SCAC ¶¶ 175-180; SJTC ¶¶ 344-49.  As with the Project Fusion allegations, these allegations are defective.

*First*, although Plaintiffs try to portray OTCDerivNet as part of a sinister plot to reduce access to SwapClear, their factual allegations show that it was only through OTCDerivNet that

---

[43]    Plaintiffs' allegations relating to Tradeweb's Dealerweb affiliate relate mainly to the post-2013 period and are therefore addressed *infra* at 41.  Plaintiffs also accuse Tradeweb and the Dealers of "hiding" the ownership interest that certain Dealers acquired in Tradeweb through Project Fusion (SCAC ¶¶ 115-17), but that allegation is belied by public securities filings of Tradeweb's parent company.  *See infra* at 78-79 & nn.92-95.

SwapClear successfully launched.  *Supra* at 15.  Indeed, according to materials cited in the complaints, "[i]t was only after eight of the main dealing banks created OTCDerivNet in September 2000 and were given a stake in SwapClear's governance that the service began to gain acceptance."[44]  The complaints also acknowledge that SwapClear launched a clearing product designed specifically for the buy-side in the wake of the financial crisis (SCAC ¶ 189; SJTC ¶ 357), thus making SwapClear "the first [clearinghouse] to provide clearing services for interest rate swaps to buy-side clients."[45]  All of this conduct is precisely the opposite of what one would expect of a conspiracy to "prevent buy-side access to IRS clearing."  SCAC ¶ 175.

*Second*, Plaintiffs' conspiracy allegations once again make no economic sense.  Plaintiffs suggest that the Dealers conspired through OTCDerivNet to "take control" of SwapClear, but their own allegations reveal that the participants in OTCDerivNet acquired their governance rights in SwapClear in 2000 (SCAC ¶¶ 176-80; SJTC ¶¶ 345-49), many years before the alleged conspiracy began in 2007.  Moreover, although the Dealers allegedly used these governance rights to limit membership in SwapClear to firms that contributed capital to SwapClear (SCAC ¶ 190; SJTC ¶ 358), these membership requirements likewise originated many years before the alleged conspiracy began (SCAC ¶ 180; SJTC ¶ 349).  In any event, the requirements for *membership* in SwapClear are irrelevant:  SwapClear admittedly offered clearing services to buy-side firms that were not members of the clearinghouse.[46]  Plaintiffs' own complaints—reinforced by the Dodd-Frank rulemaking record—thus confirm that the obstacle to buy-side clearing in the

---

[44]   *See* Ex. 1, cited in SCAC ¶ 174 n.69 & SJTC ¶ 343 n.136 (Norman, *supra* note 7, at 169).

[45]   *See* Ex. 1, cited in SCAC ¶ 174 n.69 & SJTC ¶ 343 n.136 (Norman, *supra* note 7, at 310).

[46]   *Supra* at 15 & n.32; SCAC ¶ 189; SJTC ¶ 357.  The complaints fail to identify any alleged shortcomings in SwapClear's buy-side clearing product, and they do not deny that the product began to be widely used once the Dodd-Frank clearing mandates took effect.

28

pre-2013 period was not some sort of "conspiracy" among the Dealers, but rather the buy-side's

aversion to the substantial costs associated with clearing. *Supra* at 7-8.

*Third*, Plaintiffs' allegations regarding OTCDerivNet are egregious examples of

conclusory pleading.  Apart from a few mundane allegations that OTCDerivNet's board

members sometimes met and communicated with each other (SCAC ¶¶ 182-83; SJTC ¶ 351),

Plaintiffs do not plead a single "evidentiary fact" to support their conclusory assertion that the

Dealers conspired through OTCDerivNet. *Kendall*, 518 F.3d at 1047-48.  Nor do they identify a

"specific time, place, or person involved" in an alleged conspiratorial agreement. *Twombly*, 550

U.S. at 565 n.10.  Instead, Plaintiffs simply allege that "the Dealer Defendants" as an

undifferentiated whole conspired to "boycott[]" and "prevent access" to buy-side clearing

services "[f]rom 2008 through 2013."  SCAC ¶¶ 175, 183, 188; SJTC ¶¶ 344, 351, 356.  Under

settled law, these undifferentiated allegations of "agreement" and "conspiracy" are insufficient.

*See, e.g.*, *In re Elevator*, 502 F.3d at 50-51 (allegations describing a conspiracy in "general terms

without any specification of any particular activities by any particular defendant" are

inadequate); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 208

(S.D.N.Y. 2012) ("[T]he court begins by identifying pleadings that, because they are no more

than conclusions, are not entitled to the assumption of truth, and then determines whether the

remaining well-pleaded factual allegations, accepted as true, plausibly give rise to an entitlement

to relief."); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011)

("[c]onclusory, collective language is too convenient, too undisciplined, and too unfocused" to

state an antitrust claim).

*Finally*, Plaintiffs fare no better with their allegations that the Dealers conspired through

OTCDerivNet to boycott a novel "Swapstream" product designed by the Chicago Mercantile

Exchange ("CME").  SCAC ¶ 188; SJTC ¶ 356.  These allegations fail at the outset because they are far too vague and conclusory to state a plausible antitrust claim.  *See id.*  These allegations independently fail because they conflate the CME's *Swapstream* product with the CME's *clearing* product.  According to the CME website, the CME launched its IRS *clearing* product in 2010, with the active support of nine of the Dealers.[47]  Plaintiffs never allege that the Dealers boycotted *that* product, nor could they.  Instead, Plaintiffs accuse the Dealers of boycotting "Swapstream," a novel product that would have bundled together a CME-designed IRS contract with a CME trading platform and a CME clearing solution.  SCAC ¶¶ 187-88; SJTC ¶¶ 355-56.  Plaintiffs admitted in their prior complaints that this bundled product never even launched (CAC ¶ 291), an allegation that they do not contradict in their amended complaints.[48]  Plaintiffs' threadbare allegations that the Dealers somehow "boycotted" a product that never even launched do not support their claims.

### 3.     The remaining pre-2013 allegations fail to state a plausible claim.

In their remaining pre-2013 allegations, Plaintiffs assert that the Dealers conspired through a variety of trade associations and other entities including the ISDA, the FIA, the Tradeweb board of directors, and the strategic investment groups of certain Dealers.  *See, e.g.*, SCAC ¶¶ 126, 151-57, 203.  Although Plaintiffs announce in conclusory terms that "the Dealer Defendants" entered into conspiratorial agreements at unidentified meetings of these organizations (*id.*), these assertions of "agreement" are legal conclusions, not factual allegations.  *See Citigroup*, 709 F.3d at 135-36.  These assertions, moreover, are unaccompanied by the type

---

[47]     *See* Press Release, CME Group, *CME Group Begins Clearing OTC Interest Rate Swaps* (Oct. 18, 2010), http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=519694.

[48]     The Court may consider admissions in prior complaints.  *See Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989); *Poindexter v. EMI Record Grp. Inc.*, 2012 WL 1027639, at *2 (S.D.N.Y. 2012).

of "evidentiary facts" necessary to convert them into plausible allegations of an antitrust conspiracy.  *See Kendall*, 518 F.3d at 1047.  Indeed, *none* of Plaintiffs' pre-2013 allegations—including those relating to Tradeweb and OTCDerivNet—provides any "direct evidence" of conspiracy, any evidence of parallel conduct inconsistent with independent decision-making, or sufficient allegations of the "who, what, where and when" of a conspiratorial agreement.

Instead, Plaintiffs essentially speculate that the Dealers might have used the meetings of various legitimate organizations as opportunities to conspire.  It is well settled, however, that a "mere opportunity to conspire" at legitimate meetings will not support an inference that "an illegal combination actually occurred."  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).  Plaintiffs' "conclusory assertions dressed up as facts" are therefore insufficient to plead an antitrust conspiracy.  *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 437 (S.D.N.Y. 2015); *see also Twombly*, 550 U.S. at 567 n.12 ("belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible); *In re Musical Instruments*, 798 F.3d at 1196 ("mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement"); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *33 (S.D.N.Y. 2014) ("*Aluminum I*") (allegation that defendants met and communicated at committee meetings was "no more than suggestive of potential opportunity to communicate").

### C.    Plaintiffs' post-2013 allegations fail to state a plausible antitrust claim.

In the post-2013 period, Plaintiffs shift their focus to allegations that the Dealers boycotted three new all-to-all trading platforms: Tera, Javelin, and TrueEx.  Unable to allege any "direct evidence" of a conspiracy to boycott those platforms, Plaintiffs attempt to piece together an inference of conspiracy from allegations of parallel conduct.  As shown below,

however, Plaintiffs have not even adequately alleged parallel conduct by the Dealers, and all of the conduct that they do allege is fully consistent with independent decision-making.

### 1.    Plaintiffs do not adequately allege a market-making boycott.

Plaintiffs urge this Court to infer a boycott conspiracy mainly from allegations that the Dealers engaged in a parallel refusal to make markets on all-to-all trading platforms. *See, e.g.*, SCAC ¶ 208; SJTC ¶ 128. For two independent reasons, no such inference should be drawn.

*First*, Plaintiffs fail to allege any meaningful parallel conduct by the Dealers, much less parallel conduct inconsistent with unilateral decision-making. Although Plaintiffs imply that all twelve Dealers acted in unison to "boycott" and "crush" any platform that attempted to introduce all-to-all trading (SCAC ¶¶ 18, 207-09, 223; SJTC ¶ 1, 5, 267), the complaints ultimately reveal that, to the contrary:

- Bloomberg and Tradeweb offered anonymous all-to-all IRS trading beginning in 2013, yet encountered no alleged difficulties with the Dealers;

- at least seventeen dealers have supported TrueEx, and JPMorgan supported TrueEx from its inception;

- at least two Dealers supported Javelin notwithstanding a relatively low level of interest in that platform; and

- Tera elected not to recruit any Dealers to its platform based on a deliberate strategy of recruiting "alternative liquidity providers" instead of traditional dealers.

*Supra* at 17-21.

Far from alleging the type of "uniformity" and "simultaneity" required to plead parallel conduct, *see In re Musical Instruments*, 798 F.3d at 1195-97 & n.14, these allegations show *divergent* conduct in which many of the Dealers actually *supported* one or more all-to-all trading platforms. Plaintiffs' conspiracy claims fail for this reason alone. *See id.* (declining to infer an antitrust conspiracy from allegations of non-uniform and non-simultaneous parallel conduct); *Burch*, 662 F.3d at 228 (allegations that various competitors "were choosing to decline,

decrease, and even increase credit to [the plaintiff]" fell "far short of demonstrating parallel behavior"); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 237 (E.D.N.Y. 2009) (dismissing claim where it was "questionable whether Plaintiff's allegations even establish a pattern of parallel conduct"), *aff'd*, 391 F. App'x 59 (2d Cir. 2010); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (dismissing claim where allegedly parallel prices "followed different pricing paths at different times").

*Second*, even if Plaintiffs had adequately alleged a parallel refusal to deal with Tera and Javelin, such conduct would be fully consistent with "rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. According to the complaints, Tera and Javelin were attempting to "disintermediate" the Dealers and deprive them of "billions of dollars" in trading profits (SCAC ¶¶ 5, 102-03; SJTC ¶¶ 14, 275), but Tera and Javelin could not succeed in that effort without substantial support from multiple Dealers. *See, e.g.*, SCAC ¶ 273 n.102 (alleging that participation of "a small number" of dealers would not be enough to sustain an all-to-all platform); *id.* ¶ 276 (alleging that the Dealers account for "almost all of the liquidity in the IRS market").[49] If those allegations are true, they provide a strong *unilateral* reason for the alleged refusals to deal with Tera and Javelin:  any Dealer that supported those platforms would have been contributing to the destruction of its own trading profits.  Because Plaintiffs' own allegations "show that independent self-interest is an obvious alternative explanation for defendants' common behavior," their claims should be dismissed.  *In re Ins. Brokerage*, 618 F.3d at 326.

---

[49]   *See also* SCAC ¶ 313 ("Given the indispensable role of dealers in the OTC derivatives market, it is clear that few structural changes can occur without dealer support."); SJTC ¶ 238 ("because the Dealer Defendants are the primary liquidity providers to the market, they are likely to be the counterparties in most trades with buy-side customers, even on an all-to-all trading platform").

The Supreme Court's decision in *Twombly* reinforces this conclusion.  In *Twombly*, the plaintiff alleged a conspiracy among regional telephone companies to refrain from competing for business in each other's historical territories.  *See* 550 U.S. at 551.  Although the Court acknowledged that each defendant had declined in parallel to compete in the territories of its rivals, the Court declined to infer an antitrust conspiracy, cautioning that the defendants:

> were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword.  Hence, a natural explanation for the noncompetition alleged is that the [defendants] were sitting tight, expecting their neighbors to do the same thing.

*Id.* at 568.  Likewise here, a "natural explanation" for the alleged refusals to support Tera and Javelin is that the Dealers "were born in" a world of dealer-to-client trading, "liked the world the way it was," and thus were "sitting tight, expecting their neighbors to do the same thing."  *Id.*

*Williams v. Citigroup, Inc.*, 2009 WL 3682536 (S.D.N.Y. 2009), *aff'd in relevant part*, 433 F. App'x 36 (2d Cir. 2011), is equally on point.  There, the plaintiff alleged a conspiracy among several investment banks to boycott a new financing structure that "threaten[ed] Defendants' and their co-conspirators' positions in the . . . derivative markets."  *Id.* at *4.  The court dismissed the claim under *Twombly*, reasoning that the alleged threat to the investment banks "does not suggest a wide-ranging conspiracy but rather unilateral action among the [defendants], each of whom wants to preserve its own market position."  *Id.*  So too here, the Dealers' alleged refusal to support all-to-all platforms merely suggests unilateral action by each Dealer, "each of whom wants to preserve its own market position."  *Id.*; *see also In re Ins. Brokerage*, 618 F.3d at 349 (where defendants are "[r]eaping enormous profits," it is natural for them to have "no desire to upset the apple cart").

Plaintiffs counter that in the absence of a conspiracy, it "would have been in the individual interest" of each Dealer to partner with Tera or Javelin in order to "gain a first-mover

advantage."  SCAC ¶¶ 342-44; SJTC ¶¶ 376-77.  But if Plaintiffs are correct that only the

sustained support of multiple dealers is sufficient to make a trading platform viable (*supra* at 33),

then a Dealer takes little or no risk by simply sitting tight and waiting to see which platforms

attract significant support.  Furthermore, it is sheer speculation to assert that the advantages

supposedly available from supporting an untried startup platform would have outweighed the

"billions of dollars" that the Dealers allegedly stood to lose if the market moved to all-to-all

trading.  SJTC ¶ 14.  Plaintiffs' unadorned speculation about the theoretical advantages of

supporting Tera and Javelin fails to supply a plausible allegation that the Dealers acted

inconsistently with their individual interests.  *See* Areeda & Hovenkamp, *Antitrust Law* Vol. VI

¶ 1414 (3d ed. 2010) ("[A]n action contrary to self-interest is not merely a different judgment

than an armchair observer would have made. . . .  [I]t must be an action that is so irrational that

no firm would have engaged in it except on the understanding that others were in agreement.").

