**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: INTEREST RATE SWAPS ANTITRUST LITIGATION<br><br>This Document Relates To:  All Class Actions | No.  16 MD 2704 (PAE) |

**CLASS PLAINTIFFS' CONSOLIDATED OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................8

    A.    The Dealer Defendants Enjoy Massive Profits at the Expense of Investors in a Bifurcated Market ................................................................8

    B.    All-to-All Trading Emerges as a Threat ..............................................10

    C.    The Dealer Defendants Conspired to Block All-to-All Trading.........................10

    D.    ICAP Agreed Not to Open an All-to-All Trading Platform in Exchange for Continued Liquidity from the Dealer Defendants .................................15

    E.    The Dealer Defendants Conspired to Crush the SEFs Offering All-to-All Trading.................................................................................16

    F.    Defendants' Conduct Harmed Investors Through Inflated Bid/Ask Spreads........19

    G.    Defendants Conspired in Secret and Continue to Plot in Private .........................19

ARGUMENT .................................................................................................20

I.     DEFENDANTS DISREGARD THE APPLICABLE LEGAL STANDARDS ...............20

II.    THE COMPLAINT PLEADS A PLAUSIBLE CONSPIRACY CLAIM AGAINST EACH DEFENDANT ................................................................24

    A.    The Complaint Directly Alleges that Defendants Conspired to Prevent the Adoption of All-to-All Trading ..............................................26

    B.    The Complaint Alleges Abundant Specific Facts to Support a Plausible Inference of Conspiracy ..................................................34

         1.    The Complaint Alleges Background Conditions Making a Conspiracy Plausible..................................................................36

         2.    The Complaint Alleges Specific Conduct from Which a Conspiracy May Be Inferred.............................................................37

         3.    The Complaint Alleges Specific Steps Taken by Defendants to Conceal Their Conspiracy.................................................41

    C.    Defendants' Various Criticisms of the Complaint Fail.........................................42

         1.    Defendants Erroneously Assert that All-to-All Trading and Clearing Were Not Feasible Before Dodd-Frank ......................................42

         2.    Defendants Mistakenly Claim the Complaint Must Allege Unanimity ..................................................................47

|  |  | 3. | Defendants' Alternative Explanations Cannot be Credited | 50 |
|  |  | 4. | Defendants' Arguments About Market Bifurcation Fail | 52 |
|  |  | 5. | Defendants' Cases Do Not Support Dismissal | 54 |
|  | D. | The Complaint Adequately Pleads a Claim Against HSBC | | 58 |
|  | E. | The Complaint Adequately Pleads a Claim Against Tradeweb | | 61 |
|  | F. | The Complaint Adequately Pleads a Claim Against ICAP | | 66 |
| III. | | PLAINTIFFS HAVE EVERY RIGHT TO PURSUE THEIR ANTITRUST CLAIMS | | 69 |
|  | A. | Plaintiffs Have Standing to Bring Their Antitrust Claims | | 71 |
|  |  | 1. | Plaintiffs' Injuries Are Direct | 74 |
|  |  | 2. | Plaintiffs Are Naturally Motivated to Enforce the Antitrust Laws | 78 |
|  |  | 3. | Plaintiffs' Injuries Are Not Speculative | 79 |
|  |  | 4. | No Damages Apportionment Issues Exist | 82 |
|  | B. | Dodd-Frank Does Not Impliedly Preclude These Antitrust Claims | | 82 |
|  |  | 1. | Dodd-Frank Expressly Preserves Existing Antitrust Remedies | 83 |
|  |  | 2. | Even Absent the Savings Clause, Implied Preclusion Is Unwarranted | 89 |
| IV. | | PLAINTIFFS CAN RECOVER FOR INJURIES OVER THE ENTIRE CLASS PERIOD | | 94 |
|  | A. | Defendants' Conspiracy Was Concealed from Plaintiffs | | 96 |
|  |  | 1. | The Conspiracy Was Self-Concealing | 96 |
|  |  | 2. | Defendants Affirmatively Concealed Their Conspiracy | 98 |
|  | B. | Plaintiffs Did Not Learn of Defendants' Conspiracy Until 2014 | | 99 |
|  | C. | Plaintiffs Exercised All Necessary Diligence | | 103 |
| V. | | THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT | | 106 |
| | | CONCLUSION | | 107 |

## TABLE OF AUTHORITIES

**Page**

### Cases

*131 Main St. Assocs. v. Manko*,
  179 F. Supp. 2d 339 (S.D.N.Y. 2002)............................................................. 99, 103

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
  181 F.3d 216 (2d Cir. 1999)................................................................................. 57

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016)........................................25, 77-78, 81, 97, 99, 102, 104

*In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum I*"),
  13-MD-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) .............................. 55, 77

*In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum IV*"),
  13-MD-2481 (KBF), 2016 WL 5818585 (S.D.N.Y. Oct. 5, 2016) ...................................... 77

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)........................................................................... passim

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987)......................................................... 36, 37, 58, 61

*Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*,
  398 F.3d 56 (1st Cir. 2005)................................................................................. 76

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................... 20

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"),
  459 U.S. 519 (1983)........................................................................................... 73

*Atucha v. Commodity Exch., Inc.*,
  608 F. Supp. 510 (S.D.N.Y. 1985) ...................................................................... 77

*Barry v. St. Paul Fire & Marine Ins. Co.*,
  555 F.2d 3 (1st Cir. 1977).................................................................................. 96

*Bates v. United States*,
  522 U.S. 23 (1997)............................................................................................. 87

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................... 6, 20, 22, 34

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
  448 F.3d 573 (2d Cir. 2006)............................................................................. 106

*Beverage Corp. v. Honickman*,
  55 F.3d 762 (2d Cir. 1995)................................................................................. 77

*Bigelow v. RKO Radio Pictures*,
 327 U.S. 251 (1946) .................................................................................. 81

*In re Blood Reagents Antitrust Litig.*,
 756 F. Supp. 2d 623 (E.D. Pa. 2010) ........................................................ 48

*Blue Shield of Va. v. McCready*,
 457 U.S. 465 (1982) .............................................. 70, 71, 72, 74, 75, 76, 79

*BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*,
 603 F. App'x 57 (2d Cir. 2015) ....................................................... 103, 104

*In re Brand Name Prescription Drugs Antitrust Litig.*,
 123 F.3d 599 (7th Cir. 1997) ..................................................................... 68

*Brokers' Assistant, Inc. v. Williams Real Estate Co., Inc.*,
 646 F. Supp. 1110 (S.D.N.Y. 1986) ........................................................... 76

*Burtch v. Milberg Factors, Inc.*,
 662 F.3d 212 (3d Cir. 2011) ...................................................................... 56

*Chambers v. Time Warner, Inc.*,
 282 F.3d 147 (2d Cir. 2002) ...................................................................... 22

*Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*,
 605 F. Supp. 2d 870 (W.D. Ky. 2009) ........................................................ 87

*City of Detroit v. Grinnell Corp.*,
 495 F.2d 448 (2d Cir. 1974).................................................................99-100

*In re Commodity Exchange Inc. Gold Futures & Options Trading Litig.*,
 14-MD-2548 (VEC), 2016 WL 5794776 (S.D.N.Y. Oct. 3, 2016) ............... 25, 104

*Concord Assocs., L.P. v. Entm't Props. Trust*,
 817 F.3d 46 (2d Cir. 2016)........................................................................ 20

*Concord Assocs., L.P. v. Entm't Properties Trust*,
 12-cv-1667 (ER), 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) ................... 57

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
 370 U.S. 690 (1962).................................................................................. 42

*In re Credit Default Swaps Antitrust Litig. ("CDS")*,
 13-MD-2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ............... passim

*In re Credit Default Swaps Antitrust Litig.*,
 13-MD-2476 (DLC), 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016).............. 82

*Credit Suisse Securities (USA) LLC v. Billing*,
 551 U.S. 264 (2007)..................................................................... 86, 89, 92

*In re Crude Oil Commodity Futures Litig.*,
 913 F. Supp. 2d 41 (S.D.N.Y. 2012)........................................................... 95

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009)..................................................................................... passim

*DNAML Pty, Ltd. v. Apple Inc.*,
  25 F. Supp. 3d 422 (S.D.N.Y. 2014).................................................................. 73, 75, 78

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 (S.D.N.Y. 2011)..........................................................................77-78

*Disabled in Action of Metro. N.Y. v. Hammons*,
  202 F.3d 110 (2d Cir. 2000).............................................................................................. 88

*In re Domestic Airline Travel Antitrust Litig.*,
  15-MC-1404 (CKK), 2016 WL 6426366 (D.D.C. Oct. 28, 2016) ........................................ 48

*Duplan Corp. v. Deering Milliken Inc.*,
  594 F.2d 979 (4th Cir. 1979) ............................................................................................ 53

*In re Elec. Books Antitrust Litig. ("eBooks")*,
  859 F. Supp. 2d 671 (S.D.N.Y. 2012).......................................................................... passim

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
  588 F.3d 128 (2d Cir. 2009)................................................................................... 89, 91, 92

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)........................................................................................... 56, 61

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
  16-cv-57 (PAE), 2016 WL 3773394 (S.D.N.Y. July 8, 2016) .............................................. 8

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  681 F. Supp. 2d 141 (D. Conn. 2009)............................................................................... 33

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013).........................................................................................35-36

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004)........................................................................................ 36, 41

*In re Foreign Exch. Benchmark Rates Antitrust Litig. ("FX I")*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015).......................................................................25, 26, 56

*In re Foreign Exch. Benchmark Rates Antitrust Litig. ("FX II")*,
  13-cv-7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ............................77-78, 81

*Garber v. Legg Mason, Inc.*,
  347 F. App'x 665 (2d Cir. 2009) ...................................................................................... 22

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
  711 F.3d 68 (2d Cir. 2013)................................................................................................ 74

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016)........................................................................25-26, 63, 66, 67, 72-73

*Global Network Commc'ns, Inc. v. City of N.Y.*,
  458 F.3d 150 (2d Cir. 2006)..................................................................... 22

*Goldberger v. Integrated Res., Inc.*,
  29 F.3d 43 (2d Cir. 2000)..................................................................... 100

*Goldman v. Belden*,
  754 F.2d 1059 (2d Cir. 1985)................................................................. 22

*Gordon v. N.Y. Stock Exch.*,
  422 U.S. 659 (1975)............................................................................... 89

*Grund v. Del. Charter Guar. & Trust Co.*,
  788 F. Supp. 2d 226 (S.D.N.Y. 2011)............................................... 63, 69

*GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*,
  580 F. Supp. 2d 321 (S.D.N.Y. 2008)................................................... 102

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002)................................................................. 36

*Hinds Cnty., v. Wachovia Bank N.A.*,
  700 F. Supp. 2d 378 (S.D.N.Y. 2010)..................................................... 56

*Hinds Cnty. v. Wachovia Bank N.A.*,
  790 F. Supp. 2d 121 (S.D.N.Y. 2011)................................................... 103

*Ill. Brick Co. v. Illinois*,
  431 U.S. 720 (1977)................................................................... 70, 73, 93

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
  146 F.3d 66 (2d Cir. 1998)............................................................... 21, 22

*In re Interest Rate Swaps Antitrust Litig.*,
  16-MD-2704 (PAE), 2016 WL 4131846 (S.D.N.Y. Aug. 3, 2016)...................... 101

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
  768 F. Supp. 2d 961 (N.D. Iowa 2011)................................................... 48

*In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*,
  00-cv-7804 (LMM), 2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) ........... 95, 97, 103

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981)............................................................................... 81

*Javier v. Beck*,
  13-cv-2926 (WHP), 2014 WL 3058456 (S.D.N.Y. July 3, 2014) ................ 62-63, 69

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1984)............................................................................. 103

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959)................................................................................. 5

*Lexington Ins. Co. v. MGA Entm't, Inc.*,
   12-cv-3677 (SAS), 2014 WL 3955205 (S.D.N.Y. Aug. 13, 2014) ....................................... 42

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
   700 F.2d 785 (2d Cir. 1983) ....................................................................................... 76

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   14-MD-2573 (VEC), 2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016) ......................... 25, 95, 102

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ..................................................................................... 8, 42

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
   753 F.3d 395 (2d Cir. 2014) ..................................................................................... 74, 75

*In re Magnesium Oxide Antitrust Litig.*,
   10-cv-5943 (DRD), 2011 WL 5008090 (D. N.J. Oct. 20, 2011) .......................................... 106

*Masters v. Wilhelmina Model Agency, Inc.*,
   02-cv-4911 (HB), 2003 WL 1990262 (S.D.N.Y. Apr. 29, 2003) ................................. 105, 106

*Mayor & City Council of Balt. v. Citigroup Inc.*,
   709 F.3d 129 (2d Cir. 2013) ..................................................................................20-21, 54-55

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*,
   62 F.3d 967 (7th Cir. 1995) ....................................................................................... 69

*Merced Irrigation Dist. v. Barclays Bank PLC*,
   15-cv-4878 (VM), 2016 WL 6820738 (S.D.N.Y. Nov. 10, 2016) ....................................... 77

*Merced Irrigation Dist. v. Barclays Bank PLC*,
   165 F. Supp. 3d 122 (S.D.N.Y. 2016) ....................................................................... 101, 103

*Meredith Corp. v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015) ....................................................................... 93

*In re Merrill Lynch Ltd. P'ship Litig.*,
   154 F.3d 56 (2d Cir. 1998) ....................................................................................... 105

*In re Musical Instruments & Equipment Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................................................................... 55

*In re Natural Gas Commodity Litig.*,
   337 F. Supp. 2d 498 (S.D.N.Y. 2004) ....................................................................... 97

*New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*,
   651 F. Supp. 802 (S.D.N.Y. 1986) ........................................................................... 76

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ..................................................................................... 60

*New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
   323 F. Supp. 2d 559 (S.D.N.Y. 2004) ....................................................................... 93, 94

*In re Nine W. Shoes Antitrust Litig.*,
   80 F. Supp. 2d 181 (S.D.N.Y. 2000)................................................................... 97

*In re OSB Antitrust Litig.*,
   06-cv-826 (GD), 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007)...........................56-57

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
   12-cv-2837 (KBF), 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) ......................... 57

*In re Optical Disk Drive Antitrust Litig.*,
   10-MD-2143 (RS), 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011)......................... 48

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
   541 F. Supp. 2d 487 (D. Conn. 2008)................................................................ 61

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
   467 F.3d 283 (2d Cir. 2006)...................................................................76-77, 81

*Pearl v. City of Long Beach*,
   296 F.3d 76 (2d Cir. 2002)................................................................................ 100

*Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*,
   512 F. Supp. 711 (S.D.N.Y. 1981) ..................................................................... 91

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   08-cv-42 (JG), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011)..................... 56, 96, 103

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   08-cv-42 (JG), 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013)............................. 78

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012)................................................................................ 42

*In re Publ'n Paper Antitrust Litig.*,
   04-MD-1631 (SRU), 2005 WL 2175139 (D. Conn. Sept. 7, 2005) ....................... 97, 103, 106

*Reading Indus. Inc. v. Kennecott Copper Corp.*,
   631 F.2d 10 (2d Cir. 1980)................................................................................ 81

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979)......................................................................................... 93

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007).............................................................................. 21

*S.E.C. v. Wyly*,
   788 F. Supp. 2d 92 (S.D.N.Y. 2011)................................................................. 104

*Sahu v. Union Carbide Corp.*,
   548 F.3d 59 (2d Cir. 2008)................................................................................ 22

*Schenker AG v. Societe Air France*,
   102 F. Supp. 3d 418 (E.D.N.Y. 2015) ............................................................... 104

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ............................................................. 26, 35, 37, 48

*Sebelius v. Cloer*,
   133 S. Ct. 1886 (2013) ................................................................................... 87

*Sira v. Morton*,
   380 F.3d 57 (2d Cir. 2004) ............................................................................. 21

*Sky Angel v. Nat'l Cable Satellite Corp.*,
   947 F. Supp. 2d 88 (D.D.C. 2013) ................................................................... 59

*Silver v. N.Y. Stock Exch.*,
   373 U.S. 341(1963) ....................................................................................... 90

*Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.*,
   10-cv-3751 (DLC), 2010 WL 5392927 (S.D.N.Y. Dec. 29, 2010) ....................... 77

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008) ........................................................................... 22

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) ............................................................. 1, 24, 34, 41

*State of N.Y. v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988) ............................................................. 95, 96, 97, 99

*Straxx v. Commodity Exch., Inc.*,
   524 F. Supp. 936 (S.D.N.Y. 1981) ................................................................... 91

*Strobl v. N.Y. Mercantile Exch.*,
   768 F.2d 22 (2d Cir. 1985) ..................................................................... 87, 89-90

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
   71 F.3d 119 (4th Cir. 1995) ........................................................................... 95

*In re Term Commodities Cotton Futures Litig.*,
   12-cv-5126 (ALC), 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ....................... 26

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ........................................................................... 36

*United States v. Am. Express Co.*,
   838 F.3d 179 (2d Cir. 2016) ....................................................................... 64-65

*United States v. Apple Inc.*,
   952 F. Supp. 2d 638 (S.D.N.Y. 2013) ......................................................... 41, 42

*United States Secs. & Exch. Comm'n v. Power*,
   525 F. Supp. 2d 415 (S.D.N.Y. 2007) ............................................................. 105

*United States v. Paramount Pictures*,
   334 U.S. 131 (1948) ....................................................................................... 68

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)............................................................................... 53

*United States v. Wilkinson*,
    754 F.2d 1427 (2d Cir. 1985)............................................................... 58

*Veltri v. Bldg. Serv. 32B-J Pension Fund*,
    393 F.3d 318 (2d Cir. 2004).................................................................. 95

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)...........................................................83, 84, 86, 93-94

*In re Vitamins Antitrust Litig.*,
    MISC 99-197 (TFH), 2000 WL 1475705 (D.D.C. May 9, 2000).......................... 99

*In re W. States Wholesale Natural Gas Antitrust Litig.*,
    661 F. Supp. 2d 1172 (D. Nev. 2009).................................................... 90

*Wacker v. JP Morgan Chase & Co.*,
    16-2482-CV, 2017 WL 442366 (2d Cir. Feb. 1, 2017) ......................20-21, 24

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
    648 F.3d 452 (6th Cir. 2011) ............................................................... 50

*Weis-Buy Farms, Inc. v. Quality Sales LLC*,
    11-cv-2011 (WIG), 2012 WL 2237166 (D. Conn. June 15, 2012).......................... 63

*Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015)..................................................... 22

*Williams v. Citigroup, Inc.*,
    08-cv-9208 (LAP), 2009 WL 3682536 (S.D.N.Y. Nov. 2, 2009) .......................... 56

*Woelke & Romero Framing, Inc. v. N.L.R.B.*,
    456 U.S. 645 (1982)........................................................................... 88

*Woori Bank v. Merrill Lynch*,
    542 F. App'x 81 (2d Cir. 2013) .......................................................... 102

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)...................................................... 61

## Statutory Authorities

7 U.S.C. § 6s ............................................................................................. 85

7 U.S.C. § 7 ............................................................................................... 85

7 U.S.C. § 7a-1 .......................................................................................... 85

7 U.S.C. § 7b-3 .......................................................................................... 85

7 U.S.C. § 19 ............................................................................................. 91

7 U.S.C. § 24a .................................................................................................... 85

7 U.S.C. § 64s .................................................................................................... 86

12 U.S.C. § 1843 ................................................................................................ 84

12 U.S.C. § 5303 ....................................................................................... 7, 83, 85

12 U.S.C. § 5363 ................................................................................................ 84

12 U.S.C. § 5390 ................................................................................................ 84

15 U.S.C. § 78c-4 ............................................................................................... 85

15 U.S.C. § 78m ................................................................................................. 85

15 U.S.C. § 78o-10 ............................................................................................. 85

47 U.S.C. § 152 .................................................................................................. 84

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376-2223 (2010) ....................................... 4, 82

## Rules and Regulations

17 C.F.R. § 242.203(b)(1) ................................................................................... 92

Fed. R. Civ. P. 8(a)(2) ........................................................................................ 20

Requirements for Swap Execution Facilities,
   78 Fed. Reg. 33476, 33477 (June 14, 2013) .................................................. 91

## Treatises

7 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2007) ................. 33, 72, 75, 82

7 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2003) .................................... 41

## Legislative Materials

156 Cong. Rec. E1347-01, E1347, 2010 WL 2788137 ................................... 88, 89, 91

156 Cong. Rec. S5902-01, 55927, 2010 WL 2788026 .......................................... 88

S. Rep. No. 111-176 (2010) ................................................................................. 87

## Other Authorities

*Standing to Sue for Treble Damages Under Section 4 of the Clayton Act,*
   64 Colum. L. Rev. 570 (1964) ........................................................................ 77

Plaintiffs respectfully submit this consolidated brief in opposition to the motions to dismiss filed by (i) the "Dealer Defendants,"[1] (ii) HSBC, (iii) ICAP, and (iv) Tradeweb. *See* Dkt. Nos. 159, 163, 165, 169, 189.

## PRELIMINARY STATEMENT

This case presents a textbook example of an antitrust conspiracy designed to block competition and keep prices high. Although "detailed factual allegations" are not required at the pleading stage, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010), the Complaint here marshals extraordinarily detailed factual allegations demonstrating that Defendants conspired to exclude competition in the interest rate swaps ("IRS") market, costing investors billions of dollars.

Specifically, Defendants conspired to block "all-to-all" trading by IRS investors. As the Complaint explains, all-to-all trading is used in many financial markets to allow investors to trade anonymously with each other and other trading partners in real time on electronic trading platforms and with live, executable pricing.[2] All-to-all trading provides transparency for investors and expands the number and type of counterparties with which they can trade. Consequently, it yields more price competition and better prices, which is precisely why so many financial products—including equities, corporate bonds, and various futures contracts—are traded today on all-to-all trading platforms.

But the Dealer Defendants did not want all-to-all trading to blossom in the IRS market. They viewed all-to-all trading as a threat to the good thing they had going as the "dealers" in the

---

[1]  The Dealer Defendants are Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS. The full names of these entities, and their related affiliates, are provided in the Complaint. The Dealer Defendants filed a joint brief, while HSBC also filed a supplemental brief.

[2]  *See* Second Consolidated Amended Class Action Complaint ¶10 (December 9, 2016) (Dkt. No. 142) ("Complaint"). Citations to paragraphs of the Complaint appear as "(¶_.)"

existing over-the-counter ("OTC") market.  As dealers in that market, the Dealer Defendants were involved in every trade (investors had no choice but to trade through them) and faced minimal price competition.  The Dealer Defendants thus made huge profits in the OTC market from their ability to buy low and sell high on every IRS transaction.  The difference between the price at which dealers purchase IRS from investors (the "bid") and the price at which they sell the same IRS to investors (the "ask") is called the "bid/ask spread."  In the opaque OTC market they controlled, the Dealer Defendants kept these spreads artificially wide.

The Dealer Defendants knew they could not keep charging these wide spreads to IRS investors if all-to-all trading developed.  They knew that under all-to-all trading, they would have to compete for trades with non-dealers, and investors would enjoy more price competition and transparency.  They feared "disintermediation" (their term for losing their privileged status as dealers) and the resulting hit to their bottom lines.  And that is why when the Dealer Defendants saw the IRS market began to evolve toward all-to-all trading in 2007, they scrambled to figure out how they could *jointly* halt that development in its tracks.  Their solution was to form a classic cartel.

The cartel's strategy was hatched by the Dealer Defendants' secretive "strategic investment" groups—groups whose mission was to protect the "dealer community" from threats to their dominance of OTC markets.  They called one of the strategies they developed a "dealer consortium" strategy, which involved the Dealer Defendants *jointly* taking over any company that threatened their market dominance and shutting it down.  In late 2007, the Dealer Defendants saw a threat emerging from Defendant Tradeweb, which was planning to introduce a trading platform for IRS that would allow investors to trade all-to-all and outside of the Dealer Defendants' control.  The Dealer Defendants decided to employ their "dealer consortium"

strategy to take over Tradeweb's IRS business to neutralize the threat. The Complaint lays out exactly how this happened, who was involved, and the dates of key events.

The Dealer Defendants gave their plan the codename "Project Fusion," a fitting name for the plan that brought them together as a cartel. As the Complaint painstakingly details, Project Fusion involved both a plan for the Dealer Defendants' takeover of Tradeweb's IRS business and a complicated scheme for *hiding* that takeover from public scrutiny. Rather than acknowledging their takeover of Tradeweb's IRS business, the Dealer Defendants falsely represented that they were making only a "minority" investment in Tradeweb to support its IRS platform. The Dealer Defendants maintained that deception to the present day, until it was first exposed by the Complaint in this action.[3]

After they took control of Tradeweb's IRS business in October 2007, the Dealer Defendants quickly shut down the new platform. Tradeweb agreed to shelve its plans to roll out an all-to-all trading platform for IRS (and has abided by that agreement to the present day). The principal architects of the conspiracy then installed themselves on the boards of the two new Tradeweb companies they had created as part of their scheme and used those positions as cover for conspiratorial meetings in the years that followed. At those meetings, and others specifically identified in the Complaint, the Dealer Defendants plotted to prevent any other all-to-all threats from emerging. Their goal was to squash all-to-all trading wherever it might emerge. Defendant ICAP, an interdealer broker, joined the conspiracy in 2009, when it agreed with the Dealer Defendants to prevent investors from accessing its own all-to-all IRS trading platform (and ICAP, too, has abided by that agreement to the present day).

---

[3] In their motion to dismiss briefs, Defendants try in vain to claim they were truthful about their takeover of Tradeweb's IRS business. These efforts fail. *See* Statement of Facts Parts B and C, Sections II.A-B *infra*.

In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376-2223 (2010) ("Dodd-Frank"), one purpose of which was to promote competition in swaps markets.  The Act mandates that certain IRS be centrally cleared and traded on exchanges or swap execution facilities ("SEFs").  Several entities launched SEFs to satisfy investors' longstanding demand for all-to-all trading, including TeraExchange, Javelin, and TrueEx.  These SEFs offered all-to-all protocols to meet the tremendous investor demand for more competitive, and less expensive, IRS trading platforms.

Dodd-Frank could have been a turning point toward a more competitive IRS market.  But as the Complaint details, the Dealer Defendants shut down every avenue by which SEFs tried to bring more competitive offerings to investors.  The Dealer Defendants crushed TeraExchange and Javelin, and greatly crippled TrueEx.  TeraExchange and Javelin have filed their own antitrust complaint seeking to recover the profits they lost from the devastating effects of the Dealer Defendants' boycott.  Their allegations provide additional detail about (and corroboration of) Defendants' unlawful conduct.

In squashing the SEFs, the Dealer Defendants engaged in increasingly brazen behavior that finally brought their collusion out of the shadows.  Multiple Dealer Defendant personnel, for example, openly stated that the dealers viewed TeraExchange as a "Trojan Horse" they were determined to stop.  And they increasingly provided nearly identical excuses to the SEFs for why they were withholding support.  In June of 2014, after TeraExchange was finally able to overcome enough of the roadblocks put in its way by the Dealer Defendants to make a single trade on its platform, *four different Dealer Defendants* called TeraExchange on the same day with the identical pretextual threat that they would not use its platform until they "audited" its rulebook.  Such conduct finally exposed the Dealer Defendants' coordination.

4

Plaintiffs in this matter, investors who overpaid the Dealer Defendants on IRS transactions as a direct result of the conspiracy, conducted an investigation through counsel which yielded the class action Complaint now before the Court—a Complaint that, for the first time, exposes Defendants' cartel and how it operated.

This is not the first time dominant players in a market conspired to prevent rivals from entering with a new or disruptive offering.  For decades, courts have held that "group boycotts" and "concerted refusals to deal" are *per se* violations of the antitrust laws because they have no redeeming qualities.[4]  Nor is it the first time such a boycott occurred in financial markets. Indeed, many of the Defendants recently faced governmental investigations and class actions alleging they conspired to boycott entrants that threatened their position as dealers in the credit default swaps ("CDS") market.  In fact, the conspiracy in the CDS market, which resulted in settlements of nearly $1.9 billion for CDS investors, involved some of the very same personnel from the same Defendant banks using similar tactics to block competition as those alleged here.[5] If anything is unique about this case, it is the extraordinary level of detail the Complaint provides, before any discovery has taken place, about how the conspiracy was formed and operated.

---

[4]  *See, e.g.*, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959) ("Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category.").

