USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/8/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
IN RE:

INTEREST RATE SWAPS ANTITRUST LITIGATION

*This Document Relates to All Actions*
------------------------------------------------------------------X

16-MD-2704 (PAE)
16-MC-2704 (PAE)

ORDER

## ORDER RESOLVING DISCOVERY DISPUTES

PAUL A. ENGELMAYER, District Judge:

The Court has carefully reviewed the parties' helpful joint letter (Dkt. 319) identifying and setting out their respective positions on a series of discovery disputes. This order resolves those disputes.

### I. Background

The pending disputes involve seven topics. In general, they have in common that plaintiffs made factual allegations about these topics in their amended complaints, and those allegations relate, at least in substantial part, to portions of these complaints that the Court has held did not state a claim.

As described by the parties in their joint letter, the seven topics are:

- CME's Swapstream platform;
- Certain subjects related to the FIA-ISDA Cleared Derivatives Execution Agreement ("CDEA") Drafting Committee;
- ICAP and i-SWAP;
- Certain subjects related to inter-dealer brokers;
- LCH Clearnet, SwapClear, and the impact of clearing generally;
- OTCDerivNet; and

1

- Certain subjects relating to Tradeweb and Dealerweb.

As to each topic, the allegations in the Second Amended Consolidated Class Action Complaint ("SAC") and Javelin/Tera's Second Consolidated Amended Complaint ("JTSAC") either exclusively or largely involved the pre-2013 period. As to the pre-2013 period, the Court, in its decision (Dkt. 49) ("MTD Op.")[1] resolving defendants' motion to dismiss, has held that the complaints did not state a claim. Largely on that basis, defendants oppose discovery into these topics or accede to more limited discovery than plaintiffs will accept. Plaintiffs, for their part, argue that these topics remain relevant to issues in the case, including the alleged background to the alleged Sherman Act § 1 conspiracy in 2013-2016 that the Court has held adequately pled.

The Court has closely considered the parties' arguments. As to some areas, the Court holds that discovery is merited; as to others, it holds that it is not. Where the Court holds discovery proper, it has sought to be as clear as possible in delineating the parameters of proper discovery. The Court's hope is that these rulings, albeit sometimes expressed at a general level, will enable the parties, without the need for further court intervention, to resolve completely the process of organizing discovery in these areas (*e.g.*, to agree upon search terms targeted to the discovery the Court has approved).

## II. General Principles

In resolving these disputes, the Court has applied the principles governing discovery under Federal Rule of Civil Procedure 26 with which counsel are well familiar.

The Court agrees conceptually with plaintiffs that the dismissal of plaintiffs' claims as to the pre-2013 period does not itself categorically make plaintiffs' allegations as to events and

---

[1] The docket numbers quoted herein, unless otherwise specified, are from the Master Case ("MC") docket.

conduct prior to 2013 irrelevant or improper subjects for discovery. Events and conduct that formed the basis for dismissed claims may still be germane to surviving claims. As plaintiffs note, courts have often ordered production of discovery germane to dismissed claims.[2] However, in such circumstances, it is imperative that the discovery sought be justified as germane to a theory of liability that has survived the motion to dismiss.

Here, the discovery sought as to most topics largely predates the 2013–2016 period as to which the Court has sustained plaintiffs' claims. Discovery as to pre-2013 events, however, may still be relevant to the surviving claims. It may illuminate the background to the 2013–2016 conspiracy. It may shed light on the relationships between defendants and their key personnel during 2013–2016. It may reveal experiences and information of such persons that informed their motivations and conduct during 2013–2016. Indeed, for this reason, the Court has authorized document discovery dating to July 21, 2010, the date of Dodd-Frank's passage, more than two years before the start date of the cognizable conspiracy. Dkt. 59.

At the same time, particularly given the long (four-year) period of the surviving claims and the substantial scope of the discovery as to that period that all agree is proper, it is important that requests for discovery as to pre-2013 events be critically evaluated for relevance and that any discovery that is ordered be carefully tailored to viable theories of relevance.

---

[2] *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15 CIV 7488 (CM) (JCF), 2017 WL 3822883, at *8 (S.D.N.Y. Aug. 30, 2017) (compelling production of documents relating in part to dismissed claim where the factual allegation of an unlawful agreement underlying that dismissed claim remained relevant to well pled claims); *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 375 (S.D.N.Y. 2006) (compelling production of documents relevant to both the dismissed tortious interference claim and the still-pending defamation claims).

### III.  Discussion

With those guideposts in mind, the Court turns to the parties' specific disputes. The Court resolves these using the parties' joint classifications of their disputes. The Court addresses the disputes in the order in which the parties have presented them.

