USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11 13 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

IN RE:                                              :

INTEREST RATE SWAPS ANTITRUST LITIGATION   :

*This Document Relates to All Actions*              :

------------------------------------------------------------ X

16-MD-2704 (PAE)
16-MC-2704 (PAE)

ORDER NO. 55

## OPINION & ORDER
## RESOLVING DISCOVERY DISPUTE

PAUL A. ENGELMAYER, District Judge:

The Court has reviewed the parties' competing letters regarding the request by defendant Goldman Sachs ("GS")[1] to claw back a July 1, 2013 email attaching the Statement of Objections ("SO") sent by the European Commission ("EC") to GS and other dealers during an investigation of credit default swaps ("CDS"). These are: plaintiffs' letter of November 5, 2018 disputing GS's right to claw back these materials, Dkt. 610[2]; and GS's letter of November 8, 2018, defending the clawback, Dkt. 614 ("Defs. Ltr."). The Court has also received, from GS, the declaration of Jonas Koponen of Linklaters LLP. Koponen, an EU advocate, represented GS in connection with the now-closed CDS investigation. Defs. Ltr. Ex. 1 ¶ 3 ("Koponen Decl.").

Under the clawback provisions of the protective order in this litigation, a party seeking to claw back inadvertently produced materials must demonstrate that the materials were "protected from disclosure under . . . any [] applicable United States or foreign law, regulation, privilege, or immunity from disclosure." Dkt. 300, Protective Order §§ 2.6, 12.3.

---

[1] The Court here uses "Goldman Sachs" to refer to defendants The Goldman Sachs Group, Inc.; Goldman Sachs & Co. LLC; Goldman Sachs Bank USA; Goldman Sachs Financial Markets, L.P.; and Goldman Sachs International.

[2] ECF docket numbers in this case refer to the filings in case 16-MD-2704 (PAE).

The issue presented is whether GS's clawback—which was occasioned by plaintiffs' having quoted the SO in their proposed Fourth Amended Complaint ("FAC")—is proper. The Court finds that it is.

By way of background, as Koponen explains, the SO was not a finding by the EU. Instead, it documented a formal step in an antitrust investigation. In that step, the EC informed the parties to an investigation of the bases for its preliminary view that there had been a violation of the Treaty on the Functioning of the European Union ("TFEU"). *See* Koponen Decl. ¶¶ 6–8.

As such, the SO was, at the time it issued, undisputedly confidential, such that recipients like GS were barred from disclosing it in U.S. civil litigation. Articles 15 and 16a of Commission Regulation 773/2004, Koponen Decl. Ex. B (Commission Regulation (EC) No. 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty (as amended), 2004 O.J. (L 123) 18), specifically prohibited a recipient like GS from using the SO for purposes other than judicial or administrative proceedings for the application of Articles 101 and 102 of the TFEU. These prohibit, under EU law, anti-competitive agreements and abuse of a dominant position. And communications particular to the SO by the Director General for Competition ("DG COMP") at the time of its issuance underscored that this prohibition applied to the SO specifically. *See* Koponen Decl. ¶¶ 6–8; *id.* ¶ 8 ("The [SO] has been sent to enable you to defend yourself in this proceeding. Its contents should not be disclosed to any person, body or agency other than for this purpose unless you have the prior explicit authorisation of the Commission." (quoting Koponen Decl. Ex. D (letter by DG COMP accompanying transmission of the SO)). At the time it issued, the SO therefore was clearly protected from disclosure in a U.S. litigation such as this by foreign law and regulation within the meaning of the Protective Order.

The issue separating the parties is whether the SO still so qualifies, given later events—in particular, the closure of the EU's investigation without any enforcement action having been taken. These events appear undisputed. In his uncontroverted declaration, Koponen attests that the subjects of the EC's investigation who had received the SO, including GS, contested the preliminary findings of fact and law contained in the SO and asked the EC to close the file. *Id.* ¶ 10. Koponen attests that the EC later reopened its investigation. *Id.* He attests that, on December 4, 2015, the EC adopted a formal decision to close the proceedings against the subject CDS dealer banks without taking action against them, finding that "[t]he evidence was not sufficiently conclusive to confirm the Commission's concerns with regards to the 13 investment banks." *Id.* (quoting Kaponen Decl. Ex. E (European Commission Daily News Article (Dec. 12 2015))).

In support of its argument that the SO remains confidential following the closure of the EC's investigation, GS notes that the prohibitory language in Commission Regulation 773/2004 and in DG COMP's communications to the SO's recipients were not qualified in any relevant way. They do not state or imply, for example, that, upon the cessation of the EC's investigation, the prohibitions on the dissemination of its SO would lift.

GS further notes that, in October 2014, the DG COMP instructed the CDS defendants (including GS) in a civil action then pending in this District, not to disclose confidential information created in connection with the EC's CDS investigation—including, specifically, the SO. The DG-COMP's letter stated that these materials were confidential. It instructed the CDS defendants that they were "strictly prohibited by law" from using that information for any purpose other than relating to "judicial or administrative proceedings for the application of EU competition law." *See* Pl. Ltr. Ex. G at 3. Although the EC investigation had yet to be closed,

the letter did not state that this prohibition was subject to change upon any closure of the EC investigation. The prohibition, as described, was not thus qualified.

