USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/20/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
IN RE:

INTEREST RATE SWAPS ANTITRUST LITIGATION

*This Document Relates to All Actions*
------------------------------------------------------------- X

16-MD-2704 (PAE)
16-MC-2704 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves defendants' motion to dismiss the Amended Complaint ("AC") of trueEX, LLC ("trueEX"), Dkt. 510,[1] for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

For the reasons that follow, the Court denies the principal relief sought by that motion: dismissal of trueEX's claims under § 1 of the Sherman Act (and of trueEX's parallel claims under New York's antitrust statute, the Donnelly Act). The Court, however, grants the motion to dismiss trueEX's state-law claims of unjust enrichment and tortious interference.

## I. Introduction

Defendants' motion to dismiss trueEX's AC presents an unusual problem, in that it asks the Court to dismiss an antitrust claim that, as formulated by the other plaintiffs in their earlier complaints in this multi-district litigation, the Court has held plausibly pled.

trueEX's AC pleads that its platform for the trading of interest rate swaps ("IRSs") was a target of a group boycott conspiracy, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, beginning around 2013 among investment banks who dealt in IRSs (the "Dealer Defendants" or "Dealers"). The Court has already sustained such a claim, as brought by other plaintiffs in earlier-filed complaints in this MDL. Specifically, in July 2017, the Court resolved motions to

---

[1] ECF docket numbers refer to those filed under 16-MD-2704.

1

dismiss the complaints brought by a putative class of investor plaintiffs and by two non-class plaintiffs: Javelin Capital Markets LLC ("Javelin") and Tera Group, LLC ("Tera"). These non-class plaintiffs had, alongside trueEX, developed electronic trading platforms that were operational by 2013 or 2014 and that, as alleged, stood to offer anonymous all-to-all electronic trading of IRSs that threatened to cut into the Dealers' profit margins. As relevant here, those earlier plaintiffs had alleged that, between 2013 and 2016, the Dealers had conspired to boycott the nascent all-to-all platforms not only of Javelin and Tera, but of trueEX as well. In the July 2017 ruling, the Court sustained these claims. The Court held that these plaintiffs had plausibly pled a conspiracy whose targets included the Javelin and Tera platforms and that of then-non-party trueEX. *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 474 (S.D.N.Y. 2017) ("*IRS I*").[2]

On June 14, 2018, with discovery well underway as to the earlier plaintiffs' claims, trueEX filed a complaint of its own in which it adopted this theory for its own benefit. *See* Dkt. 411. There, and in its ensuing AC, filed August 7, 2018, Dkt. 464, trueEX sought relief claiming, consistent with the earlier plaintiffs' surviving claims, that its IRS platform had been among the targets of the alleged conspiracy. trueEX's claims are coextensive with those of the earlier plaintiffs, save that it alleges that the conspiracy, as aimed at the trueEX platform,

---

[2] The Court here assumes knowledge of the background, allegations, and history of this multi-district litigation, including as reviewed in *IRS I* and its other rulings, including its other decision on a motion to dismiss: *In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069 (S.D.N.Y. May 23, 2018) ("*IRS II*"). The Court recites here only those facts necessary to resolve the issue at hand.

continued through the date of its AC. On August 28, 2018, defendants moved to dismiss the AC. Dkt. 511 ("Def. Mem.").[3]