Plaintiffs fare no better with their conclusory assertion that absent a conspiracy,

"[e]volution to all-to-all trading open to the entire market would have been inevitable."  SCAC

¶ 342; SJTC ¶ 376.  As noted above, even most of the *buy-side* comments on the CFTC's

proposed trading rules expressed a preference for RFQ trading over all-to-all trading.  *Supra*

at 11-12.  Moreover, the CFTC expressly permitted RFQ trading—and rejected calls for

mandatory all-to-all trading—based on its conclusion that trading rules should "provide

appropriate flexibility for market participants."  *See* SEF Rule at 33,497 n.270.  Finally, Plaintiffs

do not offer a *single* allegation that IRS contracts trade in the same kind of volumes as products

that trade successfully on an all-to-all basis.  *See supra* at 8-9.  It therefore should come as no

surprise that RFQ trading has attracted the most support from participants in the IRS market.

## 2. Plaintiffs do not adequately allege an FCM clearing boycott.

Plaintiffs also allege that the Dealers' FCM affiliates "capitulated to the demands of their respective trading desks" by refusing to clear trades for all-to-all trading platforms. *See* SCAC ¶¶ 194-95; SJTC ¶¶ 137-38. These allegations fail to support an inference of conspiracy for the same reasons as Plaintiffs' market-making allegations: they do not adequately allege either parallel conduct or conduct inconsistent with independent decision-making.

Parallel conduct. Although Plaintiffs imply that the FCMs of all twelve Dealers refused in parallel to clear trades for all-to-all trading platforms (*e.g.*, SCAC ¶ 191), their non-conclusory factual allegations extend only to *some* Dealers and only to the *Tera and Javelin* platforms:

- There are no allegations of a single clearing problem at TrueEx, Bloomberg, or Tradeweb even though those platforms offered all-to-all trading;

- There are no allegations that Javelin had a clearing problem with eight out of twelve Dealers' FCMs;

- There are no allegations that Tera had a clearing problem with six of the Dealers' FCMs after Tera finally connected to a credit hub; and

- There are no allegations that clearing on Tera and Javelin was unavailable through non-defendant FCMs.

*Supra* at 21-22. The complaints also expose key differences between the Tera and Javelin startup platforms and their better-established competitors: Tera and Javelin had far less buy-side support than their competitors, and most of their alleged clearing difficulties relate to the period *before* they connected to a credit hub. *Id*.

Even more significant, only two of Plaintiffs' allegations purport to involve simultaneous conduct by multiple defendants, and neither allegation supports an inference of conspiracy. First, citing a 2015 magazine article, Plaintiffs allege that four of the defendant FCMs raised their clearing fees in an attempt to "penaliz[e]" unidentified buy-side firms for unidentified conduct. SCAC ¶ 199; SJTC ¶ 231. That vague and conclusory allegation, however, is refuted

36

by the very article cited to support it, which discusses general increases in clearing fees that are attributed solely to a new set of banking regulations.[50]

Second, Plaintiffs assert that the day after Tera conducted its first and only IRS trade, four FCMs contacted Tera and asked to review its rulebook.  SCAC ¶¶ 233-35; SJTC ¶¶ 203-05.  Although Plaintiffs assert that these requests were "pretextual" because "the CFTC had already reviewed . . . TeraExchange's rulebook prior to granting it SEF registration" (SCAC ¶¶ 26, 235; SJTC ¶ 205), that assertion is demonstrably incorrect.  At the time in question, Tera had obtained only a *temporary* registration with the CFTC (SCAC ¶ 219; SJTC ¶ 205), and the CFTC does "not conduct any substantive review" of temporary registrations.[51]  Plaintiffs are therefore left only with an unremarkable allegation that a small number of FCMs—four out of twelve— deferred the task of reviewing Tera's rulebook until someone actually traded on Tera.[52]

In short, none of Plaintiffs' allegations involve simultaneous conduct by a majority of the defendants, and none supports an inference of a massive antitrust conspiracy.  *See In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 972 (N.D. Iowa 2011) (dismissing claim where plaintiffs failed to allege facts "that could tie together the specific, discrete incidents

---

[50]   Ex. 19, cited in SCAC ¶ 199 n.82 & SJTC ¶ 231 n.48 (citing Peter Madigan, *FCMs Try to "Off-board" Credit and Commodity Funds*, Risk (July 30, 2015)).  "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control . . . ." *Poindexter v. EMI Record Grp. Inc.*, 2012 WL 1027639, at *2 (S.D.N.Y. 2012).

[51]   SEF Rule at 33,487; *see also id.* ("a grant of temporary registration does not mean that the Commission has determined that a SEF applicant is fully compliant with the Act").

[52]   The Tera rulebook that applied at the time illustrates the importance of reviewing a platform's rulebook before clearing trades on the platform.  That rulebook not only stated that it was binding on any party that accessed the platform "in any way" (Preamble), but also addressed, among other issues, conflicts between Tera rules and clearinghouse rules (Rule 603), the ability of FCMs to enforce obligations against participants (Rule 606(a)(ii)), dispute resolution (Rules 310 & 906), and limits on Tera's liability (Rule 907).  *See* TeraExchange § 40.6 Submission to the CFTC (Apr. 15, 2014), http://teraexchange.com/style/images/rnd/Tera%2040.6%20Filing%2014-21%20-%20Rulebook%20Amendments.pdf.

of admitted misconduct and the overarching all-defendant four-plus-year conspiracy" alleged by plaintiffs); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. 2011) (dismissing claim where allegations of sporadic misconduct were "a far cry from establishing plausibility for a broad six year continuing agreement among all defendants").

Independent decision-making.  Even if it were true that the Dealers caused their affiliated FCMs to refuse to clear trades on Tera and Javelin (and it is not), such conduct would be fully in line with rational and independent business conduct.  Antitrust law does not require or expect that established firms will support new market entrants that threaten to reduce their profits. Rather, "[f]irms need not like [such] competitors; they need not cheer them on to success; a desire to extinguish one's rivals is entirely consistent with, often is the motive behind, competition."  *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989).  As a result, a plaintiff cannot state an antitrust claim simply by alleging that the defendants acted in parallel to resist new market entrants, since there would be no basis for concluding that "resistance to the upstarts was anything more than the natural, unilateral reaction of each [incumbent] intent on keeping its [] dominance."  *Twombly*, 550 U.S. at 566.

These principles easily dispose of Plaintiffs' clearing allegations:  the alleged resistance to Tera and Javelin is readily explainable as the "natural, unilateral reaction" of incumbent firms intent on preserving their profits.  Indeed, "if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing."  *Twombly*, 550 U.S. at 566; *see also id.* ("resisting competition is routine market conduct"); *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 885 F. Supp. 511, 520 (S.D.N.Y. 1995) (holding that "the various motives

each individual defendant may or may not have had to be rid of [plaintiff]" do not "give[] rise to an inference that the defendants *conspired* to boycott [plaintiff]" (emphasis in original)).

### 3. Plaintiffs' "bifurcation" and "name give-up" allegations do not support their claims.

Plaintiffs also assert that a boycott conspiracy may be inferred from the "bifurcation" of the IRS market into a wholesale dealer-to-dealer segment and a retail dealer-to-client segment. *E.g.*, SCAC ¶¶ 20-21. As Plaintiffs acknowledge, however, this so-called bifurcation arose long before the alleged conspiracy period for legitimate economic reasons. *Supra* at 6-9. Under settled law, no inference of conspiracy may be drawn simply from the continuation of business patterns that began before the alleged conspiracy. *See, e.g.*, *Twombly*, 550 U.S. at 567-69 (declining to infer conspiracy from the continuation of pre-existing business patterns); *RxUSA Wholesale*, 661 F. Supp. 2d at 231-32 (same). That is especially true in trading markets such as this one, in which "whatever market structures are set in place first have a lot of persistence."[53]

Plaintiffs' bifurcation allegations also fail for three additional reasons. *First*, Plaintiffs' own complaints admit that TrueEx, Bloomberg, and Tradeweb offer fully anonymous all-to-all trading. SCAC ¶¶ 279, 303 n.122; SJTC ¶¶ 220, 254 n.80. Thus, if all-to-all trading were as attractive as Plaintiffs claim, buy-side firms presumably would be trading with each other on these all-to-all platforms. Plaintiffs counter by asserting that buy-side firms refrain from trading on all-to-all platforms "as a result of Defendants' conspiracy" (SCAC ¶ 304 n.123), but that

---

[53] Transcript of the July 15, 2015 U.S. Commodity Futures Trading Commission Public Roundtable: The Made Available to Trade Process, at 72:6-8 (remarks of Prof. Darrell Duffie), http://www.cftc.gov/idc/groups/public/@newsroom/documents/file/transcript071515.pdf; *see also* Ex. 20, cited in SCAC ¶ 88 n.16 & SJTC ¶ 84 n.7 (Darrell Duffie, *Dark Markets* 7 (2012) ("Once liquidity is established in OTC markets, it may be difficult for exchanges to compete for a critical mass of order flow, as investors are naturally drawn to the most liquid available market.")).

circular assertion is purely conclusory.[54]  Plaintiffs' own complaints supply a much more convincing explanation:  all-to-all trading is viable only in markets that are sufficiently liquid and standardized.  SCAC ¶ 10; SJTC ¶ 15.  Although Plaintiffs vaguely assert that the IRS market is such a market (*see id.*), they never identify the actual trading frequency of any of the various tenors of IRS, and they nowhere assert that IRS contracts trade with anywhere near the frequency of the types of instruments that trade on all-to-all exchange platforms.  The absence of such allegations is no accident.  *See supra* at 8-9.

Second, although the complaints try to leave the impression that dealer-to-dealer trading occurs mainly on electronic all-to-all exchanges (*e.g.*, SCAC ¶¶ 19-20, 82-85), Plaintiffs never squarely make such an allegation, nor could they.  The materials cited in their own complaints confirm that the vast majority of dealer-to-dealer trading actually takes place over the telephone, through interdealer voice-brokers.[55]  Buy-side firms are free to trade through these voice-brokers under the CFTC's impartial access regulations, but according to the materials cited in the complaints, most decline to do so because they prefer dealer-to-client RFQ trading.[56]

---

[54]   Plaintiffs speculate that "the Dealer Defendants would quickly learn" from their FCMs if buy-side firms were using anonymous all-to-all platforms and would retaliate against buy-side firms that used such platforms.  SCAC ¶ 303 n.122.  This speculation deserves no weight because Plaintiffs fail to identify a single instance of such theoretical "retaliation"; they fail to explain why non-defendant FCMs do not defeat the alleged retaliation scheme; and they never explain how the Dealers' FCMs supposedly know whether any given trade occurred on the all-to-all platforms operated by TrueEx, Bloomberg, and Tradeweb as opposed to their RFQ platforms.

[55]   Ex. 6, cited in SCAC ¶ 171 n.67 & SJTC ¶ 261 n.86 (Smith, *supra* note 29, at 4, 13 ("the vast majority of interest rate swap trades on [dealer-to-dealer SEFs] are executed on the phone and subsequently punched into a computer")); Ex. 21, cited in SCAC ¶ 299 n.115 & SJTC ¶ 245 n.65 (Peter Madigan, *CFTC to Clamp Down on Delays in Swap Clearing*, Risk, at 4 (Aug. 5, 2015) (79 percent of ICAP IRS trades were "intermediated by a voice broker")); Ex. 9, cited in SCAC ¶ 370 n.189 (O'Leary, *supra* note 35, at 3 ("in USD IRS, for example, dealer-to-dealer volumes are 80%-plus voice")).

[56]   *See supra* at 12-13; Ex. 6, cited in SCAC ¶ 171 n.67 & SJTC ¶ 261 n.86 (Smith, *supra* note 29, at 5 ("No buy-side client in the world is going to engage with that kind of [voice-broking] process because it is so archaic and alien to them.")).

*Third*, Plaintiffs lack adequate factual allegations of conspiratorial bifurcation of the IRS market.  To be sure, Plaintiffs assert that defendant ICAP—a London-based interdealer broker— agreed to stay out of electronic dealer-to-client trading in exchange for Tradeweb's agreement not to "further expand" into electronic dealer-to-dealer trading through its Dealerweb affiliate.  *See* SCAC ¶¶ 169-73; JTC ¶¶ 337-41.  But that conclusory assertion makes no chronological sense:  Plaintiffs allege a conspiratorial agreement in 2009 even though ICAP did not launch a U.S. electronic trading platform until 2013.  *See* SCAC ¶¶ 169, 171.  In addition, the complaints ultimately confirm that buy-side entities *do* have access to ICAP's platform and that Tradeweb *does* compete for dealer-to-dealer trades through Dealerweb.  *See supra* at 13-14 & n.29; SCAC ¶¶ 147-49, 301; SJTC ¶¶ 247, 316-18.

In any event, all of Plaintiffs' factual allegations are fully consistent with the conclusion that ICAP and Tradeweb each made *unilateral* decisions to remain focused on their historical market segments.  According to the complaints, "Tradeweb's historical focus has been on providing electronic trading services in the *dealer-to-client* side of the market," whereas ICAP is an interdealer broker that historically focused on "brokering IRS trades *between dealers*."  SCAC ¶¶ 66-67.  "Hence, a natural explanation for the noncompetition alleged" is that each firm simply "liked the world the way it was," and preferred to focus on its historical customer base rather than pursuing aggressive expansion.  *Twombly*, 550 U.S. at 568.  This "natural explanation" bars any inference of some sort of market allocation agreement involving ICAP and Tradeweb.  *See id.* at 551, 568-69 (declining to infer conspiracy from "common failure meaningfully to pursue attractive business opportunities"); *In re Zinc*, 155 F. Supp. 3d at 375 (rejecting allegations that competitors had stayed out of each other's market segments as "indicative of no more than a natural and independent desire to avoid a turf war").

Similar reasoning applies to Plaintiffs' allegations regarding the persistence of "post-trade name give-up," *i.e.*, the practice of post-trade disclosure of the names of the parties to anonymous trades (such as trades arranged by interdealer brokers).  No inference of conspiracy should be drawn from that practice given that it originated long before the alleged conspiracy period.[57]  Moreover, the complaints concede that dealers continue to have non-conspiratorial reasons to prefer the practice:  name give-up allegedly provides dealers with valuable information about the market.  *See* SCAC ¶¶ 7, 309, 329; SJTC ¶¶ 7, 78, 235.  In addition, the Acting Chairman of the CFTC has recognized that name give-up can improve pricing and liquidity in the swap markets, and the CFTC has expressly declined to regulate the practice.[58] And the Dealers did not act in parallel with respect to name give-up:  according to the complaints, UBS opposed the practice before the industry and the CFTC.  SCAC ¶¶ 292-93, 299 n.116, 309, 310; SJTC ¶¶ 19, 179 n.37, 240, 245 n.66, 252.