[5]  The *CDS* complaint, for example, identified Dexter Senft as one of the conspirators involved in organizing the boycott of new CDS trading platforms.  The Complaint here alleges that Mr. Senft was also one of the key architects of the boycott strategy concerning the IRS market.  *Compare Second Consolidated Amended Class Action Complaint*, *In re Credit Default Swaps Antitrust Litig.*, 13-MD-2476, Dkt. No. 286 (S.D.N.Y. Apr. 14, 2014) ("CDS Compl.") ¶¶64, 163 (identifying Senft's participation) *with* Compl. ¶¶112-14, 129, 135, 164 & n.58, 182, 247, 264-65, 296, 370 & n.189 (documenting Senft's role).  Brad Levy of Goldman Sachs and William Hartnett of Citi also played a prominent role in the boycotts in both matters.  *Compare* CDS Compl. ¶¶64, 163 (identifying participation of both Levy and Harnett in conspiracy), *with* Compl. ¶¶112-14, 133, 223, 296, 298 (identifying Levy's participation in conspiracy), *and* Compl. ¶¶104, 183, 223 (identifying Hartnett's participation in conspiracy).

Defendants' motions to dismiss lack merit.  The poverty of their arguments is revealed by their blatant disregard of the Complaint's allegations in favor of their own counter-statement of facts, even though it is axiomatic that the Complaint's allegations must prevail at this stage. Moreover, at every step, their arguments are rejected by the overwhelming weight of legal authority, including a wealth of Supreme Court and Second Circuit precedent.  Indeed, Judge Cote's recent decision in *In re Credit Default Swaps Antitrust Litigation* ("*CDS*"), 13-MD-2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014), applied this very precedent to reject what were effectively the same arguments.  To summarize:

*Plausibility.*  Defendants' lead argument is that the Complaint is "implausible" under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  But the Complaint in this case could hardly be more different from *Twombly*, a case where the complaint contained *no facts* about how the conspiracy was formed or operated and instead relied solely on an *inference* of collusion arising from the defendants' parallel *inaction*.  Here, the Complaint directly alleges that Defendants met and conspired, and it provides a compelling factual chronology of how and why the conspiracy happened, when and where conspiratorial meetings occurred, who was involved, what Defendants agreed to do, and the specific concerted actions they took.  Defendants' various arguments that the conspiracy is implausible fail to credit these factual allegations and cannot be reconciled with governing law.  The separate arguments of HSBC, Tradeweb, and ICAP lack merit for the same reasons.  The Complaint clearly alleges sufficient conduct by each to show that they joined and assisted the conspiracy.  *See* Sections II.B-F *infra*.

*Standing.*  The Dealer Defendants argue that Plaintiffs lack standing to bring antitrust claims because their injuries are too "indirect" and "remote."  But Plaintiffs and the class are the very IRS consumers who paid more to the Dealer Defendants on their IRS transactions as a

direct result of the conspiracy—a conspiracy whose very objective was to prevent Plaintiffs and the class from trading IRS in a competitive market.  There could hardly be a clearer case for antitrust standing.  Indeed, direct-purchaser consumers like Plaintiffs are the *preferred* entities to vindicate Congress' goals in providing a private right of action under the antitrust laws.  *See* Section III.A *infra*.

*Implied Preclusion.*  Defendants argue that Plaintiffs' conspiracy claim is impliedly precluded by Dodd-Frank.  But as the Act's full title reflects, Dodd-Frank was intended to *reform* Wall Street and to *protect consumers*, not to shield banks from antitrust liability when they secretly conspire to overcharge investors.  Indeed, anticipating the very misuse of the Act Defendants attempt here, Congress expressly rejected any suggestion that Dodd-Frank could be invoked to such effect, by including a broadly-worded antitrust savings clause:  "Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."  12 U.S.C. § 5303.  The *CDS* court relied on this clause to reject the defendants' identical argument in that case.  *See* Section III.B *infra*.

*Statute of Limitations.*  The Dealer Defendants argue that Plaintiffs' claims based on injuries incurred before November 25, 2011 (*i.e.*, four years prior to the filing of the first class action complaint) are time-barred.  But, as in *CDS*, Plaintiffs may recover for injuries going back to the beginning of the conspiracy since the statute of limitations was tolled while Defendants concealed their collusion.  As the Complaint alleges in great detail, prior to Defendants' overt actions in 2014 to block the SEFs, no one knew of the conspiracy's existence, because Defendants conceived it in secret and kept it hidden.  Plaintiffs have adequately pled all of the

requirements for tolling at this stage, and any factual disputes about these allegations cannot be resolved on a motion to dismiss.  *See* Section IV *infra*.

     *Unjust Enrichment*.  Finally, for the same reasons as set forth above, Plaintiffs have also properly alleged a claim for unjust enrichment.  *See* Section V *infra*.

**STATEMENT OF FACTS**

     The following facts, drawn from the Complaint, must be accepted at this stage.  On a Rule 12(b)(6) motion to dismiss, a court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in Plaintiffs' favor."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 169 (2d Cir. 2015); *accord Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 16-cv-57 (PAE), 2016 WL 3773394, at *3 (S.D.N.Y. July 8, 2016).

### A.    The Dealer Defendants Enjoy Massive Profits at the Expense of Investors in a Bifurcated Market

     An IRS is a financial instrument used by investors primarily to hedge interest rate exposure or speculate on interest rate changes.  (¶¶68-70.)  The parties to an IRS exchange cash flows on a specific amount of money, making periodic payments to one another for a fixed period of time.  (¶68.)  Historically, IRS have been traded OTC, meaning trades took place through market-making dealer banks, *i.e.*, the Dealer Defendants.  (¶¶73, 76.)

     To buy or sell an IRS in the OTC market, investors or "end users," known collectively as the "buy side," had to call a dealer on the telephone to obtain a "bid" price, at which the dealer would purchase an IRS, or an "ask" price, at which the dealer would sell an IRS.  (¶¶74-76.)  Dealers keep their ask prices higher than their bid prices, collecting as profit the bid/ask spread.  The wider the spread, the more the dealer earns and the more the trade costs the investor.  (*Id.*)

8

Trading in the OTC market mainly took place over the telephone, with investors forced to rely on dealers for real-time price information and trading liquidity.  (¶¶76-77.)  An investor could rarely call more than one or two dealers at a time, and because the prices provided by the banks were executable only for the duration of the call, there was little price transparency for investors and little price competition between dealers.  (¶¶77-78.)  Capitalizing on this opacity and lack of competition, dealers extracted wide bid/ask spreads from, and enjoyed tremendous profits at the expense of, investors.  (¶¶9, 78.)

By contrast, dealers transacted with each other on sophisticated trading platforms, operated by interdealer brokers ("IDBs"), in a separate dealer-only market.  (¶80.)  On these platforms, a dealer could trade with any other dealer, and had access to all of the prices available in the market.  (¶84.)  Dealers enjoyed price transparency and competition (and tighter bid/ask spreads) in the interdealer market, particularly as compared to that available to retail investors. (¶80.)

By the mid-2000s, IRS trading volumes had skyrocketed, with the outstanding notional value of IRS climbing to approximately $230 trillion by 2006.  (¶¶71-72.)  The market had also adopted the ISDA Master Agreement which standardized the material terms of most IRS trades. (¶71.)  Central clearing was introduced as well.  (¶¶90-92.)[6]  These changes meant the IRS market was primed to evolve away from the dealer-centric OTC model, as numerous other financial markets had done before it.  (¶¶321-22, 340-47.)

---

[6]  Central clearing, which has been used in a variety of financial markets for over a century, uses a clearinghouse on every transaction to reduce counterparty default risk.  The clearinghouse steps into the middle of every trade, serving as the counterparty to both buyer and seller, turning the original transaction into two separate trades.  (¶¶91-96.)  Central clearing of investor IRS trades was feasible by, at the latest, the early 2000s.  (¶93.)

### B.      All-to-All Trading Emerges as a Threat

By 2007, the IRS market was ready to move to electronic all-to-all trading, where buy-side entities could trade with one another as well as with dealers.  Investors were clamoring for all-to-all trading, seeking the attendant price transparency, efficiency, and competition (and thus tighter bid/ask spreads).  (¶¶87, 99.)  There were no market-based or technological reasons why IRS could not move to all-to-all trading.  (¶88.)  As noted, the Dealer Defendants were already enjoying all-to-all trading on IDB platforms.  (¶¶84-85.)

In late 2007, recognizing the market was ready for change, Tradeweb planned to meet investors' demand for an all-to-all IRS trading platform.  (¶111.)  The Dealer Defendants saw Tradeweb's plan as a threat to their collective dominance of the IRS market.  (¶112.)  They knew such a platform would attract significant trading volumes, thereby bringing price transparency and competition to the market.  (¶203.)  More importantly, they recognized all-to-all trading would liberate end users from their dependence on dealers as market makers; in the Dealer Defendants' own words, all-to-all trading would "disintermediate" them, freeing investors from the Dealer Defendants' stranglehold.  (¶¶87, 102.)  Thus, such a platform would not only imperil their privileged status as the primary market makers for IRS, but also the supracompetitive bid/ask spreads they extracted from investors as a result of the OTC market structure.  (¶203.)  Several of the Dealer Defendants' own studies concluded as much.  (¶¶332-38.)

### C.      The Dealer Defendants Conspired to Block All-to-All Trading

To neutralize this threat, the Dealer Defendants entered into a conspiracy to freeze the existing two-tiered IRS market.  They employed a so-called "dealer consortium" strategy that was developed by a secretive Principal Strategic Investments Group ("PSI") at Goldman Sachs. The PSI Group developed this strategy as a way for the dealers *jointly* to prevent OTC financial

markets from developing in ways that would hurt their collective interests as the so-called "dealer community." (¶102.)

Goldman Sachs' PSI Group worked with similar groups at the other Dealer Defendants. Very little has ever been publicly disclosed about these groups, because the Dealer Defendants hid them from scrutiny. These groups were secretly tasked with coordinating strategy with the other Dealer Defendants to control market evolution for their collective benefit. (¶¶106-08.) The spotlight shown on these groups by this and the *CDS* case have recently led to their personnel admitting, for example, that they had jointly exercised "*too much control*" over financial markets like IRS, such that "[w]hen change happened," it did so only with their "blessing." (¶¶109-10.)

Brad Levy from Goldman Sachs' PSI Group worked with two of his counterparts— Stephen Wolff of Deutsche Bank and Dexter Senft of Lehman Brothers (later of Barclays and then Morgan Stanley)—to form a dealer consortium to block any and all initiatives in the IRS market that would impact the dealers' bottom line. (¶112.) Together, these three recruited the other Dealer Defendants into the fold. (¶114.) The Dealer Defendants organized their scheme through secret face-to-face meetings, as well as telephonic and electronic communications in late 2007. (¶108.) They codenamed their plan to form a consortium to seize control of Tradeweb "Project Fusion." (¶114.) The plan included both seizing control of Tradeweb's IRS business and deceiving the public about the transaction. (¶¶100-42.)

On October 1 and 2, 2007, the Dealer Defendants and Tradeweb privately formed two new LLCs. (¶116.) They installed Tradeweb's *IRS business* in an entity called Tradeweb NewMarkets LLC, of which the Dealer Defendants took a controlling 80% share. At the same time, they took a minority stake in the *other* newly-created entity (*i.e.*, the one that did not have

the IRS business), which they then held out as the public face of the deal.  Knowing that their joint seizure of Tradeweb's IRS business could draw scrutiny, the Dealer Defendants concealed the takeover by issuing press releases characterizing the banks' investments as nothing more than the purchase of a "minority" stake in Tradeweb, never mentioning they had taken a controlling share in the entity they set up to house the IRS business.  (¶¶115-23.)  In fact, the Dealer Defendants' joint assumption of control over Tradeweb's IRS business was first publicly disclosed by Plaintiffs' Complaint.[7]

The Dealer Defendants cemented their control of Tradeweb by filling the boards of directors of *both* newly-created entities (the one that had the IRS business and the one that did not) with the Dealer Defendants' own personnel—many of which were members of their strategic investment groups or heads of their IRS trading desks.  (¶¶126-38.)  As the Complaint notes, some Dealer Defendants installed the *same person* on both boards, often the head of IRS trading, further demonstrating that their creation of two supposedly separate companies was a sham designed to hide the true nature of the transaction.  (¶130 n.44.)  The Dealer Defendants then killed Tradeweb's plans for an all-to-all trading platform.  (¶125.)  Tradeweb agreed to abandon the plans and to help maintain the bifurcated market by allowing investors to trade only on its OTC platform.  (¶¶144-49.)

The Dealer Defendants used the two newly created Tradeweb boards of directors to plot the next steps of their conspiracy.  (¶126.)  Their scheme was orchestrated through weekly face-to-face and telephonic Tradeweb board meetings, as well as through informal meetings and communications, over the entirety of the Class Period.  (¶¶138-41.)  The Dealer Defendants also planned and coordinated their actions through their control of the boards of directors of other

---

[7]  As explained below, Defendants wrongly claim that *non-conspirator* Thomson Reuters disclosed the relevant facts in its SEC filings.  *See* Section II.A *infra*.

market infrastructure corporations and associations, including the International Swaps and

Derivatives Association ("ISDA"), the Futures Industry Association ("FIA"), and OTCDerivNet.

(¶¶152-53, 182-88.)  Many of the same bank personnel held seats on more than one of these

boards at the same time, allowing them to meet in multiple venues and to exercise coordinated

control over multiple aspects of market infrastructure to better effectuate their conspiracy.

(¶182.)  The heads of the Dealer Defendants' IRS trading desks also regularly communicated

with each other by email and Bloomberg messages.  (¶158.)  From 2013 to 2015, these IRS

trading heads met in New York City on a monthly basis at meetings hosted by Tradition, an IDB.

(¶204.)  They used these meetings to coordinate their opposition to the SEFs.  (*Id.*)

The Dealer Defendants plotted to perpetuate the bifurcated market, restricting the buy

side to trading environments that largely replicated the OTC market, with investors still trading

exclusively with dealers.  (¶¶125, 141.)  This plot ensured the Dealer Defendants would remain

the primary market makers for IRS, allowing them to continue extracting supracompetitive

bid/ask spreads from investors.  (¶¶126, 141.)

The Dealer Defendants used various coercive tools to implement their conspiracy.  To

police market bifurcation, the Dealer Defendants mandated that trading platforms employ a

practice known as "name give-up," which prevents anonymous trading.  (¶¶292-93.)  This

reporting requirement allows dealers to discover any investor trading on a "dealer-only"

platform, such as those operated by the IDBs.  (¶¶293-94.)  Investors want anonymous trading to

avoid such possible detection.  (¶308.)  The Dealer Defendants punished any platform that

resisted using name give-up.  (¶¶86, 297.)

The Dealer Defendants jointly refused to use any trading platform that did not abide by

their dictates, thereby starving such platforms of the trading liquidity needed to survive.  (¶¶160,

202.)  The Dealer Defendants also "threaten[ed] to withdraw liquidity from any trading platform that admits buy-side firms onto its [order book]," a punishment known as the "penalty box." (¶160.)  They also threatened investors who broke their rules with the penalty box.  (¶¶163-64.)

The primary IDBs for IRS—BGC, GFI, ICAP, Tradition, and Tullett Prebon—wanted to open their all-to-all trading platforms to buy-side investors to earn commissions on the additional trade volumes.  (¶159.)  But the Dealer Defendants prevented the IDBs from doing so, collectively threatening any IDB that opened its platforms to investors with the penalty box. (¶160.)  When one IDB, GFI, attempted to offer anonymous trading in 2009 and again in 2014, which would have enabled investors to trade on its platform without being discovered, the Dealer Defendants threatened it with a collective boycott, causing it to reverse course.  (¶¶161-62.)  As a result, IDBs have not opened their platforms to buy-side investors.  (¶165.)  IDBs have maintained name give-up, effectively making it impossible for an investor to access the platform without detection.  (¶¶293, 309.)  And they prevent investors from even attempting to trade on those platforms.  (¶¶165, 294.)

The Dealer Defendants also plotted to block investors from clearing IRS, long before clearing was mandated by Dodd-Frank.  (¶¶174-90.)  Certain of the Dealer Defendants took control of dealer-only SwapClear, founded in 1999, through a special vehicle they created for the collusion, called OTCDerivNet.  (¶¶176-80.)  Once they had control of SwapClear, they made it prohibitively expensive and impossible for the buy side to use it.  (¶180.)  By the mid-2000s, as the Dealer Defendants became concerned about the growth of electronic trading of IRS, they installed many of the same personnel they had installed on the two new Tradeweb boards on the board of OTCDerivNet, which they then used as a vehicle to conspire.  (¶¶181-82.)[8]  From 2008

---

[8]  JP Morgan and HSBC joined OTCDerivNet in 2009.  (¶177.)

through 2013, they specifically discussed how the Dealer Defendants could jointly prevent or delay the buy side's ability to clear IRS trades.  (¶183.)  And they conspired to extinguish a specific threat from the Chicago Mercantile Exchange ("CME"), which, in 2008, began offering buy-side IRS clearing through its Swapstream/CME Cleared Swaps/Clearing360 product.  (¶¶184-88.)  The Dealer Defendants collectivity boycotted the Swapstream offering, depriving it of the liquidity it needed to survive.  (¶¶187-88.)

The Dealer Defendants continued to use their control of central clearing to prevent investors from accessing all-to-all trading after the clearing of IRS became mandatory with the 2010 passage of Dodd-Frank.  (¶191.)  Because clearing centralizes all counterparty default risk with the clearinghouse, Dodd-Frank required that futures commission merchants ("FCM") serve as intermediaries between investors and the clearinghouse.  (¶96.)  Each FCM sets credit limits for its clients and posts collateral to the clearinghouse on behalf of the client, thereby assuring the clearinghouse that its clients' obligations will be met throughout the life of each transaction.  (*Id.*)  As the Dealer Defendants operate the primary FCMs in the market, they are the gatekeepers to clearing.  (¶191.)

In furtherance of the conspiracy, the Dealer Defendants agreed to withhold clearing services from any investor or second-tier dealer seeking to trade on an all-to-all anonymous platform, clearing only those trades coming from dealer-to-client request-for-quote ("RFQ") platforms.  (¶¶194-97.)  The Dealer Defendants' stranglehold on clearing made it effectively impossible for investors to execute trades on all-to-all platforms.

D.    **ICAP Agreed Not to Open an All-to-All Trading Platform in Exchange for Continued Liquidity from the Dealer Defendants**

In 2009, ICAP joined Defendants' conspiracy, agreeing not to open its all-to-all trading platform, i-Swap, in the United States, in exchange for the Dealer Defendants' continued

provision of liquidity to ICAP's IDB platforms.  (¶¶166, 168-69.)  In April of that year, the

Dealer Defendants moved most of their interdealer mortgage bond trading onto a new dealer-

controlled platform called Dealerweb, effectively eliminating ICAP's business in the sector.

(¶¶167-68.)  Fearing that the Dealer Defendants would do the same in the IRS space—and thus

starve ICAP of critical trading volume—ICAP threatened to open an anonymous all-to-all

trading platform (i-Swap) in the United States.  (¶168.)

      ICAP and the Dealer Defendants negotiated a truce in the spring and summer of 2009:

ICAP would not bring i-Swap to the U.S. market in exchange for Dealerweb not entering the IRS

market (¶169), a détente that continues today.  When ICAP eventually brought i-Swap to the

U.S. market in February 2013, it limited the platform to dealer-only trading.  (¶¶171-72.)  The

Dealer Defendants have kept up their end of the bargain, trading only minimal volumes on

Dealerweb's IRS platform (which it did eventually open) and directing much of their interdealer

trading to ICAP's platforms.  (¶173.)

### E.     The Dealer Defendants Conspired to Crush the SEFs Offering All-to-All Trading

      With the passage of Dodd-Frank, Congress mandated that certain IRS be centrally

cleared and traded on exchanges or electronic SEFs to make the IRS market more competitive.

(¶202.)  The Dealer Defendants, however, conspired to destroy or neutralize all three SEFs—

TeraExchange, Javelin, and TrueEX—that offered anonymous all-to-all platforms to investors.

(¶208.)  These platforms had sophisticated trading technology, facilitated centralized clearing,

cleared regulatory hurdles, and attracted massive investor support.  (*Id*.)

      Defendants crippled and gutted these platforms through coordinated attacks, utilizing

many of the tactics they previously employed against Tradeweb and ICAP.  (¶208.)  Only

TrueEX's dealer-to-client platform has been allowed to survive, and only because it does not

threaten the bifurcated market structure defended by Defendants.  (*Id.*)  The Dealer Defendants coordinated this response through meetings at the aforementioned forums, including the monthly meetings held in New York City from 2013 to 2015, as well as through regular communications between members of their strategic investment groups.  (¶¶203-05.)

In 2011, TeraExchange launched an anonymous RFQ platform and an order book platform, both of which could be used for all-to-all trading.  (¶¶212-19.)  TeraExchange spent millions of dollars developing the platforms' state-of-the-art technology.  (¶212.)  On the strength of its offerings, TeraExchange garnered robust support from investors and non-traditional liquidity providers, which were eager to access the price transparency, competition, and tight bid/ask spreads associated with all-to-all trading.  (¶¶213-16, 220.)  To the Dealer Defendants, however, TeraExchange was a "Trojan Horse"—it would pull them into competition with non-dealers for IRS trading, thereby disrupting their status as the dominant IRS market makers.  (¶217.)

The Dealer Defendants first tried their "dealer consortium" strategy, claiming they wanted to "invest" in TeraExchange while secretly planning to take over its platforms and neutralize them as a threat (just as they had done with Tradeweb in 2007).  (¶221.)  Members of the Dealer Defendants' strategic investment groups, including Brad Levy of Goldman Sachs, ambushed TeraExchange personnel with unsolicited offers to "invest" in the platforms.  (¶223.)  When TeraExchange rebuffed the Dealer Defendants' advances, they moved to a full-frontal assault, implementing a collective boycott and jointly refusing to trade on TeraExchange's platforms, starving them of critical liquidity.  (¶224.)

The Dealer Defendants' FCMs also refused to clear investor trades executed on TeraExchange's platforms.  (¶¶201, 225-28)  This effectively made it impossible for investors to

utilize the all-to-all platforms.  (¶236.)  When two investors did manage to execute a trade on TeraExchange's order book, BNPP (the FCM for both) immediately alerted the other Dealer Defendants, which collectively threatened to pull banking services if the investors continued to use the platform.  (¶¶234, 236.)

The Dealer Defendants also orchestrated the demise of Javelin.  Like TeraExchange, Javelin developed state-of-the-art anonymous RFQ and order-book trading platforms, both of which allowed all-to-all trading.  (¶245.)  Javelin garnered significant support from second-tier dealers and investors, which recognized that its platforms would bring transparency and competition to the market, leading to tighter bid/ask spreads.  (¶¶248, 251, 267.)

As with TeraExchange, the Dealer Defendants saw Javelin as a threat to the bifurcated IRS market.  (¶¶247-48.)  They boycotted Javelin's platforms, refusing to provide them with critical trading liquidity, despite Javelin's efforts to recruit the banks to the platforms.  (¶¶247, 249.)  The Dealer Defendants did little to hide their refusal to support Javelin's all-to-all trading protocols, telling one Javelin employee to "look for a new job" and telling another he would "never work" on Wall Street again.  (¶¶249, 270.)  The Dealer Defendants also cut off investors' ability to trade on Javelin by refusing to clear trades executed on its platforms.  (¶252.)  Some Dealer Defendants directly pressured their buy-side clients not to trade on Javelin's platforms.  (¶¶264-66.)  Facing these obstacles and threats, investors abandoned the platforms.  (¶269.)

TrueEX's efforts to bring an anonymous all-to-all order book to market met a similar fate.  (¶279.)  TrueEX's order book offered sophisticated all-to-all trading technology and enjoyed significant investor support.  (¶¶280-81.)  But the Dealer Defendants collectively boycotted TrueEX's order book and effectively shut it down.  (¶¶282-83.)  The Dealer

Defendants allow TrueEX's *RFQ* platform to persist only because it is not anonymous and only because it is limited to dealer-to-client trading, and so does not challenge the status quo.  (¶284.)

The Dealer Defendants' attacks decimated the SEFs' all-to-all trading efforts, leaving investors shut out of all-to-all electronic trading.  (¶209.)  As Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel, explained, the result is that there remains "a two-tier market today on the S[EF]s—dealer-to-dealer and dealer-to-client" and "[i]t is not truly an all-to-all market."  (*Id.*)

### F.    Defendants' Conduct Harmed Investors Through Inflated Bid/Ask Spreads

Defendants' conspiracy harmed Plaintiffs and the class by depriving them of more competitive trading options and forcing them to pay inflated bid/ask spreads on every IRS transaction.  Absent Defendants' conspiracy, the market would have widely adopted all-to-all trading (¶¶329-35), which would have brought increased transparency, efficiency, and competition, leading to reduced bid/ask spreads (¶¶336-38).  The Complaint's allegations regarding the effects all-to-all trading would have on spreads paid by investors reflect an academic consensus, are confirmed by the analyses of several of the Dealer Defendants themselves, and are firmly grounded in empirical evidence.  (¶¶320-39.)

### G.    Defendants Conspired in Secret and Continue to Plot in Private

Defendants conceived and conducted their conspiracy behind closed doors.  Defendants knew they risked serious legal and financial repercussions if their collusion was exposed.  The tactics Defendants used included:  misleading public statements regarding their takeover of Tradeweb (¶¶115-42, 366-69); shadowy "strategic investment" groups that worked in concert to protect a "community" of horizontal competitors (¶¶5, 106-09); a smokescreen of boards and committees that lent a veneer of legitimacy to meetings where anticompetitive conduct was planned (¶¶17, 126-42, 152-57, 182-83, 363); private coordination among the Dealer

19

Defendants' FCMs (¶¶198-201); and misdirection in public statements about practices in and possibilities for the IRS market (¶¶370-72).

The Dealer Defendants are *still* operating under an agreement to work together to shield their conduct from scrutiny. As recently as May 2016, a "secret society" comprised of their top lawyers convened at a Versailles luxury hotel to discuss, among other things, imposing joint restraints on their settlement of litigation. (¶¶383-84.) Consistent with their agreement at that meeting, leaked by an insider who presumably was disturbed by what occurred, the Dealer Defendants have maintained their closed ranks through the filing of their motions to dismiss in this case—motions that, ironically, argue that it is implausible that they would have ever secretly met and conspired.

## ARGUMENT

## I.   DEFENDANTS DISREGARD THE APPLICABLE LEGAL STANDARDS

Rule 8 provides that a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation mark omitted); *accord Twombly*, 550 U.S. at 570. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"'[T]here is no heightened pleading standard in antitrust cases.'" *Wacker v. JP Morgan Chase & Co.*, 16-2482-CV, 2017 WL 442366, at *2 (2d Cir. Feb. 1, 2017) (quoting *Concord Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 52 (2d Cir. 2016)). Rather, "[a]t the pleading stage, Plaintiffs . . . need only 'raise a reasonable expectation that discovery will reveal evidence

of illegality.'"  *Id.* (quoting *Mayor & City Council of Balt. v. Citigroup Inc.*, 709 F.3d 129, 135 (2d Cir. 2013)).

Disregarding these fundamental principles, Defendants mischaracterize,[9] ignore, and directly contradict the Complaint's factual allegations in an effort to construct a self-serving counter-narrative.  For example, the Dealer Defendants' so-called "background statement" at pages 6-13 of their brief offers their own competing factual narrative that directly contradicts the Complaint's factual allegations, draws inferences in Defendants' favor, and relies on extrinsic materials in a manner that is clearly impermissible at the pleading stage.

Contrary to Defendants' approach, it is well settled that a "[c]ourt accepts as true for purposes of the motions to dismiss only those factual allegations that actually appear in the Complaint."  *In re Elec. Books Antitrust Litig.* ("*eBooks*"), 859 F. Supp. 2d 671, 686 (S.D.N.Y. 2012) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).  Courts will not "take judicial notice of the complete contents of articles cited in the Complaint," nor will they "draw inferences against the plaintiffs from those facts that *are* in the Complaint."  *Id.*  *Cf. Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint.").