#### A.  CME's Swapstream Platform

Plaintiffs seek from each Dealer Defendant "[d]ocuments concerning CME Swaps," Request No. ("R-") 65, "documents concerning CME Cleared Swaps," R-66, "[d]ocuments concerning Swapstream," R-67, and "[d]ocuments concerning CME Clearing360," R-68. Plaintiffs' theory of relevance is that CME's Swapstream "was essentially a SEF precursor," which the defendants collectively quashed during the period 2008–2011, using conduct that plaintiffs argue defendants later used as a "playbook" for a collective scheme to later "block the SEFs."

The Court declines to authorize such discovery. The Court has squarely rejected as factually unsupported plaintiffs' theories of antitrust liability relating to Swapstream. *See* MTD Op. at 53–54. Plaintiffs' theory of relevance here effectively reprises plaintiffs' earlier allegations about these matters. Moreover, the allegations regarding CME and its Swapstream product in the SAC all predate 2010 and therefore Dodd-Frank and the discovery period. Plaintiffs do not articulate a coherent theory why defendants' interactions with each other or with CME as to Swapstream years before the 2013–2016 period have any material bearing on potential antitrust liability during 2013–2016. Even if plaintiffs' discovery requests regarding CME and Swapstream were more tailored than the sweeping requests in requests R-65 through R-68, discovery on these subjects would lack justification.

### B. Tradeweb and Dealerweb

Plaintiffs seek from each Dealer Defendant "[d]ocuments concerning any threats or risks posed by Tradeweb to Your business or to the dealer community," R-38, "[d]ocuments concerning the provision of liquidity to Tradeweb's platforms," R-42, "[d]ocuments concerning whether liquidity would be provided to any platform competing with Tradeweb," R-43, "[d]ocuments concerning any discussion with other banks about the provision of liquidity to Tradeweb's platforms," R-44, "[d]ocuments concerning the fees charged to trade by Dealerweb SEF and Tradeweb SEF," R-51, "[d]ocuments concerning any meetings hosted, facilitated, or attended by Chris D'Annibale or Dealerweb, involving more than one Dealer Defendant," R-52, and "[d]ocuments concerning Your strategy regarding whether to provide liquidity or otherwise trade through Dealerweb in IRS or any other asset classes," R-136.

The parties' dispute as to these requests, at least as formulated in this part of the parties' joint submission, appears limited.[3] Defendants state that they object categorically only to request R-38. Defendants state that, as to the other six requests, they are generally willing to produce the documents requested "to the extent that they relate to Javelin, TrueEx, TeraExchange, SEF trading of IRS, or anticipated changes to the OTC IRS market in light of Dodd-Frank"; defendants state that they do not believe any other information responsive to these six requests is relevant to the case. Plaintiffs do not dispute defendants' claim that the live dispute among these requests turns on request R-38, which they ask the Court to enforce. The Court therefore confines its assessment here to that one request. To the extent, however, that there are—or later

---

[3] The Court later (*see* § III-F, *infra*) addresses a different area of dispute relating to "Tradeweb and Dealerweb meetings," which arises in part from requests overlapping those described above.

5

develop—other disputes regarding this set of requests, the Court's reasoning as to request R-38 may prove instructive.

As to request R-38, the Court's assessment is that this request, while overbroad, is valid in part. As to overbreadth, the defense properly notes that the request, on its face, can be read to seek documents relating to "Project Fusion," in which various Dealer Defendants, beginning in 2007, allegedly steered Tradeweb away from introducing an all-to-all trading platform. The Court has rejected that theory of liability as failing to state a claim. *See* MTD Op. at 44–52. Yet request R-38 does not contain a date limitation as to the content of the documents. On its face, it therefore calls for the production of documents authored on or after July 21, 2010, that reflect on such pre-Dodd Frank events as Project Fusion. Such materials are out of bounds. To the extent that request R-38 calls for production of documents predating Dodd-Frank or relating to pre-Dodd Frank activities such as Project Fusion, the Court sustains defendants' objection.