Finally, Koponen attests that the EC, recently alerted by GS to its inadvertent production in this lawsuit of the SO, has asked GS to claw back the SO. *Id.* ¶ 16.

These authorities persuasively demonstrate that the EC's SO today remains prohibited from disclosure.

In arguing that the EC's closure of its investigation eliminated GS's confidentiality duty, plaintiffs primarily rely upon Articles 5 and 6 of a 2014 EU directive. *See* Pl. Ltr. Ex. C (Council Directive 2014/104, 2014 O.J. (L 349) (the "2014 Directive"). Under Article 6 of that directive, after an EU competition authority has closed its proceedings, an EU member state court may order the disclosure of "information that the competition authority has drawn up and sent to the parties in the course of its proceedings." *Id.* art. 6(b). The 2014 Directive allows an EU member state court to order the disclosure of the SO in member state litigation that raises the same issues, provided that the EU court has found that specified standards for disclosure have been met. *See* Koponen Decl. ¶¶ 25–30.

The 2014 Directive is inapposite here. No EU member state court has ordered the disclosure of the SO. And, insofar as the United States is not a member state and the instant multi-district litigation is not a member-state litigation, the 2014 Directive does not give this Court the authority to order the SO's disclosure.

Plaintiffs denounce as a "quasi-nativist policy" the EU rules that permit an EU member state court to authorize disclosure of an SO to facilitate private litigation in its borders while not authorizing disclosure for litigation outside the EU, such as in the United States. The Court has no occasion here to contend with this argument. No EU member state has entered any such

order. Plaintiffs' objection regarding the potential for differential treatment of EU versus U.S. litigations is thus entirely theoretical. And the Court cannot presume that an EU member-state court would find the 2014 Directive's conditions for disclosure met were a request for disclosure of the SO made in a hypothetical EU member-state litigation that brought claims that mirrored those here. Among other points of distinction, this case involves a different market (interest rate swaps) from the market addressed by the EU investigation that produced the SO (credit default swaps). And the governing legal principles are set here by U.S. antitrust law, not EU competition law. In any event, plaintiffs' objection to the EU's different strictures for member-state versus foreign litigations is ultimately one of policy, properly addressed to EU policymakers, not individual courts in the U.S.

Finally, the Court notes, plaintiffs' counsel's conduct in this litigation reflects their awareness that European law did not permit or entitle plaintiffs to disclosure of the SO or other materials related to the EC's closed CDS investigation. Plaintiffs' lead counsel also participated in the parallel CDS litigation. Counsel were aware of the SO's existence from, *inter alia*, that litigation. However, while otherwise energetically pursuing broad-ranging document discovery in this litigation, plaintiffs' counsel here did not seek production of the SO or related EC materials in discovery, even though this case was filed a year after the EC's CDS investigation ended, and even though document discovery in this case commenced more than two years after the EC investigation's termination. The Court agrees with GS that plaintiffs' present claim that the termination of the EU proceedings entitles them to the SO is opportunistic—an attempt to take advantage of GS's inadvertent production here of that document—rather than reflecting a genuine claim of longstanding entitlement to it and related materials from the EC's investigation.

The Court therefore, like other U.S. courts presented with similar disputes, upholds the application of the EC's confidentiality requirements for documents created as part of EC investigations, even after such investigations have terminated. *See, e.g.*, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), 2010 WL 3420517, at *1, *3 (E.D.N.Y. Aug. 27, 2010) (denying a motion to compel documents from EC investigations against Visa and MasterCard where a decision had issued against MasterCard)[3]; *In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078, 1084 (N.D. Cal. 2007) (declining to compel the production of EC investigative documents because "[a]lthough [the] investigation is completed, the Commission argues that production of the EC documents would undermine its ability to initiate and prosecute future investigations"). This determination respects the EC's unambiguous directives as to the confidential treatment it intended for its written communications with the subjects of its investigations, and the legitimate interests served by such confidentiality. As such, this ruling furthers important principles of comity. *See, e.g.*, *Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960) ("Upon fundamental principles of international comity, our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an unnecessary circumvention of its procedures."); *In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d at 1084 ("[T]he Commission's letter . . . raises some concerns that discovery of the EC documents could impact U.S.-E.U. cooperation in the enforcement of the antitrust laws. It seems that any marginal

---

[3] DG COMP also filed an amicus brief in that case declining to authorize production of the Visa Statement of Objections. DG COMP there noted "the European Commission's general policy that the Statement of Objections and the information contained therein should be used only for the purpose of proceedings concerning the application of [European competition law]." *In re Payment Card Interchange Fee*, 2010 WL 3420517, at *4 (quoting Letter from Irmfried Schwimann to Visa Inc. dated August 1, 2009) (alteration in original).

benefit that the plaintiff would gain from disclosure is outweighed by the impact that disclosure will have on the Commission's interests in the effective enforcement of its competition laws and its cooperation with the U.S. to enforce those laws internationally . . . .").

The Court accordingly denies plaintiffs' challenge to GS's clawback request. Plaintiffs are directed to dispose forthwith of the inadvertently produced materials consistent with the Protective Order in this case. The Court further directs plaintiffs, within three days of this decision, to file a revised Fourth Amended Complaint that excises all allegations that either refer to or are based on the inadvertently produced materials.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 13, 2018
New York, New York