In moving to dismiss the AC notwithstanding the Court's earlier decision, defendants argue, in essence, that facts pled by trueEX or otherwise newly cognizable in light of the AC *detract* from the claim earlier held plausible: that defendants' conspiracy extended to trueEX. Defendants argue that trueEX's AC must be evaluated on its own terms. And, they argue, the facts now cognizable make implausible a theory that Dealers conspired to boycott trueEX. These include that various Dealers, at points between 2013 and the date of the AC, (1) cleared trades for trueEX, (2) on-boarded with, and traded on, trueEX, (3) established a direct connection to, and provided live quotes on, trueEX, and/or (4) provided live quotes to trueEX's anonymous, all-to-all central limit order book ("CLOB"). *See* AC ¶¶ 9 & n.2, 10, 197–202, 218–219, 227. Defendants also argue that the AC's theory that Dealers boycotted, in addition to trueEX's anonymous trading platform for IRS, trueEx's "name disclosed" (*i.e.*, non-anonymous) request-for-quotes ("RFQ") platform is in tension with the Dealers' ostensible goal of preserving non-anonymous RFQ trading as a profit center. Finally, defendants also note that trueEX's IRS trading platform has survived, as reflected in the AC's allegation that the Dealers' boycott "continues to this day," AC ¶ 4, and argue that this allegation is implausible given this pending litigation.

These facts, defendants argue, differentiate trueEX's situation from those of Javelin and Tera, whose all-to-all IRS trading platforms the earlier plaintiffs pled had been destroyed by the Dealers' near-complete boycott of them and associated services. Defendants argue that these

---

[3] On September 18, 2018, trueEX filed a brief in opposition. Dkt. 543 ("trueEX Mem."). On October 2, 2018, defendants filed a reply. Dkt. 562.

3

facts undermine trueEX's claims that its platform was a target of a boycott. Defendants argue that the extent of parallel Dealer conduct towards the trueEX platform is less than that towards the Javelin and Tera platforms. They note, for example, that trueEX offers no analogue to the striking incident in which, on the first business day after Tera's first trade, four Dealers "made the identical demand of Tera (to audit its rulebook) as a condition for clearing trades . . . ." *IRS I*, 261 F. Supp. 3d at 475. Independently, individual defendants argue that, even if a conspiracy among Dealers whose objects included hobbling trueEX has been plausibly pled, the facts linking certain individual defendants to that object are too sparse to allow trueEX's claim against them to stand.

trueEX counters with several arguments. It argues that the Court's earlier decision that trueEX was a target of the Dealers' plausibly-pled boycott conspiracy is law of the case and cannot be reconsidered on a motion to dismiss. trueEX also disputes that some facts on which defendants rely are cognizable; it argues that, while the fact of public filings and publications may be noticed, the Dealers improperly treat for the truth of the matter asserted facts embedded in these public materials. On the merits, trueEX contends that its AC asserts sufficient facts to support the inference of a boycott. These include conduct directly tending to limit the success of, and the liquidity extended to, trueEX's all-to-all anonymous IRS trading platform; and conduct tending to check the growth of trueEX's other platforms for trading IRSs such as its non-anonymous RFQ platform (platforms which, if successful, had potential to give traction to trueEX's anonymous all-to-all platform). trueEX contends that its AC broadly alleges numerous acts by Dealers antithetical to trueEX's goal of growing the all-to-all platform, including similar stratagems engaged in by multiple Dealers that fortify the claim of concerted action. trueEX contends that, but for coordinated Dealer resistance, its trading platform should have gained

4

more traction, given its substantial investment (nearly $95 million), its promising technology and platform design, and the support of numerous prominent buy-side customers.

## II. Discussion

The Court evaluates defendants' motion to dismiss under the same standards reviewed in *IRS I*. *See* 261 F. Supp. 3d at 460–463.

### A. Law of the Case

The Court first considers trueEX's argument that independent review of the plausibility of its AC is barred by the law of the case doctrine.

The law of the case doctrine has two branches. The first requires a trial court to follow an appellate court's previous ruling on an issue in the same case. *United States v. Uccio*, 940 F.2d 753, 757 (2d Cir.1991) (citing *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977)). This is the so-called "mandate rule." *United States v. Tenzer*, 213 F.3d 34, 40 (2d Cir. 2000). The second branch, relevant to trueEX's argument here, is more flexible. It is implicated when a court, district or appellate, reconsiders its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court. It provides "that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case," *Uccio*, 940 F.2d at 758, unless "cogent" and "compelling" reasons militate otherwise, *Tenzer*, 213 F.3d at 39. *See generally United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (summarizing above doctrine).