### D.    Plaintiffs fatally rely on impermissible group pleading.

The complaints also should be dismissed because they rely on impermissible "group pleading."  Plaintiffs bear the burden of showing that each of the separate defendants in this action, "*in their individual capacities*, consciously committed themselves to a common scheme designed to achieve an unlawful objective."  *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*,

---

[57]    *See* SCAC ¶ 292; Ex. 22, cited in SCAC ¶ 160 n.52 & SJTC ¶ 237 n.57 (Peter Madigan, *Massad: Sefs Fear Retaliation If They End Name Give-Up*, Risk, at 3 (Apr. 23, 2015) ("Post-trade name give-up has been a convention of [swaps] trading for the past 20 to 30 years.")).

[58]    *See, e.g.*, SEF Rule at 33,499 (declining to regulate name give-up in RFQ trading); Ex. 23, SCAC ¶ 307 n.125 & SJTC ¶ 241 n.61 (Financial Times, *CFTC Not Planning on Anonymity for Swaps Market*, at 1 (Oct. 26, 2015) (quoting former CFTC Chairman Massad as stating that, for the time being, "we are not taking any action" on name give-up due to "different views within the Commission"); Ex. 26, Giancarlo CFTC White Paper, *supra* note 5, at 37-39 ("Without the information provided by name give-up, liquidity makers will provide less liquidity to the market, especially in times of crisis, and charge higher prices to customers."); *id.* (noting that name give-up may help stop market abuses).

181 F.3d 216, 234 (2d Cir. 1999).  Collective allegations that generalize about "defendants" as a group are therefore "insufficient to withstand review on a motion to dismiss."  *Concord Assocs., L.P. v. Entm't Props. Trust*, 2014 WL 1396524, at *24 (S.D.N.Y. 2014).  Instead, the complaints must notify each individual defendant of "how he is alleged to have conspired, with whom and for what purpose."  *In re Zinc*, 155 F. Supp. 3d at 384; *see also Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387, at *6 (S.D.N.Y. 2012) (complaint must "provide a plausible factual basis to distinguish the conduct of each of the defendants"); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) (plaintiffs must allege "a factual connection between each Defendant and the alleged conspiracy").

Plaintiffs' pre-2013 allegations fall woefully short of these requirements.  Those allegations rely entirely on blunderbuss allegations that "the Dealer Defendants" as an undifferentiated whole engaged in conspiratorial "agreements."  *See, e.g.*, SCAC ¶¶ 125, 144, 149-50, 160, 166, 188; SJTC ¶¶ 272, 294, 313, 318-19, 330, 335, 356.  Apart from a few vague references to legitimate business communications (*e.g.*, SCAC ¶¶ 112-14 (naming three Dealers that allegedly led the Project Fusion venture)), the only individualized allegations relating to the pre-2013 period consist of dry recitations of the members of various lawful organizations.  SCAC ¶¶ 127-37, 152-53, 182-83.  Plaintiffs' allegations wholly lack the "specification of any particular activities by any particular defendant" that is necessary to tie each individual Dealer to a pre-2013 conspiracy.  *See In re Elevator*, 502 F.3d at 50-51.  The pre-2013 allegations therefore should be dismissed.

Even as to the post-2013 period, the large majority of Plaintiffs' allegations are pled collectively against "the Dealer-Defendants."  *E.g.*, SCAC ¶¶ 202, 204, 210, 221, 237, 249, 282;

SJTC ¶¶ 124, 128, 132, 186, 211, 223, 327.  And those allegations that do attribute specific

conduct to specific Dealers are insufficient to connect any Dealer to a broad conspiracy:

- **BNPP.**  The BNPP allegations fail at the outset because BNPP had no alleged involvement with the "principal forum" of the alleged conspiracy—Tradeweb—and there are no allegations that it declined to clear for Javelin or "neutralized TrueEx."  Although Plaintiffs allege that BNPP *unilaterally* asked a customer to "'abstain from executing on Tera while they resolve some operational issues'" (SCAC ¶ 241; SJTC ¶ 207), unilateral action is insufficient to state an antitrust conspiracy claim.  None of the other allegations contains any specificity with regard to how, when, or where BNPP allegedly conspired, and there are no allegations that BNPP took any actions in furtherance of a conspiracy.

- **RBS**.  Plaintiffs' allegations do not remotely implicate RBS in an antitrust conspiracy.  RBS admittedly provided liquidity on Javelin; there are no allegations that RBS declined to clear for Tera or Javelin; and any allegations regarding RBS's concern about Javelin's overbroad MAT submissions—which caused an "uproar" even on the buy-side, *supra* at 20 n.38—or the manner in which it provided liquidity to Javelin are at best entirely consistent with economic self-interest.  SCAC ¶¶ 273-76 & n.102; SJTC ¶¶ 153, 158-59.

- **UBS.**  The complaints make clear that UBS, a lower-tier dealer,[59] (i) "partner[ed]" with Javelin to enable trading on its platform through UBS's Neo service,[60] and (ii) publicly opposed "name give-up," a practice that the Dealers supposedly agreed to "insist on" and used to "police" the alleged conspiracy.  SCAC ¶¶ 292-93, 299 n.116, 309-10; SJTC ¶¶ 19, 179, 240, 245 n.66, 252.  That UBS publicly opposed this alleged "policing mechanism," while promoting a Neo service that expanded "access to greater all-to-all liquidity," SCAC ¶ 269, SJTC ¶ 234, fatally undermines the group-pleaded claim that UBS participated in any "carefully planned and well-orchestrated conspiracy," SJTC ¶ 5.

- **Bank of America.**  The most substantive allegation against Bank of America asserts that it resisted clearing trades for Tera in 2012 (SCAC ¶¶ 227-28), but that was before Tera launched its platform or connected to a clearinghouse or a credit hub.  *Supra* at 17, 21-22.  Plaintiffs nowhere allege that Bank of America refused to clear trades for Javelin, and allegations that it declined to clear for Tera are consistent with independent decision-making and therefore cannot support a claim.

---

[59]    According to statistics cited in the complaints, UBS's market share ranked 15th among dealers, behind four dealers not named as defendants.  *See* Ex. 24, cited in SCAC ¶ 312 n.135 & SJTC ¶ 362 n.145 (*2013 Global Interest Rate Derivatives: Dealer Rankings & Market Trends Report*).

[60]    *Supra* at 20.  In this round of complaints, Plaintiffs ironically attempt to explain away UBS Neo by alleging that it was "walled off" from UBS's trading desk. *See* SCAC ¶ 269 n.101; *see also* SJTC ¶ 179 n.37.  That allegation cannot be reconciled with Plaintiffs' allegations that the Dealers' trading desks breach regulatory walls to exert control over affiliates.  *See, e.g.*, SCAC ¶¶ 191-98; SJTC ¶¶ 132-42.

- **Barclays.**  The material allegations specific to Barclays assert that it (i) was the first dealer to offer electronic IRS trading and (ii) told Tera that it was too "resource constrained" to support clearing on Tera.[61]  The first allegation tends to exonerate Barclays, and the second fails to identify conduct inconsistent with Barclays' unilateral interests, especially as Barclays is not alleged to have refused to clear trades on Javelin.

- **Citi.**  Plaintiffs allege that Citi declined to set up clearing for Tera in 2012, but this was before Tera launched its platform or connected to a clearinghouse or credit hub.  *See supra* at 17, 21-22.  Citi also allegedly did not support a European IDB in executing trades on Tera in 2014 because Citi had not approved Tera's rulebook.  SCAC ¶ 240; SJTC ¶ 214.  These unremarkable allegations are consistent with unilateral conduct, and there is no allegation that Citi refused to clear trades on Javelin.

- **Credit Suisse.**  Beyond the allegations discussed elsewhere, the complaints allege that Credit Suisse had a "heated" discussion with an interdealer broker seeking to introduce anonymous trading in a market that is *not* alleged to be the IRS market.[62]  SCAC ¶ 162; SJTC ¶¶ 260, 332.  This irrelevant allegation fails to connect Credit Suisse to an IRS conspiracy and is consistent with unilateral conduct.

- **Deutsche Bank.**  The specific allegations as to Deutsche Bank relate almost entirely to its alleged reluctance to clear trades on Javelin.  SCAC ¶¶ 255-61.  But Plaintiffs fail to explain why Deutsche Bank would *want* to clear such trades, as doing so allegedly would cannibalize its own trading profits.  *E.g.*, *id.* ¶¶ 9, 103.  These allegations are fully consistent with unilateral conduct and fail to state a claim against Deutsche Bank.

- **Goldman Sachs.**  Plaintiffs allege that Goldman Sachs inquired about the possibility of investing in Tera's platform (SCAC ¶ 223), but they also assert that dealers *should* have been pursuing "equity share[s] in [] trading platform[s]."  SCAC ¶ 344.  Plaintiffs also accuse Goldman of various one-off instances of uncooperative conduct with respect to Tera and Javelin, but as explained above, any such conduct would be fully consistent with Goldman's unilateral interest in protecting its trading profits.

---

[61]   SCAC ¶¶ 79, 229; SJTC ¶ 199.  Plaintiffs allege that Credit Suisse, Deutsche Bank, and Morgan Stanley also cited the so-called "pretextual excuse" of resource constraints (*id.*), but they plead no *facts* indicating that the resource constraint issue was other than genuine and in fact admit the "high cost" of building a data connection to a platform.  SJTC ¶ 172.  Nor do they identify when or where these statements allegedly were made or the specific contents of the alleged statements.  Such conclusory assertions do not support Plaintiffs' claims.  *In re Musical Instruments*, 798 F.3d at 1194 n.6 (requiring identification of "who, did what, to whom (or with whom), where, and when").

[62]   Plaintiffs deleted the allegation in their prior complaints that "GFI's platform was targeted at the CDS market" (CAC ¶ 147 n.37; JTC ¶ 290 n.103), but do not contradict that admission in their current complaints.  *See also* Ex. 25, cited in SCAC ¶ 341 n.167 & SJTC ¶ 371 n.150 (Karen Brettell, *Banks' Pressure Stalls Opening of U.S. Derivatives Trading Platform*, Reuters, at 1 (Aug. 27, 2014) (GFI "dropped plans for fully anonymous trading on its *credit* platform")).

- **JPMorgan.** Apart from allegations addressed *supra* at 36-37, the complaints distinguish JPMorgan only by indicating that it (i) supported TrueEx from the outset, (ii) agreed to test the Javelin platform, (iii) supported two of its clearing customers on Javelin for nine months, and (iv) allegedly gave unspecified "static" to those customers while clearing their trades. *See supra* at 19 & n.37; SCAC ¶¶ 250, 252, 268; SJTC ¶¶ 154, 170, 178. These allegations do far more to exonerate JPMorgan than to tie it to a conspiracy.

- **Morgan Stanley.** Apart from allegations addressed elsewhere, the only unique allegation concerning Morgan Stanley's participation in a boycott is that it refused to clear trades on Javelin (SCAC ¶ 254), but Javelin's complaint explains that it was *Javelin* that declined to cover the "high cost" of setting up a "direct data connection to Morgan Stanley," which was necessary for Morgan Stanley to conduct the credit checks that were required before Morgan Stanley could clear trades on Javelin's platform (SJTC ¶ 172).

Plaintiffs' post-2013 allegations therefore fail along with their pre-2013 allegations.[63]

### E.     Plaintiffs' allegations about other markets do not salvage their claims.

Plaintiffs' claims are not improved by their gratuitous reference to a prior class action and related investigations of the credit default swap ("CDS") market. SCAC ¶¶ 348-56; SJTC ¶¶ 380-89. To start, there were never any findings or admissions of liability in the CDS matters. Rather, the European Commission closed its investigation after finding no improper conduct by any of the CDS dealers, and the Department of Justice likewise closed its investigation without any suggestion of wrongdoing.[64] Moreover, although the CDS class action survived an initial motion to dismiss, the allegations there were markedly different from those at issue here. The CDS case involved a much more targeted set of conspiracy allegations that centered on the CDS defendants' alleged attempt to prevent a single trading platform from entering the CDS market by jointly denying the platform access to essential intellectual property. *See In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112 (S.D.N.Y. 2014) ("*In re CDS*"). The CDS plaintiffs

---

[63]     The allegations regarding HSBC fail for the reasons stated in HSBC's separate brief.

[64]     *See* European Commission Press Release, *Commission Closes Proceedings Against 13 Investment Banks in Credit Default Swaps Case* (Dec. 4, 2015), http://ec.europa.eu/competition/ antitrust/cases/dec_docs/39745/39745_13719_14.pdf.

also asserted that the defendants had "abruptly and simultaneously" reversed position and refused to deal with the new CDS trading platform, and the CDS complaint purported to describe "the who, when, and where" of the alleged conspiratorial agreement among the CDS defendants. *Id.* at \*10.  This case, by contrast, involves allegations of a sprawling and amorphous nine-year conspiracy without any comparable allegations sufficient to satisfy *Twombly*.

Tera and Javelin's reference to a CFTC investigation of alleged manipulation of the ISDA-fix interest rate is even further afield.  *See* SJTC ¶¶ 390-91.  The ISDA-fix matter, and other recent matters involving alleged manipulation of benchmark rates, have nothing to do with the purported boycott conspiracy alleged here.  Rather, the benchmark rate cases involved allegations of different conduct, different products, and different markets, and survived motions to dismiss based on purported allegations of "direct evidence" of collusion and "extensive allegations of parallel conduct" inconsistent with unilateral action.[65]  No comparable allegations are made here.  In any event, Plaintiffs' allusion to such cases is irrelevant under Second Circuit law, which squarely rejects attempts to use conspiracy allegations in one market to shore up allegations in another market on the theory that, "if it [allegedly] happened there, it could have happened here."  *In re Elevator*, 502 F.3d at 52.

---

[65]   For example, *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015), emphasized that the complaint there "offer[ed] direct evidence akin to the 'recorded phone call in which two competitors agreed to fix prices at a certain level'—the Second Circuit's paradigmatic example of direct proof of a Section 1 violation."  *Id.* at 591 (quoting *Citigroup*, 709 F.3d at 136).  The court in *Alaska Electrical Pension Fund v. Bank of America Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016), similarly underscored that "the Amended Complaint contains extensive allegations of parallel conduct" that "required [defendants] to act against their own economic self-interest."  *Id.* at 54-55.  And, in *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 781-82 & nn.19-20 (2d Cir. 2016), the court found that certain complaints contained "numerous allegations that clear the bar of plausibility," including allegations of a bank's purported advance knowledge of other banks' confidential LIBOR submissions, and allegations that the economic evidence alleged by plaintiffs was probative of conspiracy and plus factors.  No equivalent allegations exist here.

## II.     CLASS PLAINTIFFS LACK ANTITRUST STANDING.

Even if Class Plaintiffs had alleged plausible antitrust claims, they would not be the right parties to advance them.  The central premise of this case is that Defendants engaged in conduct that was intended to, and did, prevent the development of certain IRS trading platforms.  Thus, the private antitrust plaintiffs that are "proper part[ies] to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement," *Gatt*, 711 F.3d at 80, are the allegedly boycotted trading platforms, not entities like Class Plaintiffs that must cobble together a series of "what ifs" in order to get from the purported conduct to their alleged injury.  And here, two of the allegedly boycotted platforms—Tera and Javelin—have brought their own antitrust actions, thereby ensuring that any alleged antitrust violation will be efficiently enforced.