While courts may under some limited circumstances take "judicial notice" of extrinsic materials, Defendants stretch this practice well beyond its limits.  Specifically, they disregard the

---

[9]   Defendants' mischaracterization of the Complaint starts on the first page of their brief, where they assert this case alleges only a "boycott [of] Tera, Javelin, and . . . TrueEx."  (Dealer Br. at 1.)  As discussed above, the Complaint expressly alleges that, in addition to those three SEFs, Defendants blocked other entities from offering all-to-all trading to investors, including Tradeweb, ICAP, and numerous other IDBs including GFI, going back to 2007, and that investors would have benefited from all-to-all trading well before the SEFs emerged. Defendants' "injury-in-fact" argument (Dealer Br. at 70) fails for this reason alone.

settled rule that a court can take notice only of "*the fact of*" public documents and filings, such as *the existence of* a CFTC rule or comments submitted on the rule.  On a motion to dismiss, such materials may *not* be introduced for "the truth of the matters asserted."  *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (applying rule to litigation); *accord Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (also to "press coverage, prior lawsuits, or regulatory filings").  This limit exists because factual matters asserted in such public documents do "not meet either test of indisputability contained in Rule 201(b):  they are not usually common knowledge, nor are they derived from an unimpeachable source."  *Int'l Star*, 146 F.3d at 70; *see also Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006) (holding that taking judicial notice of extrinsic material was improper where the court "relied on those materials to make a finding of fact that *controverted* the plaintiff's own factual assertions").[10]

Defendants' misuse of the press reports and other materials cited in the Complaint highlights the reasons why such materials may not be introduced for the truth of their contents.  Press articles often report differing viewpoints.  Yet Defendants routinely offer one statement

---

[10]    *Garber v. Legg Mason, Inc.*, cited by the Dealer Defendants (Dealer Br. at 6-7 n.4), acknowledges this rule, and holds courts may notice "the *fact* that press coverage . . . or regulatory filings contained certain information, without regard to the truth of their contents." 347 F. App'x 665, 669 (2d Cir. 2009).  Likewise, in *Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*, this Court recognized that only matters "not subject to reasonable dispute because [they] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" are susceptible to judicial notice.  127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).  Defendants similarly abuse the rule that courts may consider a document that is "integral to the complaint" because the complaint "relies heavily upon its terms and effect."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  None of the documents in question meets that standard:  "limited quotation does not constitute incorporation by reference," *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985), and quotations "used by the plaintiffs largely for the purpose of indicating that evidence existed to support the complaint's assertions," and thereby to "establish that the complaint's factual assertions are plausible," are "not extrinsic evidence incorporated into the complaint," *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 544).

plucked from an article as the truth, even when the same article contains other statements that directly contradict it.

For example, the Dealer Defendants quote an article in *Risk* for the proposition that "RFQ trading has proven much more popular than all-to-all order-book trading because . . . 'pricing is perceived to be better using that method.'"  (Dealer Br. at 12-13.)  But the central thrust of the article is that "buy-side firms argued name give-up is simply a way of ensuring [order books] on broker-run Sefs remain dealer-only"—just as the Complaint alleges.  (*Id.* Ex. 3 at 2.)  The snippet quoted by the Dealer Defendants is simply the opinion of one person included as a *counterpoint* to investment managers at Citadel and Eaton Vance who stated that name give-up discourages investors from trading on SEFs.  (*Id.* at 2-3.)  Yet Defendants improperly urge the Court to adopt that one snippet as the truth.[11]

All of Defendants' arguments based upon improper use of these materials should be disregarded.[12]  When the Complaint's factual allegations are credited, read in context, and all inferences drawn in Plaintiffs' favor, the Complaint easily states a claim against each Defendant.

---

[11]   Defendants routinely portray quotes as establishing a fact when contrary perspectives are cited in the same article.  *Compare, e.g.*, Dealer Br. at 13 n.28 (citing Dealer Br., Ex. 4 and quoting without attribution the COO of Bloomberg arguing clients "get arguably better pricing" with name give-up) *with* Dealer Br., Ex. 4 at 1 (quoting a UBS officer saying clients are "sitting on the sidelines because [SEF order books] still maintain post-trade order give-up").  The Dealer Defendants characterize a news article as "refuting" Plaintiffs' allegations when in fact it simply reports the *Dealer Defendants' own* pretextual explanations for punitive clearing price hikes.  *Compare* Dealer Br. at 36-37 *with* Dealer Br., Ex. 19.  And they misrepresent a joint letter from the largest players in the derivatives industry as a "buy-side plea."  (Dealer Br. at 7-8 & n.10 (citing a joint letter from the FIA, ISDA, and the Securities Industry and Financial Markets Association ("SIFMA")).)

[12]   Defendants' improper extrinsic material, drawn from nearly sixty sources, falls into three categories:  (1) wholly extrinsic material not included, cited, or referred to in the Complaint, and not otherwise subject to judicial notice; (2) public records offered *not* for the fact that they exist, but for the truth of the matters asserted in them; and (3) material cited or referenced in, but not integral to, the Complaint.  **Appendix A**, attached hereto, identifies why each of these documents should be excluded from this Court's consideration.

## II.    THE COMPLAINT PLEADS A PLAUSIBLE CONSPIRACY CLAIM AGAINST EACH DEFENDANT

The Complaint states a facially plausible claim that Defendants participated in a conspiracy to block all-to-all trading.  *See Wacker*, 2017 WL 442366, at *2 (2d Cir. Feb. 1, 2017) ("A plaintiff need only allege enough facts to raise a right to relief above the speculative level, and state a claim to relief that is plausible on its face." (internal quotation marks omitted)). Indeed, while antitrust conspiracies "are rarely evidenced by explicit agreements," *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012), Plaintiffs here have uncovered an avalanche of facts that show an actual agreement to restrain trade.

Defendants' motion is broadly premised on the assertion that Plaintiffs "face an enormous challenge" because it is presumptively implausible that large Wall Street banks would have engaged in a massive anticompetitive scheme to the detriment of investors.  (Dealer Br. at 1.)  This argument suggests a deep unwillingness of these banks to acknowledge what the rest of the world now knows.  In reality, *each* of these banks has been implicated in numerous anticompetitive schemes, in multiple financial markets, during the exact period of time covered by the Complaint.  As the Complaint notes, "collusion was rampant at these Wall Street banks," which "lacked meaningful safeguards or oversight to prevent collusion."  (¶21.)  To the contrary, they "had a pervasive culture of pursuing short-term profits at any cost" (*id.*)—a culture that, far too often, led them to collude with each other to put their mutual interests over the interests of their customers.

Defendants also claim that the Complaint's conspiracy allegations are not sufficiently specific.  In fact, although "a complaint . . . does not need detailed factual allegations" at the pleading stage, *Starr*, 592 F.3d at 321 (2d Cir. 2010), this Complaint's factual allegations are extraordinarily detailed.  The Complaint does not, contrary to Defendants' arguments, merely

make conclusory allegations that some vague agreement may have existed.[13]  Instead, the

Complaint specifically alleges that the Dealer Defendants *actually agreed*—beginning at least

with "Project Fusion"—to work together to prevent IRS investors from trading all-to-all.  The

Complaint also amply alleges sufficient facts to infer such a conspiracy.  Defendants' alleged

conduct, taking place in concert over the course of nearly a decade, readily permits an inference

that it was undertaken pursuant to a clandestine agreement to suppress competition and to inflate

profits for the IRS-dealer cartel.

Indeed, the factual allegations here are even more extensive than those offered at the

pleading stage in numerous other financial collusion cases in which motions to dismiss were

denied.[14]  As was true when the Second Circuit recently upheld a claim that many of these same

---

[13]  Defendants' strategy is, in substantial part, to call any allegations that implicate them in illicit conduct "conclusory" and urge the Court to disregard them.  The Second Circuit has squarely rejected this approach.  *See Anderson News*, 680 F.3d at 189 (holding "the district court erred in characterizing the [complaint's] factual allegations as conclusory and in refusing to accept as true the reasonable inferences that could be drawn from those allegations").

[14]  *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) (holding plaintiffs plausibly stated a claim that twenty-three banks (including nine of the Dealer Defendants) and several financial services corporations conspired to fix the London Interbank Offered Rate ("LIBOR") benchmark rate); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016) (largely denying defendants' motion to dismiss antitrust claims against fourteen banks (including the Dealer Defendants) and ICAP alleging they colluded to rig a benchmark interest rate incorporated into a broad range of financial derivatives); *In re Commodity Exchange Inc. Gold Futures & Options Trading Litig.*, 14-MD-2548 (VEC), 2016 WL 5794776 (S.D.N.Y. Oct. 3, 2016) (largely denying defendants' motion to dismiss antitrust claims against six banks (including four Dealer Defendants) and a financial services provider alleging a conspiracy to manipulate and suppress gold prices); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 14-MD-2573 (VEC), 2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016) (largely denying defendants' motion to dismiss antitrust claims against four banks (including three of the Dealer Defendants) alleging a conspiracy to manipulate and suppress silver prices); *In re Foreign Exch. Benchmark Rates Antitrust Litig. ("FX I")*, 74 F. Supp. 3d 581, 590 (S.D.N.Y. 2015) (largely denying defendants' motion to dismiss antitrust claims against the twelve Dealer Defendants alleging they conspired to manipulate benchmark rates in the foreign exchange market); *CDS*, 2014 WL 4379112 (largely denying motion to dismiss complaint alleging that the Dealer Defendants and two financial services companies colluded to prevent the emergence of exchange-trading platforms for CDS).

banks conspired to fix the LIBOR, a benchmark rate often used in connection with IRS:  "[T]his is not" a "[c]lose case" at the pleading stage.  *Gelboim*, 823 F.3d at 781.

### A.     The Complaint Directly Alleges that Defendants Conspired to Prevent the Adoption of All-to-All Trading

The Complaint states an antitrust claim, first and foremost, because it directly alleges that Defendants *actually agreed* to prevent adoption of all-to-all trading and thus to suppress competition and inflate their own profits.  Such allegations—even when they involve significantly less detail than is offered in the Complaint—are routinely held to satisfy the pleading threshold.

In *Anderson News*, for example, the Second Circuit held the plaintiff plausibly alleged an "actual agreement" by providing the "various dates" on which the defendants "met or communicated" to "plan[] a concerted boycott" along with other details.  680 F.3d at 187.  In *eBooks*, the plaintiff stated an actual agreement by "describ[ing] specific conversations" in which the defendants agreed to "adopt a joint strategy."  859 F. Supp. 2d at 682.  In *CDS*, the Court cited *Anderson News* in upholding a conspiracy claim that set forth the "who, when, and where" of the agreement.  2014 WL 4379112, at *10.  In *FX I*, the court held the complaint adequately alleged an agreement where it specified which of the defendants' personnel entered into the agreement, the modes of communication, and their subject matter.  74 F. Supp. 3d at 591.[15]

The Complaint here is replete with similar facts.  The Complaint alleges that Defendants' conspiracy originated from the Dealer Defendants' "strategic investment groups," secretive groups which exist to "coordinate with their competitors to control market structures" and to

---

[15]   *See also SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412, 433 (4th Cir. 2015) ("[Plaintiff's] complaint alleges an actual agreement to boycott in detail and does not rely, as in *Twombly,* on parallel conduct alone."); *In re Term Commodities Cotton Futures Litig.*, 12-cv-5126 (ALC), 2013 WL 9815198, at *21 (S.D.N.Y. Dec. 20, 2013) ("A plausible suggestion of agreement can be derived from specific allegations of actual agreement among defendants.").

protect the interests of the "dealer community" as a whole.  (¶¶102, 104-05.)  Each of the

Defendants either maintained such a group or "conducted similar strategic activities through their

trading businesses."  (¶106.)  The Complaint identifies the groups' leaders by name.  (¶¶102,

104-05.)  The Complaint further explains that Goldman Sachs' PSI Group, in particular, came up

with a "dealer consortium" strategy—their words—by which the dealers would work together

*jointly* to eliminate threats in financial markets in which they participated.  (¶102.)

These groups put this strategy into action in the IRS market when, in 2007, they learned

that Tradeweb "was planning to introduce electronic all-to-all trading to the IRS market."

(¶111.)  Because this development threatened the status quo in which IRS were traded OTC,

generating massive profits for dealers, the Dealer Defendants colluded to maintain their position

as market makers.  (¶¶102, 112-14.)  Brad Levy (Goldman Sachs), Stephen Wolff (Deutsche

Bank), and Dexter Senft (Lehman Brothers) hatched the plan for the consortium, codenamed it

"Project Fusion," and recruited the other Dealer Defendants to join through secret meetings with

their counterparts in the fall of 2007.  (¶¶102, 108, 112-14.)

As the Complaint alleges, one of the Project Fusion consortium's first acts was to

(secretly) acquire joint control of Tradeweb's IRS business for the purpose of shutting down its

plans to introduce a buy-side-friendly platform, and for the purpose of using that joint control to

coordinate their activities in the market.  (¶¶116-21.)  The Dealer Defendants specifically

"agreed . . . that Tradeweb would not move forward with an all-to-all IRS trading platform and

that they would not support other trading platforms that threatened to move the market toward

all-to-all trading," including by withholding liquidity from Tradeweb's competitors.  (¶125.)

The existence of this illicit agreement is confirmed by the Dealer Defendants'

extraordinary efforts as part of Project Fusion to conceal their takeover of Tradeweb's IRS

business from the public.  While proclaiming publicly that they were merely taking a "*minority*" stake in "Tradeweb" generally, and that the purpose was to invest in IRS trading, the Complaint alleges that, in fact, the Dealer Defendants took an *80% controlling stake* in Tradeweb's IRS business.  (¶116.)  They did this through unusually complex maneuvers that were designed to cover their tracks.

Specifically, on October 1 and 2, 2007, the Dealer Defendants and Tradeweb created two new Tradeweb entities:  the first ("Tradeweb Markets") was intended to be the public face of the deal; the second ("Tradeweb NewMarkets") was created to house Tradeweb's IRS business while remaining in the shadows.  (¶¶116-17.)  The Dealer Defendants paid $180 million to make a *minority* investment in Tradeweb Markets and focused on that (largely innocuous) transaction in their press releases.  (¶118.)  That was merely a cover, however, for their real objective:  to assume *ownership control* over Tradeweb NewMarkets, the entity that actually mattered.[16]  They accomplished this by paying $280 million to jointly acquire an 80% stake in this new entity.  (¶120.)

The Dealer Defendants and Tradeweb issued press releases about the deal, which mentioned *only the Dealer Defendants' minority investment in the entity that did not actually own the IRS business*.  (¶¶118-21, 123-24.)  Their releases never mentioned that the Dealer Defendants paid $280 million to take *control* of Tradeweb's IRS business by purchasing an 80% ownership stake in Tradeweb NewMarkets.  Nor did the releases mention that this new entity was set up to house Tradeweb's IRS business.  (¶¶118-24.)  In fact, when the Dealer Defendants cagily acknowledge in their *brief* that "Tradeweb New Markets LLC [was] the entity that housed

---

[16]   As the Complaint alleges, the "central purpose" for the creation of Tradeweb NewMarkets was "to give the Dealer Defendants control over IRS trading at Tradeweb."  (¶116.)

Tradeweb's IRS business" (Dealer Br. at 78), it marks the *first time* they publicly admitted this fact.[17]  And they did so only after the Complaint brought this fact to light.

Try as they might, Defendants cannot explain away their deception.  They argue that their press releases were "clear" about their assumption of control over Tradeweb's IRS business because the releases stated:  "Separately, Thomson and the dealers will fund additional investment in asset class expansion."  (*Id.* at 73.)  They suggest that this single oblique statement, amidst a flood of deceptive ones, made everything clear because it was "common market knowledge that IRS was a new (not established) asset class for Tradeweb."  (*Id.* at 77-78.)  There are a number of problems with this argument.

For one, Defendants' dubious assertion about what is "common market knowledge" cannot be credited at the pleading stage, especially because it contradicts the Complaint.[18]  For another, even if this assertion were credited, it would hardly make a cryptic reference to the Dealer Defendants "fund[ing] additional investment in asset class expansion" say what it simply does not say:  that the Dealer Defendants *jointly took control* over Tradeweb's IRS business.

Defendants also claim a later-issued press release about Citi joining the consortium "makes clear" that the Dealer Defendants jointly took control of Tradeweb's IRS business.  (*Id.* at 78.)  But the Citi release does nothing of the sort.  Rather, as the Complaint explains, it perpetuated the deceit by referring to Citi "acquiring a *minority* stake" in Tradeweb, while saying

---

[17]   Indeed, the Dealer Defendants appear to have now admitted a key fact about their conspiracy that they had previously hidden from the public:  that in 2007, they jointly created a new Tradeweb entity designed to house Tradeweb's IRS business so they could take control over that entity and the future of Tradeweb's IRS business.

[18]   The Complaint alleges Tradeweb was in the IRS market well before 2007.  (¶¶100-01 (Tradeweb "developed a dealer-to-client RFQ platform for IRS" before 2007).)  Tradeweb's own website dates its introduction of IRS to *2005*:  http://www.tradeweb.com/About-Us/History/ ("2005:  [Tradeweb] Adds Interest Rate Swaps, CDS Indices and Repo marketplaces").

*nothing about the controlling stake* taken by the Dealer Defendants in the entity they created to house IRS.  (¶123 (emphasis added).)[19]

The Dealer Defendants next claim that their deception was mitigated by statements made by *non-conspirator* Thomson Reuters ("Thomson"), a Canadian information company, in Form 20-F SEC filings, used to register the securities of a foreign company trading on U.S. exchanges. But Thomson's filings did not disclose that the Dealer Defendants jointly took control of Tradeweb's IRS business either.[20]  Thus, even if an IRS investor had stumbled across Thomson's 20-Fs, which investors had no reason to review (¶122 n.40), and even if the investor scoured hundreds of pages to find the few sentences about the transaction, the investor *still* would not have learned that Tradeweb NewMarkets was set up to house Tradeweb's IRS business or that the Dealer Defendants now controlled the future of Tradeweb's IRS platform.  Besides, even if the Thomson SEC filings had disclosed all of the relevant facts (which they did not), that would hardly exonerate *the Dealer Defendants' own* deliberately deceptive statements about the transaction in their press releases.

---

[19]   Defendants also cite another Tradeweb press release not referenced in the Complaint. (Dealer Br. at 78 n.91.)  But this press release, once again, discloses only their $180 million purchase of a 15% minority stake, which it falsely links to IRS, without saying a word about the Dealer Defendants' *$280 million* purchase of an *80% stake* in the entity that actually housed IRS.

[20]   Defendants conspicuously fail to quote any language from the Thomson SEC filings they cite in footnotes 93 to 95 of their brief.  Contrary to Defendants' assertions, *none* of the cited Thomson SEC filings stated that Tradeweb's IRS business was given to Tradeweb NewMarkets as part of Project Fusion.  Those SEC filings do not appear to say anything about IRS at all.  At most, they cryptically stated:  "Additionally, Thomson and the dealers will fund additional investment in asset class expansion through a new entity, TradeWeb New Markets." The Thomson Corp. Form 6-K, Ex. 99.1, at 19 (Nov. 9, 2007), https://www.sec.gov/ Archives/edgar/data/1075124/000104746907008895/a2180879zex-99_1.htm.  Nor would IRS investors have learned that the Dealer Defendants had seized control of Tradeweb's IRS business to shut down the planned platform if they happened to listen to the Thomson earnings call from October 25, 2007 (which investors had no reason to listen to).  (Dealer Br. at 78 n.92.)

Indeed, as the Complaint alleges, not a single news publication reported that the Dealer Defendants jointly assumed control of Tradeweb's IRS business in 2007.  Publications like the *New York Times* and the *Wall Street Journal* fell right into Defendants' trap.  (¶122.)  The Complaint in this case provided the first public disclosure of what Project Fusion really was:  the Dealer Defendants' joint assumption of control over Tradeweb's IRS business, so they could neutralize the threat it posed to their market dominance.  These allegations alone suffice to plead an actual unlawful agreement.

Defendants try to recast their involvement in Project Fusion as each of them unilaterally pursuing an attractive "investment opportunity."  (Dealer Br. at 16, 25.)  But the Complaint alleges that Project Fusion was a *joint* effort of the Dealer Defendants' secretive strategic investment groups to use their "dealer consortium" strategy, which was specifically designed to take over and neutralize perceived threats to the "dealer community" *as a whole*.  Nothing about this conduct was "unilateral."[21]

Indeed, the Complaint even quotes a bank source as *admitting* these groups colluded to prevent change in the market, just as the Complaint alleges, when the source stated in October 2016 that the Dealer Defendants' strategic investment groups had exerted "*too much control*" over the market by withholding their "blessing" from "change."  (¶110 (emphasis added).)  That is nothing less than an admission of these groups' *joint* exercise of control over developments in

---

[21]   It is ironic that Defendants argue they behaved "unilaterally" or "independently" in connection with Project Fusion, when the very codename they chose means "[t]he process or result of joining two or more things together to form a single entity."  "Fusion," *Oxford English Online Dictionary*, https://en.oxforddictionaries.com/definition/fusion.

the market, just as the Complaint alleges, since no single bank had the power to exercise control over market development unilaterally.[22]

Although nothing more is required at the pleading stage to state a plausible conspiracy claim, the Complaint provides much more.  The Complaint proceeds to detail how Defendants' conspiracy persisted throughout the Class Period.  The Complaint specifically alleges the conspirators met and communicated with each other about how to "protect the banks' role as dealers and maintain an artificially bifurcated IRS market."  (¶108.)  And it specifies how and where this occurred:  after the Dealer Defendants took control of the boards of the two newly-formed Tradeweb entities, their personnel, identified by name in the Complaint,[23] used those board meetings to coordinate their activities regarding the IRS market.  (¶¶138-39, 141.)  The Complaint specifically alleges these discussions took place on phone calls and in person in Miami, as well as at dinners in Long Island and New York City restaurants.  (¶141.)  The Complaint explains that the Dealer Defendants also "met and colluded under the auspices" of the FIA (¶¶153, 198), ISDA (¶152), and OTCDerivNet (¶183).

---

[22]   Providing further corroboration, the Complaint alleges the Dealer Defendants later attempted to employ their "dealer consortium" strategy in early 2013 to neutralize the threat posed by TeraExchange.  (¶¶221-24.)

[23]   The Complaint identifies the following Dealer-Defendant personnel as using their seats on newly-formed Tradeweb boards to collude:  Shea Wallon (Bank of America), Luke Halestrap (Bank of America), Dexter Senft (Barclays, Morgan Stanley), Andrew Challis (Barclays), Christopher Mosher (Barclays), Sandeep Arora (Citi), Nicholas Brophy (Citi), Sean Flynn (Credit Suisse), Timothy Blake (Credit Suisse), Stephen Wolff (Deutsche Bank), Michele Faissola (Deutsche Bank), Brad Levy (Goldman Sachs), Vic Simone (Goldman Sachs), Colin Corgan (Goldman Sachs), Simon Maisey (JP Morgan), Christopher Willcox (JP Morgan), Kemal Askar (JP Morgan), David Moore (Morgan Stanley), Richard Volpe (RBS), Michelle Neal (RBS), Joan Lavis (UBS), and Stuart Taylor (UBS).  (¶¶127-37.)

The Complaint further alleges that the Dealer Defendants' heads of IRS trading (many of whom are identified by name[24]) held *monthly meetings* in New York City from 2013 to 2015 to coordinate their "strategies for combating and thwarting the threat posed by SEFs" (¶¶203-04); they also communicated regarding the conspiracy "via telephone, email, instant messaging, and Bloomberg messaging" (¶363), as well as at "lunches, dinners, industry conferences, and other events" (¶158). The Complaint specifically alleges the Dealer Defendants used these secret discussions to coordinate their mutual opposition to all-to-all trading. (¶203.) These allegations must be accepted as true, and they strongly support the conspiracy claim.[25]

Defendants' recent conduct dispels any illusion that they operated "independently" or had qualms about meeting in secret and agreeing to close ranks. In May 2016, a "secret society" of the Dealer Defendants' top lawyers met in Versailles, France to discuss the terms on which they would settle this lawsuit and others. (¶30.) As reported by one of the attendees, these senior bank lawyers agreed to file the very motion to dismiss now before the Court, in an effort to escape liability for their conduct, before any bank would break ranks to discuss settlement.

---

[24]   Luke Halestrap (Bank of America), Ariane Athalie-Tersin (BNPP), David Elsley (Citi), Nicholas Brophy (Citi), Stuart Bancroft (Citi), Timothy Blake (Credit Suisse), Michele Faissola (Deutsche Bank), Neill Pattinson (HSBC), Andrew Powell (JP Morgan), Christopher Willcox (JP Morgan), Simon Maisey (JP Morgan), Kemal Askar (JP Morgan), David Moore (Morgan Stanley), Richard Volpe (RBS), Simon Wilson (RBS), and Paolo Croce (UBS). (¶¶128-37, 183 n.72.)

[25]   *See CDS*, 2014 WL 4379112, at *10 (finding that "representatives of all Dealer-Defendants secretly met and communicated during certain time periods at certain places" supports "allegation that a conspiracy existed"); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009) ("[E]vidence of the frequent and friendly communications between the defendants and the secrecy of their meetings is sufficient to allow a reasonable jury to infer that the defendants participated in an unlawful price-fixing conspiracy."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶1417a (3d ed. 2007) ("[A] call or meeting that occurred and that has not been innocently explained can invite a sinister inference. An exchange carried out in a furtive manner warrants an even stronger inference. Offering an innocent explanation that turns out to be false can also be suspicious.").

The Complaint thus specifically and directly alleges the existence of an actual agreement, its membership, the time of its formation, its anticompetitive purpose, the strategy that gave rise to it, how it was hidden from public view, and even its codename.  These allegations are sufficient to state a plausible conspiracy claim under any accepted standard.

### B.   The Complaint Alleges Abundant Specific Facts to Support a Plausible Inference of Conspiracy

But there is still more in the Complaint—much more.  Beyond alleging that Defendants *actually agreed* to suppress development of an all-to-all IRS market, the Complaint abounds with "factual matter (taken as true) to suggest that an agreement was made."  *Anderson News*, 680 F.3d at 184.  Plaintiffs may also state an antitrust conspiracy by alleging "circumstances, occurrences, and events" that plausibly suggest agreement.  *Id.* at 182 (quoting *Twombly*, 550 U.S. at 555 n.3).  Or as *Twombly* put it, to survive a motion to dismiss, a complaint's allegations need only "indicate[] the sort of restricted freedom of action and sense of obligation that one generally associates with agreement."  550 U.S. at 557 n.4.[26]  The Complaint here alleges a host of conduct generally associated with agreement.

In *Anderson News*, the Second Circuit reversed the district court's dismissal of a boycott claim by a magazine wholesaler alleging the defendants agreed to divide the market and drive the plaintiff out of business.  The complaint alleged certain executives of publishers and distributors engaged in meetings and communications on specific dates to plan an illegal boycott. It also alleged some of these executives made statements regarding the demise of the plaintiff or individual defendants' refusals to work with the plaintiff (and/or a similarly-situated wholesaler),

---

[26]   *See also Starr*, 592 F.3d at 322 (factual allegations that invest either "action or inaction alleged with a plausible suggestion of conspiracy" are sufficient to state claim (internal quotation marks omitted)); *eBooks*, 859 F. Supp. 2d at 681-82 (parallel conduct allegations state a claim if context is suggestive of agreement, including where conduct is unlikely to result from chance or plausibly contravenes each defendant's self-interest absent similar conduct by rivals).

which the court held could "plausibly be interpreted as evincing their agreement" to eliminate plaintiff and to divide the market.  680 F.3d at 187-89.

Meetings among the defendants allegedly happened after an interview in which the plaintiff publicly announced a distribution surcharge on the defendants, and it was alleged that in those meetings the defendants planned a concerted boycott, which was implemented by refusals to deal with the plaintiff.  *Id.* at 187-88.  The Second Circuit found these "factual allegations and the reasonable inferences that may be drawn from them" sufficient to state a plausible claim, emphasizing that "the truth of reasonable inferences that could be drawn" from the plaintiffs' allegations must be assumed.  *Id.* at 189.[27]

Also instructive is *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013), where plaintiff—a new entrant into the market for polystyrene products—developed a way to recycle polystyrene, which would reduce costs for consumers.  The success of the recycling model was predicated on the participation of one or more of the five major producers of polystyrene.  *Id.* at 38.  At least one of those producers "demonstrated interest" in the recycling method, but through a trade association, producers conspired to refuse to deal with the plaintiff to "ensure that . . . Defendants' existing market shares will not be disrupted, the status quo will be maintained, and the Defendants will be able to offer higher-priced products."  *Id.* Citing the "defendants' parallel conduct following the . . . meeting as well as their global failure

---

[27]   Similarly, the plaintiffs in *CDS* adequately alleged a conspiracy claim by alleging the "who, when, and where of [defendants'] gatherings," including "that some of them were held under the auspices of board or committee meetings, while others of them were held under the guise of phony entities lacking any legitimacy whatsoever."  2014 WL 4379112, at *10.  In *SD3*, the Fourth Circuit held that the plaintiffs pled a plausible boycott claim where the complaint "identifie[d] the particular time, place, and manner in which the boycott initially formed."  801 F.3d at 430.  Specifically, the complaint identified the meeting held at which the agreement was reached and "name[d] at least six specific individuals who took part in forming the boycott, noting which defendant each person ostensibly represented."  *Id.*

to adopt [plaintiff's recycling] system" and the one producer's "abrupt[] withdr[a]w[al]" of its

interest, the First Circuit held the allegations stated a plausible agreement. *Id.* at 47-48.