However, there is relevance to the Dealers' joint operation of Tradeweb after Dodd-Frank. First, as the Court's decision on the motion to dismiss indicated, because of the Dealers' common control of Tradeweb, the Dealers' communications and collaboration in connection with operating Tradeweb, after Dodd-Frank, supplied a potential forum for communications antecedent to, and from 2013 on in furtherance of, the well-pled conspiracy. Second, after Dodd-Frank, Tradeweb itself eventually came to operate two SEFs, but neither operated as an anonymous all-to-all IRS trading platform. While the Dealers were at liberty to direct this aspect of their joint venture in this fashion, their communications with one another as to the strategic direction of Tradeweb's SEFs in the post-Dodd-Frank period have potential to illuminate their actions and intentions with respect to the SEFs (Javelin, TeraExchange, and TrueEx) that did attempt to operate anonymous all-to-all IRS trading platforms. For example, these

6

communications may reflect a common concern that were Tradeweb to operate such a platform, it would hurt the Dealers' IRS profit margins. The Court accordingly sustains request R-38, as applicable to documents disseminated or created on after July 21, 2010, as hereby modified, with the Court's limiting language added in italics: "[d]ocuments concerning any threat or risks posed by Tradeweb *following Dodd-Frank* to Your business or to the dealer community." So narrowed, R-38 is tailored to yield properly discoverable evidence. The Court expects that this ruling will give counsel sufficient guidance to negotiate search terms.

### C.  ICAP and i-SWAP

Plaintiffs seek from each Dealer Defendant "[d]ocuments concerning ICAP's actual or potential efforts to launch an all-to-all IRS trading platform in the United States," R-132, "[d]ocuments concerning communications with ICAP concerning its potential all-to-all ICAP IRS trading platform," R-133, "[d]ocuments concerning meetings regarding a potential all-to-all ICAP IRS trading platform," R-134, "documents concerning buy-side firms' ability to trade on i-Swap," R-140, and "[d]ocuments concerning ICAP's decision to introduce i-Swap into the United States in February of 2013," R-141. Plaintiffs theorize that the defendants may have used economic coercion to stop inter-dealer broker ICAP from launching an anonymous all-to-all IRS trading platform in ways that prefigured how "[d]efendants responded to similar threats later on from" the SEFs (Javelin, TeraExchange, and TrueEx) as to whom plaintiffs have stated a viable claim.

The Court declines to authorize such discovery. Plaintiffs' theory that ICAP's offerings and the construct of its platform were the product of economic pressure marks an about-face from their allegations about ICAP in the SAC, where plaintiffs theorized, albeit without stating a claim, that ICAP had been a witting co-conspirator of the Dealer Defendants. *See* MTD Op. at

75–78. And as the Court noted, the SAC's allegations about ICAP's SEF had limited coherence, including that the SAC alleged that ICAP's SEF "limited participation to the Dealers" while elsewhere admitting that the SEF, consistent with the CFTC's impartial access requirement, was open for IRS trading to the buy side. *See id.* at 78. To the extent plaintiffs focus on the concern that ICAP's SEF did not invite anonymous all-to-all trading, plaintiffs have not articulated a non-conclusory basis to claim that this decision resulted from pressure from the Dealers. Further, in contrast to Tradeweb, the Dealer Defendants did not control ICAP. Thus, discovery as to ICAP is far less likely to reveal collaboration among the defendants as to IRS trading in the 2013–2016 period than is discovery as to Tradeweb.

In declining to authorize discovery keyed to ICAP or i-SWAP, the Court notes—as defendants acknowledge—that discovery mentioning ICAP or i-SWAP may nevertheless be responsive to other document requests. For example, documents calling for communications among Dealer Defendants concerning provision of liquidity for SEFs or anonymous all-to-all IRS trading might mention these subjects. For avoidance of doubt, documents responsive to such requests are not to be withheld or redacted on account of a reference to ICAP or i-SWAP.

### D.   SwapClear

Plaintiffs seek from each Dealer Defendant "[d]ocuments concerning the policies, practices, procedures, pricing, capital requirements, or other restrictions in SwapClear's rulebook regarding membership." R-120. Plaintiffs claim that SwapClear's rulebook "effectively limited participation on its clearing platform to the IRS dealers," and that defendants are responsible for these provisions of the rulebook, and state that they believe that these restrictions remained in place during the discovery period. Plaintiffs do not state, however, whether they believe that such restrictions applied during the period (2013–2016) in which plaintiffs have stated a claim.

Defendants, opposing such discovery, note that plaintiffs have not alleged that any conduct concerning SwapClear or its rulebook occurred during the discovery period. They note that, as alleged, the rulebook policies that plaintiffs term exclusionary were put in place in 2009. The parties' dispute as to this request does not appear to involve issues regarding SwapClear other than in connection with its rulebook.

The Court declines to authorize the discovery sought. It is not alleged that SwapClear's rulebook during the 2013–2016 period in which plaintiffs have stated a claim contained any provisions that tended to restrict the buy-side's access to clearing of IRS trades. Nor is it alleged that relevant changes were made to SwapClear's rulebook during the pre-2013 period in which the Court has authorized discovery. There is therefore no factual predicate for request R-120.