The Second Circuit has offered the following guidance as to application of the second branch:

> [W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case. However, this branch of the doctrine, while it informs the court's discretion, "does not limit the tribunal's power." Thus, we have noted that "[t]he doctrine of the law of the case is not an

5

inviolate rule," and the decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine. In this context "prejudice" does not mean harm resulting from the failure to adhere to the prior decision; "rather, it refers to a lack of sufficiency of notice" or a lack of sufficient "opportunity to prepare armed with the knowledge that [the prior ruling is not deemed controlling]." We have noted that this Court will adhere to its own prior rulings in a given case "absent 'cogent' or 'compelling' reasons" to deviate, such as "'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"

*Uccio*, 940 F.2d at 758 (citations omitted).

The law of the case doctrine does not bar assessment of the plausibility of trueEX's AC here, for two reasons.

First, trueEX's allegations are not made "in the same case" in which the Court previously ruled. The Court's earlier ruling insofar as it addressed a § 1 conspiracy reaching trueEX was made on the basis of complaints in two other cases: the putative class action brought by investor plaintiffs and the joint action brought by Javelin and Tera. Although trueEX's complaint has been consolidated with these earlier cases for pretrial supervision in this MDL, it is formally a separate case. The law of the case doctrine thus does not apply here. Under the law of the case doctrine, the Court's assessment of the adequacy of the class and Javelin/Tera complaints, including as to the scope of the well-pled conspiracy, is binding as to those two earlier cases. The doctrine would thus inhibit the Court from using the fact of trueEX's new complaint as a basis to constrict the scope of the conspiracy found well-pled in those two earlier cases. And defendants do not claim otherwise: they have not sought, and do not seek here, reconsideration of the Court's holding in those cases that the plausibly-pled § 1 conspiracy among the Dealers extended to the trueEX platform. But the doctrine does not apply in this separate action. In an MDL proceeding, each lawsuit consolidated within the MDL must independently state a claim. *See, e.g., Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 429 (S.D.N.Y. 2015)

6

(noting when evaluating whether an MDL plaintiffs have adequately stated a claim that "each complaint and all claims raised therein must rise or fall on their own merits"); *cf. Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1331 (7th Cir. 1994) ("[E]ach complaint must, of course, be assessed on its own allegations . . . .").[4]

Second, even if the law of the case doctrine applied here, that doctrine is flexible. The Court may deviate from it where there are "cogent or compelling" reasons to do so. *See Tenzer*, 213 F.3d at 39 (quotation marks omitted). Here, such reasons are apparent. At the time the Court ruled on the initial plaintiffs' claims, the principal focus as to the 2013–2016 period was the Dealers' conduct towards Javelin and Tera, then the only two plaintiffs to bring damages claims asserting harm to their IRS platforms from a boycott. Although Javelin and Tera, as well as class plaintiffs, alleged that the Dealers' boycott had extended to the trueEX platform, and although the Dealers challenged these claims in moving to dismiss, the allegations as to trueEX's platform specifically, at the time, were secondary. And the Dealers, not being subject then to a damages action by trueEX, had a reduced incentive to litigate as vigorously the adequacy of the specific claim that trueEX had been a conspiracy target. With trueEX now seeking monetary relief, and over a somewhat longer time period than implicated by the earlier complaints, fairness entitles defendants, faced for the first time with a claim for damages by trueEX, to contest the adequacy of its complaint on the merits. If trueEX's AC has pled facts that make the once-

---

[4] The cases on which trueEX relies in arguing that the law of the case doctrine applies here are very far afield. *See N.Y.C. Dep't of Fin. v. Twin Rivers, Inc.*, 95 Civ. 1389 (HB) (HBP), 1997 WL 299423, at *1–2 (S.D.N.Y. June 5, 1997) (applying doctrine in context of motion to dismiss affirmative defenses where earlier ruling was on a motion to dismiss in the same case and involved the same parties); *In re Clean Water Rule: Definition of "Waters of the United States,"* 140 F. Supp. 3d 1340, 1341 (J.P.M.L. 2015) (order by Judicial Panel on Multidistrict Litigation denying centralization in case to be resolved on an administrative record).