Class Plaintiffs attempt to confuse the issue by alleging that they "directly" entered into IRS transactions with the Dealers.  SCAC ¶¶ 37-38.  Directly transacting with the Dealers does not make the alleged *injuries* direct.  The harm that Class Plaintiffs allege arises from the Dealers' conduct directed at the trading platforms, not from Class Plaintiffs' transactions with the Dealers.  *Cf. In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 5818585, at *1 (S.D.N.Y. 2016) ("the fact that the parties may compete in a market into which competitive effects trickle down is not equivalent to competing in the market in which the anticompetitive conduct occurred . . . or the market(s) intended to be most directly affected").  "'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'"  *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*")).

### A.    Legal standard.

To bring a private antitrust claim under Sections 4 or 16 of the Clayton Act, a plaintiff "must show both constitutional standing and antitrust standing."  *Gelboim*, 823 F.3d at 770 (citing *AGC*, 459 U.S. at 535 n.31).  The doctrine of antitrust standing "prevents private plaintiffs from recover[ing] damages . . . merely by showing injury causally linked to an illegal presence in the market."  *Gatt*, 711 F.3d at 76.  Standing limitations are necessary because "an over-broad reading of § 4 could result in overdeterrence, imposing ruinous costs on antitrust defendants, severely burdening the judicial system and possibly chilling economically efficient competitive behavior."  *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993).  Antitrust standing is a "threshold question," and its absence requires dismissal.  *See Gatt*, 711 F.3d at 75.

To establish antitrust standing, a plaintiff must plausibly allege both (i) that he or she suffered an antitrust injury and (ii) facts that support his or her suitability as a plaintiff to pursue the alleged violation—that he or she would be an "efficient enforcer" of the antitrust laws.  *See, e.g.*, *Gelboim*, 823 F.3d at 772, 777-78; *Gatt*, 711 F.3d at 76; *Paycom*, 467 F.3d at 290-91.

The Second Circuit considers four factors when determining whether a plaintiff is an efficient enforcer:  "(1) the 'directness or indirectness of the asserted injury,' which requires evaluation of the 'chain of causation' linking appellants' asserted injury and the [challenged conduct]; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which appellants' damages claim is 'highly speculative'; and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'"  *Gelboim*, 823 F.3d at 778 (quoting *AGC*, 459 U.S. at 540-45).

Although the Second Circuit has instructed that the weight given to each factor "will necessarily vary with the circumstances of particular cases," *Gatt*, 711 F.3d at 78, the Supreme

Court has directed that the first and second factors are "requirements, which must be met in every case," and not "mere factors to be weighed in a balance," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014). Where, as here, the alleged injury is indirect and plaintiffs themselves are not directly connected to the purported violations, plaintiffs lack antitrust standing regardless of the other two factors. *See id.* In any event, all four factors weigh against finding that Class Plaintiffs would be efficient enforcers of the antitrust laws.

### B. Class Plaintiffs' alleged injury is indirect and remote.

#### 1. The allegations of the Class Complaint show an attenuated chain of causation between the alleged conduct and Class Plaintiffs' injury.

Class Plaintiffs claim that the Dealers "conspired to prevent buy-side investors from trading IRS on modern electronic trading platforms that provide more transparent and competitive trading options." SCAC ¶ 4. In particular, the Dealers purportedly agreed to boycott and prevent trades from taking place on all-to-all trading platforms such as Tera, Javelin, and TrueEx. SCAC ¶¶ 18, 23-27, 174-287, 396. The Dealers also allegedly co-opted co-defendant Tradeweb to prevent it from developing an all-to-all IRS trading platform (SCAC ¶¶ 14-18, 67, 100-50), and coerced ICAP and other unidentified IDBs not to open their platforms to the buy-side (SCAC ¶¶ 20, 65, 159-73). This conduct allegedly caused Class Plaintiffs to pay "artificially inflated bid-ask spreads on every IRS they purchased or sold during the Class Period," *i.e.*, to "pay inflated fixed rates when they were on one side of a swap or receive unduly low fixed rates when they were on the other side of a swap." SCAC ¶¶ 387, 401.

Examining these allegations together, Class Plaintiffs' alleged injury is too indirect and too remote from Defendants' purported conduct to sustain antitrust standing. Indeed, to travel from the alleged conduct to the alleged injury, the following leaps are necessary: (i) in the absence of a conspiracy, the Dealers would have supported the SEFs and other entities that

sought to create all-to-all IRS exchanges (which no entity was then using); (ii) these entities would have developed and launched the new trading exchanges, or expanded existing exchanges; (iii) these exchanges would have attained sufficient liquidity to become viable trading platforms; (iv) these exchanges would have connected to clearing facilities; (v) with the introduction of these new or expanded exchanges, traders would have abandoned their current RFQ trading model to trade on the new exchanges; (vi) additional liquidity providers would sign on to trade IRS on the new exchanges; and (vii) that incremental liquidity would have narrowed bid-ask spreads across the entire IRS market.[66]  In addition, Class Plaintiffs' purported injury is entirely derivative of the alleged injury suffered by the boycotted entities.  Indisputably, Class Plaintiffs cannot claim any injury if Defendants did not harm the trading platforms first.

### 2.    Second Circuit precedent confirms that Class Plaintiffs' alleged injuries are not legally cognizable.

Second Circuit law supports the finding that Class Plaintiffs' alleged injuries are too derivative and attenuated to establish antitrust standing.  In *Paycom*, an internet merchant claimed that MasterCard's policy of prohibiting its member banks from working with competing payment-card networks reduced competition in the market for network services, which in turn reduced the number of payment options available to the merchant and caused the adoption of policies unfavorable to the merchant.  467 F.3d at 288, 293.  Though the merchant did business directly with MasterCard, the Second Circuit held that the merchant's alleged injuries were indirect because MasterCard's competitors in the network services market "were the entities directly harmed by [the policy]," having "los[t] the substantial business" they otherwise would

---

[66]    As noted *infra* at 56, the complaint now contains several paragraphs discussing the effects that all-to-all trading allegedly has had on bid-ask spreads in other markets. *See* SCAC ¶¶ 319-39.  At best, this additional information addresses only the seventh of the leaps necessary to go from the alleged conduct to Class Plaintiffs' purported injury.

have enjoyed.  *Id.* at 293.  The merchant's alleged injuries "flowed from the injuries suffered by

[the competing payment-card networks]."  *Id.*  Likewise here, the alleged injuries to Class

Plaintiffs are indirect because those injuries flow from the alleged injuries to trading platforms

like Tera and Javelin.  *See id.*

In *Reading Industries, Inc. v. Kennecott Copper Corp.*, a refiner of copper scrap claimed

that a conspiracy to fix the price of refined copper caused it to pay higher prices in the copper

scrap market.  631 F.2d 10, 11-13 (2d Cir. 1980).  The Second Circuit held that the plaintiff did

not have standing to assert its claims because its theory of injury "depend[ed] upon a

complicated series of market interactions between the two sources of copper:  the refined copper

market in which defendants acted and the copper scrap market in which [plaintiff] allegedly

sustained injuries."  *Id.* at 13.  As with Class Plaintiffs, the alleged injury in *Reading* was remote

because there were too many steps in the "attenuated economic causality" chain and "other

market variables could have intervened to affect [the] pricing decisions" that resulted in the price

that the copper scrap refiner paid.  *Id.* at 14; *see also de Atucha v. Commodity Exch., Inc.*, 608 F.

Supp. 510, 511-13, 515-18 (S.D.N.Y. 1985) (plaintiff was not an efficient enforcer because

plaintiff's theory depended on complicated series of interactions between the market where

challenged conduct occurred—the United States silver futures market—and the market where

plaintiff allegedly suffered injury—an international exchange).

Here, as in those cases, there is a critical gap between the conduct, which allegedly

involved the Dealers' conspiratorial refusal to support certain nascent trading platforms, and the

harm Class Plaintiffs allegedly suffered, which involved IRS transactions on existing platforms.

The farther down the chain the alleged damages are from the conduct, the more difficulty there is

in "isolating [Class Plaintiffs'] particular damage from other potential causal factors."  *Aluminum*

52

*I*, 2014 WL 4277510, at *22.  Class Plaintiffs seek to confuse the issue by alleging that they

entered into IRS "directly" with the Dealers (SCAC ¶¶ 37-38), but the fact that Class Plaintiffs

transacted with the Dealers as opposed to other parties is not sufficient to make Class Plaintiffs

efficient enforcers of the antitrust laws.  Plaintiffs also must allege that their injuries flow

*directly* from the challenged conduct.[67]  *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d

390, 403-05 (S.D.N.Y. 2011) (denying antitrust standing because alleged injury in compact disc

market was too attenuated from alleged misconduct in internet music market).  Here, however,

they have not.  Class Plaintiffs' supposed injuries do not stem from their direct transactions with

the Dealers, but rather are an alleged trickle-down effect from the Dealers' conduct directed at

the trading platforms—a fact Class Plaintiffs implicitly acknowledge.  *See* SCAC ¶¶ 328-31

(discussing impact, absent alleged conspiracy, that *electronic all-to-all trading* would ultimately

have had on Plaintiffs' transactions).

### C.      More efficient enforcers exist and have already sought to enforce the antitrust laws.

Class Plaintiffs also lack standing for the independent reason that there is an identifiable

group of more direct alleged victims whose self-interest motivates them to vindicate the public

interest in antitrust enforcement, and who thus are more efficient enforcers of the antitrust laws.

*AGC*, 459 U.S. at 542; *Gatt*, 711 F.3d at 79.  "Implicit in [this] inquiry is recognition that not

---

[67]     The analysis of this factor in *In re Credit Default Swaps Antitrust Litigation* is erroneous.  The court in that case incorrectly concluded that the "directness of injury" factor supported plaintiffs' standing because they had transacted directly with defendants, even though the alleged anticompetitive conduct occurred outside of those transactions and did not have a direct effect on the transactions.  2014 WL 4379112, at *8.  As the cases cited above teach, the proper focus with respect to this factor is the directness of the connection between the *alleged anticompetitive conduct* and the *alleged injury*.  Here, the alleged *anticompetitive conduct* did not occur in the course of the Class Plaintiffs' transactions with Defendants, but rather in connection with Defendants' dealings with SEFs such as plaintiffs Tera and Javelin.

every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced."  *Gelboim*, 823 F.3d at 779.[68]

Here, the alleged victims whose injuries would be direct, and would thus be more efficient enforcers, are the SEFs and other entities that supposedly would have otherwise created successful all-to-all IRS platforms.  SCAC ¶¶ 4, 18, 23-27, 396.  Indeed, two of the SEFs that the Dealers allegedly boycotted, Tera and Javelin, have brought claims based on allegations identical to those of the Class Plaintiffs.  *Compare* SCAC ¶ 396, *with* SJTC ¶ 401.  That distinguishes this case from *In re CDS*, where the owners of the allegedly boycotted platforms had not sued.  Here, denying Class Plaintiffs standing will not "'leave [an alleged] antitrust violation . . . unremedied.'"  *In re CDS*, 2014 WL 4379112, at *9 (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009)).

## D.    Class Plaintiffs' damages are highly speculative.

Yet another reason the Class Plaintiffs are inefficient enforcers is that their alleged damages are highly speculative and would not be susceptible to "a just and reasonable estimate . . . even with the aid of expert testimony."  *Gelboim*, 823 F.3d at 779-80.  The fact that Class Plaintiffs' damages are highly speculative is a "sign" that Class Plaintiffs are "inefficient engine[s] of enforcement."  *Id.* at 779.

---

[68]    This factor again distinguishes this case from other recent actions in which "efficient enforcer" standing has been found.  *Cf. In re London Silver Fixing, Ltd., Antitrust Litig.*, — F. Supp. 3d —, 2016 WL 5794777, at *12 (S.D.N.Y. 2016) ("a rigid rule requiring Plaintiffs to have transacted 'at' the Fix Price would effectively eliminate private enforcement with respect to all claims brought by futures sellers"); *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, — F. Supp. 3d —, 2016 WL 5794776, at *13 (S.D.N.Y. 2016) (same); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *11 (S.D.N.Y. 2016) ("With respect to the FX futures market, there are no other alternative enforcers."); *Alaska Elec.*, 175 F. Supp. 3d at 60 ("the Court has no reason to believe that the non-defendant banks suffered any financial injury at all from Defendants' manipulation of that market, and therefore cannot conclude that those banks could serve as [] more 'efficient enforcers'").

"Where the 'theory of antitrust injury depends upon a complicated series of market interactions,' the damages are speculative." *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at \*10 (S.D.N.Y. 2014) (quoting *Reading*, 631 F.2d at 13).  As detailed above, the indirect path from the alleged conduct to Class Plaintiffs' purported injury is based on a lengthy chain of uncertain events, involving numerous independent entities.  A break in the chain at any point would make Class Plaintiffs' supposed injury a logical impossibility.  That is precisely the kind of uncertainty that the Second Circuit has found renders a plaintiff's alleged injury impermissibly speculative.  *See, e.g.*, *Paycom*, 467 F.3d at 293 ("No one can state that, absent [MasterCard's policy to its member banks], increased competition from [other payment card companies] would have forced [MasterCard] to adopt policies more favorable to [plaintiff].").

Moreover, even if the chain of causation were unbroken, setting damages would be an exercise in conjecture.  The Court first would have to hypothesize about whether alternative trading platforms like Tera, Javelin, and TrueEx would have succeeded at all in the "but-for world."  The Court next would have to hypothesize about which specific entities would have succeeded and how successful they would have been.  That would mean speculating about which of the thousands of IRS tenors would have moved to all-to-all SEFs from the over-the-counter market or RFQ SEFs, and when.  The Court also would have to determine in the but-for world which "alternative providers of liquidity [would] enter the market."  SCAC ¶ 329.  Then, the Court would have to determine the impact that all-to-all trading would have had on the Dealers' participation in IRS transactions.[69]

---

[69]   The gravamen of Class Plaintiffs' claims is that "the Dealer Defendants joined together as a cartel to protect their privileged position as dealers" that allowed them to "generate[] tremendous profits . . . year after year."  SCAC ¶¶ 4, 9.  In a but-for world where new trading platforms erode the profitability of the Dealers' participation in the IRS market, presumably the Dealers would adjust their participation level.

Even if such an alternative universe could be constructed, the Court would have to quantify the impact of all these various differences on bid-ask spreads for each and every IRS transaction with the Dealers from January 1, 2008 through the present—an impossible task given the individual negotiations involved in many IRS transactions.  Beyond that, the Court would need to determine the costs associated with accessing the various exchanges, and whether and to what extent each Plaintiff suffered a net injury across all of its IRS transactions.  *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 489 (S.D.N.Y. 1987) ("An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct." (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986))).

In an effort to overcome these obstacles, Class Plaintiffs have amended their complaint to allege that "[t]he financial harm suffered by buy-side investors is directly observable and can be readily measured and quantified."  SCAC ¶ 320.  But all Class Plaintiffs have done is identify certain reports discussing some of the effects that electronic trading has had on other markets.  *Id.* ¶¶ 321-28.  Even if those reports were deemed to be relevant to the distinct characteristics of the IRS market, they would not in any way address the number of antecedent independent steps that would have to occur before electronic all-to-all trading could even theoretically affect Class Plaintiffs' IRS transactions.