The Complaint here meets and often exceeds the specifics of the pleadings in these cases.

It details Defendants' motivation to conspire and the market conditions that made the conspiracy

feasible, it specifies the content of Defendants' agreements, it describes the actions taken to carry

out (and to hide) those agreements, and it identifies the individuals involved. These detailed

allegations plainly support an inference that Defendants unlawfully conspired.

### 1.    The Complaint Alleges Background Conditions Making a Conspiracy Plausible

At the outset, the IRS market is inherently conducive to collusion because it is a

concentrated market, dominated by Defendants here. (¶312.) *See, e.g.*, *Todd v. Exxon Corp.*,

275 F.3d 191, 208 (2d Cir. 2001) ("Generally speaking, the possibility of anticompetitive

collusive practices is most realistic in concentrated industries."). *Cf. In re High Fructose Corn*

*Syrup Antitrust Litig.*, 295 F.3d 651, 654-55 (7th Cir. 2002) (finding the "structure of the market

was such as to make secret price fixing feasible").

The Complaint also alleges the Dealer Defendants shared "a common motive to

conspire." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987) (holding a "common

motive to conspire" is indicative of conspiracy). *See also In re Flat Glass Antitrust Litig.*, 385

F.3d 350, 360 (3d Cir. 2004) ("evidence that the defendant had a motive to enter into a price

fixing conspiracy" is indicative of conspiracy). They were motivated to keep collecting inflated

profits at investors' expense and worked to defeat any threats to the bifurcated market in which

dealers enjoyed all-to-all trading only among themselves. (¶¶9, 74, 203, 319-39, 387, 401.)

As the Complaint details, the Dealer Defendants' own analyses confirm the financial

magnitude of the inflated bid/ask spreads paid by investors. (¶¶332-38.) The Dealer Defendants

also realized that, while "no single Dealer-Defendant could prevent [all-to-all style platforms] from emerging, . . . all Dealer-Defendants would profit from such prevention." *CDS,* 2014 WL 4379112, at *10. (*See* ¶¶341-44) (alleging that, absent a conspiracy, it would be in the individual interest of Dealer Defendants to support the move to all-to-all trading). Thus, they were motivated to conspire to maintain the bifurcated IRS market structure.

The Complaint also alleges that Defendants had abundant opportunities to conspire through their numerous inter-firm communications, which occurred at multiple levels. (*E.g.*, ¶¶17, 108-10, 126-42, 177-83, 383.) *See Apex Oil*, 822 F.2d at 254 (holding "a high level of interfirm communications" supports inference of a conspiracy); *SD3*, 801 F.3d at 432 ("Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire."). The Complaint also alleges that, during the period the conspiracy was formed, the Dealer Defendants "established mechanisms and forums for illicit conversations among competitors in order to advance the banks' collective financial interests over those of their customers." (¶21.)

And, indeed, the Complaint does not just allege that the Dealer Defendants had *opportunities* to conspire; it alleges they actually "*used* these mechanisms and forums for collusion to conspire in the IRS market." (*Id.* (emphasis added).) *See also* Section II.A *supra*.

## 2. The Complaint Alleges Specific Conduct from Which a Conspiracy May Be Inferred

The Complaint also alleges a host of specific factual information from which an unlawful agreement may be inferred. At the broadest level, the Complaint alleges that Defendants succeeded in maintaining an artificially bifurcated market. To date, the IRS market has not developed in the manner that economic theory, investor demand, technological feasibility, and the historical experience of comparable financial markets would predict.

Numerous examples exist where financial instruments transitioned from OTC trading to more transparent and efficient platforms once sufficient liquidity and standardization was achieved.  (¶¶10, 71.)  For IRS, the liquidity and standardization preconditions for this evolution existed since at least the early 2000s.  (¶¶10, 11, 72, 79.)  Central clearing was operational in the IRS market by the mid-2000s, and likely feasible even earlier.  (¶¶12, 93.)  The central clearing of IRS was a step toward electronic all-to-all trading and serves as further evidence that IRS are suited for more efficient and transparent forms of trading.  (¶¶12-13, 90-93.)  And yet, the outdated OTC model prevails.  As Professor Darrell Duffie, a leading economist in the field, explains:  "At this point, *we lack convincing theories that explain why such simple and heavily traded instruments [as IRS] are traded over the counter*."  (¶88.)

The Complaint also alleges that, since 2008, each of the Dealer Defendants has agreed to trade only with investors on dealer-to-client RFQ platforms.  (¶149.)  And it alleges the specific means by which the Dealer Defendants jointly ensured the IDBs would not provide all-to-all trading.  (¶¶160-65.)  The Dealer Defendants uniformly refused to clear investors' trades on all-to-all platforms, and, at least Barclays, BNPP, Credit Suisse, and JP Morgan punished investors that attempted to trade on all-to-all platforms by raising their clearing fees.  (¶¶194-201, 226.)

The Complaint further details how the Dealer Defendants utilized "name give-up," a relic of a time before central clearing when counterparties' identities had to be disclosed in order to assess risk.  (¶¶292-93.)  The Dealer Defendants *colluded* to *impose* this outmoded practice on the market as a policing mechanism for their conspiracy.  (¶¶294-302.)  The Complaint provides

multiple examples of the Dealer Defendants placing IDBs and investors in the "penalty box" for violating the Dealer Defendants' rules.  (¶¶160-65, 297.)[28]

Referring to the Dealer Defendants' policing of market bifurcation, the Complaint quotes an IDB as acknowledging:  "'[s]waps will be off limits' for the buy side, because IRS trading was 'the territory of our dealer banks.'"  (¶165.)  And it quotes a hedge fund manager as stating: "In interest rate swaps, we have been given strong signals by our dealers that they would be annoyed if we, as a buy-side firm, showed up in the interdealer platforms."  (¶163 n.57.)  With superficial exceptions, the Dealer Defendants all boycotted trading on TeraExchange, Javelin, and TrueEx, thereby denying liquidity to those platforms because they had the nerve to offer anonymous trading (*i.e*., without name give-up).  (¶¶224, 249, 282, 297.)  And the Dealer Defendants refused to clear trades executed on these platforms.  (¶¶194-95, 197.)

The Complaint also alleges joint conduct by the Dealer Defendants to block specific all-to-all providers.  *First*, as explained above, the Complaint details the Dealer Defendants' anticompetitive takeover of Tradeweb's IRS business in order to neutralize it as a threat. *Second*, the Complaint details how the Dealer Defendants boycotted Javelin's trading platforms despite being offered attractive terms and a cut of the brokerage fees.  (¶¶246-78.)  Among many other factual details, it alleges, how, from 2013 to 2015, Javelin personnel met with each of the Dealer Defendants on numerous occasions to recruit them to the platform, only to be boycotted by all but RBS (which did not engage Javelin more than superficially).  (¶¶247-50.)

The Complaint explains that the Dealer Defendants gave nearly *identical* excuses for refusing to trade on the platform, pointing to a supposed lack of investor support (despite significant investor enrollment).  (¶271.)  The Complaint alleges Dexter Senft, a ringleader of the

---

[28]   For example, the Dealer Defendants threatened GFI with a collective withdrawal of liquidity when it sought to do away with name give-up in both 2009 and 2014.  (¶¶161-62.)

conspiracy, even secured a modification to Javelin's standard NDA so he could "discuss Javelin," as well as the eighty investor firms that had expressed interest in it, "with other Dealer Defendants." (¶247.) And the Complaint also describes how the Dealer Defendants pressured investors not to trade on Javelin, including by foregoing clearing revenues from their FCMs by depriving them of necessary clearing services. (¶¶253, 260, 263-66.)

*Third*, the Complaint alleges that *multiple* Dealer Defendants characterized TeraExchange as a "Trojan Horse," in *separate* conversations. (¶¶217, 242.) Defendants' consistent use of the same phrase to describe TeraExchange is highly probative of their coordination. The Complaint also alleges the Dealer Defendants acted on their agreement by forbidding IDBs from signing up with TeraExchange. (¶241.) The Complaint identifies *by name* buy-side entities that dealers "asked" to avoid trading on TeraExchange and forbade from signing up with TeraExchange. (*Id.*)

The Complaint further alleges BNPP's clearing desk learned when TeraExchange executed its first investor-to-investor trade, and immediately informed BNPP's trading desk, which immediately contacted the trading parties to threaten them not to trade again on TeraExchange. (¶235.) The very next day, BNPP, Citi, JP Morgan, and UBS each demanded to "audit" TeraExchange's rulebook. (*Id.*) That each of these banks called to make this pretextual demand on the *same* day, in the *same* manner, and in response to the *same* trade supports an inference of coordinated action.

*Fourth*, the Complaint alleges the Dealer Defendants boycotted TrueEX in parallel by refusing to trade on its order book. (¶282.) And while the Dealer Defendants trade with investors on TrueEX's RFQ platform, they all, in striking similarity, limit such trading to bespoke swaps (while trading plain vanilla swaps on Bloomberg and Tradeweb). (¶285.)

The Complaint also alleges that numerous of Defendants' actions in carrying out their conspiracy were contrary to their own independent economic self-interest.  For example, the Dealer Defendants sacrificed clearing fees through their refusal to clear investor trades on all-to-all platforms (¶195)—but by presenting a unified front, they successfully prevented all-to-all trading and preserved their inflated profits on supracompetitive bid/ask spreads on the dealer-to-client RFQ platforms.  (*See also* ¶¶340-46.)

Each Dealer Defendant had an independent interest in being one of the first dealers on an all-to-all SEF because it could engage with buy-side traders ahead of the other dealers.  (¶344.) Passing up such opportunities to profit by offering IRS investors more competitive terms and thereby increasing volume "would be irrational assuming that the defendant operated in a competitive market," *Flat Glass*, 385 F.3d at 360-61.  But it makes perfect sense in the context of an illegal agreement not to compete.  *See Starr*, 592 F.3d at 324 ("Some acts, or failures to act, cannot be profitably continued unless rivals behave in parallel." (quoting 7 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, §1415b (2d ed. 2003))).

### 3. The Complaint Alleges Specific Steps Taken by Defendants to Conceal Their Conspiracy

The Complaint also alleges that the Defendants took repeated and concerted steps to *conceal* the conspiracy.  *See* Statement of Facts Part G *supra*.  Most significantly, the Complaint alleges the Dealer Defendants went to extraordinary lengths to hide their joint takeover of Tradeweb's IRS business and have continued to conspire to jointly shield their conduct from scrutiny as recently as May 2016.  This pattern of conduct "serves as strong evidence" of a conspiracy.  *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 694 n.59 (S.D.N.Y. 2013) (decision to hide coordination "strongly supports a finding of consciousness of guilt" as pattern of coordination "serves as strong evidence" of conspiracy).

41

Together, these comprehensive allegations readily state a plausible conspiracy claim.

## C.   Defendants' Various Criticisms of the Complaint Fail

Defendants offer various criticisms of the Complaint, nearly all of which depend on

directly contradicting the Complaint's factual allegations and focusing on specific allegations in

isolation.  These tactics are improper, and Defendants fail to undermine the Complaint's

plausibility.  *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)

("The character and effect of a conspiracy are not to be judged by dismembering it and viewing

its separate parts, but only by looking at it as a whole."); *Loreley*, 797 F.3d at 169 (court must

"accept[] all factual allegations in the complaint as true and draw all reasonable inferences in

Plaintiffs' favor").[29]

### 1.   Defendants Erroneously Assert that All-to-All Trading and Clearing Were Not Feasible Before Dodd-Frank

Defendants argue it is implausible that they conspired to prevent all-to-all IRS trading

before Dodd-Frank, because such trading was *impossible* (or perhaps unwanted) before Dodd-

Frank.  In Defendants' words, "there was essentially nothing to boycott before 2013 at the

earliest:  no all-to-all IRS platforms even began operating until 2013."  (Dealer Br. at 24.)

This argument is illogical and contradicts large swaths of the Complaint.  At a broad

level, the Complaint alleges that *the reason* why no all-to-all IRS platforms were open to

investors before 2013 is because *Defendants conspired* to achieve that exact result.  The

Complaint explains that the conspiracy originated with the desire of the Dealer Defendants to

---

[29]   *See also Apple*, 952 F. Supp. 2d at 694 ("In evaluating the existence of an antitrust conspiracy, courts consider the 'totality of the evidence.'" (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012))); *Lexington Ins. Co. v. MGA Entm't, Inc.*, 12-cv-3677 (SAS), 2014 WL 3955205, at *4 (S.D.N.Y. Aug. 13, 2014) ("The purpose of the plausibility inquiry [] is not to assess whether each allegation, in isolation, counts as a plausible fact.  The purpose is to determine whether *all* the allegations, viewed in aggregate, taken as true . . . lead to a reasonable inference" of plausibility.(internal quotation marks omitted)).

take over Tradeweb's IRS business to shut down its plans to offer a buy-side-friendly trading platform and to use their joint control of that business as a vehicle to control the IRS market going forward. Tradeweb's platform would have opened to investors absent the conspiracy.

The Complaint further alleges that several IDBs *actually operated* all-to-all IRS trading platforms long before 2013, and many of them wanted to open these platforms to investors; but they were punished any time they took steps in that direction. (¶¶159-65.) Investors could have traded on these platforms as well absent the conspiracy. And the Complaint further alleges the Dealer Defendants *themselves* would have been rewarded for providing or supporting all-to-all platforms before 2007.[30] But the Dealer Defendants conspired to make sure *none* of this happened. Thus, far from undercutting the conspiracy claim, the lack of all-to-all trading options for investors prior to 2013 confirms the conspiracy had its intended effect.

Defendants' argument that IRS were not *viable candidates* for all-to-all trading (Dealer Br. at 39-40) also fails. The Complaint squarely alleges that, by the early 2000s at the latest, IRS were sufficiently standardized and liquid for all-to-all trading. (¶¶71, 87.) The Complaint further: (i) reports the conclusion of one of the world's foremost experts on OTC financial markets that there are no "convincing theories that explain why such *simple and heavily traded* instruments are traded over the counter" (¶88); (ii) details the demand for all-to-all trading by sophisticated investors, including the numerous large proprietary trading firms, investment entities, and banks, that signed up for and attempted to use the all-to-all platforms offered by TeraExchange and Javelin (¶¶213-14, 220, 227, 231, 233, 251, 255, 265-68); and (iii) reports the

---

[30] "There was [] tremendous demand from the buy side for competitive platforms on which they could trade IRS not only with dealers, but also with each other. Any dealer that would have acted to provide such a platform would have been rewarded with considerable business and lucrative brokerage fees from the buy side." (¶87; *see also* ¶¶341-44 (explaining that, absent a conspiracy, dealers would have been individually motivated to support all-to-all trading platforms).)

conclusion of a report by Citi itself that predicted, in its own words, "*a significant portion of interest rate swap volume is likely to migrate to clearing and exchange trading*" (¶334).[31]  This prediction by a Citi analyst is *premised* on the fact that IRS are suitable for all-to-all trading and clearing.  Defendants are left to dispute their own analysts.

In short, it is *Defendants* who are making an implausible assertion when they claim that IRS are not candidates for all-to-all trading.  In any case, at most they raise a factual dispute that will be the subject of discovery and expert testimony; their assertion that IRS cannot be traded all-to-all can hardly be resolved in their favor at the pleading stage.

Taking a slightly different approach, Defendants argue that, even if all-to-all trading had been available to investors before 2013, investors would have declined to use it because the buy side was not equipped to centrally clear IRS trades.[32]  But their argument that Congress had to "force" investors to use central clearing against their will is itself implausible and irreconcilable with the Complaint.  Central clearing is hardly an exotic concept—it has been used in financial markets for over a century and widely embraced by investors in dozens of financial markets, just as it was here.  The Complaint alleges that, by 2007, the IRS market was "poised and ready for all-to-all electronic trading" and there "was great buy-side demand for this development, and *no infrastructure limitations or other technical impediments prevented it*."  (¶13.)  And the Complaint also alleges (citing tremendous buy-side demand, including thirty-three early adopters of an IRS clearing option in 2008) that investors were "*ready, willing, and eager to clear their*

---

[31]  A JP Morgan report reached a similar conclusion.  (¶¶335-36.)

[32]  For example, Defendants argue that "clearing is an admitted prerequisite to all-to-all trading; and buy-side firms did not equip themselves to clear their trades until Dodd-Frank forced them to do so in 2013."  (Dealer Br. at 24.)

*IRS trades*" well before Dodd-Frank.  (¶187 (emphasis added).)[33]  Defendants' assertion that investors supposedly did not want to clear IRS trades before they were forced to do so by Congress is thus rebutted by the Complaint's well-pled allegations.

Defendants improperly base their argument that investors did not want to clear IRS trades on extrinsic materials and then draw unreasonable inferences in their favor.  They argue, for example, that comment letters submitted in response to Dodd-Frank demonstrated that clearing would present an "'overwhelming' burden[]" on investors.  (Dealer Br. at 8.)  Yet they neglect to mention the letter upon which they rely was submitted by *ISDA*, *SIFMA*, *and FIA*—that is, organizations *controlled* by the Dealer Defendants and used as tools of the conspiracy.  (*See* ¶¶151-57, 178 n.70.)  Defendants also improperly rely upon two letters from the Financial Services Roundtable (formerly known as the *Bankers* Roundtable), which argue that more time was needed for investor clearing not because of technical limitations, but to negotiate clearing arrangements.  Defendants' argument based on these materials that the *buy side* was opposed to central clearing is contradicted by the Complaint and transparently improper.

More basically, the Complaint alleges that the fact there was no investor clearing of IRS trades before Dodd-Frank was *itself* the result of Defendants' collusion.  The Dealer Defendants had long regarded the prospect of clearing investors' trades as a threat to their dominance of the IRS market, fearing it to be the "first step" or "thin end of a wedge" that would ultimately "disintermediate" them.  (¶¶174-75.)

The Complaint explains that the Dealer Defendants coordinated their opposition to investor clearing through OTCDerivNet, an entity they created for this very purpose.  When they

---

[33]   *See also* ¶87 (tremendous demand from investors for competitive platforms on which they could trade IRS not only with dealers, but also with each other); ¶99 (investors demanding all-to-all trading of IRS, IRS were fully capable of trading on modern electronic platforms with all-to-all trading protocols, and infrastructure supporting those protocols existed by 2007).

saw the threat emerging from Tradeweb, the Dealer Defendants installed some of the key

architects of the conspiracy (identified by name) on those boards and, from 2008 through 2013,

used it as a vehicle to "specifically discuss[] how the Dealer Defendants could jointly prevent or

delay the buy side's ability to clear IRS trades." (¶183.) These allegations too are fatal to

Defendants' argument that investors were not interested in clearing IRS before Dodd-Frank.

CME planned to offer IRS clearing to investors through Swapstream and its OTC

clearing solution "CME Clearing360." (¶¶184-85.) As noted, thirty-three investor firms signed

up for an "Early Adopter" program in 2008, a fact that supports the Complaint's allegations that,

contrary to Defendants' arguments, investors were "ready, willing and eager to clear IRS trades"

long before Dodd-Frank. (¶187.) The Dealer Defendants responded by boycotting Swapstream,

which caused CME's clearing solution to fail. (¶¶185-88.)[34] Notably, the Complaint alleges this

boycott occurred simultaneously with the Dealer Defendants' similar boycott of a CME-backed

clearing and trading platform for CDS. (¶¶348-56.)

The Dealer Defendants claim these allegations should be disregarded because "they are

egregious examples of conclusory pleading." (Dealer Br. at 29.) To the contrary, the Complaint

alleges facts: it identifies, for example, *by name* who conspired through OTCDerivNet, for what

purpose, about what, when, and the steps they took as a result. (¶¶176-90.) These facts must

also be considered in the context of the Complaint's other allegations about the Dealer

---

[34]  Defendants claim that the Complaint mistakenly "conflate[s]" Swapstream with
CME's clearing product. (Dealer Br. at 30.) In fact, the Complaint alleges that the Dealer
Defendants boycotted Swapstream because, as Defendants themselves admit, it "bundled
together a CME-designed IRS contract with a CME trading platform and a CME clearing
solution." (*Id.*) Clearing IRS through Swapstream was precisely what the CME offered in 2008,
and what thirty-three investor firms signed up for, namely:  "CME Swaps on Swapstream, the
first centrally-cleared interest rate swaps available to all over-the-counter (OTC) market
participants." (¶185 n.73.) If anyone is sowing confusion, it is Defendants, when they refer to a
clearing product that CME offered in *2010,* not 2008. (Dealer Br. at 30.)

Defendants' strategies for preventing all-to-all trading.  For example, Mr. Senft, one of the key architects of Project Fusion, installed himself on the OTCDerivNet board in 2007, along with other key players who were simultaneously installed on the newly-created Tradeweb boards, for the purpose of stamping out all-to-all trading.  This was no coincidence.  (¶¶182-83.)

Finally, the Complaint also alleges that the Dealer Defendants worked together to take over and close off to investors a clearing venture called SwapClear.  (¶¶176-80.)[35]  Defendants argue that these allegations about SwapClear "make no economic sense" because the Complaint alleges that Defendants first took control of SwapClear in 2000, years before they allegedly launched the conspiracy with Project Fusion.  But the fact that the Dealer Defendants put themselves in a position to seize control of the clearing infrastructure before the Tradeweb threat emerged in 2007 merely confirms that they anticipated the emergence of all-to-all trading platforms.  (¶175 ("[T]he Dealer Defendants have long sought to control the clearing infrastructure for the financial markets they dominate so they would be positioned to head off threats to their dominance.").)  There is no tension between the allegation that Defendants' IRS conspiracy actively commenced in 2007 with Project Fusion and the fact that they had laid the groundwork earlier.[36]

### 2.      Defendants Mistakenly Claim the Complaint Must Allege Unanimity

Taking another tack, Defendants argue the Complaint's allegations do not show unanimous, identical conduct by all of them.  But courts sensibly do not demand unanimity to

---

[35]   The Dealer Defendants argue "it was only through OTCDerivNet that SwapClear successfully launched."  (Dealer Br. at 27-28.)  But this assertion contradicts the Complaint's allegations and cannot be credited at the pleading stage.

[36]   The Complaint identifies other conduct by Defendants before 2007 that, even if not giving rise to a conspiracy claim on its own, certainly supports the inference that the Dealer Defendants were prepared to collude.  (¶164 n.58 (Dealer Defendants put Barclays in the "penalty box" in *2003* for launching its dealer-to-client electronic trading platform for IRS).)

find a conspiracy.  *See, e.g.*, *SD3*, 801 F.3d at 428-29 (rejecting defendants' argument that alleged parallel conduct must be "simultaneous" or "identical" or that defendants need to move in "lockstep" to plead a plausible conspiracy); *In re Domestic Airline Travel Antitrust Litig.*, 15-MC-1404 (CKK), 2016 WL 6426366, at *13 (D.D.C. Oct. 28, 2016) ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) ("Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct.").  Rather, a complaint may support a conspiracy claim by, for example, "pleading facts indicating that the defendants acted *similarly*."  *SD3*, 801 F.3d at 427 (quotation marks and citation omitted) (emphasis added).[37]

In point of fact, the Complaint does provide many examples of striking simultaneity.  It alleges, for example, that the conspiracy began with nearly all of the Dealer Defendants simultaneously investing in Tradeweb *at the exact same time* and *jointly* employing complicated machinations to hide what they were doing.  And it alleges that, six years later, Barclays, Bank of America, Credit Suisse, Citi, Deutsche Bank, and Morgan Stanley each met with

---

[37]  *In re Optical Disk Drive Antitrust Litig.*, 10-MD-2143 (RS), 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011), on which Defendants rely (Dealer Br. at 38), provides a stark contrast to the specific allegations in the Complaint.  There, the court dismissed the plaintiffs' allegations that a group of defendants participated in a six-year bid-rigging scheme because the allegations pertained only to a small subset of the defendants and concerned only three discrete auctions during that six-year period.  2011 WL 3894376, at *9.  Similarly, in *In re Iowa Ready-Mix Concrete Antitrust Litigation*, 768 F. Supp. 2d 961, 972 (N.D. Iowa 2011), the court dismissed allegations of a massive four-year price-fixing conspiracy because the plaintiffs alleged only discrete agreements between individual subsets of the defendants to fix prices in three brief instances and they did not allege overarching parallel conduct or plus factors—instead conclusorily alleging that defendants entered into a price-fixing conspiracy.  By contrast, the Complaint here alleges a coordinated and comprehensive campaign of parallel trading and clearing boycotts by all of the Dealer Defendants against, *inter alia*, TeraExchange, Javelin, and TrueEX since their inception.

TeraExchange in a strikingly similar fashion, each proposing to invest in the entity in a manner that is reminiscent of how they took over Tradeweb years before. (¶¶222-24.) Such strikingly uniform conduct over the course of years does not happen when firms are acting independently.

According to Defendants, the Complaint's concession that "at least two Dealers supported Javelin" is fatal to the boycott claim. (Dealer Br. at 32.) But that a few of the Dealer Defendants gave limited and superficial support for some of the SEFs does not undermine the boycott claim. In fact, the Complaint alleges that RBS provided only limited, non-competitive pricing while it monitored the platform's development. (¶273 & n.102.) The Dealer Defendants themselves recognized that such nominal participation on a platform did not undermine their conspiracy. (*Id.*) And, contrary to Defendants claim that UBS "partnered" (a term not used in either complaint) with Javelin, UBS' trading and clearing desks jointly refused, along with the other Dealer Defendants, to provide liquidity to Javelin and blocked the clearing of trades on its platform.[38]

Defendants similarly claim that "at least seventeen dealers have supported TrueEx, and JPMorgan supported TrueEX from its inception." (Dealer Br. at 32.) To the contrary, the Complaint alleges that the Dealer Defendants *boycotted TrueEx's all-to-all trading capabilities* by "refusing to trade IRS with buy-side investors on the TrueEX order book." (¶282.) The Dealer Defendants also retaliated against investors that attempted to use TrueEX's order book, making it impossible for investors to use the platform. (¶¶164, 282.) The Dealer Defendants "supported" only TrueEX's *dealer-to-client RFQ platform*, and that is only because it effectively mirrors trading in the OTC market. (¶284.) They collectively boycotted its all-to-all platform.

---

[38]   Defendants assert that UBS supported Javelin because its aggregation service connected investors to Javelin's platforms. (Dealer Br. at 20.) But this service did nothing to overcome UBS' commitment to the trading and clearing boycotts of Javelin and thus did nothing to actually help investors *trade* on the platform.

Defendants also argue that the Complaint does not sufficiently allege a clearing boycott of TeraExchange, Javelin, and TrueEX by *all* of the Dealer Defendants' FCMs.  (Dealer Br. at 36.)  But the Complaint plainly states that "the Dealer Defendants had their FCMs withhold clearing services from any buy-side entity or second-tier dealer seeking to trade on SEFs operating all-to-all anonymous trading platforms, *including TeraExchange, Javelin, and TrueEx* . . . ."  (¶194 (emphasis added).)  It further alleges that the Dealer Defendants' FCMs also "refuse to conduct pre-trade credit checks for any prospective trade on an anonymous all-to-all SEF" (¶196), which includes TeraExchange, Javelin, and TrueEX.[39]

### 3.    Defendants' Alternative Explanations Cannot be Credited

Defendants' various efforts to offer alternative, innocent explanations for some of their conduct in isolation are also unavailing and misplaced at this stage.  *See Anderson News,* 680 F.3d at 189 ("[T]he question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory."); *eBooks*, 859 F. Supp. 2d at 687 (rejecting defendants' attempt to put forward "legitimate alternative explanations for their parallel actions").[40]

Nor do their explanations survive scrutiny.  The Dealer Defendants argue, for example, that their refusals to deal with TeraExchange and Javelin reflected independent decisions in their own business interests because all-to-all trading posed a threat to their profits.  (Dealer Br. at 33.) They claim that, "if Plaintiffs are correct that only the sustained support of multiple dealers is sufficient to make a trading platform viable, then a Dealer takes little or no risk by simply sitting

---

[39]    Contrary to Defendants' claim that investors could clear trades through non-defendant FCMs (Dealer Br. at 36), the Complaint alleges that the Dealer Defendants effectively operate the only FCMs available to investors for clearing.  (¶191 n.77.)  As a result, the Dealer Defendants exerted gatekeeping control over investor clearing.  (¶191.)