The Court, however, will permit plaintiffs to seek discovery of the SwapClear rulebook itself during the discovery period. In the event that the text of the rulebook reveals modifications to it during the discovery period that are consistent with plaintiffs' theory of liability, plaintiffs are at liberty to seek anew discovery relating to SwapClear, focused on the process by which the particular restrictions at issue were adopted.

### E. Impact of Central Clearing

Plaintiffs seek from each Dealer Defendant "[d]ocuments concerning the feasibility of clearing or central clearing for IRS," R-14, and "[d]ocuments concerning the actual or potential impact of central clearing on Your business, Your IRS business, or bid-ask spreads, profits, or revenues generally," R-18. Plaintiffs contend that, while central clearing existed in the 2013–2016 period as a result of Dodd-Frank's mandates, for various reasons, the general feasibility and impact of central clearing remained relevant "market-structure" issues. Defendants dispute that these topics are relevant.

As to these requests, the Court broadly agrees with plaintiffs. As the Court's decision on the motion to dismiss reflects, access to and the feasibility of clearing are issues that are centrally bound up in the process by which the IRS trading market and trading platforms evolved. As that decision further reflected, access to clearing remained relevant during the 2013–2016 period. For example, plaintiffs allege that, during that period, FCMs affiliated with Dealers withheld clearing services to the Javelin and Tera trading platforms, allegedly to advance the Dealers' objective that these new platforms falter. *See, e.g.,* MTD Op. at 57–58. In these circumstances, the knowledge, views, and experiences of the Dealer personnel relevant to the IRS trading issues in this case with respect to central clearing—and the importance of clearing facilities to enable anonymous all-to-all trading—are germane.

The Court therefore upholds these requests with respect to documents disseminated or created during the discovery period. In particular, it is appropriate to expect defendants to include search terms reflecting these concepts in electronic searches as to custodians who are otherwise factually relevant to this case. The Court expects the parties to negotiate appropriately tailored search terms.[4] Separately, the Court holds, it is appropriate to expect the defendants to produce any known studies, models, and the like in their possession regarding the feasibility and impact of central clearing of IRS, regardless of whether the materials exist within the records of the custodians whose electronic communications are to be searched, provided, of course, that these were created or disseminated during the discovery period.

---

[4] It is not clear to the Court whether plaintiffs pursue, with respect to document custodians whose records are not otherwise relevant to this case, electronic searches with respect to these topics. If so, the Court expects that, at most, a very limited number of additional custodians as to these topics would be necessary.

F.  **Tradeweb and Dealerweb Meetings**

Plaintiffs seek from each Dealer Defendant "[d]ocuments concerning meetings of the Board of Directors of Tradeweb Markets LLC or Tradeweb NewMarkets LLC," R-46, "[d]ocuments concerning the establishment, structure, and membership of any other Tradeweb boards or committees upon which Your personnel served," R-47, "[d]ocuments concerning the meetings of any other Tradeweb boards or committees upon which Your personnel served," R-48, and "Your communications with or as a member of the Board of Tradeweb about IRS," R-98. Plaintiffs also seek "[d]ocuments concerning any meetings hosted, facilitated, or attended by Chris D'Annibale or Dealerweb, involving more than one Dealer Defendant." R-52. Plaintiffs argue that these records are relevant insofar as conspiratorial discussions about IRS could have occurred in these fora. Defendants challenge these disputes as overbroad. They state that, as a compromise position, they would agree "to produce documents responsive to these requests to the extent they relate to meetings regarding Javelin, TeraExchange, TrueEx, or the feasibility of all-to-all anonymous IRS trading."

The requests in question—calling for virtually all documents relating to meetings and communications at Tradeweb—are indeed extraordinarily overbroad, as defendants note. Nevertheless, a limited subset of the documents requested, regarding collaborations among Dealer Defendants in connection with operating Tradeweb, are properly discoverable. In particular, the Court regards documents reflecting communications among the defendants in their capacities as owner/operators of Tradeweb regarding central issues in this case as properly discoverable.

The Court—building off of defendants' proposed compromise position—therefore will sustain these requests to the extent that they seek "records of meetings and/or communications

11

on or after July 21, 2010, involving representatives of more than one Dealer Defendant owner of Tradeweb, which relate to Javelin, TeraExchange, TrueEx, or all-to-all IRS trading." The Court expects that document searches sufficient to capture this concept will primarily be directed at custodians at each defendant who are already independently relevant to this case. The Court, in other words, does not expect that searches for Tradeweb-related records will materially expand the number of custodians at a given defendant whose records are to be searched. However, the Court recognizes that, to accommodate this request, it may be appropriate for a given defendant to expand to a limited degree the number of such custodians, where the Dealer personnel who were responsible for managing Tradeweb were distinct from those responsible for the Dealer's IRS trading operations.