7

sustained claim of a § 1 conspiracy aimed at its platform now implausible—so as in effect to snatch defeat from the jaws of victory—defendants are entitled to dismissal of the AC.

The Court therefore evaluates trueEX's complaint *de novo*, unconstrained by the law of the case doctrine.

### B. Analysis Under Rule 12(b)(6)

On the merits, the Court holds that trueEX's AC states a plausible § 1 claim.

#### 1. Existence of a § 1 Dealer Conspiracy Aimed at trueEX's IRS Platform

Defendants' argument for dismissal of AC's § 1 claim largely evaluates the Dealers' conduct towards trueEX in isolation. Defendants primarily argue that, given the Dealers' various business dealings with and support for the trueEX platform, a claim of a plot across Dealers to boycott trueEX is not plausible. As defendants put the point, unlike with Javelin and Tera, trueEX "is reduced to complaining about the timing and extent of each Dealer's participation" in trueEX's platform, as opposed to alleging the total shunning of that platform. Def. Mem. at 11.

These arguments have undeniable force. The facts defendants highlight suggest greater Dealer support for trueEX, and longer-lasting Dealer business relations with trueEX, than for Javelin and Tera.[5] They suggest that certain practices and tactics utilized with respect to those

---

[5] The Court assumes *arguendo* that the facts on which defendants rely are all cognizable on their motion to dismiss, recognizing that trueEX disputes whether some facts drawn from public filings or publications have been improperly considered for the truth of the matters asserted. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (court can take notice of materials attached to or referenced in a complaint, but it may not consider these materials for "the truth of the matters asserted"). Because the Court denies the motion to dismiss even considering all facts on which defendants rely, it has had no occasion to consider trueEX's methodological challenge to defendants' treatment of various facts as cognizable on a motion to dismiss. *Cf. IRS I*, 261 F. Supp. 3d at 479–481 (holding, on motion to dismiss plaintiffs' earlier complaints, that certain materials on which defendants relied to demonstrate "market realities" in ostensible tension with plaintiffs' claims were not cognizable for the truth of the matter asserted on a motion to dismiss).

other platforms may not have been used, or were used not nearly to the same extent, with respect to trueEX's platform. Were the AC's allegations as to trueEX viewed in isolation, a substantial question would arise as to whether the Dealers' conduct towards trueEX, given the extent of the business dealings between them and trueEX, stated a plausible boycott conspiracy claim.

But on a motion to dismiss, the Court must view the factual allegations in the light most favorable to non-moving party trueEX and in the context alleged. Here, the critical context of the Dealers' behavior towards trueEX is that the Dealers are plausibly alleged, at the very same time, to have engaged in a contemporaneous and multi-dimensional attempt to stifle from emerging two other, similar platforms seeking, in the wake of the Dodd-Frank statutory and regulatory mandates that paved the way for such platforms, to enable all-to-all IRS trading: those of Javelin and Tera.

trueEX's AC explicitly situates the claim of a plot against it in the context of a broader-ranging plot against these two like platforms. *See, e.g.*, AC ¶¶ 231–313. The AC does not claim that trueEX was a singular target of Dealers. Rather, like the earlier plaintiffs, it alleges a wider Dealer conspiracy aimed at destroying or marginalizing multiple such platforms. And the Court has sustained these claims as well-pled. It has held that the original plaintiffs (Javelin, Tera, and the putative class) have convincingly pled a boycott by the same Dealers of Javelin and Tera's all-to-all trading platforms. As *IRS I* chronicled, that claim was backed by commendably detailed allegations of parallel acts, stratagems, and locutions among multiple Dealers with respect to these platforms. Those claims remain well-pled.[6]