In sum, "to find antitrust damages . . . would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy . . . on the price of [IRS transactions], where countless other market variables could have intervened to affect those pricing decisions."  *Reading*, 631 F.2d at 13-14.  Antitrust standing does not extend to claims requiring such

"intricate efforts to recreate the possible permutations in the causes and effects of a price change." *Id.* at 14.

>        **E.        Apportioning damages would be prohibitively complex.**

Finally, the difficulty of identifying damages and apportioning them between Class Plaintiffs on the one hand and the allegedly boycotted entities on the other weighs against a finding that Class Plaintiffs are efficient enforcers. *Gatt*, 711 F.3d at 79-80.  As noted above, assessing damages supposedly suffered by the Class Plaintiffs necessarily involves examining the effects of the alleged activity on alternative trading platforms that could have developed. Tera and Javelin seek to recover the capital that they invested in their failed exchanges and the fees they purportedly would have earned had the exchanges succeeded.  SJTC ¶¶ 114, 123, 409. Class plaintiffs seek to recover the "artificially inflated bid-ask spreads" that they supposedly paid because the exchanges did not succeed.  SCAC ¶ 401.  But if SEFs like Tera and Javelin succeeded, and the Dealers made less money on IRS transactions, they presumably would have decreased the number of IRS transactions in which they engaged with Class Plaintiffs.  These inherent tensions between the two sets of claims make apportioning damages between Class Plaintiffs and Tera and Javelin prohibitively difficult.

**III.    THE COMMODITY EXCHANGE ACT AND THE DODD-FRANK ACT
         IMPLICITLY PRECLUDE PLAINTIFFS' POST-DODD-FRANK CLAIMS.**

Over the last several years, the CFTC has transformed the IRS market by exercising its authority under the CEA, as amended by Dodd-Frank, to comprehensively regulate IRS and other swap trading.  This regulatory activity, which remains in progress, addresses the very features of IRS trading targeted by Plaintiffs' claims, including the manner in which IRS are traded, the anonymity of such trading, and dealer ownership of SEFs.  In exercising its authority, the CFTC takes into account competition concerns and balances them against other statutory

goals.  *See* 7 U.S.C. § 19(a)(2); *N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 570 (S.D.N.Y. 2004) (CFTC is "charged with making rules and regulations that take into consideration the interests of the antitrust laws").  The CFTC also has authority to enforce this regulatory regime, including enforcement of the special antitrust prohibitions that apply in the swap markets.  These special prohibitions differ from the Sherman Act standard and contain exceptions for conduct that is "necessary or appropriate" to achieve the purposes of the CEA.  *See, e.g.*, 7 U.S.C. §§ 6s(j)(6), 7b-3(f)(11).

Plaintiffs' antitrust claims, if permitted to proceed, would allow the blunt instrument of the general antitrust laws to supplant the CFTC's use of its expert authority to calibrate competition in the IRS market and balance competing statutory goals.  By casting the existing features of the IRS market as evidence of a broad antitrust conspiracy, Plaintiffs' claims would deter market participants from engaging in activity that the CFTC permits or encourages, which would not only disrupt the CFTC's regulatory scheme but also risk great harm to buyers and sellers of IRS.  In the face of this conflict between agency regulation and the general antitrust laws, the latter must give way under *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007).  All claims relating to post-Dodd-Frank conduct should therefore be dismissed.

### A.    All four *Billing* factors weigh in favor of implied preclusion.

In *Billing*, the Supreme Court recognized that application of the antitrust laws may be precluded by another regulatory regime—even where the plaintiffs allege an unlawful conspiracy under the Sherman Act.  *See* 551 U.S. at 267.  The Court focused on the practical risks of antitrust plaintiffs seeking redress for an alleged conspiracy in the context of highly regulated activity.  The Court noted that "evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities marketing activity may overlap, or prove identical," and that antitrust suits and the "risk of treble damages" could therefore cause market participants

58

to avoid conduct that "securities law permits or encourages."  *Id.* at 281-82.  Engaging in a pragmatic analysis focused on "context and likely consequences," *id.* at 275, the Court found that the "threat of antitrust lawsuits, through error and disincentive, could seriously alter . . . conduct in undesirable ways" and that "to allow an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities markets."  *Id.* at 283; *see also Elec. Trading Grp., LLC v. Banc of Am. Secs. LLC*, 588 F.3d 128 (2d Cir. 2009) (finding that securities regulation impliedly precluded price-fixing claims regarding securities lending).

The Court in *Billing* identified four factors that determine when the antitrust laws are implicitly precluded.  *See* 551 U.S. at 285.  All four factors strongly support the conclusion that Plaintiffs' antitrust claims are precluded here:  these actions involve "(1) an area of conduct squarely within the heartland of [the relevant substantive] regulations; (2) clear and adequate [federal agency] authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes."  *Id.*  Here, the CFTC designed and continues to refine the very market structure targeted by Plaintiffs' allegations.  Permitting these claims to proceed not only would disrupt the CFTC's ability to regulate IRS trading, but also would deter market participants from engaging in activity that the CFTC "permits or encourages."  *Id.* at 282.  And, even more so than in *Billing*, "any enforcement-related need for an antitrust lawsuit is unusually small."  *Id.* at 283.  Not only does the CFTC consider competition concerns in its regulatory activity (as in *Billing*), but it also enforces antitrust prohibitions that were specially prescribed by Dodd-Frank for the swap markets.

### 1.    Within the heartland of regulation.

This case satisfies the first *Billing* factor because the conduct at issue—IRS trading—is "central to the proper functioning of well-regulated" swap markets, and also "lie[s] squarely within an area of financial market activity" that federal law—here, the CEA and Dodd-Frank—

seeks to regulate.  *Id.* at 276.  Under this factor, courts broadly consider "the underlying market activity," not "the alleged anticompetitive conduct."  *Elec. Trading Grp.*, 588 F.3d at 134 (noting that, in *Billing*, the "underlying market activity" was defined as "the IPO process").  IRS trading is clearly "within the heartland of the [swaps] business" and the "'heartland of [swaps] regulation.'"  *Id.* at 134.  And "Title VII of the Dodd-Frank Act amended the CEA to establish a comprehensive new regulatory framework for swaps."  SEF Rule at 33,477.

### 2.    Clear agency authority to regulate.

The second factor—authority to regulate—follows swiftly from the first:  "the law grants the [agency] authority to supervise all of the activities here in question."  *Billing*, 551 U.S. at 276.  The CFTC has broad authority to "promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of [the statutory] chapter."  7 U.S.C. § 12a(5).  The CFTC also has authority to regulate IRS market actors and market structure, including the manner in which IRS are traded, the anonymity of such trading, and dealer ownership of SEFs.  *Supra* at 9-14.

Moreover, Congress has granted the CFTC authority to regulate the antitrust dimensions of swaps trading, including by enforcing the special antitrust prohibitions that apply in this market.  *See* 7 U.S.C. § 6s(j)(6) ("Unless necessary or appropriate to achieve the purpose of [the CEA, as amended by Dodd-Frank], a swap dealer or major swap participant shall not—(A) adopt any process or take any action that results in any unreasonable restraint of trade; or (B) impose any material anticompetitive burden on trading or clearing."); *see also id.* § 7b-3(f)(11) (imposing same prohibition on SEFs).

### 3.    Ongoing agency regulation.

The CFTC has made use of its authority to regulate the IRS market.  In this Circuit, even an agency roundtable can "indicate[] active [agency] monitoring."  *Elec. Trading Grp.*, 588 F.3d

at 136.  The CFTC has far exceeded that bar by issuing dozens of regulations and taking other actions relating to the IRS market.[70]  Among many examples:  the CFTC regulates the manner in which trades may occur on SEFs.  *See* 17 C.F.R. § 37.9(a)(2).  It regulates access to SEFs.  *See id.* § 37.200(b).  It regulates the ownership of SEFs and clearinghouses.  *See* Proposed Conflicts Rule at 63,743, 63,745.  And it has implemented the special antitrust prohibitions provided in Dodd-Frank.  *See, e.g.*, 17 C.F.R. § 37.1100.  The CFTC has also reviewed and approved various SEF rulebooks, including those of ICAP and Tradeweb.  *See* SEF Rule at 33,485 (SEF rulebooks submitted to CFTC for "review and approval").  Moreover, after the complaints in these actions were filed, the CFTC began an investigation of the very conduct alleged by Plaintiffs,[71] and the CFTC has in the past brought numerous enforcement actions for violations of its swap regulations.[72]

## 4.  Risk of conflict.

As to the final factor, courts must consider whether there would be a "risk that the [regulatory] and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct."  *Billing*, 551 U.S. at 275-76.  In *Billing*, the Supreme Court engaged in a practical analysis of the "likely consequences" of allowing antitrust litigation in heavily regulated areas, including whether evidence put forward to

---

[70]   *See Dodd-Frank Final Rules, Final Guidance, Final Exemptive Orders, and Other Final Actions*, U.S. Commodity Futures Trading Commission, http://www.cftc.gov/LawRegulation/ DoddFrankAct/Dodd-FrankFinalRules/index.htm.

[71]   *See, e.g.*, Christina Rexrode, *Citigroup Says CFTC Investigating Banks' Interest-Rate Swaps*, Wall St. J. (Oct. 31, 2016), http://www.wsj.com/articles/citigroup-says-cftc-investigating-banks-interest-rate-swaps-1477921515 (noting that the CFTC is currently investigating "the trading and clearing of interest rate swaps by investment banks").

[72]   *See, e.g.*, *In re TeraExchange LLC*, CFTC Docket No. 15-33 (Sept. 24, 2015) (alleging that Tera violated 7 U.S.C. § 7b-3(f)(2)(B) and 17 C.F.R. § 37.203(a)); *In re Coinflip, Inc.*, CFTC Docket No. 15-29 (Sept. 17, 2015); *In re Austl. & N.Z. Banking Grp. Ltd.*, CFTC Docket No. 15-31 (Sept. 17, 2015); *In re INTL FCStone Mkts., LLC*, CFTC Docket No. 15-27 (Aug. 19, 2015).

support claims of conspiracy would "overlap" or "prove identical" with evidence showing agency-permitted conduct. *Id.* at 275, 281. In such circumstances, the "risk of treble damages" could disrupt an agency's regulatory scheme, leading market participants to avoid conduct that the agency "permits or encourages." *Id.* at 282-83 (noting conflict created by "disincentive" and "chilling effect" on market participants). The Court also recognized the potential for conflict between generalist judges and juries and agency expertise in drawing "fine, complex, detailed" lines separating "activity that the [agency] permits or encourages (for which [plaintiffs] must concede antitrust immunity)" and conduct that the agency "forbid[s]." *Id.* at 279.

In considering the fourth factor, "actual and immediate" conflict is not required; "potential conflict" is sufficient. *See Elec. Trading Grp.*, 588 F.3d at 138 (stating with respect to potential conflict that the "proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit"). As described below, Plaintiffs' claims would involve both actual and potential conflict between the Sherman Act and the CFTC's carefully calibrated regulatory regime.

### a)   Conflict with the CFTC's antitrust and enforcement authority.

Permitting Plaintiffs' antitrust claims would conflict with the CFTC's specialized antitrust authority over swaps, which requires the agency to use its expertise to balance antitrust and competition concerns against other statutory goals. As noted, the CFTC is charged with enforcing the special antitrust prohibitions that Dodd-Frank placed on swaps dealers, major swaps participants, and SEFs. These prohibitions differ from the Sherman Act in reaching "unreasonable restraint[s] of trade" and "material anticompetitive burden[s]," and contain an exception for conduct "necessary" or "appropriate" to achieve the purposes of the CEA, as

amended by Dodd-Frank.[73] *See supra* at 13, 58.  Plaintiffs' complaints are replete with

allegations (however conclusory) that might qualify as "unreasonable restraint[s] of trade" and

"material anticompetitive burden[s]," but that the CFTC nevertheless may deem to be

"necessary" or "appropriate" to achieve the CEA's purpose.  Applying both the Dodd-Frank

antitrust prohibitions and the Sherman Act to the same trading conduct by Defendants would

thus risk "conflicting guidance, requirements, duties, privileges, [and] standards of conduct."

*Billing*, 551 U.S. at 275-76; *see also United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S.

694, 734 (1975) ("*NASD*") (implied preclusion ensures that agency regulation is "free from the

disruption of conflicting judgments that might be voiced by courts exercising jurisdiction under

the antitrust laws.").  And, as in *Billing*, attempting to avoid the conflict by targeting only that

conduct that is prohibited by both sets of antitrust prohibitions would involve the drawing of

"complex, sinuous line[s]" that requires "[swaps]-related expertise," *Billing*, 551 U.S. at 285,

particularly with respect to what conduct is "necessary" or "appropriate" to achieve the purposes

of the CEA.  This would entail the "serious risk that antitrust courts will produce inconsistent

results," *id.*, or "unusually serious mistakes," *id.* at 282, which, in turn, would "overly deter"

beneficial market practices that the CFTC believes to be necessary or appropriate to achieve the

purposes of the CEA, *id.* at 285.[74]

---

[73]   Further compounding the risk of conflict is that the CFTC is also required to consider
competition concerns in its rulemaking efforts and balance these concerns against other factors.  *See*
7 U.S.C. § 19(a)(2) (requiring consideration of, *inter alia*, the "protection of market participants and
the public"; the "efficiency, competitiveness, and financial integrity" of the markets; and "price
discovery"); *see also* 7 U.S.C. § 19(b) (CFTC must "take into consideration the public interest to be
protected by the antitrust laws").

[74]   Moreover, the CFTC has authority to enforce other prohibitions that are relevant to specific
allegations in Plaintiffs' complaints, such as the requirement that SEFs provide "impartial access" to
market participants, 7 U.S.C. § 7b-3(f)(2)(B)(i); SEF Rule at 33,507; *see also* SCAC ¶ 20 (alleging
that certain SEFs exclude buy-side entities from the ability to trade on interdealer platforms), and
regulations prohibiting swap dealers from "directly or indirectly" interfering with or influencing the
(continued)

The CFTC's broad authority to regulate anticompetitive conduct in the swap markets not only creates the risk of conflict with private antitrust enforcement, s*ee Billing*, 551 U.S. at 275; *NASD*, 422 U.S. at 734, but also demonstrates why "any enforcement-related need for an antitrust lawsuit is unusually small," *Billing*, 551 U.S. at 283 (noting both the SEC's enforcement authority and the requirement that SEC take competitive considerations into account as reasons that antitrust actions are not required to address alleged anticompetitive behavior).[75]

### b)    Conflict with the CFTC's judgment on RFQ trading.

Plaintiffs' complaints denigrate RFQ trading and treat the persistence of this form of trading as evidence of an antitrust conspiracy.  *See* SCAC ¶¶ 27, 150.  Allowing Plaintiffs' claims to proceed would therefore conflict with the CFTC's considered judgment about the benefits of RFQ trading to the swap markets.