[40]    *See also Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleading stage.").

tight and waiting to see which platforms attract significant support." (*Id.* at 35 (citation omitted).)[41]  But the Complaint specifically alleges that, absent a conspiracy, each Dealer Defendant would face a risk of being left behind by not supporting an all-to-all trading platform. (¶¶341-46.)  The Dealer Defendants would also have been "dragged onto all-to-all platforms by client demand, pursuing the revenue available on such platforms [and with] Dealers who failed to adhere to their client's demands," quickly losing business.  (¶343.)

And the Complaint specifically alleges that TeraExchange had a strategy that, absent the conspiracy, would have driven Dealer Defendants to the platform even if they were reluctant to join.  (¶¶213-17.)  TeraExchange recruited a host of alternative liquidity providers to its platform who were prepared to "trade IRS at tighter bid/ask spreads than traditional dealers."  (¶215.)  In turn, this would drive even reluctant Dealer Defendants to the platform, as many of their investor clients would demand that the Dealer Defendants engage in "best execution," which refers to a trading entity's duty to secure the best price available in executing a trade when acting as the client's agent.  (¶216.)

As the Complaint explains, "if IRS trades were available on TeraExchange at tighter bid/ask spreads due to the liquidity provided by proprietary trading firms, the buy side would demand that the Dealer Defendants execute their trades there as well."  (¶217.)  This is precisely why the Dealer Defendants collectively identified TeraExchange as a "Trojan Horse"—their words—and the fact that multiple dealers used this same label for TeraExchange confirms they were discussing this threat with each other.  (*Id.*)

---

[41]   Contrary to Defendants' assertion, the Complaint does not allege that "only the sustained support of multiple dealers is sufficient to make a trading platform viable."  (Dealer Br. at 35.)  Rather, the Complaint alleges that "the nominal participation of a small number of them on any one platform would not undermine their conspiracy."  (¶273 n.102.)

Defendants have no meaningful response to these allegations; they simply ignore the incriminating "Trojan Horse" allegations.  They are left to claim, falsely, that the reason why TeraExchange failed is because "Tera elected not to recruit any Dealers to its platform . . . ." (Dealer Br. at 32.)  To the contrary, the Complaint alleges that TeraExchange "welcomed and sought the participation of the Dealer Defendants on its platform."  (¶213.)  It met with each of the Dealer Defendants, "hop[ing] to secure their support" (¶222), and it "tried to convince the Dealer Defendants to join its platform" (¶224).

Similarly weak is Defendants' attempt to explain why four of them—BNPP, Citi, JP Morgan, and UBS—contacted TeraExchange on the same day in June of 2014, with the same demand to "audit" TeraExchange's rulebook before any further trades could be conducted. Defendants say this merely reflects that, coincidentally, all four banks had "deferred the task of reviewing Tera's rulebook until someone actually traded on Tera," a "review" they claim was necessary because TeraExchange "had obtained only a *temporary* registration with the CFTC." (Dealer Br. at 37.)  But they cannot deny that these banks were *informed* of the trade by BNPP. Moreover, it is highly unlikely that all four banks would have engaged in this identical behavior absent collusion, especially since the Complaint also alleges that the Dealer Defendants refused to let *anyone* trade on TeraExchange's platforms, in strikingly parallel fashion, through mid-2014.  (¶¶224-44.)  As for the claim that these banks had some regulatory obligation to conduct this audit, the Complaint quotes a Citi employee confessing that Citi's refusal to allow trades on TeraExchange "was more of an internal policy rather than a regulatory one."  (¶240.)

### 4.    Defendants' Arguments About Market Bifurcation Fail

Defendants argue that the Complaint fails to allege that they conspired to keep the IRS market bifurcated, even though the Complaint squarely makes that allegation in a number of places.  (¶¶21, 67, 108, 141, 148, 168, 172, 319.)  Defendants nevertheless try to chisel away by

arguing, for example, that the Complaint's account of the ICAP détente (*see* Statement of Facts Part D) "makes no chronological sense [because] Plaintiffs allege a conspiratorial agreement in 2009 even though ICAP did not launch a U.S. electronic trading platform until 2013." (Dealer Br. at 41.) Defendants miss the point: the Complaint alleges that ICAP *would have* introduced i-Swap, its European IDB capable of all-to-all trading, to the U.S. in 2009 *but for* ICAP's agreement with Tradeweb and the Dealer Defendants. (¶¶168-69.)

As the Complaint makes clear, ICAP limited i-Swap to Europe until 2013, and, even now, limits trading on the platform in the U.S. to dealers. (¶171.) And, while ICAP now permits investors to *register* for i-Swap to adhere to CFTC regulations, ICAP does not actually let them *trade* on the platform, thereby rendering their access useless. (*Id.*) Meanwhile, although Dealerweb has moved into the IRS market, the Dealer Defendants adhere to the détente agreement by conducting much of their interdealer trading on ICAP. (¶173.)

Defendants also try to recast the ICAP détente agreement as ICAP and Tradeweb just doing what they had always done. (Dealer Br. at 41.) But that is "no defense" to collusion. *Duplan Corp. v. Deering Milliken Inc.*, 594 F.2d 979, 982 (4th Cir. 1979) ("[I]t is no defense that [the defendants'] actions . . . amounted to no more than adherence to prior practices." (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253 (1940))). Moreover, the Complaint alleges far more than passive conduct. It alleges, for example, that when ICAP expanded i-Swap to the U.S. in February 2013, it falsely promoted that its platforms were open to everyone, even as ICAP brokers "prevented the buy side from trading on i-Swap by refusing to accept bids or offers from buy-side investors for voice-brokered trades or for inclusion on any electronic trading platform." (¶171.) Such conduct is far more consistent with conspiratorial conduct than with ICAP behaving wholly unilaterally.

Defendants try to explain away another tool of the conspiracy, the maintenance of name give-up, by arguing that (i) name give-up existed before the conspiracy, (ii) it provides valuable information to dealers, (iii) the CFTC has declined to regulate the practice, and (iv) UBS opposed it.  (Dealer Br. at 42.)  But the Complaint alleges that the historical justification for name give-up expired years ago (¶¶292-95) and that the dealers do not just jointly "prefer the practice" (Dealer Br. at 42)—they *jointly impose it*, backed by powerful threats that they do not hesitate to carry out (¶¶161-62, 297).  There is, moreover, no reason to believe the CFTC was aware that Defendants had *colluded* to impose the practice as a way of policing their conspiracy.  And the fact that UBS formerly spoke out against the practice (¶¶292, 309), but nonetheless supported these joint efforts, only confirms it did so pursuant to its agreement with the other Dealer Defendants.

Defendants also assert that there is no market bifurcation because the Complaint concedes that Bloomberg and Tradeweb have offered anonymous all-to-all trading platforms since 2013 and "encountered no alleged difficulties with the Dealers."  (Dealer Br. at 32.)  But the Complaint alleges that the Dealer Defendants use name give-up to prevent investors from accessing these platforms (including on Bloomberg and Tradeweb via MarkitWIRE's "last look" protocol), thereby rendering them effectively unavailable.  (¶¶149, 164, 304.)  The Dealer Defendants also refuse to clear investors' trades executed on these platforms, making it effectively impossible for investors to trade on them.  (¶197.)  As a result of the Dealer Defendants' campaign of intimidation and interference, investors "do not try to access the order books operated by Tradeweb or Bloomberg."  (¶164.)

### 5.    Defendants' Cases Do Not Support Dismissal

Similarly, Defendants' cases (Dealer Br. at 22-47) provide no basis for dismissal.  The complaint in *Mayor & City Council of Balt.*, 709 F.3d 129, on which Defendants prominently

rely, is very different from this one.  There, the plaintiffs alleged that several banks conspired to stop buying auction-rate securities for their proprietary accounts, causing auctions to fail and the market to collapse.  *Id.* at 131-32.  As in *Twombly*, the complaint alleged virtually nothing about the agreement but relied almost entirely on the defendants' parallel withdrawal from the market. *Id.* at 138.  Thus, unlike here, the complaint failed to allege facts supporting an inference of conspiracy, *id.* at 136-37, such as the who, what, where, and when of the conspiracy.  The plaintiffs also could point only to a handful of *intra*-bank communications, which the court concluded did not suggest *inter*-defendant communications.  *Id.* at 139.  The Complaint here contains everything the Second Circuit found absent in that case.

In *In re Musical Instruments & Equipment Antitrust Litigation*, the court held that the plaintiffs' allegation that the defendants merely shared information through their membership in a trade association was insufficient to suggest an illegal agreement.  798 F.3d 1186, 1196 (9th Cir. 2015).  Far more than information-sharing is alleged here.  Similarly, in *In re Aluminum Warehousing Antitrust Litigation* ("*Aluminum I*"), the district court held that bare allegations that the defendants belonged to a trade organization "is no more than suggestive of potential opportunity to communicate," and did not, standing alone, support an inference of conspiracy. 13-MD-2481 (KBF), 2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014).  The court noted the complaint lacked any allegations about who from the defendants was on the committee at the time of a relevant event.  *Id.*

Here, by contrast, the Complaint specifies the time, place, and attendees at conspiratorial meetings, as well details concerning Defendants' collective motivations and their concerted conduct over the course of the conspiracy.[42]

Finally, Defendants' reliance on "group pleading" cases also has no application to this Complaint.  (Dealer Br. at 42-46.)  As this is a *group boycott* and *conspiracy* case, it is unsurprising that the Dealer Defendants often engaged in the same conduct.  Courts recognize the commonsense principle that a complaint may make collective allegations that apply to the defendants as a whole, which is often the case here.  *See, e.g.*, *FX I*, 74 F. Supp. 3d at 594 ("Even in the absence of specific allegations identifying the exact date and time of each illicit act, the U.S. Complaint gives 'defendant[s] fair notice of what the claim is and the grounds upon which it rests.'" (quoting *Anderson News*, 680 F.3d at 182)).[43]

_____

[42]   In *Williams v. Citigroup, Inc.*, the plaintiffs relied on nothing more than alleged parallel conduct and a motive to conspire, without any "*specific* allegations, beyond stating the conclusion [that the defendants conspired to harm plaintiff] to suggest any actual concerted action."  08-cv-9208 (LAP), 2009 WL 3682536, at *3 (S.D.N.Y. Nov. 2, 2009) (emphasis added).  Similarly, in *In re Elevator Antitrust Litigation*, the plaintiffs coupled a conclusory allegation of conspiracy with allegations of mere parallel conduct, irrelevant European conduct, and a list of "theoretical possibilities" as to how the conspiracy might have been carried out.  502 F.3d 47, 50-51 (2d Cir. 2007).  And in *Burtch v. Milberg Factors, Inc.*, the complaint alleged only telephone calls between the defendants on issues tangential to the purported agreement; it failed to "specify a time or place that any actual agreement . . . occurred, nor [did it] indicate that any particular individuals or Factors made such an agreement."  662 F.3d 212, 225 (3d Cir. 2011).

[43]   *CDS*, 2014 WL 4379112, at *10 (rejecting Defendants' argument that "references to 'Dealer-Defendants' as a group are insufficiently particular" where the complaint alleged the conspiratorial participation of each Dealer-Defendant and listed Dealer-Defendant representatives attending various meetings at which the attendees were alleged to have colluded); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 08-cv-42 (JG), 2011 WL 7053807, at *13 (E.D.N.Y. Jan. 4, 2011), *adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012) (rejecting defendants' objection "to the use of the term 'defendants' or to defined groups of defendants in the individual claims"); *Hinds Cnty. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("A § 1 complaint must adequately allege the plausible involvement of each defendant and put defendants on notice of the claims against them, but it need not be detailed with overt acts by each defendant."); *In re OSB Antitrust Litig.*, 06-cv-826 (GD), 2007

The "group pleading" cases cited by Defendants are easily distinguishable.  *AD/SAT,*
*Division of Skylight, Inc. v. Associated Press*, for example, merely stands for the proposition that,
*on a motion for summary judgment*, a plaintiff must submit evidence of each defendant's
involvement with the conspiracy.  181 F.3d 216, 234 (2d Cir. 1999).  Unlike the detailed
allegation of the Complaint, the pleadings in *Concord Associates, L.P. v. Entertainment*
*Properties Trust*, 12-cv-1667 (ER), 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014); *Hinds*
*County v. Wachovia Bank N.A.*, 708 F. Supp. 2d at 362; and *Ochre LLC v. Rockwell Architecture*
*Planning & Design, P.C.*, 12-cv-2837 (KBF), 2012 WL 6082387, at *7 (S.D.N.Y. Dec. 3, 2012),
relied on conclusory allegations as to various groups of defendants, without specifying any
individual conduct.  In *Concord Associates*, for example, the complaint merely alleged that a
group of defendants "entered into 'agreements, combinations and conspiracies'" with another
group of defendants.  2014 WL 1396524, at *24.

Unlike these complaints, the Complaint here specifically identifies, by bank and by name,
individuals from *each* Defendant that participated in the conspiracy—including those installed
on the Tradeweb boards and the heads of the IRS trading desks—and it explains what each of
them did over the course of the entire conspiracy.  (*See*, *e.g.*, ¶¶112-14, 127-37, 152-54, 156,
158, 182-83, 198-99, 223, 228-30, 250, 253-65, 270, 274-77, 290, 296, 298, 368-72.)  The
Complaint is replete with allegations of conduct by specific Dealer Defendants.  (*See*, *e.g.*, ¶¶14-
15, 25, 102-05, 112-14, 123-25, 127-37, 152-54, 156, 158, 162, 177-80, 182-83, 198-99, 205,
223, 227-32, 234-36, 240-41, 246-47, 250-65, 270-71, 274-77, 290, 296, 298, 368-72.)

In support of their "group pleading" argument, Defendants submit a series of bullets that
purport to assemble the Complaint's allegations against each.  (Dealer Br. at 44-46.)  But

WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be
detailed defendant by defendant.").

Defendants inexplicably ignore most of the Complaint's incriminating allegations, including those identified above.  For example, none of Defendants' bullets acknowledge that the Complaint expressly alleges that nearly all of them participated in Project Fusion as part of a scheme to secretly seize joint control of Tradeweb's IRS trading business to shut down a threatening platform.

Plaintiffs have prepared a more accurate defendant-by-defendant summary in bullet form in **Appendix B**, attached hereto.  As that non-exhaustive Appendix makes plain, the allegations the Complaint makes against each Defendant are more than sufficient at this stage.  As detailed extensively herein, the Complaint supplies a myriad of specifics—including names, dates, locations, and motivations, as well as chronologies and quotations from which reasonable inferences can and must be drawn—determinatively lacking in each of these cases on which Defendants rely.  Nothing more is required under Rule 8.

### D.    The Complaint Adequately Pleads a Claim Against HSBC

HSBC argues separately that Plaintiffs have not adequately pled its participation in the conspiracy.[44]  While HSBC was not part of Project Fusion, the Complaint nevertheless alleges sufficient facts to support the conclusion that HSBC joined and took steps in furtherance of the unlawful conspiracy to block all-to-all trading.  As the Second Circuit has held, "once a conspiracy is shown, only slight evidence is needed to link another defendant with it."  *Apex Oil*, 822 F.2d at 257 (citing *United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir. 1985)); *see also eBooks*, 859 F. Supp. 2d at 690 ("[A] conspirator may join a conspiracy at any time that it is ongoing; there is no requirement that a conspirator join a conspiracy from its inception. . . .

---

[44]    Dkt. No. 163, Defendants HSBC Bank PLC, HSBC Bank USA, N.A., and HSBC Securities (USA) Inc.'s Supplemental Memorandum of Law in Support of Their Motion to Dismiss the Second Amended Complaints ("HSBC Br.").

[T]he fact that [a defendant was] involved in only a portion of it[] does not undermine the existence of the conspiracy itself or [the defendant's] role as a participant.").

The Complaint alleges that, in 2009, HSBC joined OTCDerivNet, an organization the Dealer Defendants had created and used "to control how clearing would develop in the IRS market." (¶177.) The Complaint alleges that HSBC installed Elie El Hayek, the bank's Global Head of Rates (that is, the head of its IRS trading desk), on OTCDerivNet's board, alongside other key players in the conspiracy, where they "specifically discussed how the Dealer Defendants could jointly prevent or delay the buy side's ability to clear IRS trades" through 2013. (¶183 & n.72.)[45]

HSBC argues that membership on a board of directors does not establish antitrust liability, citing *Sky Angel v. National Cable Satellite Corp.*, 947 F. Supp. 2d 88, 102 (D.D.C. 2013). (HSBC Br. at 4.) But the Complaint pleads more than membership—it alleges HSBC installed its head of IRS trading on a board used as a vehicle of the conspiracy, alongside key architects of the conspiracy, and that those board memberships *were actually used* to have illicit conversations about blocking investors from centrally clearing IRS trades.

The Complaint alleges that the principal purpose of OTCDerivNet was to allow the Dealer Defendants to secure control of SwapClear, an enterprise the Dealer Defendants perceived to be a threat. (¶¶176-79.) Accordingly, HSBC's decision to join OTCDerivNet is itself probative of its joining the conspiracy. And the Complaint alleges specific actions taken by OTCDerivNet, at the behest of the Dealer Defendants who controlled it, to prevent investors from joining SwapClear and to otherwise restrict clearing membership to dealers only. (¶180.)

---

[45]   Mr. El Hayek also represented HSBC on the ISDA board, which, as noted above, the Dealer Defendants also used as a forum for collusion. (¶152.) Najib Lamhaouar, another HSBC official, colluded with the Dealer Defendants via his seat on the FIA board. (¶153.)

Then, when CME launched a clearing service that might loosen the Dealer Defendants' grip on clearing IRS, the Dealer Defendants, through OTCDerivNet, "agreed to clear only *interdealer* IRS trades and only on *SwapClear* (the entity they controlled)," effectively starving the new platform.  (¶¶187-88.)  HSBC is implicated by all of these allegations.

The Complaint also alleges that HSBC's purportedly independent FCM (¶193) refused to clear trades on TeraExchange "without approval from the IRS trading desk" (¶230).  HSBC's FCM told TeraExchange that the FCM would not clear trades without approval from the IRS trading desk.  (*Id.*)  HSBC would have no reason to forego clearing fees and flout the independence of its FCM unless it was participating in the alleged conspiracy to block platforms like TeraExchange.  Its conduct displays a "willingness to forsake short-term profits to achieve an anticompetitive end," which the Second Circuit has repeatedly recognized is "indicative of anticompetitive behavior."  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 659 (2d Cir. 2015) (quotation marks and citation omitted).

The Complaint alleges that HSBC, in concert with the other Dealer Defendants, conspired to punish IDBs that made moves toward opening platforms to investors (¶162); boycotted investors that attempted to trade on IDBs; conspired to prevent anonymous trading that would interfere with the boycott (¶¶163-64); provided liquidity to ICAP's IDB platform as part of an agreement to keep ICAP from opening an anonymous all-to-all platform to investors (¶¶166-73); and boycotted efficient new platforms like Javelin, TeraExchange, and TrueEX that threatened the Dealer Defendants' privileged position as market middlemen (¶¶202-87).  And when the Complaint alleges the Dealer Defendants effectively directed 98% of their trades to platforms with name give-up to maintain an artificially bifurcated market, HSBC is fully implicated.  (¶¶303-07.)

HSBC argues that the Court should disregard all of the Complaint's allegations that do not specifically reference HSBC by name.[46]  But, as noted, there is no need for a plaintiff to call out each defendant by name when referring to all the conspirators collectively.  It is reasonable to refer to Defendants collectively when they act as a group, which is what the Complaint does here.  The Complaint's allegations are more than sufficient to provide the "slight evidence" needed "to link" HSBC to the conspiracy.  *Apex Oil*, 822 F.2d at 257.

### E.  The Complaint Adequately Pleads a Claim Against Tradeweb

Like HSBC, Tradeweb argues that the allegations in the Complaint do not plausibly allege that it participated in the conspiracy.[47]  These arguments also wither under scrutiny. Tradeweb was involved in the conspiracy from the beginning.  Although it may have had different motivations for joining the conspiracy from the Dealer Defendants, that "does not undermine the existence of the conspiracy itself or [Tradeweb]'s role as a participant."  *eBooks*, 859 F. Supp. 2d at 690.

Among other things, the Complaint specifically alleges that Tradeweb:  (1) had "plans . . . to introduce . . . all-to-all trading" to IRS investors in late 2007 (¶¶14, 111);

---

[46]  The cases HSBC cites in support of its arguments are factually inapposite in that their complaints only made conclusory allegations without any specific facts.  *See, e.g.*, *Elevator*, 502 F.3d at 50-51 (dismissing complaint that "enumerates basically every type of conspiratorial activity that one could imagine . . . in *entirely general terms* without *any* specification of *any* particular activities by any particular defendant*" (emphases added)); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) ("*Mere generalizations* as to any particular defendant—or even defendants as a group—are insufficient." (emphasis added)); *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008) ("Nowhere does the complaint cite to specific wrongful acts of specific defendants to support the allegations of 'customer allocation, the division of markets, the adjustment of capacity bid rigging, elimination of competitors, predatory pricing, non-competition and monopolization.'").

[47]  Dkt. No. 169, Notice Of Defendant Tradeweb Markets LLC's Motion to Dismiss the Second Consolidated Amended Complaints; Dkt. No. 170, Memorandum of Law in Support of Defendant Tradeweb Markets LLC's Motion to Dismiss the Second Consolidated Amended Complaints ("Tradeweb Br.").

(2) instead facilitated the Dealer Defendants taking control of its IRS business by employing a complicated set of maneuvers in conjunction with the Dealer Defendants that, among other things, involved creating two new Tradeweb entities within twenty-four hours (¶¶115-17); (3) collaborated with the Dealer Defendants to conceal their takeover of its IRS business (¶¶116-23); (4) "agreed with the Dealer Defendants . . . to shutter the possibility of offering buy-side investors access" to all-to-all trading (¶¶16, 144-46) and maintained its end of the bargain up to the present day; (5) provided "a forum" that the Dealer Defendants used "to hold secretly conspiratorial discussions" in order "to coordinate their actions" (¶¶17, 138-40); (6) charged five-hundred times more to trade on Dealerweb (reserves for dealers) than Tradeweb's retail SEF (designed for non-dealers) in order to entrench and maintain a bifurcated market (¶¶147-49); and (7) participated in the détente by limiting the expansion of Dealerweb, in exchange for ICAP's agreement not to establish an anonymous all-to-all platform (¶¶169-73, 306 n.124).

These allegations, viewed together as they must be, are more than sufficient to state a claim against Tradeweb.  Tradeweb's principal tactic is to disagree with the Complaint's well-pled allegations.  To take just three examples:  (1) where the Complaint alleges Tradeweb shuttered a plan to introduce all-to-all trading (¶¶111-14), Tradeweb disputes that any such plan existed (Tradeweb Br. at 14); (2) where the Complaint alleges investor clearing was feasible to support an anonymous all-to-all trading platform prior to 2013 (¶¶90, 175-80, 187-88), Tradeweb asserts that clearing was not feasible before it became mandatory under Dodd-Frank (Tradeweb Br. at 15); and (3) where the Complaint alleges sufficient investor demand to support an anonymous all-to-all trading platform (¶¶24-25, 111, 209, 213, 251, 255, 265-66), Tradeweb relies on extrinsic sources not cited in the Complaint to claim otherwise (Tradeweb Br. at 17). Tradeweb's disagreements with the facts are improper at this stage. *See, e.g.*, *Javier v. Beck*, 13-

cv-2926 (WHP), 2014 WL 3058456, at *3 (S.D.N.Y. July 3, 2014) ("[A] dispute as to the facts

underlying the Complaint is not appropriate on a motion to dismiss.").[48]

Equally unavailing are Tradeweb's arguments that it might have unilaterally engaged in

some of the alleged conduct.  (Tradeweb Br. at 18-19.)  Such an assertion is irrelevant when the

Complaint specifically alleges the defendant *actually* did so pursuant to a *per se* unlawful

conspiracy.  *Cf. Gelboim*, 823 F.3d at 776 (rejecting argument that conduct is not anticompetitive

when the plaintiff could have "suffered the same harm under normal circumstances of free

competition" (citation omitted)).

Tradeweb also argues that the Complaint's allegations that it provided Defendants with

an opportunity to conspire do not implicate Tradeweb itself.  (Tradeweb Br. at 20-21.)  But the

Complaint does not just allege that Tradeweb provided an "opportunity" to conspire; it alleges

that Tradeweb actively facilitated that collusion.  Tradeweb and the Dealer Defendants, for

example, created two new Tradeweb entities to hide their true objectives as part of Project

Fusion and then filled the boards of these two new companies with bank representatives.  (¶¶116,

126-39.)  The Complaint also alleges that Tradeweb agreed (against its independent interests) to

shutter plans for an anonymous all-to-all electronic IRS platform open to the buy side.  (¶¶144.)

It designed two SEF platforms in a way that reinforces a bifurcated IRS market structure.

(¶¶147-48).  And it limited its RFQ capabilities to ensure that only dealers can respond to quote

---

[48]  *See also Weis-Buy Farms, Inc. v. Quality Sales LLC*, 11-cv-2011 (WIG), 2012 WL
2237166, at *3 (D. Conn. June 15, 2012) ("While [defendant] may dispute [plaintiff's] factual
allegations and may even prevail at the summary judgment stage, . . . for purposes of this motion
to dismiss the Court must accept these factual allegations as true."); *Grund v. Del. Charter Guar.
& Trust Co.*, 788 F. Supp. 2d 226, 245 (S.D.N.Y. 2011) ("[D]isputes and denials of the facts
alleged . . . are improper for a Rule 12(b)(6) motion to dismiss, where factual allegations are
taken as true and viewed in a light most favorable to Plaintiffs.").

requests. (¶150.) These actions were undertaken in furtherance of the conspiracy at the expense of Tradeweb's independent competitive interest.

Tradeweb next contends that its "ownership structure [has] never been concealed." (Tradeweb Br. at 21). But Tradeweb does not really contend that *the conspirators* (the Dealer Defendants and Tradeweb) themselves disclosed the truth about Project Fusion—*i.e.*, that the Dealer Defendants jointly seized control of Tradeweb's IRS business. Rather, in a dramatic understatement, Tradeweb characterizes the deceptive press releases issued by the conspirators as "not highlight[ing] certain intricacies of the transaction structure." (*Id.* at 22.) As discussed above, those "intricacies" were purposefully created by the Dealer Defendants and Tradeweb precisely so they could "not highlight" (read: *conceal*) the truth: that the Dealer Defendants took control over the future of Tradeweb's IRS business.

Instead, like the Dealer Defendants (*see supra* at 30-31), Tradeweb contends that a *non-conspirator*, Thomson, supposedly revealed the truth about Project Fusion in a Form 20-F SEC filing, which Tradeweb attaches as Exhibit 8 to its brief. The specific language to which Tradeweb points is, literally, on page 606 of the 636-page exhibit. But, unfortunately, even if an IRS investor was somehow still reading on page 606 of the Thomson SEC filing, that investor *still* would not have discovered the truth because that SEC filing did not disclose that the Dealer Defendants jointly took control of Tradeweb's IRS business in 2007 either. As a result of the deception in which Tradeweb actively participated, the Complaint in this action provides the first disclosure of what really occurred.

Relying on the Second Circuit's recent decision in *United States v. American Express Co.*, 838 F.3d 179 (2d Cir. 2016), a case that involved *unilateral* action by American Express, not horizontal collusion, Tradeweb next argues the Complaint does not "plausibly allege that

there was adequate demand for an anonymous, all-to-all IRS trading platform from both dealer-side *and* buy-side customers." (Tradeweb Br. at 15.) But this assertion is mistaken. The Complaint alleges, for example, that in late 2013, "Javelin had signed up seven second-tier dealers to trade on" its all-to-all platform. (¶248.) And the Complaint's allegations regarding buy-side demand are legion. (¶¶87, 99, 213-14, 220, 227, 231, 233, 251, 255, 265-68.)