### G.     OTCDerivNet, SwapClear, and LCH.Clearnet

Plaintiffs seek from each Dealer Defendant "[d]ocuments sufficient to show Your membership on or participation in the Board of OTCDerivNet, including to show which, if any, of Your Personnel held seats on the Board," R-86, "Your communications with or as a member of the Board of OTCDerivNet about IRS," R-87, "[d]ocuments sufficient to show Your membership on or participation in the Board of SwapClear, including to show which, if any, of Your Personnel held seats on the Board," R-88, "Your communications with or as a member of the Board of SwapClear about IRS," R-89, "[d]ocuments sufficient to show your ownership interest in SwapClear," R-90, "[d]ocuments sufficient to show Your membership on or participation in the Board of LCH.Clearnet, including to show which, if any, of Your Personnel held seats on the Board,," R-91, and "Your communications with or as a member of the Board of LCH.Clearnet about IRS," R-92.

The Court declines to authorize any of the discovery sought as it relates to defendants' communications in connection with their or their agents' service on the boards of these three entities, *i.e.*, the discovery sought in R-87, R-89, and R-92. Plaintiffs' pleadings and the limited additional support appended to their discovery requests do not supply a non-speculative basis for supposing that these communications furthered the 2013–2016 conspiracy that the Court has held well-pled. And a request requiring review and production of such communications has obvious potential to be burdensome. As the Court's earlier discussion of SwapClear reflects, plaintiffs' allegations as to these topics either wholly or overwhelmingly concern prior periods, as to which the Court has not found a plausibly pled claim.

As the remaining requests (R-86, R-88, R-90, R-91), the Court will require defendants to respond to these requests, but only to the extent that they require defendants to produce documents sufficient to identify their personnel who were members of the boards of these organizations during the period July 21, 2010 through the end of 2016. The Court does so because, depending on the content of other discovery, it may emerge that personnel who served on these boards also played roles in conduct during 2013–2016 that plaintiffs claim was actionable. If this proves so, common service on these boards by personnel at different Dealers who prove to be responsible for parallel actions at their respective Dealers may help support the inference of coordination between Dealers. The Court expects that the burdens of complying with these requests, as narrowed herein, will be relatively limited.

**H.   The FIA-ISDA Cleared Derivatives Execution Agreement Drafting Committee and Meetings Hosted by Tradition**

Plaintiffs seek from each Dealer Defendant "[d]ocuments sufficient to show Your membership on or participation in the Cleared Derivatives Execution Agreement ("CDEA") Drafting Committee ("CDEA Drafting Committee")," R-103, "Your communications with or as

13

a member of the CDEA Drafting Committee about IRS," R-104, "[d]ocuments concerning a meeting of the CDEA Drafting Committee on or about April 8, 2011," R-117, and "[d]ocuments concerning any meeting hosted by an Interdealer Broker known as Tradition, the interdealer broking arm of Compagnie Financier Tradition, at which more than one Dealer Defendant was present," R-118. Plaintiffs argue that these meetings are relevant as potential fora in which the defendants allegedly conspired. Defendants dispute that there is a factual predicate for this claim. However, defendants agree, as a compromise position, to produce documents concerning a CDEA Drafting Committee meeting on or about April 8, 2011, in which Javelin allegedly participated, and documents concerning other meetings of that committee that relate to "Javelin, TeraExchange, TrueEx, and the feasibility of all-to-all anonymous IRS trading" "to the extent they are located by the Defendants' searches."

As to these requests, the Court adopts defendants' compromise position as reasonable, with one modification. As to the documents concerning meetings of the CDEA Drafting Committee other than the April 8, 2011 meeting, the Court modifies defendants' proposal as follows: defendants are to produce—as the Court has ordered with respect to Tradeweb— "records of meetings and/or communications on or after July 21, 2010, involving representatives of more than one Dealer Defendant, which relate to Javelin, TeraExchange, TrueEx, or all-to-all IRS trading."

Separately—as with SwapClear, OTCDerivNet, and LCH.Clearnet, and for the reasons as given in that context—the Court directs defendants to produce documents sufficient to identify their personnel who were members of the boards of these committees or organizations during the period July 21, 2010 through the end of 2016.

14

## CONCLUSION

For the reasons and in the manner set forth herein, the Court resolves the parties' pending discovery disputes, as reported in the parties' joint letter of December 19, 2017.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: January 8, 2018
       New York, New York