---

[6] The AC appears to substantially recapitulate the allegations as to Javelin and Tera recited in those plaintiffs' Second Consolidated Amended Complaint ("JTSAC"). Dkt. 145. To the extent the AC may not do so as to every particular, the Court understands its discussion of the Javelin and Tera platforms to incorporate the JTSAC's allegations by reference, albeit to do so *sub*

9

The claimed Dealer behavior towards trueEX thus must be evaluated, not myopically as the Dealers' brief largely proceeds, but against the backdrop of a contemporaneous Dealer plot against entities that posed a similar threat to the Dealers' business model and profitability.

So viewing the AC, the Court cannot dismiss as implausible its claim that the Dealers' actions towards trueEX were coordinated among them and driven by similar aims. Viewed in the context of a broader plot to hobble like platforms, the AC pleads enough facts to plausibly support that the Dealers' overall actions towards trueEX were, on the whole, antagonistic to its all-to-all anonymous trading platform and bespoke an inter-Dealer agreement conspiracy to hobble it. That is so even though, as the Dealers emphasize, trueEX admits "that each of the Dealers participated on its platform at least to some degree." Def. Mem. at 13.

In particular, trueEX's allegations suggestive of coordination among Dealers to inhibit trueEX from reaching a critical mass and thereby becoming a competitive threat to the market-making Dealers in the IRS market include the following:

- The Dealers provided only limited liquidity to multiple trueEX's platforms—both its CLOB and RFQ platforms—with the effect of denying it enough volume in IRS transactions in general to eat into the Dealers' IRS market share. AC ¶¶ 5, 15, 225–30.

- The Dealers created unreasonable delays and erected artificial barriers to the progress of the trueEX platform. These included needlessly protracted reviews of standard form documentation including rulebook review, pretextually claiming that "resource constraints" prevented them from transitioning to meaningful use of trueEX's

---

*silentio*. This inference is particularly reasonable insofar as common counsel represent Javelin, Tera, and trueEX.

10

platform while refusing trueEX's offers of resources, and creating other pretextual obstacles and excuses once the initial round of impediments cited by the Dealers had been overcome. *Id.* ¶¶ 4, 18–19, 147, 170–203.

- The Dealers conditioned their provision of liquidity to all-to-all trading platforms upon the platforms use of "name give up." *Id.* ¶ 286.
- The Dealers conditioned or avoided interactions with trueEX representatives, including close personal friends, or conditioned such interactions on agreements not to discuss doing business with trueEX. *Id.* ¶¶ 14, 18, 147, 200, 204–17.
- The Dealers delayed progress towards clearing trades on trueEX, *id.* ¶¶ 18–19, 128–138, 147, 218–24; provided only piecemeal automatic price streaming to trueEX for new-risk trades, with the effect of marginalizing trueEX, *id.* ¶¶ 9, 10, 201, 227; and did not provide automatic responses to price inquiries on parts of the trueEX platform, *id.* ¶¶ 9, 196, 198–99.
- The Dealers attempted to placate trueEX with minor business opportunities designed to create the illusion of cooperation or progress. *Id.* ¶¶ 17–18, 147.

To be sure, defendants articulate benign explanations and business justifications for these and the other areas of conduct that trueEX claims reveal a conspiracy to contain its platform from taking meaningful root. These explanations are facially coherent. They may or may not be validated by discovery. But, viewing trueEX's allegations on the standards governing a motion to dismiss, and critically in the context of the well-pled coterminous conspiracy among the very same Dealers to cripple two peer platforms, the Court cannot dismiss the AC's claims as implausible.