As described in detail in the Background section, the CFTC issued its regulation on swaps trading methods after considering comments from dozens of market constituencies.  The large majority of buy-side comments that addressed RFQ trading—including comments on behalf of asset managers, pension plans, and non-financial companies that use swaps to hedge risk—strongly supported this form of trading.[76]  For instance, the Committee on Investment of

---

[75]   decision of an affiliated clearing unit to provide clearing services to a particular customer, s*ee* 17 C.F.R. § 23.605(d)(1); *see also* SCAC ¶ 194 (alleging that Dealers have enforced their supposed conspiracy by directing their clearing units to raise clearing fees, or withdraw clearing services from, buy-side entities that attempt to trade on all-to-all platforms).

[75]   *See also Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004) (stating that where there exists a "regulatory structure designed to deter and remedy anticompetitive harm," the "additional benefit to competition provided by antitrust enforcement will tend to be small").  As in *Billing*, *see* 551 U.S. at 283, another factor that diminishes the need for private antitrust enforcement is that market participants may bring lawsuits under the CEA to obtain damages for statutory or regulatory violations.  *See* 7 U.S.C. § 25(a)-(c) (actions are limited to actual damages and a two-year statute of limitations).

[76]   *See supra* at 11 & n.23.

Employee Benefit Assets, an association representing more than 100 of the country's largest pension funds, wrote that "it is important that the rules do not force SEFs to operate an Order Book or any system that resembles an Order Book for Required Transactions," noting that "[p]ension plan fiduciaries currently effectively use RFQ systems to obtain favorable pricing for pension plans."[77]  The CFTC ultimately decided to permit RFQ trading in conjunction with an order book to provide SEFs with "additional flexibility in the execution methods for Required Transactions," SEF Rule at 33,484, and also lowered the minimum number of RFQ participants from five to three in response to buy-side concerns about the potential for wider bid-ask spreads, *id.* at 33,497-98; *see also id.* at 33,476 n.2 (recognizing that the "benefits of enhanced market transparency are not boundless, particularly in swap markets with limited liquidity").[78]

Against the backdrop of the CFTC's careful calibration of IRS trading methods, the risk of conflict with Plaintiffs' antitrust claims is clear.  Plaintiffs posit the existence of RFQ trading itself as evidence of a broad conspiracy that has held back all-to-all trading.  *E.g.*, SCAC ¶¶ 201, 208, 340.  Thus, SEFs that provide RFQs to a minimum of three recipients rather than *all* participants—and dealers that prefer platforms offering RFQ trading—may find themselves targets of a multi-billion dollar antitrust suit, despite the CFTC's express provision for such trading and its registration and approval of various SEFs that employ these trading protocols, *see supra* at 10-13.  The "likely consequences" of permitting such suits thus include "seriously

---

[77]   ABC Comment Letter, *supra* note 23, at 6, 11.

[78]   The CFTC determined that its final regulations "will improve the efficiency, competitiveness, and financial integrity of the swaps market by providing a SEF with the flexibility to offer several execution methods for Required Transactions to meet the needs of market participants, including RFQ Systems."  SEF Rule at 33,567.  Moreover, the Acting Chairman of the CFTC, Commissioner Giancarlo, has indicated that he will pursue additional flexibility in trading methods in light of the "episodic liquidity" of swaps.  Keynote Address Before SEFCON VII (Jan. 18, 2017), http://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo-19.

alter[ing] [market] conduct in undesirable ways," *Billing*, 551 U.S. at 275, 283, such as by discouraging SEFs and dealers from offering or engaging in RFQ trading.  This in turn would "threaten serious harm to the efficient functioning of the [swaps] markets."  *Id.* at 283; *Elec. Trading Grp.*, 588 F.3d at 136 ("allowing antitrust liability . . . would inhibit permissible (and even beneficial) market behavior").

c) **Conflict with the CFTC's regulation of anonymity in trading.**

Plaintiffs further allege that Dealers have pressured SEFs to require identity disclosure, often referred to as "name give-up," as a mechanism for policing the purported conspiracy.  *See* SCAC ¶¶ 292-311.  But the CFTC has already rejected the idea of "imposing a specific requirement that the identity of the RFQ requester be disclosed or anonymous."  SEF Rule at 33,499.  And as to order-book trading, where name give-up often occurs post-trade, the agency has indicated that this question remains the subject of ongoing consideration.  *See supra* at 42. This ongoing debate within the CFTC is hardly surprising, given the various pro-competitive reasons that have been cited in favor of name give-up, including improving liquidity, reducing prices, and facilitating monitoring for abusive conduct.  *See id.*

Plaintiffs' antitrust claims, if allowed to proceed, would discourage SEFs from requiring, and dealers from preferring, a practice that the CFTC presently permits.  This is a sufficient conflict to require implied preclusion.  *See Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 801 (2d Cir. 2002) ("Conflict also can exist where the [agency] has jurisdiction over the challenged activity and deliberately has chosen not to regulate it."); *see also Elec. Trading Grp.*, 588 F.3d at 138 (explaining that because the agency "could move quickly to regulate" the activity in a different manner should it become necessary, the "potential conflict weighs in favor of implied preclusion.").

66

### d) Conflict with the CFTC's regulation of dealer ownership of SEFs.

Plaintiffs allege that several Dealers took ownership interests in the Tradeweb SEF to prevent the introduction of all-to-all trading. *See* SCAC ¶¶ 17, 100-50. But here, too, permitting antitrust litigation targeting dealer ownership of SEFs—and the dealer interaction that accompanies such joint ventures—would conflict with the CFTC's ongoing regulatory activity. Pursuant to a specific Dodd-Frank provision that requires the CFTC to weigh competition concerns against other considerations,[79] the CFTC has issued a proposed regulation that would limit an *individual* dealer or other "enumerated entity" from owning more than 20 percent of the equity in a SEF. *See* Proposed Conflicts Rule at 63,743, 63,745. But the CFTC chose *not* to limit the *aggregate* equity that such entities may own in a SEF. Rather, the CFTC noted that Dodd-Frank intended to encourage competition between multiple SEFs and that dealers and other enumerated entities "would be the most likely source of funding" for new SEF entrants. *Id.* at 63,745. The CFTC found that the benefits of competition between new SEFs "outweigh the incremental benefit of better governance through limitations on the aggregate influence of the enumerated entities." *Id.*[80] Permitting antitrust claims that nevertheless treat dealer investments

---

[79] Dodd-Frank provides that, "[i]n order to mitigate conflicts of interest," the CFTC "shall adopt rules which may include numerical limits on the control of, or the voting rights with respect to," any SEF by, *inter alia*, swap dealers, major swap participants, and large banks, 15 U.S.C. § 8323(a), and requires the CFTC to balance various considerations, including improving governance, mitigating systemic risk, promoting competition, and mitigating conflicts of interest, *id.* § 8323(b). Plaintiffs make similar allegations regarding Dealers' ownership of LCH.Clearnet, a clearinghouse. SCAC ¶¶ 176-77. Clearinghouse ownership is also addressed by the CFTC's rulemaking. 15 U.S.C. § 8323(a).

[80] The Justice Department's Antitrust Division objected to the CFTC's permission of aggregate ownership of SEFs by dealers and other enumerated entities, stating that this "may not sufficiently protect and promote competition in the industry." *See* United States Department of Justice, Comments on Proposed Rules Limiting Ownership and Regulating Governance for Derivatives Clearing Organizations, Designated Contracts Markets, and Swap Execution Facilities (Dec. 28, 2010), https://www.justice.gov/atr/comments-proposed-rules-limiting-ownership-and-regulating-(continued)

in SEFs as evidence of collusion—or an independent antitrust violation—would discourage

investment in new SEFs and disrupt the expert agency's ongoing deliberations on this issue.  *See*

*Elec. Trading Grp.*, 588 F.3d at 138.

B. **Dodd-Frank's savings clause does not apply.**

Although Dodd-Frank contains an antitrust savings clause that applies across the various

titles of the Act, that clause is not universal and it does not apply here.  It provides that

"[n]othing in this Act, or any amendment made by this Act, shall be construed to modify, impair,

or supersede the operation of any of the antitrust laws, *unless otherwise specified*."  12 U.S.C.

§ 5303.

Both the text and structure of Dodd-Frank demonstrate that Congress has "otherwise

specified."  Throughout Title VII, Congress included special antitrust prohibitions applicable to

actors in the swap markets.  These provisions, titled "Antitrust considerations," state that

"[u]nless necessary or appropriate to achieve the purposes of [the CEA, as amended by Dodd-

Frank], a swap dealer or major swap participant shall not—(A) adopt any process or take any

action that results in any unreasonable restraint of trade; or (B) impose any material

anticompetitive burden on trading or clearing."  7 U.S.C. § 6s(j)(6).[81]  The phrase "restraint of

trade" is a term of art plucked from—and clearly specifying—the Sherman Act.  *See* 15 U.S.C.

§ 1; *see also, e.g.*, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 2011 WL 3878200, at *6 (S.D. Ind.

2011) (referring to "restraint of trade" as an antitrust term of art).

---

governance-derivatives-clearing.  This contrary view, however, only underscores the ways in which
different regulatory regimes approach issues in light of each regime's policy goals.

[81]   *See also* 7 U.S.C. § 7a-1(c)(2)(N) (same for clearinghouses); *id.* § 7b-3(f)(11) (same for SEFs).
Likewise, as noted, the CEA requires that the CFTC consider "competitiveness," among other
factors, in its regulatory actions, 7 U.S.C. § 19(a)(2), and requires that the CFTC "take into
consideration the public interest to be protected by the antitrust laws and endeavor to take the least
anticompetitive means of achieving the objectives" of the CEA, 7 U.S.C. § 19(b).

In crafting these special antitrust prohibitions, Congress modified the Sherman Act standard[82] and included an express exception for situations in which particular conduct is "necessary or appropriate to achieve the purposes of [the CEA, as amended by Dodd-Frank]." *E.g.*, 7 U.S.C. § 6s(j)(6).  Congress delegated the authority to scrutinize that conduct to the CFTC, the entity best positioned to consider the proper functioning of the swap markets and the purposes of Title VII.  Some entity must balance antitrust considerations with other statutory goals.  "And who but the [CFTC] itself could do so with confidence?"  *Billing*, 551 U.S. at 281.

These antitrust provisions, coupled with the other elements of the CEA and Title VII's pervasive regulation of the swap markets, are sufficient under *Billing* to demonstrate Congress's intent to modify the application of the Sherman Act in these circumstances.[83]  Indeed, in *Billing* itself, the Court found that the securities laws implicitly precluded the plaintiffs' antitrust claims despite the existence of a savings clause providing that "the rights and remedies provided by [the securities laws] shall be in addition to any and all other rights and remedies that may exist at law or in equity."  15 U.S.C. § 77p(a); *see Billing*, 551 U.S. at 275.  As is the case here, the *Billing* Court found that the savings clause at issue was not "so broad as to preserve all antitrust actions."  551 U.S. at 275 (noting that the Court had "necessarily rejected" savings-clause arguments by finding immunity in *Gordon v. N.Y. Stock Exch.*, 422 U.S. 659 (1975), and *NASD*,

---

[82]    Title VII's "unreasonable restraint of trade" prohibitions omit the Sherman Act's requirement of a combination, contract, or conspiracy, *cf.* 15 U.S.C. § 1, and the "material anticompetitive burden" prohibitions are not found in the Sherman Act.

[83]    In the *CDS* litigation, the district court found that "the antitrust-considerations provisions impose on dealers obligations above and beyond what the antitrust laws themselves require."  *In re CDS*, 2014 WL 4379112, at *17 (finding that Dodd-Frank's antitrust savings clause applied).  With all respect, this conclusion begs the question.  Determining whether these special antitrust provisions displace or supplement the Sherman Act requires a *Billing* analysis, which the court in *In re CDS* did not undertake.

422 U.S. 694).[84]  As in *Billing*, the conflict here between the CFTC's regulation under the CEA

and Dodd-Frank and the antitrust laws means that the latter must give way.[85]

## IV.   CLASS PLAINTIFFS' PRE-2013 CLAIMS FAIL TO ALLEGE INJURY-IN-FACT.

Although Class Plaintiffs purport to sue over alleged antitrust violations dating back at

least to 2008 (SCAC ¶¶ 385, 401), they fail to allege injury-in-fact in the pre-2013 period.  Class

Plaintiffs' theory of injury is that, in the absence of the alleged conspiracy, all-to-all trading on

platforms such as Tera, Javelin, and TrueEx would have "result[ed] in the compression of bid-

ask spreads" for IRS.  *See, e.g.*, SCAC ¶¶ 203, 210, 248, 401.  Class Plaintiffs do not adequately

allege, however, that any of those platforms even attempted to launch all-to-all trading before

2013, or that the buy-side even had in place the clearing arrangements necessary to support all-

to-all trading before that date.  *Supra* at 7-8, 17.  To the contrary, the complaints make clear that

Tera, Javelin and TrueEx were not ready for operation until 2013 at the earliest.  *Supra* at 17 &

n.34.  Furthermore, the three proposed class representatives have not alleged that *they* were

prepared to engage in all-to-all trading before 2013 or that the types of IRS that *they* traded were

sufficiently liquid to trade on all-to-all platforms.  *See* SCAC ¶¶ 37-39.  Plaintiffs' pre-2013

---

[84]   Indeed, had Congress wished to create an antitrust savings clause that was broader in scope, such as to cover implied or actual conflicts, it knew how to do so.  Title V of Dodd-Frank—insurance reform—contains a savings clause stating that "[n]othing in this subtitle . . . shall be construed to modify, impair, or supersede the application of the antitrust laws."  15 U.S.C. § 8231.  It goes on to say that "[a]ny implied or actual conflict between this subtitle . . . and the antitrust laws shall be resolved in favor of the antitrust laws."  *Id.*  As discussed above, the savings clause at issue here is far narrower.  *See Sebelius v. Cloer*, 133 S. Ct. 1886, 1894 (2013) ("Where Congress includes particular language in one section of a statute but omits it another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

[85]   Dismissal is also required under the Supreme Court's decision in *Trinko*.  There, the Court found that a (broader) savings clause precluded a finding of implied immunity, 540 U.S. at 406, but nevertheless held that the complaint failed to state a claim, noting "the existence of a regulatory structure designed to deter and remedy anticompetitive harm" as a "factor of particular importance."  *Id.* at 412.  The same result is warranted here.

claims should therefore be dismissed for failure to allege injury-in-fact.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (the "irreducible constitutional minimum of standing" requires an "injury in fact"); *Cordes & Co. Fin. Serv., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106-08 (2d Cir. 2007) ("injury-in-fact" is an element of an antitrust claim).

## V.   CLASS PLAINTIFFS' PRE-2012 CLAIMS ARE TIME-BARRED.[86]

A Sherman Act claim is subject to a four-year statute of limitations that runs from the date of injury.  *See* 15 U.S.C. § 15b; *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 519 (S.D.N.Y. 2009).  Because Class Plaintiffs filed their initial complaint on November 25, 2015, claims based on injuries allegedly incurred before November 25, 2011 (hereinafter "pre-2012 claims") are time-barred.[87]

Class Plaintiffs' assertion that the statute of limitations should be equitably tolled due to fraudulent concealment (SCAC ¶ 382) is unavailing.  To plead fraudulent concealment, a plaintiff must allege, with particularity under Rule 9(b), that they "remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations," that this "continuing ignorance was not the result of lack of diligence," and that "the defendant concealed the existence of the antitrust violation."  *Hinds Cnty.*, 620 F. Supp. 2d at 520.  Here, Class Plaintiffs cannot plead those elements because their pre-2012 allegations are drawn from news articles and other published information that was available before 2012.  To the extent that these pre-2012 allegations satisfy *Twombly* (which they do not, for the reasons explained above), they

---

[86]   This section addresses only the putative Class Complaint.  Tera and Javelin do not allege that they were ready for business before September 2013 or assert damages before that date.