As the Complaint explains, absent their conspiracy, it would have been in the individual self-interests of at least some Dealer Defendants to support all-to-all trading as well. (¶¶341-44.) Acting independently, a dealer "would have advanced its own self-interest by partnering with a solution provider in order to 'get in on the ground floor,' increasing its own market share and positioning itself for a fully competitive IRS market." (¶343.) Moreover, "[i]n the absence of collusion, each Dealer Defendant would have been dragged onto all-to-all platforms by client demand, pursuing the revenue available on such platforms." (*Id.*)

These incentives would have especially driven smaller Dealer Defendants to be early supporters, since they could gain market share. (¶344.) And, even if the Dealer Defendants had been reluctant, TeraExchange's strategy of recruiting alternative liquidity providers would have driven Dealer Defendants to its all-to-all trading platforms as clients demanded "best execution" of their IRS trades. (¶216.) As noted, the Dealer Defendants' own research reports, written by analysts apparently unaware of the boycott, concluded that IRS were likely to move to all-to-all trading. (¶334.)[49]

---

[49]   Tradeweb's citation to CFTC comment letters and other extrinsic materials are misleading as well as improper. As noted, *supra* 45, note 12, a number of the comment letters, for example, are nothing more than self-serving statements from Dealer-Defendant controlled organizations while the remainder are irrelevant letters on issues only tangentially related to the case.

Finally, Tradeweb challenges the Complaint's allegations of a détente involving Tradeweb and ICAP.  Like its other arguments, this challenge largely consists of disagreeing with the facts alleged.  For example, Tradeweb's first contention is that the détente is implausible because Tradeweb launched Dealerweb, which "is open to the buy side."  (Tradeweb Br. at 23.) But the Complaint quotes the acknowledgement of Tradeweb's own former managing director that "we don't have buy-side participants" on Dealerweb, a restriction which the Dealer Defendants can easily police because Dealerweb utilizes name give-up.  (¶¶147, 301.)  The rest of Tradeweb's arguments are no more sound or proper at this stage.[50]  When the Complaint's allegations are credited, as they must be at this stage, the allegation that Tradeweb joined the conspiracy is easily plausible.

### F.     The Complaint Adequately Pleads a Claim Against ICAP

ICAP's separate attacks on the plausibility of the conspiracy claim also fail.[51]  The Complaint alleges ICAP joined the conspiracy in 2009, when it reached an agreement with the Dealer Defendants:  ICAP withdrew its plan to open its i-Swap platform as an anonymous all-to-all trading platform in the United States, in exchange for the Dealer Defendants agreeing not to allow Dealerweb to encroach on ICAP's dealer-to-dealer IRS business.  (¶¶166-69.)  Pursuant to

---

[50]   Tradeweb also argues that the détente allegations fail because the Complaint does not detail communications between Tradeweb and ICAP.  (Tradeweb Br. at 23.)  But ICAP entered into the agreement with the Dealer Defendants (¶169), which controlled Tradeweb (¶¶115-42). Tradeweb's arguments that it was acting independently in its own interests when it limited Dealerweb to the mortgage bond market and when it elected not to introduce all-to-all IRS trading (Tradeweb Br. at 24, 25) are nothing more than an improper request for the Court to choose between competing plausible theories.  *See Gelboim*, 823 F.3d at 781.

[51]   Dkt. No. 165, Notice of ICAP Capital Markets LLC's and ICAP SEF (US) LLC's Motion to Dismiss All Claims; Dkt. No. 166, ICAP Capital Markets LLC's and ICAP SEF (US) LLC's Memorandum in Support of Motion to Dismiss All Claims ("ICAP Br."); Dkt. No. 189, Notice of ICAP Global Derivatives Limited's Motion to Dismiss All Claims and Adoption of Prior Submissions of ICAP Capital Markets LLC and ICAP SEF (US) LLC in Support of Same. ICAP's timeliness, preemption, and unjust enrichment arguments fail for the same reasons described herein.

this agreement, ICAP limited its i-Swap platform to dealer-only trading (¶¶171-72), while the Dealer Defendants directed interdealer trading to ICAP's platforms and have traded IRS only minimally on Dealerweb.  (¶173.)  ICAP participated in the conspiracy by maintaining name give-up on its platforms, which effectively prohibited investors from trading on those platforms for fear of retribution from the Dealer Defendants.  (¶301.)

The Complaint alleges that, if ICAP had not joined the Dealer Defendants' conspiracy, it would instead have launched its i-Swap platform in the United States to investors.  Having successfully operated i-Swap as an all-to-all platform in Europe by 2009, and having successfully introduced it to the United States as a dealer-only platform in February 2013 (¶¶170-71),[52] ICAP could easily have launched i-Swap as an all-to-all platform open to investors in the United States.  But the Complaint alleges that ICAP acted against its own economic self-interest, opting instead to support the Dealer Defendants' conspiracy, when it could have expanded its platforms and increased its profits.  (¶172.)

These well-pled facts are sufficient to state a plausible claim that ICAP conspired with the other Defendants to prevent the emergence of an all-to-all IRS trading platform—including by not opening its own platform at the Dealer Defendants' behest.[53]  On a motion to dismiss, the Court may not indulge ICAP's attempt to explain away the Complaint's factual allegations, and must draw all inferences in Plaintiffs' favor.  *See Gelboim*, 823 F.3d at 781 ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be

---

[52]   ICAP asserts (ICAP Br. at 3-4) that it permitted investors to participate in i-Swap, but the Complaint alleges otherwise (¶171).

[53]   In its tag-along motion, Defendant ICAP Global Derivatives Limited argues that the Complaint engages in improper group pleading as to the ICAP entities.  (Dkt. No. 189, at 2.)  As with the Dealer Defendants (*see* Section II.C.5 *supra*), the Complaint refers to the ICAP entities collectively because they engaged in collective action.  The Complaint makes clear, for example, that each of the named ICAP entities offered interdealer trading platforms (¶¶65-66), which, as part of the détente with the other defendants, they agreed to keep closed to the buy side (¶172).

made by the court on a Rule 12(b)(6) motion.  Skepticism of a conspiracy's existence is

insufficient to warrant dismissal . . ." (citation and internal quotation marks omitted)); *Anderson*

*News*, 680 F.3d at 189 ("The question at the pleading stage is not whether there is a plausible

alternative to the plaintiff's theory, the question is whether there are sufficient factual allegations

to make the complaint's claim plausible.").  ICAP's counter-explanations thus provide no basis

for dismissal, because they "do[] not mean that [Plaintiffs'] allegations [that ICAP's] conduct

was culpable is not also plausible."  *Id.* at 190.

    *First*, ICAP observes that the Complaint does not allege that ICAP engaged in conduct

identical to that undertaken by the Dealer Defendants.  (ICAP Br. at 6, 11-12.)  But ICAP

contributed to the conspiracy in its own way.  Similarly, it does not matter that ICAP's motives

were different from the Dealer Defendants'.  (*See id.* at 3, 6, 15-16.)  *See eBooks*, 859 F. Supp.

2d at 690 ("[T]he fact that [a defendant] might have had different motivations for joining the

conspiracy, and was involved in only a portion of it, does not undermine the existence of the

conspiracy itself or [the defendant's] role as a participant.").

    The dispositive allegation is that ICAP *joined* the conspiracy to prevent emergence of an

all-to-all IRS platform; *why* it did so is irrelevant.  *See Anderson News*, 680 F.3d at 190 (holding

that uniformity among conspirators is not required to state a plausible claim).  The antitrust laws

impose liability even when a defendant is pressured or even *coerced* to conspire.  *See United*

*States v. Paramount Pictures*, 334 U.S. 131, 161 (1948) ("[A]cquiescence in an illegal scheme is

as much a violation of the Sherman Act as the creation and promotion of one.").[54]  ICAP was

undoubtedly pressured to join the conspiracy, but that does not exonerate it for agreeing to do so.

---

[54]    *See also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 615
(7th Cir. 1997) (noting that a defendant wholesaler's participation would be actionable even if
the jury found that they "were tools of the manufacturers-reluctant accomplices, yet not the less

*Second*, ICAP argues that the Court may not draw an inference of conspiracy from its alleged conduct (ICAP Br. at 3-4, 10-12, 14-15), but the law mandates the opposite: *All* reasonable inferences that can be drawn from Plaintiffs' factual allegations must be accepted as true. *See Anderson News*, 680 F.3d at 184 (court's "failure to assume the truth of reasonable inferences that could be drawn from [plaintiff's] allegations" was reversible error). While ICAP argues it had independent, innocent explanations for its conduct, such "alternative explanations" (ICAP Br. at 10) cannot be credited at this stage.

*Finally*, ICAP improperly advances a counter narrative that contradicts many of the Complaint's well-pled allegations. *See, e.g.*, *Javier*, 2014 WL 3058456, at *3 ("[A] dispute as to the facts underlying the Complaint is not appropriate on a motion to dismiss."); *Grund*, 788 F. Supp. 2d at 245 ("[D]isputes and denials of the facts alleged . . . are improper for a Rule 12(b)(6) motion to dismiss, where factual allegations are taken as true . . . ."). These are not proper arguments at this stage. The Complaint cannot be dismissed based on ICAP's assertions about what allegations are "false" (ICAP Br. at 13), its contention that no demand for cleared trading existed prior to Dodd-Frank (*id.* at 13-14), or its assertion that it did not enter a détente with Tradeweb (*id.* at 14-15). Each of ICAP's contentions contradicts the facts pled in the Complaint. (¶¶166-73, 187, 301.)

## III.   PLAINTIFFS HAVE EVERY RIGHT TO PURSUE THEIR ANTITRUST CLAIMS

Defendants next argue that, even if they did secretly conspire to block all-to-all trading in the IRS market, Plaintiffs have no right to bring an antitrust claim about this conduct. First, they

---

liable for that"); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 973 (7th Cir. 1995) ("[T]he 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion.").

argue that Plaintiffs and the class lack standing to bring antitrust claims.  Second, they argue these antitrust claims were "impliedly" preempted by Dodd-Frank.

Both arguments are very weak and unsupported by precedent.  In fact, both the Supreme Court and the Second Circuit have squarely held that direct-purchaser consumers like Plaintiffs here have standing to bring antitrust claims for damages they suffer as a result of a conspiracy to block competition.  *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 480-81 (1982) (holding that consumers have standing when existing competitors are eliminated); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) (holding that direct purchasers have standing when potential competitors are excluded).  The Supreme Court has also held that direct purchasers like Plaintiffs have "*a preferred position* as private attorneys general" in enforcing the antitrust laws.  *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 747 (1977) (emphasis added).  Illustrating just how frivolous their standing argument is, Defendants do not even bother to address these cases, even though the *CDS* court relied on *DDAVP* in rejecting their identical standing argument in that case.  2014 WL 4379112, at *7-9.

Nor can Defendants offer any precedent supporting their tortured interpretation of Dodd-Frank, which would distort a statute enacted by Congress to *promote* competition and *protect* consumers into a vehicle for depriving investors of the right to seek damages for an illicit conspiracy to charge them higher prices.  Indeed, as Judge Cote recognized in rejecting Defendants' argument in *CDS*, Congress anticipated the very misuse of the Act that Defendants attempt here and included an express antitrust savings clause to make sure it could not succeed. 2014 WL 4379112, at *16-17.  Dodd-Frank's antitrust savings clause unambiguously rejects Defendants' assertion that the investor victims of their secret conspiracy are simply out of luck.

### A.  Plaintiffs Have Standing to Bring Their Antitrust Claims

Defendants' standing argument is at odds with unambiguous precedent that is directly on point.  The Supreme Court and the Second Circuit have squarely held that consumers who are deprived of competition by incumbents who block actual or potential competitors have standing under the antitrust laws.  In *McCready*, the Supreme Court held that a class of consumers alleging harm from the exclusion of existing competitors had antitrust standing, observing that the Clayton Act's "remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market."  457 U.S. at 479.  The plaintiffs had standing because, as consumers "within that area of the economy" endangered by the "breakdown of competitive conditions," they had alleged an injury that "was inextricably intertwined with the injury the conspirators sought to inflict" on the excluded competitors.  *Id.* at 480-84.

The Second Circuit reached the same conclusion in *DDAVP*, holding that purchasers of a pharmaceutical drug had standing where the defendants prevented generic competitors from entering the market.  585 F.3d at 688-89.  As in *McCready*, while the defendants' conduct may have "targeted their competitors," the direct purchasers of the drug also had standing because their "claimed injury of higher prices was 'inextricably intertwined' with the conduct's anti-competitive effects and thus 'flow[ed] from that which makes defendants' acts unlawful.'" *DDAVP*, 585 F.3d at 688 (quoting *McCready*, 457 U.S. at 484).

Plaintiffs here are in precisely the same position as the plaintiffs in *McCready* and *DDAVP*.  Defendants do not argue the contrary, and indeed ignore this binding precedent entirely.  This highlights the vacuous nature of their position.  *See CDS*, 2014 WL 4379112, at *7-9 (holding that, under *DDAVP*, CDS purchasers had standing).

Undaunted, Defendants argue that Plaintiffs and the class should be denied standing because they would not be "efficient enforcers" of the antitrust laws.  (Dealer Br. at 49.)[55]  They argue that investors are supposedly too "indirect and remote" from the injury caused by their conspiracy and that only excluded competitors (like TeraExchange and Javelin) are efficient enforcers of the antitrust laws.  This argument is fundamentally misguided for two reasons: First, as *McCready* and *DDAVP* make clear, it is black-letter law that a court need not choose between different sets of victims of an antitrust conspiracy.  In a case like this one, *both* the overcharged investors *and* the blocked competitors have standing.

Second, it is also black-letter law that the central purpose of the antitrust laws is to protect *consumers* like Plaintiffs.  As the leading treatise explains:  "protecting consumers from higher prices . . . is the central goal of the antitrust laws, while protecting rivals' profits is not. So in that sense we might say that the consumers' injury is the 'primary' one, while the rival's injury is only 'secondary.'"  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶339d (3d ed. 2007).  Defendants' meritless arguments turn these principles upside down:  they would deny *consumers* the right to bring antitrust claims in defiance of the "central goal," *id.*, of the antitrust laws.

To determine whether a proposed plaintiff is an "efficient enforcer," courts generally consider four factors:  "(1) the 'directness or indirectness of the asserted injury[]' . . . ; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which [the] damages claim is 'highly speculative'; and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the

---

[55]  To have antitrust standing, the plaintiff must (1) have "suffered antitrust injury," and (2) fall in the category of potential claimants who will be "efficient enforcers of the antitrust laws."  *Gelboim*, 823 F.3d at 772.  Defendants here do not contest that Plaintiffs suffered antitrust injury.

other.'"  *Gelboim*, 823 F.3d at 778 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 540-45 (1983)).  Plaintiffs satisfy each element of this test.[56]

As the direct purchasers and consumers of the IRS products on which Defendants charged inflated prices as a result of the conspiracy, Plaintiffs are clearly "efficient enforcers" of their antitrust claims.  Plaintiffs' claims vindicate the interests at the very core of the antitrust laws.  Indeed, Plaintiffs' direct payment of inflated IRS spreads to the Dealer Defendants places them in a "preferred position as private attorneys general" to enforce those laws.  *Ill. Brick Co.*, 431 U.S. at 747.

Congress' *primary* purpose in enacting the antitrust laws was to "creat[e] an effective remedy *for consumers who were forced to pay excessive prices* by the giant trusts and combinations that dominated certain interstate markets."  *AGC*, 459 U.S. at 530 (emphasis added); *see also, e.g.*, *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 427 (S.D.N.Y. 2014) ("'Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices.'" (quoting *AGC*, 459 U.S. at 530)).  While seeking to deny Plaintiffs that "effective remedy," *id.*, Defendants cannot identify any case in which a court

---

[56]   These factors come from *AGC*, a case that posed unusually complex questions of standing.  There, the Supreme Court found that labor-union plaintiffs lacked antitrust standing because their claimed injuries were several steps removed from the alleged anticompetitive conduct.  The claim in *AGC* rested on a theory that a group of employers had coerced third-parties to enter into business relationships with fourth-party nonunion firms, allegedly affecting the trade of certain fifth-party unionized firms, which eventually resulted in alleged injuries to the unions' business.  459 U.S. at 521-23.  Here, the causal chain is straightforward:  Defendants eliminated competition so they could directly charge Plaintiffs supracompetitive prices on IRS transactions.  In the Lanham Act context, the Supreme Court has recently described a set of factors similar to those of *AGC* as "slightly off the mark," since proximate causation must "be met in every case" while "potential difficulty in ascertaining damages" (the third and fourth *AGC* factors) is not "an independent basis for denying standing."  *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S. Ct. 1377, 1392 (2014).

rejected antitrust standing under remotely comparable circumstances.  Nor can they distinguish the decision in *CDS*, which found that CDS purchasers had standing in materially identical circumstances.  *See* 2014 WL 4379112, at *7-9.

### 1.     Plaintiffs' Injuries Are Direct

Determining whether an injury is "direct" entails what is "essentially a proximate cause analysis."  *CDS*, 2014 WL 4379112, at *8 (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 78 (2d Cir. 2013)).  The question is ultimately whether the claimed injury is a "type of loss" the conspiracy's conduct "would be likely to cause," *McCready*, 457 U.S. at 479, *i.e.*, whether the injury is "within the scope of the risk created by" the defendants' conduct, *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014).

Plaintiffs' claims could not be more direct:  Plaintiffs bought IRS directly from the Dealer Defendants at inflated prices the Dealer Defendants were able to charge precisely because of their conspiracy to suppress competition.  In the absence of the conspiracy, class members would have been able to trade IRS on all-to-all electronic platforms that would have substantially reduced bid-ask spreads by increasing competition.  (*E.g.*, ¶¶21, 319-39, 401.)  As common sense dictates, and empirical analyses confirm, "[c]ompetition lowers costs" because "the more competition for business, the better quotes the dealers tend to give and the narrower the spreads." (¶¶323-24.)  Moreover, under all-to-all trading, *non-dealers* would provide quotes as well, generating additional competition and further tightening bid/ask spreads.  (¶¶213-15.)  With all-to-all trading, investors can also supply quotes themselves, which would also immediately and substantially decrease their trading costs.  (¶331.)[57]

---

[57]   "Even if only one of every three trades by a buy-side firm was executed this way [*i.e.*, with the investor supplying the quote], total net trade costs for the buy-side firm could decrease by as much as two-thirds from the current RFQ regime, for a given bid/ask spread."  (¶331.)

Thus, Plaintiffs were directly injured when they purchased IRS at inflated prices because Defendants robbed the market of competition and innovation, reduced output, and diminished consumer choice.  (¶¶14, 203, 213-15, 319-39.)  These commonsense points about the effect of a conspiracy to block competition are precisely why they are unlawful *per se*.

Defendants nevertheless assert that Plaintiffs' "alleged injury is too indirect and too remote from Defendants' purported conduct" to confer standing.  (Dealer Br. at 50.)  This is wrong, and obviously so.  Plaintiffs' injuries were not only "a natural or probable consequence" of the conspiracy, *Lotes*, 753 F.3d at 412; they were the *very reason* for the conspiracy.  Plaintiffs' injury "is not some far-flung consequence of" the conduct underlying Plaintiffs' claims, but is instead "'precisely the type of loss that [defendants' conduct] would be likely to cause.'"  *DNAML*, 25 F. Supp. 3d at 429 (quoting *McCready*, 457 U.S. at 479).

Defendants' assertion that Plaintiffs' injuries are not "direct" is based on the premise that only the blocked competitors themselves have "direct" injuries for antitrust purposes.  That premise is not just wrong, it is backwards.  The central point of the antitrust laws is to protect consumers, not competitors.  *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶339d (3d ed. 2007).  That is why the Supreme Court and the Second Circuit have held that the existence of other injured parties does not make Plaintiffs' injuries "indirect," rejecting the exact argument Defendants make here.  In *McCready*, the Supreme Court "quickly disposed of" the argument that "because the alleged conspiracy was directed" at competitors, consumers lacked standing to sue.  457 U.S. at 479.  The Court explained that the antitrust remedies "cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market."  *Id.*  Because the injury to consumers "was clearly foreseeable" and the "injury alleged is so integral an aspect of the conspiracy," the consumers had standing.  *Id.*

The Second Circuit rejected this same argument in *DDAVP*, holding the plaintiffs' claim for damages was direct because, as is the case here, "harming competitors was simply a means for the defendants to charge the plaintiffs higher prices." F.3d at 688. Defendants limply assert that "[t]he analysis of this factor in *In re Credit Default Swaps Antitrust Litigation* is erroneous" (Dealer Br. at 53 n.67), but they identify no authority saying so, and they fail to acknowledge dispositive precedent such as *McCready* and *DDAVP*.[58]

Defendants erroneously rely on *Paycom Billing Services, Inc. v. MasterCard International, Inc.*, 467 F.3d 283 (2d Cir. 2006), in which a merchant sought damages allegedly caused by a MasterCard policy providing that member banks could not be issuers or acquirers of other payment cards. *Id.* at 287-88. As *CDS* recognized, *see* 2014 WL 4379112, at *8, the damages theory in *Paycom* was unusually circuitous: The plaintiff claimed that, had MasterCard not implemented the challenged policy, its competitors (like American Express and Discover) would have made more sales, which would have caused MasterCard to react by adopting a different (but *unspecified*) policy, which might have benefited the plaintiff in some *unidentified* way. *See Paycom*, 467 F.3d at 293. That asserted injury was "indirect" because any harm from the policy was "derived from the reduced issuance/transaction volumes" of the *other* payment

---

[58]     *See also Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 821-22 (2d Cir. 1983) ("[I]t avails [defendant] little to argue that customers [lacked standing] because the anticompetitive effect . . . was aimed at [competitors] rather than customers."); *Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 72 (1st Cir. 2005) (holding consumers "are presumptively favored as appropriate plaintiffs to assert antitrust injury"); *CDS*, 2014 WL 4379112, at *9 ("Both the [consumer] plaintiffs and the entities seeking to create [the competitor platform] are naturally motivated to enforce the antitrust laws due to their distinct injuries."); *New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802, 811 (S.D.N.Y. 1986) ("Consumers have standing when they are injured as a result of a defendant's improper exclusion of competitors from the market."); *Brokers' Assistant, Inc. v. Williams Real Estate Co., Inc.*, 646 F. Supp. 1110, 1124 (S.D.N.Y. 1986) (rejecting argument "that the victim of an allegedly successful boycott designed to support a broad policy of market limitation lacks standing" (quotation marks, brackets, and citation omitted)).

cards, and the resulting but unspecified change to MasterCard's policy.  *Id.  Paycom* is plainly

inapposite here, where the harm to consumers is straightforward, specified, and direct.[59]

*In re Aluminum Warehousing Antitrust Litigation* ("*Aluminum IV*"), 13-MD-2481 (KBF),

2016 WL 5818585 (S.D.N.Y. Oct. 5, 2016) (cited in Dealer Br. at 48), is also inapposite.  There,

the plaintiffs—participants in the market for *physical* aluminum—sued for injuries allegedly

resulting from the defendants' alleged misconduct with respect to the market for aluminum

*warehouse services*.  *Id.* at *4.  The markets were separate, and the plaintiffs' injuries in one

market could not be directly tied to the defendants' conduct in the other.  Here, by contrast,

Defendants blocked competition in the same IRS market in which Plaintiffs participate as

consumers and direct purchasers.  *See Merced Irrigation Dist. v. Barclays Bank PLC*, 15-cv-

4878 (VM), 2016 WL 6820738, at *3 (S.D.N.Y. Nov. 10, 2016) (distinguishing *Aluminum IV* on

this basis)[60]; *see also Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 58-59 (allegations that

---

[59]   Defendants' characterization of Plaintiffs' injuries as "derivative" (Dealer Br. at 51) is
misplaced.  A "derivative" injury is one suffered as a consequence of some other party's direct
antitrust injury.  *Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.*, 10-cv-3751 (DLC), 2010 WL
5392927, at *4 (S.D.N.Y. Dec. 29, 2010) (citing *Beverage Corp. v. Honickman*, 55 F.3d 762,
767 (2d Cir. 1995)).  For example, "injuries sustained by employees, officers, stockholders, and
creditors of an injured company" are "derivative" injuries.  *Id.*  Plaintiffs' antitrust injuries are
not derivative, but are the *direct* result of being overcharged as a result of the conspiracy.  *See*
Note, *Standing to Sue for Treble Damages Under Section 4 of the Clayton Act*, 64 Colum. L.
Rev. 570, 582 (1964) (distinguishing derivative from direct claims).

[60]   None of the other cases cited by Defendants undermine Plaintiffs' antitrust standing.
As Defendants acknowledge (Dealer Br. at 52), *Atucha v. Commodity Exchange, Inc.*, 608 F.
Supp. 510 (S.D.N.Y. 1985), held that plaintiff lacked standing where plaintiff's theory of injury
depended on a complicated series of interactions between multiple markets, far from the scenario
here.  *Aluminum I*, 2014 WL 4277510 (cited in Dealer Br. at 52-53), is distinguishable on similar
grounds.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig. ("FX II")*, 13-cv-7789
(LGS), 2016 WL 5108131, at *10 (S.D.N.Y. Sept. 20, 2016) (rejecting analogy to *Aluminum I*,
which involved plaintiffs that were "more than one level removed from the alleged conspiracy"
and where other "potential causal factors" of the alleged injuries were "readily identified").  In *In
re Digital Music Antitrust Litigation*, 812 F. Supp. 2d 390 (S.D.N.Y. 2011) (cited in Dealer Br. at
53), "the operative complaint contained no nonconclusory allegations about how the pricing of
Internet Music affected CD pricing, how the CD market operated generally, . . . or any kind of tie

plaintiffs had "to pay supra-competitive prices as a result of a horizontal price-fixing conspiracy to fix a component of the price of financial instruments that they purchased in an otherwise competitive market . . . is the quintessential antitrust injury" (internal citations and quotation marks omitted)).  Plaintiffs have every right under the antitrust laws to seek damages caused by this blocking of competition.

### 2.      Plaintiffs Are Naturally Motivated to Enforce the Antitrust Laws

Defendants next argue that Plaintiffs lack standing because the SEF victims of the boycott are "motivate[d] to vindicate the public interest in antitrust enforcement."  (Dealer Br. at 53.)[61]  Again, there is no reason to choose between allowing the SEFs to bring claims and allowing investors to bring claims.  Both plainly have the right to pursue claims for their separate injuries.  Specifically, excluded competitors may seek lost profits, and Plaintiffs may seek damages for their overpayments.  *See DDAVP*, 585 F.3d at 688 (direct purchasers have standing where "harming competitors was simply a means for the defendants to charge the plaintiffs higher prices"); *CDS*, 2014 WL 4379112, at *9 ("Both the [consumer] plaintiffs and the [competitor] entities seeking to create CMDX are naturally motivated to enforce the antitrust laws due to their distinct injuries."); *DNAML*, 25 F. Supp. 3d at 431 ("A retailer's lost profits are wholly distinct from consumer overcharges . . . .").  Again, the central purpose of the antitrust laws is to protect *consumers* like Plaintiffs from being overcharged by anticompetitive conduct.

It is obvious why Defendants would prefer a different rule.  If only blocked competitors had antitrust standing, the Dealer Defendants would enjoy a windfall from their conspiracy.

---

. . . between CD pricing and Internet Music pricing."  *FX II*, 2016 WL 5108131, at *10 (rejecting defendants' argument based on *Digital Music* where nonconclusory allegations existed); *see also Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 08-cv-42 (JG) (VVP), 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) (same).

[61]   And Plaintiffs here are obviously motivated to pursue their antitrust claims.  Indeed, it was the investigation by Plaintiffs' counsel that brought Defendants' conspiracy to light.

Defendants' conspiracy here caused investors to overpay on billions or even trillions of dollars of IRS transactions going back to 2007, when they first banded together to prevent Tradeweb from offering a buy-side friendly platform and stopped IDBs from opening their own all-to-all platforms to investors.  The claims of the two blocked SEFs that had the courage to step forward here are limited to just the profits those two SEFs would have made absent the conspiracy.  If Defendants could limit standing to just those two SEFs, they would escape with large profits from an unlawful conspiracy.  Meanwhile, harmed investors would have no redress for their injuries.

Denying standing to IRS investors would thus allow Defendants to retain a "palpable profit" from their conspiracy, while denying "compensation for injuries resulting from unlawful conduct" to investors; this is exactly why the Supreme Court held this result is intolerable under the antitrust laws.  *McCready*, 457 U.S. at 473 n.10 ("[I]n addition to allowing Blue Shield to retain a palpable profit as a result of its unlawful plan, denying standing to McCready and the class she represents would also result in the denial of compensation for injuries resulting from unlawful conduct."); *see also CDS*, 2014 WL 4379112, at *9 ("Denying [consumer] plaintiffs a remedy in favor of a suit by [competitors] would thus be likely to leave a significant antitrust violation unremedied." (internal quotation marks omitted)).