11

Defendants separately emphasize that the Dealers took asymmetric approaches towards trueEX's platform, with stratagems like those above attributed only to subsets (sometimes small subsets) of Dealers. This, however, does not preclude a finding of an attempt to conspire against all three. The same was true of a number of the stratagems alleged by Javelin and Tera to have been used to neutralize their new platforms. As the Court recognized when rejecting defendants' similar argument as directed to Javelin and Tera's complaint, each conspirator need not have played a symmetric role to be part of a broader plot:

> Conspiracies, particularly when alleged among a large group, are not always tidy and symmetric. Conspirators may aid the common venture via techniques and stratagems that are consistent and reinforcing but not entirely overlapping.

*IRS I*, 261 F. Supp. 3d at 479 (citing cases); *see also Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." (citations omitted)).

Defendants also emphasize that some Dealers did business with trueEX, and that trueEX was not destroyed. These circumstances, too, ultimately may or may not defeat trueEX's claim of an agreement to quash or marginalize trueEX's platform. While the inference of the absence of a boycott that defendants urge be drawn from these facts is coherent, it is not the only available inference. Whether various Dealers' decision to do some business with trueEX precludes the finding of a conspiracy to deny trueEX meaningful IRS liquidity—and a meaningful share of the IRS trading market—requires discovery. *See, e.g., SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) (rejecting claim that some manufacturers' licensing negotiations with plaintiff undermined § 1 boycott claim of conspiracy, and noting that "[t]he manufacturers could have achieved their alleged objective of keeping [plaintiff] off the market in any number of ways: they could refuse any licensing discussions at all, they could

engage in spurious licensing discussions, they could sign a license agreement and then never implement it, or they could scare [plaintiff] off with commercially unreasonable offers. All of these actions could be consistent with the boycott's ultimate alleged objective, exclusion from the marketplace" (citations omitted)); *cf. Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 51 (1st Cir. 2013) (faulting lower court, in dismissing complaint by allegedly boycotted company, for "improperly weight[ing] defendants' alleged inconsistent responses to [plaintiff company] when it weighted the parties' respective accounts regarding the plausibility of a conspiracy").

To be plausibly pled, a conspiracy to marginalize a looming competitive threat does not require that allegations that each conspirator acted at every turn maximally to ice that threat. trueEX's explicit theory in fact is that that certain Dealers did limited business with its platform—whether for legitimate reasons or strategically, to make the boycott less obvious—while scheming with others to deny that platform the support and business needed to grow into a meaningful presence. Indeed, the AC's central allegation is that, as a result of the Dealers' deliberately limited provision of liquidity to any of trueEX's platforms, its all-to-all IRS-trading platform—although not folding entirely—has secured only a limited toehold, less than trueEX reasonably expected. *See, e.g.*, AC ¶¶ 4, 5, 12; *cf. IRS I*, 261 F. Supp. 3d at 258 ("The Dealers did provide 'some limited liquidity to [t]rueEX's non-anonymous dealer-to-client RFQ platform,' but ensured that this platform did not 'reach critical trading mass' . . . , [which] conduct successfully neutralized [t]rueEX 'from bringing an all-to-all platform to market and becoming a competitive threat'" (citations omitted)).

On its review, the Court holds, trueEX has plausibly pled a § 1 boycott conspiracy aimed at harming, marginalizing, and/or destroying—along with the other two platforms—its platform.

The development of a full evidentiary record will test this claim. Discovery will shed light on the Dealers' full range of conduct towards trueEX and what the Dealers' actions and communications reveal about the existence of a conspiracy with the object of boycotting or marginalizing the trueEX platform. Discovery into the facts relating to trueEX may also shed light on broader issues in the case, including the existence or not of a § 1 conspiracy at all, and the duration and effect of any such conspiracy.

### 2. Participation of Individual Defendants in the § 1 Conspiracy

Whether any individual Dealer participated in a conspiracy whose objects included boycotting trueEX's platform similarly cannot be resolved against trueEX on a motion to dismiss.