[87]   Plaintiffs did not sue HSBC or Morgan Stanley until February 25, 2016, and claims based on alleged injuries incurred before February 25, 2012 are therefore barred as to those Defendants.

are necessarily ripe for dismissal because they demonstrate that Class Plaintiffs were not "ignorant" of their claims or, at the very least, were on inquiry notice before 2012.

Moreover, far from pleading their "diligence" with particularity, Class Plaintiffs fail to plead that they took *any* steps before June 2014 to investigate the wealth of publicly available information cited in their complaint.  Instead, Class Plaintiffs assert *ipse dixit* that they could not have discovered their pre-2012 claims until after "June 2014" (SCAC ¶ 357), without explaining what event took place—or what information was then discovered—that supposedly put them on notice of their claims.  Class Plaintiffs' attempt to plead that Defendants fraudulently concealed facts relevant to their pre-2012 claims is similarly unavailing, as detailed below.  Accordingly, Class Plaintiffs' pre-2012 claims should be dismissed.

### A.    Class Plaintiffs fail to plead "ignorance" of their pre-2012 claims.

Under the complaint's allegations, Class Plaintiffs had notice of their pre-2012 claims and therefore cannot plead the necessary "ignorance."  *See, e.g.*, *131 Maine St. Assocs. v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002) ("[T]he plaintiff must be ignorant of the cause of action.  Knowledge of the cause of action is not necessary.  Notice of a potential claim is all that is necessary. . . ."), *aff'd*, 54 F. App'x 507 (2d Cir. 2002); *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986) (when analyzing fraudulent concealment, "[f]acts that should arouse suspicion . . . are equated with actual knowledge").

### 1.    Class Plaintiffs had actual notice of their pre-2012 claims.

Class Plaintiffs cannot have it both ways.  Lacking direct evidence of conspiracy, Class Plaintiffs base their pre-2012 allegations on circumstantial evidence taken from news articles and other public sources published before November 25, 2011.  If the allegations based on these materials were deemed sufficient to state an antitrust claim (which they are not), then the materials necessarily would have put Class Plaintiffs on notice of their claims.  A plaintiff may

72

not "simultaneously claim that the generalized evidence cited as the basis of its complaint—the vast majority of which involves factual allegations published prior to [the limitations period]—is sufficiently detailed to state a cognizable claim for relief, and that, nevertheless, these facts were insufficiently particular to cause the statute of limitations to run." *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 497 (S.D.N.Y. 2013) (dismissing complaint as time-barred where complaint cited "extensive publicly available information" that allegedly supported plaintiff's claims), *aff'd*, 542 F. App'x 81 (2d Cir. 2013); *see also GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 329 (S.D.N.Y. 2008).

The starting point for Class Plaintiffs' pre-2012 claims is their allegation that there were "no natural or technological reasons why the IRS market did not evolve by 2008, at the latest, to allow the buy side to conduct all-to-all trading of IRS on electronic trading platforms." SCAC ¶ 99. According to the complaint, at that time, "[t]he benefits that all-to-all trading could have brought to the IRS market were *widely recognized by market participants, regulators, and economists*." *Id.* ¶ 87. Class Plaintiffs allege that such benefits were never brought to the IRS market, and that a "voice-based, OTC market" allowed "Dealer Defendants [to] generate[] tremendous profits from their privileged position as dealers." *Id.* ¶¶ 8-9.

The complaint also alleges that, by late 2007, Tradeweb was "planning to introduce electronic all-to-all trading to the IRS market" (SCAC ¶ 111), but failed to do so after several Dealers entered into a well-publicized joint venture with Tradeweb. *See id.* ¶ 118 (citing Tradeweb, *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb* (Oct. 11, 2007) ("[T]he dealers will invest approximately $180 million to purchase a minority stake in TradeWeb's established markets. Separately, Thomson and the dealers will fund additional investment in asset class expansion.")). Similarly, the complaint

urges an inference of conspiracy from the fact that ICAP launched an interdealer trading platform in Europe in 2010, but declined to launch a U.S. trading platform at that time.  SCAC ¶ 168 (citing a 2010 Financial Times article).  The newest iteration of the complaint also asserts that, in the early 2000s, the Dealers used the OTCDerivNet joint venture to take control of the SwapClear clearinghouse and to have "SwapClear adopt various restrictions in its charter and rulebook that effectively limited clearing membership to dealers only."  *Id.* ¶¶ 178-80.[88]  Class Plaintiffs also allege—albeit in a conclusory fashion—that "[b]y 2008 a number of IDBs were well-positioned to allow buy-side entities to trade on all-to-all IRS trading platforms" (*id.* ¶ 157), but that this did not occur (*id.* ¶ 165).

As evidenced by the very articles Class Plaintiffs reference in their complaint, each of these events happened in plain sight.  Class Plaintiffs could just as well have inferred an antitrust conspiracy from these events in 2011 as they did more than four years later when they filed suit.  *See Woori Bank*, 923 F. Supp. 2d at 496 (claims time-barred where "complaint clearly displays that the vast majority of the substantive allegations and supporting evidence it relies upon were available" before limitations period); *id.* (plaintiffs cannot claim that the allegations are "sufficiently detailed to state a cognizable claim for relief and that, nevertheless, these facts were somehow insufficiently particular to cause the statute of limitations to run").

### 2.    Class Plaintiffs were on inquiry notice of their pre-2012 claims.

Even if Class Plaintiffs did not have actual notice of their pre-2012 claims, they surely had enough information to be on inquiry notice.  "[A]ll that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing."

---

[88]    *See also* International Monetary Fund, *supra* note 30, at 40 (July 2011) (cited in SCAC ¶ 179 n.71) (OTCDerivNet is a "consortium of banks" that "provide[d] 100 percent funding for the development of [SwapClear], in return for a profit share and representation in the governance").

*131 Maine St. Assocs.*, 179 F. Supp. 2d at 348; *see also id.* (courts "equat[e] suspicion with knowledge in the context of fraudulent concealment" and "only inquiry notice is necessary"); *In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 6645533, at *3 (E.D. Pa. 2012) ("[I]n pleading fraudulent concealment, plaintiffs must plausibly suggest[] that they did not have knowledge or did not possess any information about the conspiracy that would have given rise to inquiry notice.").

As described above, Class Plaintiffs allege that, no later than 2008, the IRS market should have shifted to all-to-all trading; that dealers had an economic incentive to resist that shift; that after dealers took ownership interests in Tradeweb, it did not launch an all-to-all platform; that it was feasible for buy-side entities to enter the IDB market but they did not; and that dealers owned a stake in SwapClear's clearinghouse and set membership requirements that effectively limited buy-side participation.  Under the logic of Class Plaintiffs' complaint, these allegations should have provided at least a "suspicion" of a claim.

### B.   Class Plaintiffs fail to plead due diligence with particularity.

Class Plaintiffs also fail to plead with particularity that they exercised the requisite due diligence in response to the publicly available information described above.  To invoke fraudulent concealment, plaintiffs must describe "the inquiries, if any, they made, when such inquiries were made, to whom those inquiries were directed, what those inquiries were in regard to, and what response was obtained."  *Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 1990262, at *2 (S.D.N.Y. 2003).

Class Plaintiffs fall far short, offering only boilerplate recitals that they "monitored news reports" and "monitored prices" through electronic databases during the class period (SCAC ¶ 377) and "relied on the advice, monitoring, and diligence of their investment managers."  *Id.* ¶ 380.  Class Plaintiffs tellingly fail to describe any inquiries they or their investment managers

made and "what response was obtained." *Masters*, 2003 WL 1990262, at *2. For example, Class Plaintiffs do not indicate whether they or their investment managers inquired of the Defendants or anyone else (i) why the IRS market[89] had not shifted to all-to-all trading as Class Plaintiffs claim it should have in the absence of collusion; (ii) whether the Dealers were actively resisting such a shift; or (iii) why Tradeweb and ICAP waited until 2013 to launch all-to-all trading.

In short, there is no allegation—concrete or otherwise—that Class Plaintiffs specifically inquired of *anyone* about *any* of the pre-2012 allegations in their complaint based on public sources.[90] *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (upholding dismissal of complaint where plaintiffs "make no allegation of any specific inquiries of Merrill Lynch, let alone detail when such inquiries were made, to whom, regarding what, and with what response"); *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139 at *6 (D. Conn. 2005) ("[B]ecause the plaintiffs have not alleged anything regarding inquiries made into the activities alleged in the complaint or why such inquiries were not made, they have not satisfied their burden of pleading reasonable diligence.").

Finally, Class Plaintiffs provide no specificity regarding how they (supposedly) discovered the alleged pre-2012 conspiracy years later. Class Plaintiffs simply state that they

---

[89]   Although this brief adopts the complaints' use of the phrase "IRS market" (*e.g.*, SCAC ¶ 3; SJTC ¶ 1), the Dealers use that phrase colloquially, and do not admit that Plaintiffs have adequately alleged any relevant market for antitrust purposes.

[90]   Class Plaintiffs allege that "[m]arket participants are well aware that, even if they were to make tentative suggestions that the Dealer Defendants might be engaging in anticompetitive behavior, such suggestions could be met with retaliation." SCAC ¶ 373. This allegation is a makeweight: Class Plaintiffs nowhere claim that they wanted to inquire of any Defendants—or anyone else—regarding any of the pre-2012 allegations, much less that they were deterred in doing so. And, in any event, such allegations would not serve to discharge Class Plaintiffs' duty to promptly investigate, with due diligence, any claims of which they had inquiry notice.

"did not discover and could not have discovered" the alleged conspiracy "until sometime after June 2014, when the Dealer Defendants' campaign to squash SEFs from offering anonymous all-to-all trading to the buy side became apparent."  SCAC ¶ 357.  That is plainly insufficient because "it fails to encompass when and how Plaintiffs ultimately discovered the alleged . . . conspiracy—information that is certainly with[in] Plaintiffs' control.  Without some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy, it is impossible to discern whether Plaintiffs could or should have discovered it within the limitations period."  *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *25 (D.N.J. 2011); *see also Hinds Cnty.*, 620 F. Supp. 2d at 520 (dismissing claim that did not "specify when any Named Plaintiffs or Class members became aware of the antitrust violations").

## C. Class Plaintiffs fail to plead concealment with particularity.

Class Plaintiffs also fail to plead concealment of the alleged conspiracy.  Plaintiffs may plead concealment "by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury" or that the conspiracy was "self-concealing."  *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

Class Plaintiffs' claim of affirmative concealment focuses on a 2007 press release about certain Dealers' acquisition of a stake in Tradeweb.  Class Plaintiffs contend that the Dealers "worked with Tradeweb to misrepresent the true nature of [the Dealer investment] as simply a 'minority' stake."  SCAC ¶ 366.  The text of the press release belies this accusation:  it distinguished between Dealers' "purchase [of] a minority stake in TradeWeb's established markets" and Dealers' "[s]eparate[]," "additional investment in asset class expansion."  *Id.* ¶¶ 118, 120.  It was common market knowledge that IRS was a new (not established) asset class

for Tradeweb, as another Tradeweb press release cited by the complaint makes clear.[91]  At most,

the press release about which Plaintiffs complain was silent as to the size of the Dealers'

investment in "asset class expansion" at Tradeweb, and alleging "[c]oncealment by mere silence

is not enough" to satisfy Rule 9(b)'s particularity requirement.  *Moll v. U.S. Life Title Ins. Co. of

N.Y.*, 700 F. Supp. 1284, 1291 (S.D.N.Y. 1988).

In any event, Class Plaintiffs' assertions of fraudulent concealment are belied by the

public record:  the Dealers' 80 percent investment in Tradeweb New Markets LLC, the entity

that housed Tradeweb's IRS business, was in fact *publicly disclosed* in an October 25, 2007

Thomson Corp. earnings call,[92] an SEC filing made on November 9, 2007,[93] an annual SEC

filing made on April 18, 2008,[94] and in subsequent SEC filings up to and including filings

disclosing that Tradeweb Markets LLC and Tradeweb New Markets LLC had merged in 2010.[95]

*See In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 223 (E.D.N.Y.

2003) (dismissing claims as time-barred where "not only were the material terms of the

---

[91]     *See* Tradeweb, *Citi Takes Equity Stake in Tradeweb* (Apr. 8, 2008), http://www.tradeweb.com/
News/News-Releases/Citi-Takes-Equity-Stake-in-Tradeweb (cited in SCAC ¶ 123 n.41) ("As part of
this agreement, Citi will become a liquidity provider in a  number of *new Tradeweb markets*,
including interest rate swaps."); *see also* Tradeweb Press Release, Tradeweb, *Nine Global Dealers
and Thomson Financial Complete the Formation of Premier Electronic Trading Venture Using
Tradeweb* (Jan. 3, 2008), http://www.tradeweb.com/News/News-Releases/Nine-Global-Dealers-and-
Thomson-Financial-Complete-the-Formation-of-Premier-Electronic-Trading-Venture-Using-
TradeWeb (stating that Tradeweb's "new asset classes" include "derivatives, such as interest rate and
credit default swaps").

[92]     The Thomson Corp. Q3 2007 Earnings Call Transcript (Oct. 25, 2007),
http://seekingalpha.com/article/51485-the-thomson-corp-q3-2007-earnings-call-transcript.

[93]     The Thomson Corp. Form 6-K, Exhibit 99.1, at 19 (Nov. 9, 2007), https://www.sec.gov/
Archives/edgar/data/1075124/000104746907008854/a2180879zex-99_1.htm.

[94]     Thomson Reuters PLC Form 20-F for 2007, at 87 (Apr. 18, 2008), http://services.corporate-
ir.net/SEC.Enhanced/SecCapsule.aspx?c=76540&fid=5561188.

[95]     *See, e.g.*, Thomson Reuters Corp. Form 6-K, at 23 (Nov. 1, 2010), http://services.corporate-
ir.net/SEC.Enhanced/SecCapsule.aspx?c=76540&fid=7191049.

[allegedly anticompetitive] settlement not concealed, defendants affirmatively disclosed these terms to the public" in an SEC filing).

Finally, the complaint's recital that the alleged conspiracy was "[b]y its very nature . . . self-concealing" (SCAC ¶ 361) does not satisfy Rule 9(b). *See Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996) (complaint time-barred where "plaintiffs merely state in a conclusory fashion that the defendants' fraud was self-concealing"). To plead a self-concealing conspiracy, Class Plaintiffs must allege why the absence of all-to-all trading in IRS "would necessarily be assumed" to be "the result of legitimate market forces," such that Class Plaintiffs would not suspect that the absence of all-to-all trading in IRS resulted from anticompetitive conduct. *In re Publ'n Paper*, 2005 WL 2175139, at *4. Class Plaintiffs here allege the opposite: they plead that "[a]bsent a conspiracy . . . [e]volution to all-to-all trading open to the entire market would have been inevitable." SCAC ¶ 342; *see In re Publ'n Paper*, 2005 WL 2175139, at *4 ("[T]he circumstances that are alleged . . . point to the opposite conclusion. The plaintiffs allege that the price increases were not explainable by ordinary market forces.").