### 3.     Plaintiffs' Injuries Are Not Speculative

Defendants also claim that Plaintiffs' injuries are unduly speculative.  (Dealer Br. at 54-57.)  But their own internal analyses tell a different story.  As the Complaint explains, Defendants knew full well that blocking additional competition and transparency in the IRS market would hurt investors by denying them narrower bid/ask spreads (and thus increasing their costs).  (¶¶332-38.)  That is why they conspired.  For example, in a May 2012 study on the impact of increased competition and price transparency in the IRS market, Citi concluded that it

79

"expect[ed] bid/ask spreads on standardized derivatives to compress," that "a significant proportion of interest rate swap volume is likely to migrate to clearing and exchange trading," and that this would result in a significant decrease of dealer revenue.  (¶¶333-34.)[62]  Other empirical and academic analyses reached similar conclusions.  (¶¶326-31.)[63]  The Complaint also explains why the alleged conspiracy reduced choice, output, and market innovation.  These predictable outcomes of a group boycott are why it is unlawful *per se*.

In an effort to manufacture complexity, Defendants artificially divide the Complaint's causation theory into seven purported "leaps," which they stuff full of extraneous details, impermissible inferences, and invented "facts."  (Dealer Br. at 50-51, 55-56.)  Defendants tried the same gambit in *CDS* and failed.[64]  In contrast to this obfuscatory rhetorical exercise, the Complaint's account of causation is straightforward:  Defendants conspired to block all-to-all trading of IRS so they could overcharge IRS investors.

The Second Circuit in *DDAVP* rejected similar efforts to frame injuries as "speculative" based on assertions about the difficulties of accounting for the effects of the excluded competition.  585 F.3d at 689.  The Court expressed "little doubt that those effects can be sufficiently estimated and measured" and that this was "especially so when '[t]he most

---

[62]  A September 2009 JP Morgan study similarly concluded that additional post-trade transparency alone (less than a shift to all-to-all trading) would reduce bid/ask spreads on IRS by as much as 25%.  (¶335.)  Analyses conducted in 2012 by Credit Suisse and Morgan Stanley also found that increased price transparency in IRS would compress bid/ask spreads and reduce dealer margins.  (¶337.)

[63]  Studies examining the transition of stock index futures trading from open outcry to electronic markets, the introduction of post-trade transparency into the corporate bond market, the migration of equities trading on NYSE and Nasdaq to electronic communication networks, and the differences between the NYSE-traded bonds and OTC bonds *all* show that electronic trading narrows bid/ask spreads.  (¶¶322-27.)

[64]  *See CDS*, 13-MD-2476, Dkt. No. 290 at 18-21 (May 23, 2014 Dealer Defendants' Joint Motion to Dismiss).

elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *Id.* (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946)).[65]  The same is true here.  Setting aside the perverse logic of a rule that would deny standing in cases where new and innovative offerings were prevented from entering the market, the Complaint alleges that the thwarted platforms were viable, that all-to-all trading was *not* new, and the bulk of IRS trading was highly standardized.  (¶¶10-13, 19, 24, 71, 90, 208.)[66]

At best, Defendants' argument reduces to a premature challenge to Plaintiffs' damages model, which will be the product of expert analysis following discovery.  Complexities associated with damages calculations are routine and do not render damages unduly speculative at the pleading stage.  *See FX II*, 2016 WL 5108131, at *8; *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 61 ("Plaintiffs have alleged that they were directly harmed by Defendants' anticompetitive conduct by having to pay higher prices (or earning lower profits) from instruments tied to [the collusively-set benchmark], there is nothing particularly speculative

---

[65]  *See also J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 556-67 (1981) (the wrongdoer is in a poor position "to insist upon specific and certain proof of the injury which it has itself inflicted" especially when the "vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation"); *Bigelow*, 327 U.S. at 265 ("[T]he wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable.").

[66]  Defendants again rely on *Paycom* in asserting that the allegations here are "impermissibly speculative."  (Dealer Br. at 55.)  But Paycom made no allegations about the but-for world—that is, what sort of policy MasterCard would have replaced its existing policy with and how it would have benefited merchants.  *Paycom*, 467 F.3d at 293.  The other cases cited by Defendants also involved unusually convoluted theories of injury.  For example, in *Reading Indus. Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980), the plaintiffs alleged the defendants conspired to suppress prices for refined copper, which had the alleged effect of *raising* prices for scrap copper in a manner the court deemed was unexplained.  In contrast, here, the Complaint explains exactly what would have happened absent the conspiracy:  all-to-all trading platforms would have emerged and thrived.

about the injury alleged, and the damages at issue are tied to particular transactions and contracts, obviating the danger of duplicative recovery.").[67]

### 4. No Damages Apportionment Issues Exist

Finally, contrary to Defendants' argument (Dealer Br. at 57), Plaintiffs' claims present no problems of duplicative recovery or damages apportionment. Plaintiffs seek damages for *overcharges* on their IRS transactions while TeraExchange and Javelin seek *lost profits* from the transactions they were denied. These are "conceptually different measures" of damages, *DDAVP*, 585 F.3d at 689, and there is no overlap between these damages categories or any need to apportion damages at all. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶391e (3d ed. 2007) ("[T]hese injuries do not overlap."); *CDS*, 2014 WL 4379112, at *9 ("Plaintiffs' claims present no danger of duplicative recovery or problems of apportionment.").

### B. Dodd-Frank Does Not Impliedly Preclude These Antitrust Claims

Defendants next argue that, when Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376-2223 (2010), it "implicitly" precluded investors from pursuing antitrust claims when swap dealers conspire to block competition. (Dealer Br. at 57; ICAP Br. at 20.) But Dodd-Frank was intended to *reform* Wall Street and to *protect* consumers, not to provide banks with a new shield against antitrust liability.

Indeed, Congress anticipated that antitrust defendants would attempt to misuse the Act and so expressly included a broadly-worded antitrust savings clause, which specifically provides

---

[67] It is extremely unlikely this case will prove to be the rare exception where overcharge damages cannot be calculated. *CDS* involved a similar damages theory of inflated bid/ask spreads arising from the blocking of competition. The $1.9 billion settlement reached in that matter was paid out to class members under a Court-approved model that valued the spread inflation paid on each of their CDS transactions—a model supported overwhelmingly by a very sophisticated class. *See In re Credit Default Swaps Antitrust Litig.*, 13-MD-2476 (DLC), 2016 WL 2731524, at *8-13 (S.D.N.Y. Apr. 26, 2016) (granting final approval to settlement and plan of distribution).

that: "Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified." 12 U.S.C. § 5303. Defendants disregard the plain meaning of this savings clause, as well as the relevant legislative history, which confirms that Congress meant to preserve antitrust claims like those brought in this case.

Even if this savings clause did not exist, there would still be no reason to deny investors the right to bring these claims. There is no conflict between the antitrust laws and Dodd-Frank that could suggest a congressional intent to preclude antitrust claims. This case seeks damages to IRS investors for secret, *per se* unlawful collusion by dealers to block procompetitive trading options. That objective is fully consistent with Dodd-Frank. Defendants' effort to leverage a consumer-protection statute into a weapon to avoid civil liability to swaps investors must fail— just as it did in *CDS*.

### 1.     Dodd-Frank Expressly Preserves Existing Antitrust Remedies

Congress included a broadly-worded *antitrust savings clause* in Dodd-Frank to prevent civil defendants from misusing the Act in the precise way that Defendants attempt here:

> Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified.

12 U.S.C. § 5303. This clause makes clear that Dodd-Frank has no effect upon the application of the antitrust laws, except in four discrete areas unrelated to the anticompetitive conduct challenged in this case.

Where Congress expresses its intent to preserve antitrust laws through an antitrust-specific savings clause, the doctrine of implied preclusion does not apply. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004) (holding that an express savings clause "bars a finding of implied immunity"). In *Trinko*, the Supreme Court

considered whether the Telecommunications Act of 1966 impliedly repealed the antitrust laws

with respect to the conduct it regulates.  The Court noted that the regulatory regime created by

the 1996 Act might have been "a good candidate" for creating an implied antitrust immunity,

*except* for the fact that Congress specifically included a savings clause stating that "nothing in

this Act or the amendments made by this Act shall be construed to modify, impair, or supersede

the applicability of any of the antitrust laws."  *Id*.  The Court held that this provision "bars a

finding of implied immunity."  *Id*.

 The antitrust savings clause at issue in *Trinko* is materially identical to the one in Dodd-

Frank—apart from Dodd-Frank's inclusion of the phrase "unless otherwise specified."[68]  Thus,

as in *Trinko*, Dodd-Frank's antitrust savings clause preserves application of the antitrust laws in

all instances except in the limited instances where the statute "specified" that the antitrust laws

are "modif[ied], impair[ed], or supersede[d]."

 Dodd-Frank "specified" that it alters the antitrust laws in only four narrow ways, none of

which is relevant to this case.  *See* 12 U.S.C. § 5390(a)(1)(G)(ii)(III) (amending premerger

notification period "under section 7A of the Clayton Act"); *id.* § 5390(h)(11) (similar); *id.* §

5363(b)(5) (eliminating particular exemption from premerger notification requirements of the

Clayton Act); *id.* § 1843(k)(6)(B)(iii) (similar).  No other provision of Dodd-Frank even

mentions the antitrust laws, much less modifies them.  Certainly no provision of the statute

modifies the Sherman Act's prohibition on unreasonable restraints of trade.

 Thus, because the antitrust savings clause contains no qualification relevant to the claims

asserted here, there can be no implied preclusion.  Judge Cote reached this conclusion in *CDS*,

---

[68] Section 601(b)(1) of the Telecommunications Act of 1996 provides that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws."  *Trinko*, 540 U.S. at 406 (quoting 110 Stat. 143, 47 U.S.C. § 152).

holding that, because "Dodd-Frank never mentions the Sherman Act . . . , and . . . explicitly modifies the Clayton Act in four provisions, none of which is relevant here[,] . . . the antitrust laws apply with full force" to conspiracies by swap dealers to block competition.  2014 WL 4379112, at *16.

As they did in the *CDS*, Defendants argue the contrary by seizing upon certain "Antitrust Considerations" clauses contained in Title VII of Dodd-Frank.  They assert that these clauses evince an *implicit* congressional intent to modify or supersede the antitrust laws.  But that argument cannot succeed:  The savings clause leaves the antitrust laws in place "unless otherwise *specified*," 12 U.S.C. § 5303 (emphasis added), and by definition Congress cannot *specify* an intention *by implication*.[69]

The "Antitrust Considerations" provisions do not demonstrate any intent to modify the antitrust laws or to foreclose claims such as those asserted here.  Each such clause is worded slightly differently,[70] but the following provision (related to the "duties" of swap dealers and major swap participants) is illustrative:

> Antitrust Considerations.—Unless necessary or appropriate to achieve the purposes of this chapter, a swap dealer or major swap participant shall not—
>
> (A) adopt any process or take any action that results in any unreasonable restraint of trade; or
>
> (B) impose any material anticompetitive burden on trading or clearing.

---

[69]   *See* "Specify," *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/specify ("to name or state *explicitly or in detail*") (emphasis added).

[70]   *See* 7 U.S.C. § 6s(j)(6); 15 U.S.C. § 78*o*-10(j)(6); 7 U.S.C. § 24a(f)(1); 7 U.S.C. § 7b-3(f)(11); 15 U.S.C. § 78c-4(d)(10); 7 U.S.C. § 7a-1(c)(2)(N); 7 U.S.C. § 7(d)(19); 15 U.S.C. § 78m(n)(7)(A).

7 U.S.C. § 64s(j)(6).  As Judge Cote held in *CDS*, these provisions do not demonstrate an intent to preempt the application of the Sherman and Clayton Acts.  They do not even mention the antitrust laws, much less "specify" that Congress intended to modify, impair, or supersede them.

Nevertheless, Defendants erroneously assert that Dodd-Frank should be analyzed under *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007).  In *Billing*, the Supreme Court dealt with the distinct inquiry that arose "[w]here regulatory statutes *are silent in respect to antitrust*," in which case "courts must determine whether, and in what respects, they implicitly preclude application of the antitrust laws."  *Id.* at 271 (emphasis added).  Consistent with *Billing*, the Supreme Court held in *Trinko* that the existence of an applicable "antitrust-specific saving clause . . . bars a finding of implied immunity."  540 U.S. at 406.  *Billing*, in fact, distinguished *Trinko* on precisely this ground, explaining that *Trinko* was a case where the "regulatory statute[] explicitly state[d] whether [it] preclude[d] application of the antitrust laws."  551 U.S. at 271.  Thus, where, as here, a court is presented with an *antitrust-specific* savings clause, the *Billing* analysis does not apply and any "finding of implied immunity" is "bar[red]."  *Trinko*, 540 U.S. at 406.  As Judge Cote ruled in *CDS*, "the antitrust savings clause, the exception to which is not applicable here, disarms defendants' argument that Dodd-Frank implicitly repealed the antitrust laws in this context."  2014 WL 4379112, at *17.

Even if the "Antitrust Considerations" provisions did *specifically* reference the antitrust laws—which they do not—they still do not support implied preclusion because they do not "modify, impair, or supersede" the antitrust laws.  As Judge Cote held in *CDS*, and Defendants concede here, the "Antitrust Considerations" provisions sweep *more broadly* than the antitrust laws, "impos[ing] a duty to avoid taking actions that could have antitrust implications, even if

those actions fall short of actually violating the antitrust laws." 2014 WL 4379112, at *17. (*See also* Dealer Br. at 59 n.82.)

This conclusion is confirmed by the fact that these "Antitrust Considerations" clauses make no mention of the Clayton or Sherman Acts. Had Congress intended to modify the antitrust laws *via* the "Antitrust Considerations" provisions, it clearly knew how to do so, as it did in the four specific modification provisions addressed above, which specifically modify the Clayton Act in ways not relevant to this case. *See supra* at 84-85. *See generally Sebelius v. Cloer*, 133 S. Ct. 1886, 1894 (2013) ("We have long held that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (brackets in original) (quoting *Bates v. United States*, 522 U.S. 23, 29-30 (1997))).

This conclusion is also consistent with the purpose of Title VII to create transparency and open access in derivatives trading. *See, e.g.*, S. Rep. No. 111-176, at *34 (2010) (Conf. Rep.) ("Trading more derivatives on regulated exchanges should be encouraged because it will result in more price transparency, efficiency in execution, and liquidity."). There is simply no reason to conclude that Congress intended for Dodd-Frank's broad "Antitrust Considerations" directives to absolve swap dealers of their *existing* obligations under the *existing* antitrust laws.

Finally, if this straightforward reading of Dodd-Frank were in any doubt, which it is not, it is confirmed by Dodd-Frank's legislative history.[71] Speaking on his committee's conference

---

[71]    Courts routinely look to legislative history when analyzing Congressional intent in the implied preclusion context. *See Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 28 (2d Cir. 1985); *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 885 n.22 (W.D. Ky. 2009) (legislative history stating that "legislation in no way modifies or affects the scope or application of antitrust laws" is "convincing" evidence that the regulatory regime in question does not preempt antitrust liability).

report to the House, Representative John Conyers Jr., the Chairman of the Judiciary Committee[72]

explained:

> The final bill contains a number of provisions **to ensure that the antitrust laws remain fully in effec*t***.
>
> First and foremost is the antitrust savings clause in section 6 of the bill . . . .  It applies to the entire Act, and all amendments made by the Act to other laws.  **The phrase "unless otherwise specified" is added in reference to four provisions in the bill**.  In two places—sections 210(a)(1)(G)(ii)(III) and 210(h)(11) of the bill— the standard pre-merger waiting period under section 7A of the Clayton Act is explicitly shortened.  And in two other places—section 163(b)(5) of the bill, and the amendment to section 4(k)(6)11(B) of the Bank Holding Company Act made in section 604(e)(2) of the bill—there are cross-references to the exception to pre-merger review in section 7A(c)(8) of the Clayton Act that explicitly make that exception inapplicable.
>
> **The phrase "unless otherwise specified" refers only to those four specific provisions** that explicitly modify the operation of those specified provisions of the antitrust laws in specified ways, **and is not a basis for courts to consider whether any other provision in the bill might be intended as an implicit modification of how the antitrust laws operate.  The savings clause is intended to make clear that it is not**.

156 Cong. Rec. E1347-01, E1347 (daily ed. July 15, 2010) (statement of Rep. Conyers, Jr.),

2010 WL 2788137 (emphases added).

These are the same four provisions discussed above, none of which provides for

modification of the Sherman and Clayton Acts in ways relevant here.[73]  As to the "Antitrust

Considerations" provisions, Representative Conyers explained:

---

[72]   The Judiciary Committee was responsible for inserting the savings clause into the statute, so the words of that committee's chairman are "entitled to substantial weight" in assessing congressional intent as to the meaning of that clause.  *See Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 656 & n.9 (1982); *see also Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 125 (2d Cir. 2000) ("The conference report stage is closest to final passage and is generally thus the best indicator of legislative meaning apart from the statute itself.").

[73]   *See also* 156 Cong. Rec. S5902-01, 55927 (daily ed. July 15, 2010), 2010 WL 2788026 (statement of Sen. Kohl, chairman of Senate Judiciary Sub-Committee on Antitrust)

[I]n a number of places in the bill, there are provisions referring to "Antitrust Considerations" that various securities and commodities entities . . . are directed to take into account in formulating their operating rules.  There are exceptions to these directives for situations in which the entity believes pursuing them itself is inconsistent with its other obligations under the relevant securities or commodities laws.  *The fact that the entity is excused from the new directives, however, does not alter the application of the antitrust laws.  Nor does the fact that the entity follows these directives in its own rulemaking supplant the operation of the antitrust laws*.

*Id.* (emphasis added).  Thus, even if the statute were not clear on its own (it is), the legislative history rejects Defendants' proposed interpretation.

### 2.     Even Absent the Savings Clause, Implied Preclusion Is Unwarranted

Even if Dodd-Frank's antitrust savings clause did not defeat Defendants' preemption argument, implied preclusion would still be inappropriate because Plaintiffs' claims do not conflict with Dodd-Frank.  In fact, preclusion of the antitrust laws would be directly antithetical to Congress' purposes in enacting Dodd-Frank.

"Repeal of the antitrust laws by implication is not favored and not casually to be allowed," and is to be implied "[o]nly where there is a 'plain repugnancy between the antitrust and regulatory provisions.'"  *Strobl*, 768 F.2d at 27 (quoting *Gordon v. N.Y. Stock Exch.*, 422 U.S. 659, 682 (1975)).  In determining whether there is such a "plain repugnancy," courts consider four factors:  "(A) location within the heartland of [applicable] regulations; (B) . . . authority to regulate; (C) ongoing . . . regulation; and (D) conflict between the two regimes."  *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133 (2d Cir. 2009) (citing *Billing*, 551 U.S. at 285).

The fourth factor (conflict) is the linchpin of this analysis.  As courts have recognized, "repeal of antitrust jurisdiction cannot be implied simply when the antitrust laws and a regulatory

---

(observing that Dodd-Frank "includes a broad antitrust savings clause that makes clear that nothing in the act will modify, impair, or supersede the operation of any of the antitrust laws").

scheme overlap." *Strobl*, 768 F.2d at 27.  Rather, they must be in actual or potential conflict.
*See id.* (noting that "the 'plain repugnancy' found in *Gordon* was the potential for *conflicting*
standards and the fact that application of the antitrust laws would render [a particular provision]
of the Securities Exchange Act nugatory").

Where, as here, the alleged anticompetitive conduct would be forbidden under the
competing regulatory regime in any event, there is no risk of conflict and therefore no implied
immunity from antitrust liability.  *See id.* at 28 (Commodity Exchange Act did not impliedly
preclude claims that potato buyers conspired to depress potato prices, because "price
manipulation is an evil that is always forbidden under every circumstance by both the
Commodity Exchange Act and the antitrust laws"); *see also In re W. States Wholesale Natural
Gas Antitrust Litig.*, 661 F. Supp. 2d 1172, 1183 (D. Nev. 2009) ("Rather than find the antitrust
laws completely ousted, the Court concludes that given the allegations of intentional price
manipulation in Plaintiffs' Complaints, the antitrust laws and the CEA are reconcilable, as both
preclude such conduct . . . .").

Here, there is no conflict between Plaintiffs' antitrust claim and Dodd-Frank.  Dodd-
Frank was meant to promote competition and protect consumers; it was not meant to endorse
secret agreements among banks to stifle competition and inflate prices paid by consumers of
financial products.  *See Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 361 (1963) (group boycott
violated Sherman Act and was not justified by self-regulatory goals of the exchange or precluded
by securities laws).  And Congress' clear intent was to *preserve* the antitrust laws, as evidenced
by the savings clause.  Representative Conyers stressed "it is therefore essential that the antitrust
laws, the laws protecting our economic freedoms against monopolization, anticompetitive

restraints of trade, and undue market concentration, remain in place" following and regardless of

the enactment of Dodd-Frank.  156 Cong. Rec. E1347-01, E3147, 2010 WL 2788137.[74]

Defendants try to manufacture a conflict (Dealer Br. at 61-68) by misconstruing

Plaintiffs' claims as seeking to impose particular outcomes on the IRS market.  Contrary to

Defendants' contentions, Plaintiffs are *not* attempting to outlaw RFQ trading, to mandate

anonymous trading, or to prevent dealers from investing in SEFs.  (*Id.* at 64-67.)  Rather,

Plaintiffs are simply seeking damages for the financial harm caused by a conspiracy to block all-

to-all trading.[75]  That claim does not conflict with Dodd-Frank.[76]

The Supreme Court's decision in *Billing* and the Second Circuit's decision in *Electronic*

*Trading Group* are distinguishable.  In both cases, the collusion claim brought by the plaintiff

---

[74]   One of Dodd-Frank's central goals was to *increase* transparency in the trading of
derivatives like IRS.  *See Core Principles and Other Requirements for Swap Execution
Facilities*, 78 Fed. Reg. 33476, 33477 (June 14, 2013) ("A key goal of the Dodd-Frank Act is to
bring greater pre-trade and post-trade transparency to the swaps market . . . Such transparency
lowers costs for investors, consumers, and businesses; lowers the risks of the swaps market to the
economy; and enhances market integrity to protect market participants and the public.").

[75]   The fact that the CFTC has not chosen, at this time, to expressly prohibit the practices
of "name give-up" or RFQ trading does not suggest in any way that the CFTC has endorsed an
agreement among broker-dealers to require "name give-up" and forego all-to-all trading.  As the
Dealer Defendants recognize in their brief, the CFTC's willingness to permit a variety of
mechanisms for trade execution is predicated on the view that market participants should have
choice and flexibility in IRS trading on SEFs (Dealer Br. at 65), which is exactly what they are
denied when the broker-dealers collude to limit their customer's trading options to those most
favorable to the dealers, and most costly to their customers.

[76]   Defendants (Dealer Br. at 63 n.73; ICAP Br. at 21) also rely on 7 U.S.C. § 19(b) to
support their position that Dodd-Frank impliedly precludes Plaintiffs' claims, but that provision
predates Dodd-Frank by *more than 35 years*.  *See* Pub. L. No. 93-463, 88 Stat. 1389, § 107 (Oct.
23, 1974).  Courts in this district have repeatedly rejected any suggestion that by requiring *the
CFTC* to "take into consideration the public interest to be protected by the antitrust laws" when
taking regulatory action, 7 U.S.C. § 19(b), Congress somehow implicitly precluded private
plaintiffs from asserting their own interests in antitrust litigation under the Clayton Act.  *See,
e.g.*, *Straxx v. Commodity Exch., Inc.*, 524 F. Supp. 936, 939-41 (S.D.N.Y. 1981) (rejecting
defendants' claim that the cited language in 7 U.S.C. § 19 impliedly repealed the antitrust laws);
*Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 512 F. Supp. 711, 715-717 (S.D.N.Y. 1981).

directly challenged conduct by the defendants in arenas where the regulatory scheme expressly contemplated—and even required—that the defendants would collaborate.  In those specific situations, the claims thus led to a "serious legal line-drawing problem" between the type of cooperation encouraged by the regulatory scheme and where that very cooperation might run afoul of the antitrust laws.  *Billing*, 551 U.S. at 279.  In *Billing*, for example, the plaintiffs alleged collusion among a syndicate of banks administering an initial public offering ("IPO"). *Id.* at 268-69.  But SEC regulations expressly permitted bank syndicates to cooperate on an IPO with regard to price, timing, and a multitude of other factors, thereby partially displacing the normal functioning of the antitrust laws.  *Id.* at 279.  So the conspiracy claim challenged the very type of cooperation upon which the regulatory scheme relied.

In *Electronic Trading Group*, the plaintiffs alleged that broker-dealers colluded to designate certain securities "hard-to-borrow" for the purposes of short selling, therefore increasing the cost of borrowing those securities.  588 F.3d at 132.  But the applicable regulations expressly *required* that broker-dealers communicate with one another to determine the availability of securities for borrowing before accepting an order from a short seller on such securities, so the very conduct at issue (communication among competitors about the availability of a security for borrowing) was mandated by the SEC.  *Id.* at 137 (noting that 17 C.F.R. § 242.203(b)(1) "requir[es] that a broker borrow the securities or have reasonable grounds to believe that the securities can be borrowed before accepting an order from a short seller").

This case does not pose any line drawing problems.  Unlike in *Billing* or *Electronic Trading Group*, there is no regulation that requires (or even permits) the Dealer Defendants to collaborate about what type of trading platform they will jointly support.  They are supposed to make that decision on their own in a competitive environment.  There is thus no difficulty

drawing a line between conduct permitted by Defendants' regulators and collusion prohibited by the antitrust laws.

Finding implied preclusion here would also contradict the Supreme Court's longstanding recognition of the critically important role played by private enforcers in policing anticompetitive conduct in United States commerce.  As this Court has observed, "[p]rivate antitrust lawsuits 'provide a significant supplement to the limited resources available' to public antitrust regulators."  *Meredith Corp. v. SESAC, LLC*¸ 87 F. Supp. 3d 650, 670 (S.D.N.Y. 2015) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979)).  While the CFTC might have some ability to monitor the anticompetitive conduct of swaps dealers and swaps execution facilities, that monitoring function does not supplant the role played by private lawsuits in providing remedies to swaps investors for losses suffered as a result of anticompetitive conduct.[77]  *See Ill. Brick*, 431 U.S. at 746 (finding that "in addition to deterring violators and depriving them of the fruits of their illegality," private enforcement of the antitrust laws is "also designed to compensate victims of antitrust violations for their injuries") (internal quotation marks omitted).

Finally, ICAP erroneously (ICAP Br. at 20-22) relies upon two monopolization cases under Section 2 of the Sherman Act—*Trinko* and *New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004)—to argue for dismissal of the conspiracy claim.  ICAP disregards that both of those cases considered a very specific type of

---

[77]  Defendants' contention (Dealer Br. at 61) that reports of a CFTC investigation into IRS trading somehow supports implied preclusion is misguided.  The CFTC's investigation appears to have been instigated by the allegations appearing in the Complaint in this case, and only *supports* the role of the antitrust laws in preventing competition abuses in the IRS markets and illustrates the lack of a conflict.  Without investors acting as "private attorneys general" by investigating collusion and filing lawsuits, Defendants' conduct would very likely never have come to light.

antitrust claim "at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409:  the

refusal of an alleged monopolist to provide its potential competitors with access to its facilities or

infrastructure in order that these potential competitors may better compete against the

monopolist.  *See id.* at 407-08.[78]

    This case has nothing to do with forced access, the "essential facilities doctrine," or any

other doctrine standing at the outer bounds of the antitrust laws.  To the contrary, this case is

about collusion among horizontal competitors, the "supreme evil of antitrust," *Trinko*, 540 U.S.

at 408.  Dodd-Frank did not preempt this textbook example of a *per se* unlawful antitrust claim.

## IV.    PLAINTIFFS CAN RECOVER FOR INJURIES OVER THE ENTIRE CLASS PERIOD

    The Dealer Defendants also try to limit Plaintiffs to a damages period of just the four

years prior to the filing of the first class action complaint, arguing that the Clayton Act's four-

year statute of limitations bars Plaintiffs from seeking damages accruing prior to November 25,

2011.  (Dealer Br. at 71-79.)[79]  This argument fails as well.  The Complaint alleges facts

sufficient to establish that the statute of limitations was equitably tolled until June 2014, when

Defendants' concealed conspiracy finally came to light.  (¶¶357-84.)