The Court has held well-pled (1) the existence of a conspiracy among all of the remaining defendants between 2013 and 2016 to boycott the Javelin and Tera all-to-all trading platforms; and (2) the existence of a contemporaneous conspiracy to quash the trueEX all-to-all platform. Given these adequate pleadings, the question on a motion to dismiss as to any individual Dealer is a narrow one, concerning solely the conspiracy's scope. Do the facts pled plausibly support that the individual Dealer, already implicated in a conspiracy against two like platforms, was aware of the conspiracy's third and parallel object (as to trueEX's platform)? Or do the facts pled support that the conspiring Dealer was unaware of that object, or was aware of it but acted to disassociate itself from it?

The Court recognizes that fair questions have been raised about how to interpret the actions of particular conspirator Dealers towards trueEX. Defendants argue that some Dealers' business dealings with, or support of, trueEX are circumstantial evidence that, even though that Dealer has been implicated in a conspiracy to boycott Javelin and Tera, the Dealer was unaware

14

of or chose not to participate in the trueEX object of the broader § 1 conspiracy among Dealers. Defendants argue that as to a number of Dealers, the affirmative acts of obstruction towards trueEX that are pled are "razor thin." Def. Mem. at 7. At the same time, trueEX marshals allegations which, it argues, suggest each Dealer's assent to and participation in a plot to stymie it. *See* trueEX Mem. 19–21 & nn.15–32 (collecting factual allegations from the AC).

If trueEX's complaint alleged a conspiracy against its platform alone, the Court likely would have granted the motions to dismiss by one or more individual defendants, much as the Court in *IRS I* dismissed the claims against one Dealer, HSBC, because they were supported by insufficient detail. But trueEX pleads that checking its platform's advance was but one object of a broader Dealer conspiracy, in which, as *IRS I* held, each of the surviving Dealer Defendants have been plausibly implicated. Viewing the AC in light of the fact that each Dealer has been adequately pled to be part of a plausibly pled conspiracy aimed at Javelin and Tera and that a Dealer conspiracy aimed at trueEX has been held plausible, the Court's assessment is that the inferences urged by trueEX are plausible enough to preclude granting a motion to dismiss its AC as to any one Defendant Dealer. That is because any given conspirator's understanding and intentions as to the scope of a conspiracy whose existence and membership are well-pled presents a particularly fact-intensive and potentially subtle question. By nature, such questions are ill-suited for a motion to dismiss. These questions turn heavily on circumstantial inferences that are difficult to assess on the pleadings. Such questions are more properly addressed on a developed record.

After discovery is complete, there is likely be far greater clarity as to the viability of plaintiffs' claims generally, trueEX's claims specifically, and the status of various individual defendants. In the event of motions for summary judgment, the Court may be called upon to

determine (1) whether the admissible evidence would permit a jury to find a conspiracy to boycott or hobble any or all of the three IRS trading platforms at issue that sought to emerge in or around 2013 and 2014 following Dodd-Frank; and (2) if so, whether the evidence would permit a jury to find that the conspiracy's objects extended to harming trueEX's platform. And, in the event of a motion particular to an individual defendant, the Court may be called to determine whether the evidence permits a jury to find that it joined in the conspiracy and, if so, whether it was a party to all or only some of the conspiracy's objects. Or perhaps such questions will be left for resolution at trial. In all events, a fully developed record will permit a far surer assessment of whether a particular Dealer conspirator confined the scope of its participation to objects of the conspiracy other than the trueEX platform.

### 3. Statute of Limitations as to the § 1 Claim

Defendants separately move to dismiss as time-barred trueEX's claims as to conduct before June 14, 2014. trueEX opposes this motion, arguing that the running of the statute of limitations was tolled because defendants concealed their conspiracy from trueEX and because trueEX exercised all necessary diligence.