## VI.    PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED.

### A.    Tera and Javelin fail to state a Donnelly Act claim.

The Donnelly Act claim—brought only by Tera and Javelin—should be dismissed for the reasons articulated above. "The Donnelly Act is patterned after the Sherman Anti-Trust Act and is generally construed in light of federal precedent." *Great Atl. & Pac. Tea Co. v. Town of E. Hampton*, 997 F. Supp. 340, 352 (E.D.N.Y. 1998). Because Tera and Javelin "simply reallege[] the federal antitrust claim[] under the Donnelly Act," the claim "fails for the same reasons it does under federal law." *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 279 (S.D.N.Y. 2002), *aff'd in part and rev'd in part on other grounds*, 386 F.3d 485 (2d Cir. 2004).

Alternatively, the Donnelly Act does not apply where, as here, "'the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce.'"  *H-Quotient, Inc. v. Knight Trading Grp., Inc.*, 2005 WL 323750, at *4 (S.D.N.Y. 2005) (quoting *Two Queens, Inc. v. Scoza*, 745 N.Y.S.2d 517, 519 (N.Y. App. Div. 2002)).  Tera and Javelin allege that the defendants' conduct "had a substantial effect on *interstate* commerce." SJTC ¶¶ 64, 402.  Their perfunctory allegation that there is a "close nexus" between the alleged conspiracy and "injury to competition in New York," due to the location of some of the parties and the trading of IRS (*see* SJTC ¶ 410) does not change the calculus.  *See, e.g.*, *H-Quotient*, 2005 WL 323750, at *5 (because "[d]efendants are unquestionably engaged in interstate commerce, those who are damaged from an alleged restraint of trade find a remedy in the federal, not the state antitrust laws").

### B.  Tera and Javelin fail to state a tortious interference claim.

Tera and Javelin fail to state a claim for tortious interference with business relations. "This tort is a difficult one to sustain, with requirements more demanding than those for interference with [the] performance of an existing contract."  *PKG Grp., LLC v. Gamma Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006).  Specifically, "the plaintiff must allege: (1) business relations with a third party, (2) the defendant's interference with those business relations, (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means, and (4) injury to the business relationship."  *Nirvana, Inc. v. Nestle Waters N. Am. Inc.*, 123 F. Supp. 3d 357, 379 (N.D.N.Y. 2015).  Tera and Javelin's tortious interference claim should be dismissed for two main reasons.

*First*, Tera and Javelin fail to satisfy their pleading burden with respect to any of the elements of the claim.  Their entire claim consists of three boilerplate sentences (SJTC ¶¶ 414-16) that fail to identify:  (1) the identities of the "customers" or the nature of the "prospective

business relations"; (2) the "acts of Defendants" that constituted interference or which of the

many Defendants interfered with which relationship; (3) any "dishonest, unfair, or improper"

conduct; or (4) facts supporting an inference that Tera and Javelin would have entered into

particular contracts but for any interference. *See Nirvana*, 123 F. Supp. 3d at 379. This is

insufficient even to put Defendants on notice of the basis for this claim, much less to establish a

plausible entitlement to relief. *See, e.g.*, *Commercial Data Servers, Inc. v. Int'l Bus. Mach.

Corp.*, 166 F. Supp. 2d 891, 898 (S.D.N.Y. 2001) ("Plaintiff must specify some particular,

existing relationship through which plaintiff would have done business but for the allegedly

tortious behavior. A general allegation of interference with customers without any sufficiently

particular allegation of interference with a specific contract or business relationship does not

state a claim.").[96]

    *Second*, Tera and Javelin do not adequately allege that Defendants "acted with the sole

purpose of harming the plaintiff or used dishonest, unfair, or improper means." *Nirvana*, 123 F.

Supp. 3d at 379. They identify no "dishonest, unfair, or improper means" other than their claims

that certain conduct violated the antitrust laws. *See id.* Tera and Javelin's failure to plead a

plausible antitrust claim thus forecloses a finding of "dishonest, unfair, or improper means." *See,

e.g.*, *Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp.*, 2013 WL 395096, at *16

(S.D.N.Y. 2013) ("'as a general rule, the defendant's conduct must amount to a crime or an

independent tort'" (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (N.Y. 2004))); *PKG*,

446 F. Supp. 2d at 251 ("In all but the most egregious circumstances, dishonest, unfair, or

---

[96]    *See also Diario El Pais, S.L. v. Nielsen Co.*, 2008 WL 4833012, at *7 (S.D.N.Y. 2008) ("To
render Plaintiffs' tortious interference claim 'plausible,' Plaintiffs must provide some factual
allegations that but-for Defendant's alleged acts, Plaintiffs would have entered into contracts with
specific prospective advertisers"); *Stephens v. Trump Org. LLC*, 2016 WL 4702437, at *4 (E.D.N.Y.
2016) ("[t]he failure to identify a specific business relationship with a third party is fatal").

improper means must amount to misconduct that constitutes either a crime or an independent tort.").

Nor have Tera and Javelin pled that Defendants "acted with the sole purpose of harming" them, as required where a plaintiff has not pled "dishonest, unfair, or improper means." *See, e.g.*, *Carvel*, 3 N.Y.3d at 190.  To the contrary, they allege that the "Dealer Defendants conspired for one simple reason:  to continue to enjoy an extraordinary profit center."  SJTC ¶ 14.  This express allegation that the Dealers acted out of economic self-interest forecloses any assertion that they "acted with the sole purpose of harming the plaintiff" and thus requires dismissal of the tortious interference claim.  *See, e.g.*, *MMC Energy, Inc. v. Miller*, 2009 WL 2981914, at *8 (S.D.N.Y. 2009) (dismissing a tortious interference claim "[b]ecause Plaintiff . . . has conceded that Defendant's actions were taken out of profit motive, rather than maliciousness").[97]

### C.     The complaints fail to state an unjust enrichment claim.

The unjust enrichment claims in both complaints fail for two reasons.  *First*, these claims fail because Plaintiffs' antitrust claims fail.  Plaintiffs fail to allege any facts to support their unjust enrichment claims apart from their flawed antitrust allegations.  An unjust enrichment claim that rests on flawed allegations of illegality "must be dismissed."  *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995); *accord In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752, at *28 (S.D.N.Y. 2015) ("because no antitrust claim survives, the

---

[97]     *See also Chamilia, LLC v. Pandora Jewelry, LLC*, 2007 WL 2781246, at *18 (S.D.N.Y. 2007) ("To meet this requirement, defendant's conduct [must be] motivated solely by malice or to inflict injury by unlawful means, beyond mere self-interest or other economic considerations.  Here, there is not even an allegation that non-economic considerations motivated Defendant's [alleged interference], let alone that they were the sole type of motive."); *Newport Serv. & Leasing, Inc. v. Meadowbrook Distrib. Corp.*, 18 A.D.3d 454, 455 (N.Y. App. Div. 2005) (ruling that defendants were "entitle[d] to judgment as a matter of law" on plaintiff's tortious interference claim because, "to the extent that any of their conduct interfered with the plaintiff's prospective business relationship with the distributors, they were acting to protect [their] economic interests, and not for the sole purpose of harming the plaintiff").

parasitic unjust enrichment claims must be dismissed as well"); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *4 (S.D.N.Y. 2014) (dismissing an unjust enrichment claim because it was "predicated on defendants' alleged violations of antitrust or consumer protection laws . . . which the Court has dismissed"), *aff'd*, 833 F.3d 151 (2d Cir. 2016); *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 424 (E.D.N.Y. 2013) (a plaintiff "cannot recover for unjust enrichment if the underlying basis for the claim is a failed antitrust claim").

*Second*, the complaints fail to plead a cognizable claim of unjust enrichment under New York law because they do not allege that Plaintiffs conferred a benefit upon defendants.  *See, e.g.*, *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 385-86 (S.D.N.Y. 2007) (dismissing unjust enrichment claim for failure to allege conferral of benefit); *see also Icebox-Scoops, Inc. v. Disney Enters., Inc.*, 520 F. App'x 3, 4 (2d Cir. 2013) (affirming dismissal because plaintiff had "not plausibly asserted that it had conferred a benefit to [defendant] that [defendant] unjustly retained").  Here, the complaints simply state the legal conclusion that defendants were "unjustly enriched."  *See, e.g.*, SCAC ¶ 404 ("Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs"); SJTC ¶ 412 (same).  That conclusory allegation is simply not enough.  *See Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *13 (S.D.N.Y. 2014) (conclusory assertions that defendants "financially benefited" and caused plaintiff "to suffer injury" insufficient to satisfy pleading burden); *CourtAlert.com, Inc. v. e-Law, LLC*, 2013 WL 4754819, at *8 (S.D.N.Y. 2013) (dismissing claim where allegation "merely state[d] in a conclusory fashion that [defendant] was enriched"); *Jurgensen v. Felix Storch, Inc.*, 2012 WL 2354247, at *6 (S.D.N.Y. 2012) (dismissing claim where complaint merely presented

"threadbare recitals of the elements"); *Shady Records v. Source Enters., Inc.*, 351 F. Supp. 2d 74, 78 (S.D.N.Y. 2004) (dismissing claim where complaint failed to identify the benefits conferred).

## CONCLUSION

For the foregoing reasons, all claims should be dismissed with prejudice.[98]

---

[98] Defendants reserve their rights to seek arbitration of Plaintiffs' claims pursuant to any applicable agreements or SEF rules, as well as any other applicable rights under such agreements or rules such as shortened limitations periods.

January 20, 2017                    Respectfully submitted,


                                   s/  Robert D. Wick
                                   Robert D. Wick
                                   Andrew D. Lazerow
                                   John S. Playforth
                                   Katharine Mitchell-Tombras
                                   COVINGTON & BURLING LLP
                                   One CityCenter
                                   850 Tenth Street, NW
                                   Washington, DC 20001
                                   Telephone:  (202) 662-6000
                                   Facsimile:  (202) 662-6291
                                   rwick@cov.com
                                   alazerow@cov.com
                                   jplayforth@cov.com
                                   kmitchelltombras@cov.com

                                   *Attorneys for Defendants JPMorgan Chase &
                                   Co.; JPMorgan Chase Bank, N.A.; J.P. Morgan
                                   Securities LLC; and J.P. Morgan Securities plc*

s/  Kenneth A. Gallo (on consent) [99]
Brad S. Karp
Julia Tarver-Mason Wood
William A. Clareman
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
bkarp@paulweiss.com
jwood@paulweiss.com
wclareman@paulweiss.com

Kenneth A. Gallo
Roberto J. Gonzalez
Ravi Romel Sharma
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street NW
Washington, DC 20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
kgallo@paulweiss.com
rgonzalez@paulweiss.com
rsharma@paulweiss.com

*Attorneys for Defendants Citigroup Inc.;
Citibank, N.A.; Citigroup Global Markets Inc.;
and Citigroup Global Markets Limited*

---

[99]  Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's
ECF Rules and Instructions.

s/  Margaret M. Zwisler (on consent)
James E. Brandt
Christopher J. Clark
Lawrence E. Buterman
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
james.brandt@lw.com
chris.clark@lw.com
lawrence.buterman@lw.com

Margaret M. Zwisler
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
margaret.zwisler@lw.com

*Attorneys for Defendants Barclays PLC;*
*Barclays Bank plc; and Barclays Capital Inc.*

s/  Adam S. Hakki (on consent)
Adam S. Hakki
Richard F. Schwed
Keith R. Palfin
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Telephone:  (212) 848-4000
Facsimile:  (646) 848-4000
ahakki@shearman.com
rschwed@shearman.com
kpalfin@shearman.com

*Attorneys for Defendants Bank of America*
*Corporation; Bank of America, N.A.; and*
*Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated*

s/  Marshall H. Fishman (on consent)
Marshall H. Fishman
Elizabeth Zito
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 277-4000
Facsimile:  (212) 277-4001
marshall.fishman@freshfields.com
elizabeth.zito@freshfields.com

*Attorneys for Defendants BNP Paribas, S.A.
and BNP Paribas Securities Corp.*

s/  David G. Januszewski (on consent)
David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420
djanuszewski@cahill.com
hwasher@cahill.com
ekatz@cahill.com
jhall@cahill.com

*Attorneys for Defendants Credit Suisse AG;
Credit Suisse Group AG; Credit Suisse
Securities (USA) LLC; and Credit Suisse
International*

s/  Tracy V. Schaffer (on consent)
Tracy V. Schaffer
Eric P. Stephens
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
tschaffer@jonesday.com
epstephens@jonesday.com

Paula W. Render
JONES DAY
77 West Wacker
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
prender@jonesday.com

*Attorneys for Defendants Deutsche Bank AG
and Deutsche Bank Securities Inc.*

s/  Robert Y. Sperling (on consent)
Robert Y. Sperling
Joseph L. Motto
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Telephone:  (312) 558-7941
Facsimile:  (312) 558-5700
rsperling@winston.com
jmotto@winston.com

Elizabeth P. Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 282-5000
Facsimile:  (202) 282-5100
epapez@winston.com

Richard C. Pepperman II
Mark S. Geiger
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
geigerm@sullcrom.com

*Attorneys for Defendants The Goldman Sachs
Group, Inc.; Goldman, Sachs & Co.; Goldman
Sachs Bank USA; Goldman Sachs Financial
Markets, LP; and Goldman Sachs International*

s/  Andrew S. Marovitz (on consent)
Andrew S. Marovitz
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606-4637
Telephone: (312) 701-7116
Fax: (312) 706-8651
amarovitz@mayerbrown.com

*Attorneys for Defendants HSBC Bank plc;*
*HSBC Bank USA, N.A.; HSBC Securities (USA)*
*Inc.*


s/  Daniel Slifkin (on consent)
Daniel Slifkin
Michael A. Paskin
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
dslifkin@cravath.com
mpaskin@cravath.com

*Attorney for Defendants Morgan Stanley;*
*Morgan Stanley Bank, N.A.; Morgan Stanley &*
*Co. LLC; Morgan Stanley Capital Services*
*LLC; Morgan Stanley Derivative Products Inc.;*
*Morgan Stanley & Co. International plc; and*
*Morgan Stanley Bank International Limited*

s/  Arthur J. Burke (on consent)
Arthur J. Burke
James I. McClammy
Rebecca L. Martin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
arthur.burke@davispolk.com
james.mcclammy@davispolk.com
rebecca.martin@davispolk.com

*Attorneys for Defendants The Royal Bank of
Scotland Group plc; Royal Bank of Scotland
plc; and RBS Securities Inc.*

s/  David C. Bohan (on consent)
David C. Bohan
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:  (312) 902-1061
david.bohan@kattenlaw.com

Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520
dswanson@gibsondunn.com

*Attorneys for Defendants UBS AG and UBS
Securities LLC*