---

[78]    As the Supreme Court explained in *Trinko*, courts should be reluctant to compel monopolists "to share the source of their advantage" because such compelled sharing "is in some tension with the underlying purpose of antitrust":  it lessens incentives to compete and achieve monopoly power; forces courts to determine the proper price and terms of dealings among competitors; and, most importantly, "compelling negotiation between competitors may facilitate the supreme evil of antitrust:  collusions."  *Id.*  In light of these concerns, the Supreme Court declined to expand the limited circumstances in which the antitrust laws might compel cooperation between a monopolist and its competitors, reasoning that a separate regulatory regime governing access "ma[de] it unnecessary to impose a judicial doctrine of forced access." *Id.* at 411; *accord Intercontinental*, 323 F. Supp. 2d at 570 ("[T]he essential facilities doctrine serves no purpose in the circumstances of this case.").

[79]    Defendants do not dispute that Plaintiffs' claims for all injuries suffered after November 25, 2011 (and for HSBC and Morgan Stanley, after February 25, 2012) are timely.

The Clayton Act's statute of limitations is equitably tolled where a plaintiff pleads "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). This doctrine "ensures that wrongdoers are not permitted, or encouraged, to take advantage of the limitations period to commit secret illegal conduct without penalty." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 125 (4th Cir. 1995); *see also Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004) ("Where defendant is responsible for concealing the existence of plaintiff's cause of action, this Court has held equitable tolling appropriate.").

Plaintiffs have pled each of these elements here. (¶¶357-84.) To the extent Defendants seek to controvert the Complaint's allegations on these points, they may not do so on a motion to dismiss: Tolling concerns quintessential issues of fact, which are not appropriately resolved at the pleading stage. *See, e.g.*, *Silver Fixing Antitrust Litig.*, 2016 WL 5794777, at *24 ("[B]ecause resolution of a claim of fraudulent concealment is intimately bound up with the facts of the case, it often cannot be decided at the motion to dismiss stage." (internal quotation marks omitted)).[80] Defendants' limitations arguments should be rejected.

---

[80]   *See also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 58-59 (S.D.N.Y. 2012) ("[T]he fact-based arguments presented by the parties underscore that dismissal on statute of limitations grounds is not warranted at the pleading stage."); *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, 00-cv-7804 (LMM), 2004 WL 487222, at *5 (S.D.N.Y. Mar. 12, 2004) ("[W]hether such information should have put a reasonable plaintiff on notice that Defendants were possibly colluding and conspiring with other underwriters to fix their fees, is a question of fact which cannot be determined on a motion to dismiss.").

### A.   Defendants' Conspiracy Was Concealed from Plaintiffs

A plaintiff may plead concealment by alleging "either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d at 1083.  Here, the Complaint alleges both forms of concealment:  Defendants' conspiracy was self-concealing, (¶¶17, 30, 103-09, 138-41, 151-58, 198, 203-04, 221, 362-63, 374, 383-84), *and* Defendants took affirmative steps to conceal it (¶¶15, 107, 115-25, 145, 178-79, 222-24, 227, 229, 362-73).

### 1.   The Conspiracy Was Self-Concealing

Secrecy was a necessary component of the conspiracy and was present from its conception.  If investors had learned of Defendants' agreement sooner than they did, lawsuits (and government investigations) would have commenced immediately.  (¶361.)  In such circumstances, where "[a]ny knowledge of the conspiracy would lead plaintiff to seek action immediately and result in collapse of the conspiracy," *Hendrickson Bros.*, 840 F.2d at 1084 (internal quotation marks omitted), "the secrecy upon which illegal boycotts often depend" is essential.  *Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 7 n.4 (1st Cir. 1977).

Defendants' conspiracy was also self-concealing in that, as the Complaint alleges, the agreement was "implemented through private meetings under the guise" of the Dealer Defendants' putatively legitimate presence on the boards of Tradeweb and other entities and trade associations (¶¶17, 30, 103-09, 138-41, 151-58, 198, 203-04, 221, 362-63, 374, 383-84), "provid[ing] the defendants a 'cover'" for their conspiratorial discussions and preventing Plaintiffs from surmising that an antitrust conspiracy was afoot.  *See Precision Assocs.*, 2011 WL 7053807, at *51.

Accordingly, the first element of the tolling doctrine is established as a matter of law.  An antitrust conspiracy is self-concealing where, as here, it "was secretive and covert by its very

nature—it was an agreement that was 'designed to endure over a period of time' and, 'in order to endure, it had to remain concealed' from the market." *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 66 (alterations omitted) (quoting *Hendrickson Bros.*, 840 F.2d at 1084). As the *CDS* court observed in finding similar tolling allegations sufficient: "A group boycott of exchange trading has the characteristics of other types of conspiracies that have been held to be self-concealing—it is the kind of enterprise that requires a number of participants, is designed to endure over a period of time, and must remain concealed to be successful." 2014 WL 4379112, at *15 (citing *Hendrickson Bros.*, 840 F.2d at 1084).[81]

Defendants argue the conspiracy was not self-concealing because Plaintiffs have not alleged that "the absence of all-to-all trading in IRS 'would necessarily be assumed' to be 'the result of legitimate market forces.'" (Dealer Br. at 79) (citing *In re Publ'n Paper Antitrust Litig.*, 04-MD-1631 (SRU), 2005 WL 2175139 (D. Conn. Sept. 7, 2005)). But the Complaint *does* allege that *no one*, including sophisticated market participants, identified what was happening in the market was the product of collusion, until in or around June 2014. (¶¶357, 373-75, 381.)[82]

---

[81]   *See also, e.g.*, *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) (Parker Jr., J.) ("[B]y alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of fraudulent concealment."); *In re IPO Antitrust Litig.*, 2004 WL 487222, at *4 (same); *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004) (where complaint alleged that defendants engaged in manipulative trades and reported false trades, the conduct was "self-concealing").

[82]   *Publication Paper* dealt with a *price-fixing* conspiracy in which the conspirators affirmatively announced the parallel price increases to their victims. *See* 2005 WL 2175139, at *4. The court held that such a parallel price increase among ostensible competitors might in some circumstances be enough to reveal the conspiracy or at least trigger inquiry, so a plaintiff alleging that a *price-fixing* conspiracy was self-concealing *despite* announced price increases was required to allege facts showing that "any announcement of a price increase will carry with it an implicit statement that the price increase is legitimate, *i.e.*, the result of competitive forces, not collusion." *Id.* This case, in contrast, does not deal with a price-fixing conspiracy, and the Defendants made no public announcement that would have tipped off their victims to their suppression of all-to-all trading (to the contrary, their announcements deceived victims). As the Complaint explains, this only changed around June 2014, through their coordinated campaign to

The absence of that knowledge is why multiple entities invested considerable time, effort, and capital to bring all-to-all trading to the market to meet the tremendous demand for it. Multiple SEFs would not have spent years and millions of dollars to develop all-to-all platforms if they knew that legitimate market forces had been secretly replaced by a powerful dealer cartel. (¶¶208, 210-13, 218-20, 238-39, 245-46, 251, 279-81.)

## 2. Defendants Affirmatively Concealed Their Conspiracy

The Complaint also alleges that Defendants took a variety of *affirmative* steps to conceal their conduct. These steps included hiding their assumption of control over Tradeweb's IRS business through Project Fusion (¶¶15, 115-25, 145); issuing misleading press releases (¶¶15, 117-24);[83] conducting meetings concerning the conspiracy in secret (and under false pretenses) and communicating in private (¶¶17, 30, 103-09, 138-39, 141, 151-58, 198, 203-04, 221, 362-63); giving pretextual explanations for their conduct and misleading explanations for market conditions (¶¶370-72); making false statements about the purposes of Defendants' "strategic investment" groups and stonewalling inquiries (¶¶106-07, 121, 178-79, 222-24, 365-69); and masking the obstruction by Dealer Defendants' FCMs (¶¶227, 229, 364). Defendants *continued* acting to shield their conduct from scrutiny and liability as recently as May 2016, when their top

---

demand an audit of Javelin's rule book (¶¶25-26, 235)—but those events fall within the limitations period, and they triggered investigations that led to this lawsuit.

[83] Defendants argue that they did not hide their assumption of control over Tradeweb's IRS business, but were merely silent about it, and that "mere silence is not enough" to plead concealment. (Dealer Br. at 78.) But Defendants were much more than silent; they affirmatively concealed what they were doing, including by issuing overtly misleading press releases. (¶¶117-24.) Defendants also claim, illogically, that they did not conceal their assumption of control over Tradeweb's IRS business because *someone else* (non-conspirator Thomson) purportedly disclosed aspects of the relationship that they themselves had hidden. But Thomson's filings are irrelevant to *Defendants'* efforts to conceal—which the Complaint alleges were successful to the point that they affected every press report written about the transaction. In any event, Thomson's SEC filings were incomplete as well. *See supra* at 30-31.

lawyers secretly met and agreed that none would break ranks to settle the case before filing their motions to dismiss. (¶¶383-84.)

These allegations are independently sufficient to plead concealment. *In re Vitamins Antitrust Litig.*, MISC 99-197 (TFH), 2000 WL 1475705 (D.D.C. May 9, 2000), for example, held that allegations that the defendants submitted false bids, issued announcements that created the illusion of competitive pricing, instructed members of the conspiracy not to divulge its existence, convened secret meetings, confined the conspiracy plan to a small group of key officials, and avoided references in documents that would reveal the conspiracy were "clearly sufficient to meet plaintiffs' pleading burden." *Id.* at *3; *see also Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 66 (affirmative concealment shown where plaintiffs identified statements that "allegedly amounted to affirmative misrepresentations regarding how [the benchmark] ISDAfix [rate] was calculated"). The allegations here are materially similar and suffice to establish concealment at the pleading stage.

### B.       Plaintiffs Did Not Learn of Defendants' Conspiracy Until 2014

The Complaint also alleges that Plaintiffs remained ignorant of Defendants' conspiracy until, at the earliest, June 2014 (¶357), which is well within four years of the commencement of this action. Contrary to Defendants' suggestion, the relevant standard for assessing whether Plaintiffs "remained in ignorance of [their] cause of action," *Hendrickson Bros.*, 840 F.2d at 1083, is ***not*** whether Plaintiffs ever had "reason to *suspect* the probability of any manner of wrongdoing." (Dealer Br. at 74 (emphasis added).)[84]  Rather, a plaintiff must either have "actual

---

[84]     *131 Main St. Assocs. v. Manko*, 179 F. Supp. 2d 339 (S.D.N.Y. 2002), cited by Defendants, was a *summary judgment* ruling, and thus has little import for assessing concealment *allegations*. In that case, which was also not an antitrust matter, the Internal Revenue Service issued disallowance letters informing the plaintiffs of the very fraudulent tax shelters that were the gravamen of their subsequent RICO claim, and the plaintiffs' representative stated that he

knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 29 F.3d 43 (2d Cir. 2000); *see also Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. 2002) (same).

Here, nothing in the public domain prior to June 2014 put Plaintiffs on notice that Defendants had engaged in an unlawful conspiracy, and certainly nothing did so *as a matter of law*. Defendants argue that Plaintiffs must have been on notice of their claims before 2012 because "their pre-2012 allegations are drawn from news articles and other published information that was available before 2012." (Dealer Br. at 71.) But the Complaint's pre-2012 allegations about the conspiracy are not based on news articles or other published information— as detailed above, Defendants hid their conspiracy and were affirmatively deceptive about their actions. Unsurprisingly, their collusion was not reported in the news.[85] This Complaint, in fact, uncovered facts about the conspiracy's formation that had not previously been disclosed anywhere. While Plaintiffs do cite some pre-2012 new reports for some limited purposes, such as establishing when certain publicly-reported events happened, those reports did not reveal Defendants' collusion or even suggest an investigation was in order. As the Complaint alleges, *no one* at the time knew that developments in the IRS market were the result of Defendants' secret, hidden conspiracy. (¶¶357-59.)

---

"'became suspicious (hence 'aware') of [the defendants'] fraud when I received the [Internal Revenue Service] reports'" outside of the applicable limitations window. *Id.* at 352. Here, there was nothing remotely equivalent to a letter from a government agency alerting plaintiffs of Defendants' conspiracy let alone an admission of actual notice.

[85]   In fact, the Complaint alleges that the Defendants were successful in hiding their deception from major news publications, which inadvertently published the deceptive storyline advanced by Defendants instead of the truth. (¶122.)

Rather, as the Complaint explains, that collusion only began to come to light in June 2014 when the Dealer Defendants' increasingly aggressive campaign to squash SEFs from offering anonymous all-to-all trading brought their conduct out behind closed doors. (*E.g.*, ¶235.) And Plaintiffs only discovered the true nature and scope of the collusion through an investigation by counsel that went well beyond reading old new stories.[86] That investigation uncovered critical facts concerning the Dealer Defendants' stealth takeover of Tradeweb's IRS business that were *never* publicly disclosed until Plaintiffs laid them out in their Complaint. (¶122.) Thus, the Complaint's allegations are fully sufficient to plead that Plaintiffs lacked notice prior to 2012. *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 136 (S.D.N.Y. 2016) (plaintiff identifying when it "became aware of the violation satisfies the [ignorance of the violation] prong of the test").

Defendants' contention that their collusion was publicly known prior to 2012 is itself implausible. An IRS-dealer cartel surely would have drawn the attention of Congress when it was drafting Dodd-Frank in 2010, but the legislature does not appear to have been aware of Defendants' scheme. SEFs would not have raised millions in capital and worked for years to bring their platforms to market (¶211), achieved strong valuations (¶¶211, 218), or garnered praise for their promise from industry publications (¶218), if everyone had known their efforts were doomed to fail because of Defendants' cartel. TeraExchange, Javelin, and TrueEx would not have spent years of effort and millions of dollars, or amassed the support of industry

---

[86]   To the extent Defendants assume that Plaintiffs uncovered the key facts about the conspiracy simply by reading old news stories, they are mistaken. *Cf. In re Interest Rate Swaps Antitrust Litig.*, 16-MD-2704 (PAE), 2016 WL 4131846, at *3 (S.D.N.Y. Aug. 3, 2016) (observing "the efforts undertaken by Quinn Emanuel and Cohen Milstein were more generative and exceeded the investigative work of the other applicants by an order of magnitude").

participants (¶¶208, 213-14, 220, 239), if it had been known that Defendants were jointly

dedicated to squashing all-to-all trading.

Moreover, a mere suspicion of general wrongdoing is insufficient to trigger the

limitations period, which did not begin to run until Plaintiffs became aware of *specific facts*

comprising the *claim alleged* (here, an antitrust violation). *See Silver Fixing Antitrust Litig.*,

2016 WL 5794777, at *24 n.31 (rejecting argument that plaintiffs were not ignorant of alleged

manipulation of price for silver where several plaintiffs previously filed lawsuits alleging

suppression of silver prices because prior complaints involved different misconduct).[87]

Thus, Defendants cannot impute notice of Defendants' conspiracy to Plaintiffs by citing a

2010 article about ICAP's electronic trading platform for euro-denominated interest rate

derivatives (Dealer Br. at 74), or articles about other general market developments.  Such

information did not put Plaintiffs on notice of the relevant facts on which their claims are based.

*See Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 67 (article which defendants argued conferred

knowledge did not contain specific information about the misconduct at issue, but rather "only

---

[87]   *Woori Bank v. Merrill Lynch*, cited by Defendants, was a case in which "the overall
publicity surrounding Merrill Lynch's CDOs, the lawsuits filed against Merrill Lynch relating to
the CDOs, and the government investigations into Merrill Lynch's activities were sufficient to
make [plaintiff] 'actually and specifically recognize[]' this claim for damages" outside the
limitations window.  542 F. App'x 81, 82 (2d Cir. 2013).  Here, there was no analogous public,
prominent smoking-gun evidence.  *GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners
Offshore Fund, Ltd.*, 580 F. Supp. 2d 321 (S.D.N.Y. 2008), is similarly far afield.  There, a
securities fraud plaintiff was held to have actual notice based on its own allegations that, outside
of the limitations window, it had actual knowledge of, *inter alia*:  government investigations
into the same conduct at issue, defendants' denial of these investigations, defendants' withholding of
investment funds to satisfy potential fines or sanctions, and the fact that defendant disregarded
plaintiff's instruction to return its investment.  *Id.* at 328-29.  Defendants here can point to no
similar "storm warnings" of which Plaintiffs were aware before 2012.  *Id.* at 328.  The *GVA*
plaintiff was also on inquiry notice based on "numerous news articles, press releases and
lawsuits [] containing the exact allegations of wrongdoing by [defendant] that [plaintiff] now
includes in its Amended Complaint."  *Id.* at 329.  Defendants cannot point to any similar
materials disclosing their scheme prior to 2014.

underscores that the [challenged] rate-setting process was opaque and difficult to meaningfully evaluate" and that in any event "a single article raising suspicions about the rate-setting process [at issue in this case] is not enough to establish, on a motion to dismiss, that Plaintiffs failed to exercise reasonable diligence"); *Hinds Cnty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 121, 124 (S.D.N.Y. 2011) ("The quantity of information about government investigations into the alleged antitrust conspiracy . . . was simply too meager, particularly in light of the fact that [the defendant moving to dismiss] was not identified as a possible target.").[88]

### C.    Plaintiffs Exercised All Necessary Diligence

The Complaint also sufficiently alleges that Plaintiffs' lack of knowledge of Defendants' conspiracy before June 2014 did not result from any failure to act diligently.  (¶¶357, 373-75, 381.)  Because diligence is typically a "fact-based question," *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 196 (1984), it is "not resolvable on a motion to dismiss." *Publ'n Paper*, 2005 WL 2175139, at *6 n.7.  As one of Defendants' cases acknowledges, "the question of whether a plaintiff exercised reasonable diligence is frequently a question of fact to be decided by a jury." *131 Main St. Assocs.*, 179 F. Supp. 2d at 349 (cited in Dealer Br. at 72, 75).[89]

---

[88]    *See also Merced Irrigation Dist.*, 165 F. Supp. 3d at 136 (rejecting argument plaintiff had a duty to inquire—let alone knowledge—based on a single article "about which there is no evidence plaintiffs were aware at the time" and rejecting assertion that open publication of manipulated prices constituted notice of an the alleged conspiracy); *In re IPO Antitrust Litig.*, 2004 WL 487222, at *5 ("The issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather, the primary issue is whether the named plaintiffs and the members of each of the classes knew of the alleged conspiracy among defendants.").

[89]    *See also BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) ("[I]n concluding at the Rule 12(b)(6) stage that the BPP Plaintiffs failed to exhibit reasonable diligence in not discovering their injury [], the district court acted too hastily . . . . requiring the BPP Plaintiffs, at the motion to dismiss stage, to make a showing of reasonable diligence was premature." (internal citations and quotation marks omitted)); *Precision Assocs.*, 2011 WL 7053807, at *54 ("[T]he question of diligence for purposes of fraudulent concealment is better left for the summary judgment stage or the finder of fact at trial.").

The Complaint alleges that Plaintiffs were reasonably diligent.  They regularly monitored their investments (directly or through investment advisors), news reports concerning the financial industry and the IRS market, and IRS prices and bid/ask spreads (to the extent this was possible), in order to avoid being harmed by financial misconduct.  (¶¶376-78.)  Each Plaintiff retained and consulted with sophisticated investment managers who monitored and managed their IRS investments, and none of these professionals informed Plaintiffs of facts suggesting that Defendants were colluding to prevent buy-side access to all-to-all trading in the IRS market.  (¶¶379-80.)  Until June 2014, no Plaintiff believed or had reason to believe that Defendants were engaged in a secret, unlawful conspiracy the result of which was to artificially inflate the pricing of IRS.  (¶381.)  Nor did Plaintiffs have reason to undertake any further diligence in connection with their IRS investments.  (*Id.*)

These allegations are sufficient to satisfy the diligence prong.  *See CDS*, 2014 WL 4379112, at *15-16 (finding similar allegations sufficient); *see also Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 67 (rejecting defendants' diligence-arguments and holding that "requiring Plaintiffs, 'at the motion to dismiss stage, to make a showing of reasonable diligence' would be 'premature'" (quoting *BPP Ill.*, 603 F. App'x at 59)); *Gold Futures & Options Trading Litig.*, 2016 WL 5794776, at *28 (allegations that plaintiffs had no knowledge of and could not have discovered defendants' conspiracy through reasonable diligence sufficient to establish diligence prong of fraudulent concealment).[90]

---

[90]   *See also Schenker AG v. Societe Air France*, 102 F. Supp. 3d 418, 426 (E.D.N.Y. 2015) (diligence adequately pled where plaintiff asserted that "any lack of diligence on its part was due to 'the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination'"); *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 111 & n.129 (S.D.N.Y. 2011) (noting that if fraud is self-concealing or affirmatively concealed, a plaintiff logically could not say more about diligence than allege that ignorance was not a result of lack of diligence); *United States Secs. &*

The cases cited by Defendants do not hold otherwise.  In both *In re Merrill Lynch Ltd. Partnership Litigation*, 154 F.3d 56 (2d Cir. 1998) and *Masters v. Wilhelmina Model Agency, Inc.*, 02-cv-4911 (HB), 2003 WL 1990262 (S.D.N.Y. Apr. 29, 2003), the plaintiffs failed to allege that diligence could not have revealed the defendants' conspiracy.  The Complaint here squarely makes such allegations.  (¶¶375-82.)  Defendants are wrong to suggest Plaintiffs were required to allege numerous inquiries, as well as "when [their] inquiries were made, to whom those inquiries were directed, what those inquiries were in regard to, and what response was obtained."  (Dealer Br. at 75 (quoting *Masters*, 2003 WL 1990262, at *2 (citing *Merrill Lynch*, 154 F.3d at 60)).)  Defendants take this quoted language out of context:  the quoted passage addressed a situation in which the plaintiff had failed to plead concealment made discovery through reasonable diligence impossible.[91]  The Complaint here contains just such an allegation. (¶375.)

---

*Exch. Comm'n v. Power,* 525 F. Supp. 2d 415, 426 (S.D.N.Y. 2007) ("[T]he Complaint alleges affirmative acts by defendant [] to conceal the transaction's lack of economic substance and to prevent discovery of its fraudulent purpose and effect. . . .  At the pleading stage, this allegation suffices to satisfy the diligence requirement.").

[91]  In full, the passage from *Merrill Lynch* on which *Masters* relies reads:  "We find, as did the district court, that investors *failed to plead adequately that as a result of Merrill Lynch's alleged concealment they could not, through reasonable diligence, have discovered the fraud*. Investors did not allege in the SAC that they exercised due diligence; they make no allegation of any specific inquiries of Merrill Lynch, let alone detail when such inquiries were made, to whom, regarding what, and with what response."  *Merrill Lynch*, 154 F.3d at 60 (emphasis added).  Moreover, in *Merrill Lynch*, unlike here, plaintiffs had ample evidence to guide an investigation because it was alleged that the challenged real estate limited partnerships "were fraudulent because even at the outset it was clear that they could not achieve their promised returns" as indicated in prospectuses and annual reports.  *Id.* at 58.  The allegations of the Complaint are a world away from a situation in which publicly available documents transparently revealed the challenged conduct.

Neither *Masters* nor *Merrill Lynch* holds that allegations of specific inquires and details about them are *required*.[92]  (*See* Dealer Br. at 75.)  Rather, like *Merrill Lynch*, *Masters* merely stated that making such an inquiry is *one way* to satisfy the diligence requirement—not that such detailed inquires and allegations are necessary as a matter of law.[93]  The Complaint's allegations here are more than adequate.

## V.      THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT

The Complaint also states a claim for restitution under New York unjust enrichment law. (¶¶402-05.)  To plead an unjust enrichment claim, Plaintiffs must allege "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006).  As demonstrated above, Plaintiffs have adequately pled that Defendants "joined together as a cartel to protect their privileged position in the IRS market . . . to prevent buy-side investors from trading IRS on modern electronic trading platforms that provide more

---

[92]   The full sentence reads:  "*For instance*, plaintiffs make no allegations of the inquiries, if any, they made, when such inquiries were made, to whom those inquiries were directed, what those inquiries were in regard to, and what response was obtained."  *Masters*, 2003 WL 1990262, at *2 (emphasis added).

[93]   *In re Magnesium Oxide Antitrust Litig.*, 10-cv-5943 (DRD), 2011 WL 5008090 (D. N.J. Oct. 20, 2011), an out-of-Circuit district court case, on which the Defendants rely (Dealer Br. at 77), is not to the contrary.  There, the plaintiffs made no allegation regarding when enough information was available to enable discovery of the alleged conspiracy.  *Magnesium Oxide*, 2011 WL 5008090, at *25.  Here, Plaintiffs expressly make such allegations.  (¶¶257, 373-75, 381.)  *Publication Paper*, 2005 WL 2175139, is similarly distinguishable.  There, the diligence holding was based on the fact that the plaintiffs had not offered "any indication that they were not aware of [certain] circumstances (and consequently could not have been expected to investigate them)"—specifically, plaintiffs' own allegations indicated that they knew, years prior to the limitations window, of public, "highly unusual," "dramatic, lockstep" price increases, *i.e.*, price-fixing, the very conduct at issue in the lawsuit.  *Id.* at *5-6.

transparent and competitive trading options."[94]  (¶4.)  Defendants' conspiracy allowed them to

unjustly profit from Plaintiffs and the Class, who were prevented from trading on efficient

platforms and forced to trade IRS at inflated bid/ask spreads.  (¶¶403-04.)  Equity demands

restitution of the benefits Defendants unjustly extracted from Plaintiffs on these markets.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

motions to dismiss the Complaint in their entirety.


DATED:   New York, New York
              February 17, 2017

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By:   _/s/ J. Douglas Richards_
J. Douglas Richards
Michael B. Eisenkraft
Sharon K. Robertson
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Fax: (212) 838-7745
drichards@cohenmilstein.com
meisenkraft@cohenmilstein.com
srobertson@cohenmilstein.com

Carol V. Gilden (*pro hac vice*)
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Telephone: (312) 357-0370
Fax: (312) 357 0369
cgilden@cohenmilstein.com

Steven J. Toll (*pro hac vice*)
Kit A. Pierson (*pro hac vice*)

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:   _/s/ Daniel L. Brockett_
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Daniel Cunningham
Justin Reinheimer
David LeRay
Miles H. Plant
Kanika Shah (*pro hac vice*)
Thomas Popejoy
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
danielcunningham@quinnemanuel.com
justinreinheimer@quinnemanuel.com
davidleray@quinnemanuel.com
milesplant@quinnemanuel.com

---

[94]  Because Defendants' argument against Plaintiffs' antitrust claim is wrong, their argument that the unjust enrichment claim should be dismissed in parallel is also wrong.  *See eBooks*, 859 F. Supp. 2d at 693.

Jeffrey Dubner (*pro hac vice*)
Robert W. Cobbs (*pro hac vice*)
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408 4600
Fax: (202) 408 4699
stoll@cohenmilstein.com
jdubner@cohenmilstein.com

*Attorneys for Public School Teachers'*
*Pension and Retirement Fund of Chicago*


**JACOBS BURNS ORLOVE &**
**HERNANDEZ**

Joseph M. Burns
William W. Leathem
150 North Michigan Avenue, Suite 1000
Chicago, Illinois 60601
Telephone: (312) 327-3446
Fax: (312) 580-7175
jburns@jbosh.com
wleathem@jbosh.com

*Attorneys for Public School Teachers'*
*Pension and Retirement Fund of Chicago*


**LABATON SUCHAROW LLP**

Gregory S. Asciolla
David J. Goldsmith
Karin E. Garvey
Robin A. van der Meulen
Matthew J. Perez
140 Broadway
New York, New York 10006
Telephone: (212) 907-0700
Fax: (212) 818-0477

kanikashah@quinnemanuel.com
thomaspopejoy@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Attorneys for Public School Teachers'*
*Pension and Retirement Fund of Chicago*


**SUSMAN GODFREY L.L.P.**

William Christopher Carmody
Arun Subramanian
Seth Ard
Cory Buland
Elisha B. Barron
Lucas Issacharoff
1301 Ave of the Americas, 32nd Floor
New York, New York 10019
Telephone: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com
cbuland@susmangodfrey.com
ebarron@susmangodfrey.com
lissacharoff@susmangodfrey.com

*Attorneys for Mayor and City Council of*
*Baltimore*

gasciolla@labaton.com
dgoldsmith@labaton.com
kgarvey@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com

*Attorneys for Genesee County Employees'*
*Retirement System*