Exercising its discretion, the Court declines to rule on this motion at this stage. While defendants' statute of limitations argument appears substantial, the issues as to both concealment and diligence are fact-intensive. The Court's assessment of these issues will be enhanced by the development of the factual record in discovery. And deferring resolution of this question ought not add to the parties' discovery burdens as to the merits: Because the original plaintiffs timely claimed a conspiracy beginning in 2013 aimed at (among others) the trueEX platform, claims as to the Dealers' conduct towards that platform prior to June 14, 2014 are within the scope of the case regardless of whether trueEX's claim proceeds.

The Court therefore denies the motion to dismiss this portion of trueEX's claims as time-barred, without prejudice to defendants' right to renew such a motion after discovery closes.

4.  **State Law Claims**

Defendants, finally, move to dismiss trueEX's three state-law claims. The Court in *IRS I* addressed parallel claims by Javelin and Tera and set out, for each, the elements and governing legal standards. The Court's resolution of those motions tracks its resolution in *IRS I* of the motions defendants had made to dismiss the parallel state-law claims brought by Javelin and Tera.

As to trueEX's claim under the Donnelly Act, New York's antitrust statute, that Act is patterned on § 1 of the Sherman Act. *See IRS I*, 261 F. Supp. 3d at 498–99. Having denied the motion to dismiss trueEX's § 1 claims, the Court accordingly denies the motion to dismiss trueEx's second cause of action, based on the Donnelly Act. *See id.* (sustaining Javelin and Tera's Donnelly Act claims to the extent that their § 1 claims had survived a motion to dismiss).

As to trueEX's claim for unjust enrichment, in *IRS I*, the Court dismissed a similar claim by Javelin and Tera because those entities failed to allege that the Dealers had directly benefitted at their expense. *See* 261 F. Supp. 3d at 500 (citing cases). That analysis applies here. trueEX cites only one paragraph of its AC, ¶ 436, as support for its claim of a direct benefit to Dealers. But that paragraph is conclusory insofar as it purports to articulate a theory of direct benefit. It largely articulates a theory of indirect benefit (enrichment through reduced competition) that is not cognizable under the authorities cited in *IRS I*. The Court accordingly dismisses trueEX's third cause of action for unjust enrichment.

As to trueEX's claim for tortious interference with business relations, in *IRS I*, the Court dismissed Javelin and Tera's such claims as inadequately pled. *See* 261 F. Supp. 3d at 499–500

17

(reviewing elements of this tort). The JTSAC had not identified any customer with whose prospective business relationships with Javelin and Tera the Dealer Defendants had sought to interfere nor the particular nature of the prospective business relations, let alone the "particular, existing relationship through which plaintiff would have done business but for the alleged[ly] tort[i]ous behavior." *Id.* at 499 (citation omitted). trueEX's AC attempts to fill these holes, but the limited facts it adds leave the AC's tortious interference claim still too vague to survive. *See* AC ¶ 439 (claiming that trueEX "had business relationship with numerous buy-side customers, including Buy Side Client 1 through 16"); *see Envirosource, Inc. v. Horsehead Res. Dev. Co.*, No. 95 Civ. 5106 (TPG), 1997 WL 525403, at *2 (S.D.N.Y. Aug 21, 1997) ("[V]ague allegation that Envirosource interfered with 'at least 5 prospective customers' is inadequate as a matter of law."). The claim is also problematic because it does not allege that trueEX's business relationship with any particular customer was harmed by a Dealer's actions, or offer any facts to support its conclusory allegations that the Dealers "acted with the sole purpose of harming trueEX," AC ¶ 441, or otherwise used wrongful means directed at buy-side customers purportedly in an attempt to persuade them to trade elsewhere. The Court accordingly dismisses trueEX's fourth cause of action for tortious interference.

## CONCLUSION

For the reasons reviewed above, the Court denies defendants' motion to dismiss the Sherman Act § 1 and Donnelly Act claims in trueEX's Amended Complaint, but grants the motion to dismiss the state-law claims for unjust enrichment and tortious interference. The Clerk of Court is respectfully requested to terminate the motion pending at Dkt. 510.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: November 20, 2018
New York, New York