UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/13/19

IN RE:

INTEREST RATE SWAPS ANTITRUST LITIGATION

*This Document Relates to All Actions*

16 MD 2704 (PAE)
16 MC 2704 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion by the putative class plaintiffs in this multi-district litigation for leave to file a proposed Fourth Amended Complaint ("PFAC"). The Court has sustained as well-pled plaintiffs' Sherman Act § 1 claims covering the years 2013–2016. Fact discovery as to these claims is set to close soon. The Court, however, has twice ruled against class plaintiffs on their bid to also pursue claims covering the five preceding years, 2008–2012. For the reasons that follow, the Court denies the motion to amend to the extent that plaintiffs again seek to add claims for 2008–2012. The Court, however, grants the motion to the extent that plaintiffs seek to amplify on their factual allegations bearing on the 2013–2016 claims.

I. **Background**

This case centers on claims of § 1 violations affecting the market for interest rate swaps ("IRS" or "IRSs"). Plaintiffs claim that the investment banks who dealt in IRSs (the "Dealer Defendants" or "Dealers") conspired to block the emergence and later the survival of electronic trading platforms that would have permitted IRSs to be traded on an anonymous, "all-to-all" basis. Such platforms, plaintiffs claim, would have provided price benefits to investors relative to the over-the counter ("OTC") model by which IRSs were historically traded, *i.e.*, dealer-to-investor, with the investor's name disclosed to the dealer.

1

The Court has issued two decisions reviewing the claims and procedural history. On July 28, 2017, the Court issued a 108-page decision resolving motions to dismiss the Second Amended Complaints: one by the putative class of IRS investors ("SAC"); the other by non-class plaintiffs Javelin Capital Markets LLC ("Javelin") and Tera Group Inc. ("Tera"), each of which in or after 2013 opened electronic platforms for all-to-all trading of IRSs ("JTSAC"). *See In re Interest Rate Swaps Antitrust Litigation*, 261 F. Supp. 3d 430 (S.D.N.Y. 2019) ("*IRS I*"). On May 23, 2018, the Court issued a 59-page decision resolving class plaintiffs' motion for leave to file a proposed Third Amended Complaint ("PTAC"). *See In re Interest Rate Swaps Antitrust Litigation*, Nos. 16 MD 2704 (PAE) & 16 MC 2704 (PAE), 2018 WL 2332069 (S.D.N.Y. May 23, 2018) ("*IRS II*").[1] The Court incorporates those decisions by reference and, in summarizing them below, recites only necessary background.

### A. *IRS I*

On November 25, 2015, the initial complaint before this Court was filed. On June 2, 2016, the United States Judicial Panel on Multi-District Litigation transferred all related matters to this Court for coordinated or consolidated pretrial proceedings. Dkt. 1.[2] On December 9, 2016, after appointment of interim lead counsel for the class and the setting of a briefing schedule, class plaintiffs filed the SAC, Dkt. 142, and the Javelin/Tera plaintiffs filed the JTSAC, Dkt. 145.

---

[1] On November 20, 2018, the Court resolved a motion to dismiss the later-filed complaint of a third "platform" (*i.e.*, non-class) plaintiff, trueEX LLC. *See In re Interest Rate Swaps Antitrust Litigation*, Nos. 16 MD 2704 (PAE) & 16 MC 2704 (PAE), 2018 WL 6067325 (S.D.N.Y. Nov. 20, 2018). That decision, which sustained trueEX's claims in principal part, is not germane to the present motion.

[2] Docket references here are to 16-MD-2704, which embraces all filings in this case, not to the "master case" docket, 16-MC-2704, established for filings of significance.

On July 28, 2017, the Court, in *IRS I*, ruled on the motions to dismiss the SAC and JTSAC. The Court sustained the § 1 claims as to 2013–2016 (made by both sets of plaintiffs) but dismissed the § 1 claims as to 2008–2012 (made by class plaintiffs only). For each period, plaintiffs had pursued claims of *per se* illegal conduct.

As to the 2013–2016 period, the Court held that plaintiffs had plausibly pled a *per se* illegal group boycott among IRS Dealers. In this period, the Court held, plaintiffs had pled significant parallel conduct among the Dealers sufficient to give rise to an inference of an agreement among them aimed at boycotting and otherwise hobbling the platforms opened by Javelin, Tera, and a third entity, trueEX LLC ("trueEX"). In or after 2013, after the effective date of the Dodd-Frank Act, these three entities had each opened a "swap execution facility," or "SEF"—a platform on which IRSs could be electronically traded in an anonymous, "all-to-all" manner. Dodd-Frank, enacted July 21, 2010 and effective in 2013 after significant rulemaking and regulatory implementation, had anticipated, enabled, and mandated the opening of SEFs. *See generally IRS I*, 261 F. Supp. 3d at 472–81.

As to the 2008–2012 period, however, before Dodd-Frank's mandates had taken effect, the Court did not find plausible class plaintiffs' claims of a *per se* unlawful agreement among Dealers to prevent from coming into existence electronic trading platforms permitting all-to-all anonymous trading of IRSs. *See id.* at 463–72. Independently, the Court held, class plaintiffs lacked antitrust standing to pursue their pre-2013 claims. To pursue such claims, the Court noted, a plaintiff must be an "efficient enforcer" of the antitrust laws; a central factor in that inquiry is whether the plaintiff's claimed injury is speculative. The Court held that class plaintiffs' claims of injury from the failure of electronic trading to emerge in 2008–2012 were unduly speculative, as they required the finder of fact to postulate an "alternative history of IRS

3

trading" that "require[d] too many leaps of imagination and guesswork for a claim of class injury to be viable." *Id*. at 494 (citation omitted). The Court, finally, held that plaintiffs' claims based on injuries incurred before November 25, 2011 fell outside the four-year statute of limitations and were time-barred. *Id*. at 487–90.

### B.   *IRS II*

After *IRS I*, the litigation proceeded to discovery, pursuant to a court-approved case management plan. *See IRS II*, 2018 WL 2332069, at *4. On February 21, 2018—the last day on which motions seeking leave to amend were authorized—class plaintiffs moved for leave to file the PTAC. *Id.* at *5. It sought to add a new class plaintiff, new allegations as to 2013–2016, and, most consequentially, to restore the putative class's claims as to 2008–2012. *Id.* at *6.

On May 23, 2018, the Court in *IRS II* resolved the motion for leave to amend. The Court authorized the addition of a new plaintiff and of new allegations as to 2013–2016. *Id.* at *8–9. The Court, however, denied the motion to restore the 2008–2012 claims, under Federal Rule of Civil Procedure 15(a), for the following reasons.

***Futility***: The PTAC did not remedy the deficiencies that had led to dismissal of the SAC's claims as to 2008–2012 and thus was futile. *Id.* at *9–19. This was so for multiple reasons, four of which the Court developed. First, the PTAC's theory of investor injury from the failure of electronic all-to-all IRS trading to then emerge remained "a product of speculation, imagination, and guesswork," *id.* at *10, making class plaintiffs' claims of injury "far too conjectural to survive," *id.* at *9. Second, the PTAC's allegations as to "Project Fusion," a joint venture among Dealers, did not make out *per se* unlawful conduct under § 1, and the PTAC's two paragraphs of allegations as to the rule of reason were too incomplete and spare to make out a rule of reason claim. *Id.* at *11–13. Third, the PTAC's allegations as to the Dealers' conduct

4

towards Swapstream, a proposed platform of the Chicago Mercantile Exchange ("CME") for clearing transactions, also did not viably plead a § 1 violation, either *per se* (as the PTAC pled) or under the rule of reason (a theory the Court *sua sponte* considered). *Id.* at \*13–17. Fourth, plaintiffs' claims predating November 25, 2011 remained time-barred. *Id.* at \*18–19.

Independently, the Court held, considerations of delay, prejudice, and gamesmanship all required denial of the motion for leave to add claims for 2008–2012. *Id.* at \*19–28.

***Delay***: The parties had organized and conducted discovery based on the 2013–2016 parameters. Discovery disputes had been negotiated and litigated based on the premise that these were the sole claims plaintiffs were pursuing. Permitting the 2008–2012 claims would have upended the negotiated and court-approved discovery schedule. Allowing the PTAC's pre-2013 claims "would [have been] functionally tantamount—or close to it—to allowing a new MDL-sized lawsuit to be hitched to the existing claims." *Id.* at \*20; *see also id.* at \*20–22 (listing discovery areas uniquely relevant to 2008–2012 claims and assessing implications of reopened discovery, as to parties, third parties, and data gathering).

***Prejudice***: Adding the 2008–2012 claims would have prejudiced defendants, who for seven months had expended time and money in discovery based on the "only rational assumption as to this case's temporal scope: that plaintiffs' surviving claims were limited to 2013–2016." *Id.* at \*22; *see also id.* at \*22–23.

***Gamesmanship***: Plaintiffs' counsel admitted that they had been intending and planning since the day *IRS I* issued to move to amend to revive the 2008–2012 claims. The Court chronicled plaintiffs' counsels' communications to the Court and the defense between *IRS I* and the PTAC's filing. Rather than disclose this intention, these communications instead repeatedly implied the opposite. *Id.* at \*23–27. "In ways large and small," the Court stated, "plaintiffs'

counsel throughout these seven months fed the false impression that the temporal scope of plaintiffs' claims was fixed at 2013–2016. The result was to mislead the Court and the defense and to occasion extensive work and expense that—had the retooled 2008–2012 claims proven viable—would have largely gone wasted." *Id.* at *24; *see also id.* at *24–26 (reviewing communications). The Court rejected plaintiffs' counsels' justifications for such "coy" and "tactical" behavior—that the work product doctrine or the need to avoid witness tampering necessitated it. *Id.* at *27. This "unacceptable gamesmanship," *id.* at *27, independently warranted denying the motion to add the 2008–2012 claims, *id.* at *28.

After the decision in *IRS II*, plaintiffs filed a Third Amended Complaint, consistent with the Court's rulings. Dkt. 398. Discovery continued, pursuant to the case management plan.

## C.    The PFAC

On October 26, 2018, class plaintiffs filed a motion for leave to amend via a proposed Fourth Amended Complaint, Dkt. 590, the PFAC, Dkt. 693 (Declaration of Daniel L. Brockett) Ex. A ("PFAC"),[3] and a memorandum of law in support, Dkt. 591 ("Pl. Mem."). Plaintiffs had alerted the Court that a motion to amend was under consideration. *See* Dkt. 408 (June 19, 2018 letter from plaintiffs); Dkt. 430 (July 17, 2018 joint status letter).

The Court describes the PFAC more fully below. In brief, it principally seeks to restore plaintiffs' 2008–2012 claims. As to these, the PFAC reprises and recasts plaintiffs' earlier allegations regarding the two episodes on which plaintiffs' prior claims as to 2008–2012 have mainly been based: (1) Tradeweb/"Project Fusion," in which Dealers jointly acquired part of the

---

[3] The Court notes that there are differences between the unredacted hard copy of the PFAC sent to the Court as a courtesy copy and the electronic version emailed to the Court on October 25, 2018 with plaintiffs' request to file it under seal. The differences include divergent paragraph numbering. The Court cites here to the paragraph numbers of the electronic version.

business of trading-platform company Tradeweb; and (2) CME/"Project Magellan," in which the Dealers jointly negotiated and reached agreement with CME regarding its "Swapstream" product. The PFAC adds limited allegations as to these episodes. It also includes allegations as to several new areas of alleged Dealer collaboration. More than earlier complaints, the PFAC pleads, as an alternative to its theory of *per se* § 1 liability, a claim of § 1 liability under the rule of reason for 2008–2012. The PFAC also expands on its allegations as to 2013–2016. In particular, to a greater degree than before, it seeks to account for the failure to emerge, after Dodd-Frank became effective in 2013, of all-to-all platforms permitting anonymous trading of IRSs other than the allegedly boycotted platforms of Javelin, Tera, and trueEX.

On December 4, 2018, defendants filed an omnibus memorandum of law in opposition to the motion for leave to file the PFAC, Dkt. 638 ("Def. Mem."), and a declaration in support, attaching exhibits, Dkt. 637 ("Playforth Decl."). On December 27, 2018, class plaintiffs filed a reply brief, Dkt. 664 ("Pl. Reply"), and a declaration in support, Dkt. 665 ("Brockett Decl.").

## II. Legal Standards Governing the Motion to Amend

Class plaintiffs' motion to amend is subject to two Federal Rules of Civil Procedure: 15(a) and 16(b).

Rule 15(a) provides that a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend" under Rule 15. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). As noted in *IRS II*, 2018 WL 2332069, at *7, leave to amend under Rule 15(a) is properly denied upon a showing of prejudice or bad faith; "[a]mendment

may be prejudicial when, among other things, it would 'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute.'" *AEP Energy Servs. Gas Holding Corp. v. Bank of Am., N.A.*, 626 F.3d 699, 725–26 (2d Cir. 2010) (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)); *see also Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) ("The court plainly has discretion . . . to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant.").

Because the present motion to amend was filed after the deadline set in the court-ordered case management plan, it—unlike the motion addressed in *IRS II*—is also subject to Rule 16(b). *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 243–45 (2d Cir. 2007) ("Rule 16(b) also may limit the ability of a party to amend a pleading if the deadline specified in the scheduling order for amendment of the pleadings has passed."); *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 174–76 (S.D.N.Y. 2014) (discussing interplay between Rules 15 and 16 in motions to amend). Rule 16(b) requires that the Court set a schedule, which "must limit the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(3)(A). Relevant here, Rule 16(b)(4) provides that such a schedule "may be modified only for good cause." *Id.* 16(b)(4). Where Rule 16(b) applies, it informs the Court's exercise of discretion under Rule 15(a): Although Rule 15(a) provides that leave to amend is to be freely given "when justice so requires," "a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause [pursuant to Rule 16]." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *see also Ramsay-*

*Nobles v. Keyser*, No. 16 Civ. 5778 (CM), 2018 WL 6985228, at *7 (S.D.N.Y. Dec. 18, 2018) ("[T]he 'good cause' standard is permitted but not mandated when a party seeks to amend its pleadings after the deadline set in the scheduling order." (citation omitted)).

As the Second Circuit has explained, the scheduling order for which Rule 16 provides serves an important purpose: "By limiting the time for amendments, [Rule 16] is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." *Parker*, 204 F.3d at 340 (quotation marks and citation omitted). Therefore, "a finding of 'good cause' depends on the diligence of the moving party" in complying with the deadline for amendments. *Id.* (citation omitted). In addition, a court applying Rule 16 has discretion to examine the Rule 15(a) factors, "in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants," *Kassner*, 496 F.3d at 244, as well as "futility, bad faith, [and] undue delay," *McCarthy*, 482 F.3d at 200 (citation omitted).

Practical considerations pertinent to the above multi-factor analysis include the duration of the case and the stage of discovery. In *McCarthy*, for example, the Second Circuit affirmed the denial of leave to amend under Rule 15 where the motion came "more than two months after discovery was completed and more than a year and a half after the filing of the original complaint." 482 F.3d at 201 (citation omitted). The district court had noted that "if the amendment is allowed, merits discovery will need to be reopened and the litigation will, in essence, start over—the same experts will likely need to produce new reports and be re-deposed." *Id.* (quotation marks, alteration, and citation omitted). Similarly, in *Ramsay-Nobles*, Chief Judge McMahon noted when applying Rules 15 and 16 that the proposed counterclaims had come less than a month before fact discovery's close and "would have required the

reopening of a case for which extensive discovery has been conducted and one that has been proceeding for far too long." 2018 WL 6985228, at *9 (quotation marks and citations omitted). Other decisions have denied motions to amend on similar grounds. *See, e.g., Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003) (upholding denial of motion to amend under Rules 15 and 16 where "plaintiffs delayed more than one year before seeking to amend their complaint [and] discovery had been completed"); *Abdullah James George Wilson v. Corelogic Saferent, LCC*, No. 14 Civ. 2477 (JPO), 2016 WL 482985, at *1–3 (S.D.N.Y. Feb. 8, 2016) (denying under Rules 15 and 16 motion for leave to amend filed six months after deadline for amendment where motion sought to add to class claim).

### III.    The PFAC's Claims as to 2008–2012

The Court first addresses plaintiffs' motion to amend to add claims as to 2008–2012—the primary focus of the new allegations in the PFAC.

The PFAC's core allegation as to this period remains that the Dealers collaborated to impede the emergence of electronic platforms permitting all-to-all IRS trading on an anonymous basis. To this end, the PFAC amplifies on the two episodes at the heart of the 2008–2012 allegations in earlier complaints. These involve (1) "Project Fusion," the joint venture by which the Dealers in 2007 and 2008 invested in and took control of Tradeweb, and allegedly induced it not to pursue all-to-all electronic IRS trading, PFAC ¶¶ 133–204; and (2) CME, whose Swapstream trading platform the Dealers allegedly collectively shunned in 2007–2008 and whose launch of an IRS clearinghouse usable to the buy-side the Dealers allegedly acted to stall in 2008–2012 in "Project Magellan," *id.* ¶¶ 205–96. These two episodes remain the centerpieces of plaintiffs' theories of how the Dealers, in 2008–2012, violated § 1.

The PFAC includes claims about two other joint ventures, in which Dealers participated with inter-dealer brokers ("IDBs")—ICAP and Tradition. The Dealers allegedly dissuaded these

10

IDBs from supporting all-to-all anonymous trading. *See id.* ¶¶ 341–73 (Tradition); ¶¶ 394–413 (ICAP). Plaintiffs' earlier amended complaints contained allegations about ICAP and Tradition, but the PFAC's claims as to these entities are mostly new. The PFAC also newly alleges that the Dealers, in and after 2010, declined to support IDCG, a startup IRS clearinghouse. *Id.* ¶¶ 297–323. Finally, the PFAC newly alleges that the Dealers boycotted two trading platforms of non-party Bloomberg (ALLQ and BSEF), with the intention to pressure Bloomberg not to open, following Dodd-Frank, a SEF permitting all-to-all IRS trading. *Id.* ¶¶ 324–40.

Addressing these actions thematically, the PFAC alleges that the Dealers over time pursued two main strategies. *Id.* ¶ 8. First, they made "'consortium investments' in critical IRS infrastructure," *id.* ¶ 8, such as Tradeweb and CME, with the goal of "mak[ing] sure those providers acted only to protect the dealers' interests," *id.* ¶ 9. Second, when that strategy proved unavailable or unsuccessful, the Dealers engaged in a group boycott of platforms such as Javelin, Tera, and/or trueEX, with the goal that the platform changed course or "withered on the vine." *Id.* ¶ 10.

### A.    Futility

Defendants argue that, for various reasons, the PFAC's 2008–2012 claims fail to state a claim and hence are futile. The Court here finds these claims futile in two respects. First, as before, class plaintiffs lack antitrust standing. Second, with one very narrow, arguable exception, the PFAC's 2008–2012 claims do not allege conduct that is *per se* illegal under § 1. The PFAC's principal theory, of *per se* liability, is thus not viable. In the interest of efficiency, the Court does not reach or resolve defendants' alternative arguments why these claims are futile. These include that the PFAC's claims as to Tradeweb, CME, and ICAP alleging conduct before November 25, 2011—and its claims as to IDCG, Tradition, and Bloomberg alleging conduct before October 25, 2014—are time-barred. In discussing, *infra*, the lack of good cause

for amendment, the Court does, however, comment on the PFAC's new allegations of § 1 liability under the rule of reason.

### 1. Antitrust Standing

In both *IRS I* and *IRS II*, the Court held that class plaintiffs' theory of injury from the absence of electronic fora offering all-to-all anonymous trading was too speculative to make them "efficient enforcers" of the antitrust laws and thus give rise to antitrust standing, under cases including *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), and *Gatt Communications, Inc. v. PMC Associates, LLC*, 711 F.3d 68 (2d Cir. 2013).

In *IRS I*, the Court explained:

> [C]lass plaintiffs' theory of pre–2013 injury is extraordinarily conjectural, such that, had the § 1 claim as to that period not otherwise have been dismissed as implausible (and had the pre–2012 aspects of that claim not been dismissed as time-barred), the claim would not satisfy the requirements of antitrust standing. Among other infirmities, it is "entirely uncertain," *Gatt*, 711 F.3d at 79, that, absent the scheme, the necessary infrastructural preconditions for anonymous all-to-all trading, such as central clearing of IRS trades, would have developed before Dodd–Frank willed them into being in 2013. Plaintiffs' alternative history of IRS trading for the first five years of the class period (2008–2012) requires too many leaps of imagination and guesswork for a claim of class injury to be viable. *See Reading* [*Indus., Inc. v. Kennecott Copper Corp.*], 631 F.2d 10 [,13] [(2d Cir. 1980)] (no antitrust standing where indirect purchaser at end of vertical distribution line "predicate[d] its claim of injury on a basis too tenuous and conjectural for a valid causal finding of anticompetitive effect and damages"); *see also Paycom* [*Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283,] 293 [(2d. Cir. 2006)] (no antitrust standing where chain of causation was "highly speculative" and was built on "conclusory allegation[s]").

*IRS I*, 261 F. Supp. 3d at 494. In *IRS II*, the Court rejected the PTAC's attempts to cure this problem, developing at greater length why plaintiffs' theory of investor injury was speculative:

> The new allegations in the PTAC do not cure this fundamental problem. Plaintiffs' claim is still that, that but for defendants' conduct, all-to-all anonymous trading platforms would have developed years prior to Dodd–Frank, such that defendants' conduct caused them injury on their 2008–2012 IRS trades. But in various ways

including the following, plaintiffs' 2008–2012 theory of injury remains a product of speculation, imagination, and guesswork.

First, the PTAC does not allege that any such platform actually developed in the pre-2013 period, or came anywhere close. In this respect, the PTAC's allegations as to 2008–2012, like the SAC's, sharply contrast with those regarding 2013–2016. With respect to 2013–2016, plaintiffs concretely allege collusion to boycott and otherwise stymie three extant all-to-all anonymous IRS trading platforms (Javelin, Tera, and [t]rueEx) accessible to the buy-side. Plaintiffs are joined in so alleging by two entities that operated such platforms, Javelin and Tera. In contrast, the PTAC does not allege that either CME or Tradeweb ever launched such a platform during 2008–2012. *See* discussion *infra*, at 23–29. Nor does the PTAC allege that—despite such a platform's ostensible business logic, its ostensible appeal at the time to the buy-side, and the ostensible existence of the technological and infrastructural "pillars" that could be adapted to support such a platform—*any* entity, including ones like Bloomberg that are not alleged to have been boycotted, ever launched or came close to launching such a platform until after Dodd-Frank's mandates took effect in 2013.

Second, while the PTAC adds detail to its allegations as to the existence *among Dealers* of clearing arrangements, post-trade processing technology, and the necessary legal infrastructure in the pre-2013 period, *see* PTAC ¶¶ 104–118, its repeated allegation that these building blocks would have been seamlessly *adapted* to the all-to-all context, *see, e.g., id.* ¶¶ 100, 110–111, 117, is conclusory. Plaintiffs posit the ready adaptation of such infrastructure as central clearing of trades from an inter-dealer environment in which swaps were traded among highly capitalized, repeat players to one that facilitated trading of sophisticated derivatives by any market participant, no matter how small, thinly capitalized, or inexperienced. But the PTAC does not concretely allege why this process would have been natural, fluid, or at all likely. On the contrary, the PTAC—tracking the observations of the [Commodities Futures Trading Commission ("CFTC")] when it later guided this process—elsewhere notes some of the formidable hurdles to such an evolution. *See, e.g.*, PTAC ¶¶ 98, 100, 110, 115, 334, 345 (acknowledging that buy-side clearing would require "operational changes," "connections," legal arrangements, collateral arrangements, and retention of clearing agents).

Third, the PTAC's claim that buy-side firms would have participated in an anonymous, all-to-all platform had one been introduced before Dodd-Frank is an *ipse dixit.* Although the PTAC alleges that buy-side firms were interested conceptually in such a potential platform, the PTAC does not allege that any buy-side firm, before Dodd-Frank's mandates took effect, had invested in any of the collateral, technological, or legal arrangements needed to facilitate such participation in anonymous all-to-all trading. Class plaintiffs CPTF and LACERA, large public pension funds, do not allege that they did so. And while the PTAC lists large buy-side firms that had expressed interest in using central clearing so as to permit trading on an all-to-all platform, *see, e.g.*, PTAC ¶¶ 133–134 (listing

Allstate, BlackRock, DE Shaw, Freddie Mac and PIMCO as firms to whom CME "successfully reached out," and stating that Citadel, Countrywide Financial Corporation, Nomura, and other "asset managers, hedge funds, and proprietary trading firms" had committed to "an Early Adopter Program for clearing via Swapstream"), it does not allege that any such firm made any investment or took other concrete action toward this end pre-Dodd-Frank. None of these firms is party to this lawsuit.

Indeed, even after Dodd-Frank had *mandated* the central clearing and collateralization arrangements necessary to enable all-to-all swap trading, compliance with these obligations by buy-side participants proved challenging: Ultimately, the CFTC delayed implementation of its mandates, recognizing as late as December 2012 that buy-side firms were still scrambling to achieve "operational readiness" to clear their trades. As the Court earlier observed: "The CFTC delayed implementation of this mandate to 2013, in part due to 'multiple requests from buy-side entities for extra time to cope with the costs and burdens imposed by implementing mandatory clearing, which one commenter described as 'overwhelming.''" *See [IRS I]*, 261 F. Supp. 3d at 446 (quoting CFTC Clearing Rule at 74,320).

Fourth and finally, to resolve reliably class plaintiffs' claim to have experienced pricing injuries on their 2008–2012 trades as a result of the absence of the IRS trading platforms they imagine, a jury presumably would have to do more than merely posit the existence of some such platform. A jury would also have to conjure features of the platform or platforms that might have been, such as their design, mechanics, costs, entry barriers, efficiencies, limitations, regulatory constraints, and trading metrics and modalities. The PTAC scarcely addresses such matters, even as to the platforms that it claims CME and Tradeweb, but for the alleged boycott, would have introduced. Nor can the structural features of the allegedly aborted platforms be inferred from later events. While Dodd-Frank put into place a "SEF" framework for swaps trading, it cannot be assumed that the free market—but for the Dealers' allegedly illegal actions to quell CME and Tradeweb—would organically have arrived at the same place. The PTAC leaves these important parameters, which may well be inherently unknowable, to speculation.

In light of these and other factors, a jury evaluating plaintiffs' claims to have experienced injuries between 2008–2012 from the alleged conspiracy would thus be required to imagine a mode of market trading that—until mandated by a landmark federal statute and its implementing regulations aimed at stabilizing this corner of the financial system—never came to be (or even close). The PTAC's 2008–2012 claims would unavoidably require a jury to conjure an alternative history in which a form of marketplace that took federal legislation to bring about would have organically sprung up. Such would require an unacceptable amount of conjecture.

The PTAC's claim of injury as to 2008–2012, anchored in an imagined alternate history, therefore remains unacceptably speculative. It is "too tenuous and conjectural for a valid causal finding of anticompetitive effect and damages." *Reading*, 631 F.2d at 13.

*IRS II*, 2018 WL 2332069, at *10–11 (footnotes, including as to CFTC implementing rules for Dodd-Frank, omitted).

The PFAC tries again to fill this void. However, the Court's judgment, on close review of the new allegations and the documents from discovery on which these are based, is that the analysis above remains correct. The PFAC's theory of investor injury from the fact that an all-to-all marketplace permitting anonymous trading did not evolve to fruition during 2008–2012 still requires piling too many contingencies and assumptions. It remains far too conjectural to establish antitrust standing for class plaintiffs as efficient enforcers of the antitrust laws. This theory continues to stand in sharp contrast to class plaintiffs' allegations for 2013–2016, which involve a plot to boycott extant platforms, which have joined the investor plaintiffs in bringing this litigation against the Dealers.

The Court therefore affirms the analyses in *IRS I* and *IRS II*. The Court adds the following points, relevant to new material in the PFAC or arguments plaintiffs now make:

*First*, to a large extent, documents the PFAC newly cites reflect the unremarkable fact that, *after* Dodd-Frank, efforts were underway in the industry to build out the infrastructure necessary to support trading on SEFs consistent with Dodd-Frank's mandates. These included developing IRS clearing solutions accessible to the buy-side. *See, e.g.*, Playforth Decl. Ex. 12 (email draft of CME clearing solution press release, Oct. 18, 2010) at 2 (identifying advisory group of 5 buy-side and 10 dealer participants in CME's clearing solution development, announcing its launch and "live test[ing]" that day with participation by PIMCO "and perhaps one other client," but adding: "[n]ote however there is material additional work required by the

CME and the dealers before the platform is fully scalable"); *id.* Ex. 11 (Bank of America PowerPoint presentation, Dec. 6, 2010) (noting "only approximately 200 days before vanilla CDS and IRS will be mandated to cleared [sic] at an eligible clearinghouse," *id.* at 2, and noting CME's October 18, 2010 rollout, *id.* at 6); *id.* Ex. 10 (Barclays PowerPoint presentation, Dec. 6, 2011) at 5 (reporting the build-out of "BarCap's clearing platform" and "[c]urrently experiencing client ramp-up in OTC clearing ahead of mandatory dates" in a "Clearing update"); *see also* PFAC ¶ 446 & nn.535–36, 541 (citing all three documents).

Further, these documents, as defendants observe, reflect only the introduction of such clearing products and their usage on starter trades. *See also, e.g., id.* Ex. 9 (Citi OTC Derivatives Clearing Response to Caisse De Depot RFI, Dec. 6 2011) at 19 ("Citi's current OTC Derivatives Clearing business . . . reflect[s] our leadership position, albeit in a market with largely ceremonial client activity. Citi expect [sic] this to increase significantly, given the levels of client engagement and mandates won, as clearing becomes mandatory."); PFAC ¶ 446 & nn.537–38 (citing same). They do not reveal the existence of meaningful buy-side clearing infrastructure before Dodd-Frank's mandates. Still less do they reveal the industry's practical readiness for all-to-all anonymous IRS trading independent of Dodd-Frank or before 2013.[4] The fact that some buy-side clearing had begun as the industry moved to implement Dodd-Frank, *see id.* ¶ 446, similarly does not prove such readiness.

---

[4] On the Court's review, the PFAC cites just one pre-Dodd-Frank document reflecting any extant buy-side IRS clearing: a December 17, 2009 press release entitled "LCH.Clearnet Launches Buy-side Clearing for Global OTC Interest Rate Swaps." Playforth Decl. Ex. 14 at 1; *see* PFAC ¶ 442 & n.512 (citing same). Class plaintiffs have previously stated that "there was no investor clearing of IRS trades before Dodd-Frank." Dkt. 193 (class plaintiffs' consolidated opposition to defendants' motion to dismiss the SAC) at 45. The press release adds: "The extension of this proven service to customers of banks reflects a key pillar of the market changes being contemplated by regulators and legislators worldwide." Playforth Decl. Ex. 14 at 1.

*Second*, the CFTC's rules and implementing regulations for Dodd-Frank underscore that major technological and infrastructural changes were needed to ready the industry for broad buy-side IRS clearing, that the industry was not ready for all-to-all anonymous IRS trading until long after Dodd-Frank's passage, and that Dodd-Frank's regulatory mandates were integral to achieving that readiness in 2013. In assessing whether plaintiffs' claim of injury is speculative, the Court takes notice of these historical events and the explanations given by the CFTC for its regulatory actions as reflecting the publicized condition of the market. *See, e.g., Staer v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that . . . regulatory filings contained certain information [including] the publicized condition of the junk bond market during the relevant time period (citations omitted)); *Cunningham v. Cornell Univ.*, 16 Civ. 6525 (PKC), 2017 WL 4358769, at *3 (S.D.N.Y. Sept. 29, 2017) ("Courts regularly take notice of publicly available documents during regulatory filings." (citations omitted)). Such is all the more appropriate here insofar as the PFAC draws upon CFTC rule-making and implementing regulations for Dodd-Frank, *see, e.g.*, PFAC ¶¶ 449–50 & nn.547–53, and upon a buy-side commenter's submissions to the CFTC, *see id.* ¶ 442 & n.527; *see also* PTAC ¶ 333 & nn.124, 127–28 (citing buy-side comment letters on proposed CFTC rules).[5]

The CFTC's pronouncements reflect its determination that, even with Dodd-Frank's impetus, market infrastructure and buy-side participants were not yet ready for all-to-all SEF

---

[5] For avoidance of doubt, the Court would still hold that plaintiffs' claimed injury for 2008–2012 is too speculative to support antitrust standing even had it not considered these regulatory materials. Neither party here argues that the Court's notice of the fact of regulatory events is improper. *See* Pl. Mem. at 20 n.74 (disputing defendants' characterization of CFTC comments); Def. Mem. at 14 n.9 (citing cases in support of the Court taking judicial notice of CFTC filings); Pl. Reply at 12 & n.12 (disputing defendants' characterization of CFTC rules).

trading. These led to the CFTC's deferring until March 2013 the effective date of Dodd-Frank's

mandate. *See, e.g.*, Clearing Requirement Determination Under Section 2(h) of the CEA, 77

Fed. Reg. 74,284, 74,323 (Dec. 13, 2012) (IRS clearing requires "startup and ongoing costs

relating to technology and infrastructure, new or updated legal agreements, . . . and costs related

to collateralization of their positions."); *id.* at 74,324 ("In response to . . . concerns about legal

documentation and operational readiness, the Commission has clarified that compliance with the

clearing requirement will not be required for any swaps until March 11, 2013 . . . .").[6] That there

was "[r]obust [d]emand" from the buy-side for central clearing, PFAC ¶¶ 440–46, does not make

less speculative the claim that, absent alleged misconduct, this costly infrastructure would have

grown up in 2008, or 2009, or 2010, or any time before Dodd-Frank compelled it. Tasking a jury

to gauge the stack of many unknowable questions embedded in the PFAC's alternative history—

for example, whether a sufficient number of buy-side entities would have invested in such

---

[6] Buy-side comment letters were to the same effect. *See, e.g.*, Managed Funds Ass'n, Comment Letter on Proposed Clearing and Execution Implementation Rule, 76 Fed. Reg. 58,186, and Proposed Documentation and Margining Implementation Rule, 76 Fed. Reg. 58,176, at 2 (Nov. 4, 2011) (recognizing "current structural and economic barriers to widespread clearing [of swaps]"), https://www.managedfunds.org/wp-content/uploads/2011/11/CFTC-Implementation-Rules-on-Clearing-Execution-Documentation-and-Margining-Final-MFA-Letter.pdf; Def. Mem. at 14 n.9 (citing Vanguard Comment Letter on 76 Fed. Reg. 58,186, RIN 3038-AD60, at 4, 6 (Nov. 4, 2011) ("time [is] needed" to "develop industry infrastructure," "implement complex operational connections," "educate clients," and "negotiate new trading agreements"—a "process [that] is so time intensive")); *id.* (citing Ass'n of Inst. Investors, Comment Letter on 76 Fed. Reg. 58,186, RIN 308-AD60, at 3 (Nov. 4, 2011) (a "voluminous amount of documentation" is necessary, which "requires negotiations and agreements [to] be made across thousands of accounts")); *id.* (citing Coal. for Derivatives End-Users, Comment Letter on 76 Fed. Reg. 58,186, RIN 3038-AD60, at 1, 4 (Nov. 4, 2011) (claiming more time is needed to put in place "technological connections" and legal agreements)); *id.* (citing Inv. Co. Inst., Comment Letter on 76 Fed. Reg. 58,186, RIN 3038-AD60, at 2, 4 (Nov. 4, 2011) (stating that the CFTC "significantly underestimate[d] the time needed for the swap market to transition to the new framework" and that "[t]hese time periods are woefully insufficient")); *id.* (citing Fin. Servs. Roundtable, Comment Letter on 76 Fed. Reg. 58,186, RIN 3038-AD60, at 5 (Nov. 4, 2011) ("[E]stablishing clearing arrangements is resource-intensive")).

infrastructure and undertaken such collateralization to make all-to-all anonymous trading of IRSs a reality as of a particular date—would unavoidably invite an exercise in guesswork, not reliable fact-finding.

*Third*, in claiming to have cured the problem of speculative injury noted in the SAC and PTAC, plaintiffs emphasize the PFAC's allegations that Dealers acted with the intent to slow the evolution of certain offerings (of Tradeweb, CME, Tradition, Bloomberg, and ICAP) which had the potential to lead towards all-to-all trading. *See, e.g.*, PFAC ¶¶ 19, 153, 230–39, 249, 325–27, 352–53, 392–93. But these intentions do not establish the market's readiness for such trading at any time, including 2008–2012. Some PFAC allegations, in fact, describe Dealer actions aimed at *post*-Dodd-Frank (and indeed post-2012) platforms. *See, e.g., id.* ¶¶ 325, 331–40 (allegations that Dealers, after Dodd-Frank, were concerned that Bloomberg would open a SEF permitting all-to-all IRS trading, and since 2012 have boycotted certain Bloomberg platforms); *id.* ¶¶ 344–73 (allegations that after Tradition announced in 2010 its intention to open a SEF-compliant platform, Dealers acted to take control over Tradition's SEF, did so by September 2013, and today govern it so as to frustrate all-to-all anonymous trading).

To be sure, the PFAC (even more than prior complaints) alleges instances in which Dealer personnel expressed hostility to all-to-all trading or acted with intent to discourage the market's evolution in that direction. But these do not show that, before 2013, the market was ready for this transformation. As the implementation of Dodd-Frank demonstrated, even when backed by regulatory mandates, the buy-side did not adapt on the CFTC's required timetable, necessitating an extension of the mandates until March 2013. Statements by Dealers in 2008–

2012 fearing the eventual emergence of all-to-all trading do not mean that this market structure was then imminently viable.

The PFAC's claims as to 2008–2012 are therefore futile for lack of antitrust standing.

### 2. Claims of a *Per Se* § 1 Violation in 2008–2012

The PFAC, like plaintiffs' earlier complaints, dominantly pursues a § 1 theory of *per se* illegality. The Court first reviews its rulings as to the SAC's and PTAC's allegations in support of a *per se* theory, before assessing those in the PFAC.

#### a. *The SAC*

In *IRS I*, the Court sustained plaintiffs' *per se* theory as to 2013–2016, in that the SAC and JTSAC alleged "a recognized type of *per se* unlawful § 1 conspiracy: a group boycott," 261 F. Supp. 3d at 472, and parallel conduct and circumstantial evidence that made plausible the inference of a Dealer boycott aimed at the three new SEF platforms that offered all-to-all IRS trading, *id.* at 472–77. As to 2008–2012, however, the SAC's theory was based not on a boycott—for no all-to-all IRS trading platforms then existed—nor on meaningful parallel conduct, but largely on the Dealers' acquisition in 2007 alongside Thomson Corporation of a controlling stake in Tradeweb, allegedly in order to terminate a plan there to open such a platform.

The Court found the SAC's claim of a *per se* § 1 violation deficient for two reasons. First, its factual allegations as to the existence of such a plan at Tradeweb and of the Dealers' agreement to terminate it were hazy and conclusory. *Id.* at 466. Second, even assuming a well-pled agreement among Tradeweb's Dealer owners to terminate such a plan, the SAC did not plead facts under which an agreement would be *per se* unlawful:

> The SAC's allegations as to Project Fusion do not fit into any category of agreement recognized as *per se* illegal. It alleges a decision among participating Dealer Defendants as to the strategic direction of a single financial technology company

20

which they majority-owned pursuant to a joint venture. But, viewing the operation of a legitimate joint venture as akin to that of a single firm, modern antitrust law evaluates such joint conduct—including the creation of the joint venture itself, its business focus, its product selection, and its pricing—under the rule of reason, with the pleading requirements that standard imposes.

*Id.* at 467 (citations and footnote omitted). The Court added:

Plaintiffs do not cite any case in which a decision by competitors to invest in or acquire control over a business, or to direct the activities of a business, in the context of a legitimate joint venture, has been evaluated under the *per se* standard. And the SAC does not plead facts that remove the Project Fusion joint venture from Tradeweb, the subject of the joint venture, became a horizontal competitor of the Dealer Defendants which thereafter conspired with them. And Tradeweb was not such a competitor: As alleged, it was a provider of electronic trading platforms, not a market maker. And the SAC does not adequately plead that the Project Fusion joint venture was an illegitimate shell that offered no efficiency enhancements and served only to mask concerted conduct. The SAC's allegations as to Tradeweb—including as to non-defendant Thomson's minority-ownership of it, the Dealers' infusion of $280 million in it, and its existence and operation from 2007 forward—would not permit such an inference.

*Id.* at 467–68 (citation and footnote omitted).

### b. *The PTAC*

In the PTAC, plaintiffs based their theory of a *per se* violation of § 1 during 2008–2012 on two collaborations among Dealers.

The first was, again, "Project Fusion." But, the Court held in *IRS II*, the PTAC failed to rehabilitate the claims as to that arrangement. The PTAC had abandoned the SAC's conclusory claim that "'Tradeweb was planning to introduce electronic all-to-all trading to the IRS market,'" *IRS II*, 2018 WL 2332069, at * 11 (quoting the SAC), replacing it with the claim that Tradeweb was gradually upgrading its swap trading capabilities and was "'primed to adopt all-to-all trading,'" *id.* (quoting PTAC ¶ 102), and that unspecified persons at Tradeweb had discussed doing so, *id.* (quoting PTAC ¶ 223). However, the Court held that "[t]hese reconfigured allegations about amorphous 'discuss[ions]' and Tradeweb's being 'primed' to adopt all-to-all trading, [PTAC] ¶ 102, again fall far short of plausibly alleging plaintiffs' 'critical background

premise': that Tradeweb was planning in 2007 to launch all-to-all IRS trading." *Id.* at \*12 (quoting *IRS I*, 261 F. Supp. 3d at 466); *see also id.* ("The PTAC's theory of a plot to block a Tradeweb plan to introduce all-to-all IRS trading thus starts with the ill-pled premise that there ever was such a plan.").

In any event, the Court held, the PTAC failed to rectify the other pleading deficiencies in the SAC's "Project Fusion" allegations. The PTAC dubbed the "Project Fusion" joint venture a "sham" and a "formalistic shell." But the facts pled were inconsistent with these labels, including:

> "(1) The Dealers invested $280 million in Tradeweb; (2) they owned Tradeweb alongside existing owner Thomson; (3) Tradeweb, post-acquisition, was organized consistent with customary corporate formalities; (4) Tradeweb proceeded to expand other aspects of its trading platforms; and (5) its decision not to offer an all-to-all trading platform until 2013 put it on par with all other trading platforms of the day, including . . . Tera, Javelin, [t]rueEx, and Bloomberg."

*Id.* at \*12 (quoting *IRS I*, 261 F. Supp. 3d at 468 n.17). Accordingly, the Court held, "even assuming a well-pled agreement among owners to terminate a Tradeweb plan to open an all-to-all IRS trading platform, the Project Fusion joint venture as alleged remains subject to review only under the Rule of Reason." *Id.* (citation omitted).

The second basis for the PTAC's claim of *per se* illegal conduct in 2008–2012 involved CME. The PTAC alleged that, in 2006, CME had acquired Swapstream, a trading platform focused on a limited number of dealer-to-dealer IRS swaps in Europe; that CME had hoped to transform Swapstream into a worldwide electronic platform for all-to-all IRS trading; but that CME could not secure Dealer agreement to participate. *Id.* at \*13. CME then began joint negotiations with the Dealers, who were collectively represented by Edward Rosen of the Cleary Gottlieb law firm. These negotiations, in which the Dealers sought "'governance'" over the platform, did not bear fruit. *See id.* (quoting PTAC ¶ 155). Eventually, CME initiated joint

negotiations with the Dealers, again represented jointly by Rosen, regarding a "'clearing-only solution'" that would be "'open to the buy-side.'" *See id.* (quoting PTAC ¶¶ 160–61). These "Project Magellan" negotiations led to a written agreement in which Dealers agreed to provide minimum clearing volume to CME in exchange for revenue sharing. The PTAC alleged that the agreement contained a "'poison pill'" that effectively disabled CME from launching an execution platform, by allowing the Dealers to "'capture nearly all the profits.'" *Id.* (quoting PTAC ¶ 179).

In *IRS II*, the Court rejected this set of allegations, too, as a basis for a claim of a *per se* violation of § 1 during 2008–2012. Various PTAC factual allegations were contradicted by pled or cognizable facts. *See id.* at *14. These included the PTAC's implication that Swapstream had launched a trading platform, which a close reading revealed had not happened, and its errant characterization of the "Project Magellan" agreement to contain a "poison pill" provision to neuter any CME plan to launch an IRS trading platform. *See id.* ("By its plain terms, the Magellan Agreement did *not* 'poison' CME's plans to launch an IRS clearinghouse."). The PTAC's discussion of CME also contained a significant number of conclusory or general allegations, including as to central allegations for the period before the Dealers' joint, counseled negotiations with CME had begun. *Id.* at *15.

As to the PTAC's well-pled allegations of collective action among Dealers regarding Swapstream, the Court noted, these "are centered on the period *after* joint negotiations between CME and the Dealers are alleged to have begun." *Id.* This activity, the Court held, did not fit within a category that courts applying § 1 had held susceptible to *per se* condemnation:

> In that period, as pled, discussions and lawyered negotiations had begun between CME and the Dealers to reach agreement regarding the terms under which participating Dealers collectively would participate in CME's Swapstream platform. As reviewed above, the parleys during this period occurred in two phases:

regarding (1) CME's initial proposal to revamp Swapstream; and (2) CME's ensuing proposal—which resulted in a negotiated business arrangement memorialized in the Magellan Agreement—to launch a stand-alone clearinghouse.

This paradigm of collective negotiations between multiple collaborating competitors and a shared counterparty or counterparties to explore facially legitimate business arrangements does not lend itself to *per se* condemnation. *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988) (standard setting is subject to the Rule of Reason). As the Court reviewed in its discussion of Tradeweb, legitimate joint business ventures, including at the point of their creation, are subject to the Rule of Reason, and "business practice[s]" involving the "core activity of [a] joint venture . . . do not fall within the narrow category of activity that is *per se* unlawful." *Texaco, Inc. v. Dagher*, 547 U.S. 1, 8 (2006); *see id.* at n.1; *Nw. Wholesaler Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985) ("mere allegation of a concerted refusal to deal does not suffice" to merit *per se* condemnation "because not all concerted refusals to deal are predominantly competitive"); *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 316 (2d Cir. 2008) ("*Per se* treatment is not appropriate ... where the economic and competitive effects of the challenged practice are unclear"); *see also In re IRS*, 261 F. Supp. 3d at 467 (collecting cases and holding "Project Fusion" subject to Rule of Reason review).

The facts pled reveal potential pro-competitive justifications from the collaboration here in connection with the Dealers' negotiations with CME, enough to persuade the Court that the conduct alleged—in contrast to a horizontal price-fixing conspiracy or the boycott pled against Javelin, Tera, and [t]rueEx—is not by nature suitable to condemnation *per se*. Both sets of discussions among the Dealers and CME had the potential, *inter alia*, (1) to launch a new venture by assuring CME of the critical mass of Dealer support it claimed to need; (2) to help CME set standards for a new modality of IRS trading acceptable to a broad range of market participants; and, (3) as in other business contexts involving negotiations with a swath of industry players, to avoid the inefficiencies associated with duplicative one-on-one negotiations. *See, e.g.,* PTAC ¶ 135 (noting CME's goal to enlist one or more Dealers from each of "Tier 1" and "Tier 2").

That the second stage of Dealer/CME negotiations led to a counseled agreement between CME and most (although not all) Dealer Defendants also weighs against finding *per se* anti-competitiveness. The Magellan Agreement's text, too, reveals a pro-competitive justification: The revenue-sharing pact enabled the introduction of a novel clearing platform whose standing was enhanced by the agreed participation of reputable Dealers who agreed to provide minimum clearing volume to the CME. *See id.* ¶¶ 160, 179–180.

*Id.* at *15–16 (footnote omitted).

### c.    *The PFAC*

In pursuing a theory of *per se* § 1 illegality as to 2008–2012, the PFAC again principally relies on the Tradeweb and CME episodes, while also adding allegations about episodes relating to several other entities, discussed below.

As to Tradeweb and CME, the PFAC reorders and re-packages the PTAC's allegations—e.g., referring to the two episodes as embodying a "consortium strategy" across Dealers, *see, e.g.*, PFAC ¶¶ 8, 141–43—but adds limited new factual allegations.  These do not disturb the Court's earlier assessment that these complex dealings do not fall into a recognized category of conduct which the courts have condemned *per se*.  The Court holds, as before, that any § 1 assessment of the balance between the pro-competitive purposes and anti-competitive effects of these ventures must instead be under the rule of reason.

***Tradeweb***: The PFAC claims the "Project Fusion" joint venture was illegitimate because participating Dealers were motivated, in gaining control of Tradeweb and in setting its course, to shape IRS market developments so as to reduce the possibility that exchange-like trading would emerge.  *See, e.g.*, PFAC ¶¶ 15–17, 142, 154–55; *see also* Pl. Mem. at 8 (collecting PFAC allegations as to Dealers' aim to, *inter alia*, "'negate[] the threat'" of IRS exchange trading, *id.* (quoting PFAC ¶ 155 (alteration in original)) and "'slow the inevitable slide to all-to-all,'" *id.* at 9 (quoting PFAC ¶ 191)).  The PFAC claims that Dealers later ran Tradeweb "as a utility," preferring the interests of its Dealer majority owners over profit-maximization.  PFAC ¶ 195.  These allegations that the Dealers harbored such sectarian intentions track allegations in earlier complaints.  *See, e.g.*, *IRS I*, 261 F. Supp. 3d at 447–49 (discussing SAC and JTSAC).

The Court credits as well-pled that the Dealer personnel quoted in the PFAC had the intentions alleged: to steer Tradeweb's evolution, and to influence the evolution of the market, in a direction that maximized Dealers' economic interests, including to preserve trading margins.

But whether *per se* condemnation under § 1 is available does not turn on subjective intent. The availability of the *per se* rule does not turn on case-specific determinations about the quality of evidence of (or pleadings as to) intent. It does not turn on the adjectives or metaphors used by competitors in emails. It is a categorical doctrine. *Per se* condemnation is available only when courts' "considerable experience" teaches that the *category* of restraint at issue has "manifestly anticompetitive effects" and "lack[s] any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (quotation marks and citations omitted); *see also NYNEX Corp, v. Discon, Inc.*, 525 U.S. 128, 137–38 (1998) (declining to apply *per se* rule to alleged boycott claim despite allegation that defendants acted with a "special anticompetitive motive" to force the plaintiff out of business; Court did not "find a convincing reason why the presence of this special motive should lead to the application of the *per se* rule"); *cf. Conn. Ironworkers Emp'rs' Ass'n v. New England Reg'l Council of Carpenters*, 324 F. Supp. 3d 293, 305 (D. Conn 2018) ("[A]llegedly pernicious motives on their own do not suffice to overcome the 'presumption in favor of [the] rule-of-reason standard.'" (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726 (1988)).

Here, for the reasons given in *IRS I* and *IRS II*, the collaboration alleged in "Project Fusion" does not correspond to any category of activity among horizontal competitors that courts to date have condemned *per se*. It cannot be condemned on its face as an act of as price-fixing, market allocation, or—in contrast to the Dealers' alleged actions in 2013–2016 towards the new opened SEFs—as a group boycott. Rather, its structure is that of a capitalized and operational joint venture. It cannot facially be condemned as an illegitimate sham.

The Court of course does not and cannot on the pleadings assess the net competitive impact of the "Project Fusion" joint venture. But whatever the evidence adduced on a well-pled

rule of reason claim might have shown as to the balance of pro- and anti-competitive effects,

plaintiffs' pleadings themselves reveal the venture's potential pro-competitive effects. These

include, as noted, that after participants invested $280 million in Tradeweb's fledgling platform,

Tradeweb expanded aspects of its trading operations. *See IRS II*, 2018 WL 2332069, at *12

(quoting *IRS I*, 261 F. Supp. 3d at 468 n.17).[7] *IRS I* invited plaintiffs to "cite any case in which a

decision by competitors to invest in or acquire control over a business, or to direct the activities

of the business, in the context of a legitimate joint venture, has been evaluated under the *per se*

standard." *IRS I*, 261 F. Supp. 3d at 467–68. Plaintiffs have not done so.[8]

**CME**: The PFAC's allegations, though re-sequenced, are in substance quite similar to

those in the PTAC, including as to the successive rounds of joint negotiations between Dealers

and CME on which the Court focused in *IRS II*. *See* PFAC ¶¶ 223–56 (first round followed by

---

[7] Consistent with this, defendants note that documents cited in the PFAC reflect that after the Dealers' investment per "Project Fusion," Tradeweb's trading volume in IRSs, credit default swaps, and several other asset classes grew substantially from a *de minimis* base. *See* Def. Mem. at 28 & n.20 (quoting documents cited by the PFAC reflecting that Tradeweb IRS revenue grew from approximately $1.9 million in 2006 to approximately $21 million in 2009); *cf. id.* at 28 (quoting documents cited by the PFAC that articulate "Project Fusion" participants' purposes for investing as including launching "the first global trading network to offer clients the ability to trade any asset class in any currency on one platform 24 hours a day"). The PFAC contains allegations about post-"Project Fusion" business decisions by Tradeweb, for example, delaying the launch date of "click to trade" functionality, *see* PFAC ¶¶ 158, 181–87, or as to the direction of the later Dealerweb platform, *see id.* ¶¶ 188–95. The parties debate whether these later events bear on whether the "Project Fusion" joint venture was *per se* illegal. *Compare* Def. Mem. at 29–30 & n.22 *with* Pl. Reply at 19 & nn.34–35. The Court treats the PFAC as alleging that the joint venture, from its inception, was *per se* illegal, and that ensuing decisions by Tradeweb, given its control by Dealers, shed light on the motives of the Dealer participants in that venture. As noted, however, the pled facts, in totality, do not permit the venture to be condemned *per se*.

[8] For many of the same reasons, "quick look" analysis is unavailable here. It does not apply to collaborations among competitors that "'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition.'" *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 318 (2d Cir. 2008) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999).

abandonment of Swapstream plan to open all-to-all platform); *id.* ¶¶ 257–93 (second round followed by execution of "Project Magellan" agreement, in which Dealers agreed to provide minimum clearing volume to CME in exchange for revenue sharing and opening of CME clearinghouse for buy-side IRS trades).

For the same reasons noted in *IRS II*, these business arrangements also do not resemble any that courts, based on considerable experience, have condemned as *per se* anti-competitive. *See IRS II*, 2018 WL 2332069, at *15 (collecting cases). Plaintiffs do not cite any case in which a court has *per se* condemned a horizontal collaboration that is structurally or thematically similar to that pled. Nor do they cite any case so condemning a business agreement meaningfully akin to the written, counseled agreement with CME that resulted from these negotiations. Further making *per se* condemnation unavailable is the presence, on the pleadings, of the potential pro-competitive justifications noted in *IRS II* for these joint negotiations and outcomes. *See id.*

To be sure, the PFAC adds concrete allegations as to the motives of participating Dealer personnel preceding and during the sequential joint discussions with CME. *See, e.g.*, PFAC ¶¶ 230, 237, 239–43, 256, 293. As with Tradeweb, it is, in general, well-pled that these persons aspired to delay evolution of exchange trading, in favor of existing trading norms. But, again, as with Tradeweb, whether *per se* condemnation under § 1 is available turns on judicial experience with a category of business arrangement, not on participants' *mentes reae*. Otherwise, business arrangements that the courts have not condemned as *per se* and that may after discovery prove net pro-competitive could be held illegal at the threshold. This could deter economically worthwhile conduct. *See, e.g.*, *NYNEX*, 525 U.S. at 137.

Otherwise, the main substantive change from the PTAC as to the CME narrative is that the PFAC drops the allegation that a "Project Magellan" agreement provision (§ 5.05) was a "poison pill"—an allegation the Court found inconsistent with the agreement's text. *See IRS II*, 2018 WL 2332069, at \*14. The PFAC now assails § 5.05 as "so onerous in practice that it effectively prevents CME from launching an IRS trading platform," PFAC ¶ 279, on account of its requirement of consultation with Dealer founding members over trading protocols, *id.*, and its "most favored nation" and "right of first refusal" clauses, *id.* ¶ 280; *see also id.* ¶¶ 281–82 (discussing the effect of these clauses). The parties debate whether these terms have potential pro-competitive justifications. *See* Def. Mem. at 32 n.26 ("obvious" justifications include "incentiviz[ing] the Magellan dealers to support the new IRS clearing house by granting them a potential right to participate in the upside if CME successfully leveraged the new clearinghouse into a vertically integrated trading platform" (citing federal antitrust guidelines)); Pl. Reply at 22 n.43 (distinguishing guidelines as inapposite). In assessing the availability of *per se* condemnation of "Project Magellan," the Court, however, takes a holistic focus. For the reasons stated in *IRS II*, the overall agreement negotiated among the Dealers and CME is properly evaluated under the rule of reason. Whether any provision of that agreement, including § 5.05, is pro- or anti-competitive would form part of the rule of reason inquiry.

*"A unitary conspiracy"*: Plaintiffs separately argue that they have alleged a *"unitary conspiracy"* that predated 2013 and should not be "forced to prosecute a truncated conspiracy." Pl. Reply at 1, 3. The import of this argument is not clear. The Court construes plaintiffs to argue that because they have alleged a viable claim of *per se* unlawful conduct for 2013–2016, and because they have also alleged collaboration among Dealers in the preceding five years, they are entitled to application of the *per se* rule for their allegations as to collaboration in 2008–2012.

To the extent this argument seeks to relieve plaintiffs of the pleading burdens imposed by the rule of reason for the Dealers' pre-2013 business arrangements as alleged, it is wrong. The character of the Dealer collaboration alleged in 2008–2012 is fundamentally different from that alleged in 2013–2016. For 2013–2016, plaintiffs have alleged conduct among horizontal competitors (a group boycott aimed at extant platforms) of a kind that is quintessentially unlawful *per se*. It does not follow, however, that earlier agreements among Dealers of a different character (e.g., the "Project Fusion" and "Project Magellan" joint ventures)—even if motivated by a common desire to have the market maintain name-disclosed RFQ trading and not evolve towards anonymous all-to-all trading—were therefore *per se* illegal. Plaintiffs have not shown that those earlier joint arrangements are of a kind that judicial experience has condemned as *per se* unlawful. To be sure, pre-2013 dealings among Dealers may prove admissible at a trial to shed light, *inter alia*, on the existence or nature of agreements among them during 2013–2016. But plaintiffs have not offered any authority why the fact of viably pled claims of *per se* illegal conduct in 2013–2016 alters the analysis that antitrust law uses to assess earlier agreements of a different character. *See, e.g.*, *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928 (2d Cir. 1981) (even where alleged conduct is "interrelated and interdependent," courts must "analyze the various issues individually").

**ICAP, Tradition, Bloomberg, and IDCG**: Finally, although the Tradeweb and CME episodes remain the heart of plaintiffs' pre-2013 claims, the PFAC alleges joint Dealer conduct towards four other entities: ICAP, Tradition, Bloomberg, and IDCG. The Court elaborates on these allegations later, in the course of discussing delay and prejudice. The PFAC's allegations as to these episodes do not, however, warrant sustaining the claim of a *per se* violation of § 1 spanning 2008–2012.

As pled, two of the four episodes—those involving ICAP and Tradition—centrally involve a facially legitimate joint venture between Dealers and an inter-dealer broker. As such, these arrangements cannot be condemned *per se*, even if the motivations of participants were, as plaintiffs claim, to "[m]aintain the [s]tatus [q]uo." Pl. Mem. at 26 (quotation marks omitted). Under the authorities above, they are to be evaluated under the rule of reason. As to ICAP, the PFAC alleges that ICAP developed an electronic trading platform (i-Swap) for European dealer-to-dealer trading. PFAC ¶ 397. It initially achieved "no traction" but, in 2011, ICAP, in "Project Snowflake," recruited three Dealers (Barclays, Deutsche Bank, JP Morgan) to support (by streaming prices to it) a revamped i-Swap trading platform in exchange for an equity stake and governance rights. *Id.* ¶ 402. i-Swap launched in the United States when the new SEF rules took effect in 2013. *See id.* ¶ 410. Plaintiffs allege that these Dealers have used their influence to induce ICAP not to open an all-to-all trading platform. *See id.* ¶¶ 394–413. As to Tradition, the PFAC alleges that other Dealers entered into a "Trad-X" joint venture with Tradition, in which they too agreed to support a new Trad-X trading platform in exchange for equity and governance rights. *See id.* ¶¶ 341–73. Trad-X launched in the United States in 2013. *See id.* ¶ 357.[9]

---

[9] Apart from the fact that the "Project Snowflake" and "Trad-X" joint ventures do not resemble any of the species of arrangements among horizontal competitors that courts have condemned *per se*, defendants note a number of other problematic features of plaintiffs' claims of a Dealer conspiracy along the lines alleged. *See* Def. Mem. at 44–47. An example as to ICAP: In conflict with the PFAC's assertion that ICAP has "restricted all of its IRS trading platforms in the U.S. to dealers alone," PFAC ¶ 411, the SAC suggested that i-Swap's U.S. platform achieved a significant share of SEF trades and, in accordance with Dodd-Frank's "impartial access" mandate, has been "open for IRS trading by the buy side" since its launch, *see IRS I*, 261 F. Supp. 3d at 484–85. An example as to Trad-X: documents cited in the PFAC identify the group of Dealers supporting Trad-X as a "rival group" to the three Dealers supporting i-Swap, Playforth Decl. Ex. 50 (email from JP Morgan representative about "Project Snowflake" meeting), and state that "Trad-X will be a counter force to other platforms such as ICAP's i-SWAP, which is mainly supported by DB, JPM and BarCap," Playforth Decl. Ex. 51 (Credit Suisse PowerPoint presentation on "Project Trad-X").

The PFAC's new allegations about a plot against non-party Bloomberg also do not support a *per se* claim for 2008–2012. The PFAC's allegations as to Bloomberg overwhelmingly relate to 2013–2016. Specifically, the PFAC alleges that Dealer personnel met with Bloomberg in late 2011 and early 2012 to discuss Bloomberg's forthcoming SEF and conveyed that they might support Tradeweb if a partnership between Bloomberg with the Dealers were not arranged. *Id.* ¶¶ 325–36. It alleges that, in 2013, Bloomberg decided to launch an anonymous CLOB, known as BSEF, which allowed RFQ trading and received CFTC approval, but that the Dealers, viewing BSEF as a threat to develop into an all-to-all trading platform, today "refuse to provide liquidity" to BSEF. *Id.* ¶ 340; *see id.* ¶¶ 338–40. The PFAC's only allegation as to Bloomberg services offered before 2013 is that, in 2011, Bloomberg extended an OTC trading screen called ALLQ to IRSs, *id.* ¶ 326, but that Goldman Sachs, "'along with several other banks,'" withheld quote streams from ALLQ, *id.* ¶ 330 (quoting Playforth Decl. Ex. 43 (Goldman Sachs offsite management committee meeting slide notes) at 4) (emphasis omitted). The PFAC does not, however, allege any other parallel conduct or plus factors indicating that the decision by Goldman Sachs and other unspecified Dealers not to do business with ALLQ was coordinated. And, as defendants note, a document quoted in the PFAC appears to contradict this claim of Dealer non-participation, stating that "'7 of the top 10 [dealers] "opted in"' to ALLQ at its launch, and by 2013, '[a]ll dealers [were] live' on ALLQ." Def. Mem. at 42 & n.39 (quoting Playforth Decl. Exs. 40, 41).[10]

_____

[10] As with ICAP and Tradition, defendants identify other problematic features of the alleged plot among Dealers against Bloomberg. Def. Mem. at 41–44. An example as to the CLOB allegations: Defendants note that these rest almost entirely on allegations that there is minimal trading on this platform. The PFAC, however, lacks circumstantial evidence that this limited trading resulted from inter-Dealer coordination. And documents cited in the PFAC suggest independent reasons for the limited trading, *i.e.*, that "many [buyside firms are] accustomed to receiving preferential quotes offered as part of the relationships they enjoy with their dealers,"

Of the four newly alleged episodes, the PFAC's claims alleging a boycott are strongest as to IDCG. The PFAC alleges that IDCG was a small clearinghouse which in 2007 developed a promising clearing solution but which by 2011 had not "gain[ed] any traction." PFAC ¶ 314 (quotation marks and footnote omitted). The PFAC does not plead any non-conclusory claim of concerted Dealer activity towards IDCG until July 2010. That Dealers did not use IDCG before Dodd-Frank, despite pitches IDCG had made to them, *id.* ¶ 305, does not support inferring collective action. *See IRS II*, 2018 WL 2332069, at *17 ("[P]arallel lack of interest is not indicative of an inter-Dealer agreement" because, "[a]s pled, such conduct was consistent with any Dealer's independent self-interest." (citation omitted)). However, the PFAC claims, in July 2010, after IDCG cleared a starter trade with emerging SEF Javelin, PFAC ¶ 308, Dealers exchanged emails "trying to figure out who was involved in Javelin and IDCG," *id.* ¶ 309–10. Thereafter, on August 11, 2010, a "bank group" meeting was held at Deutsche Bank involving representatives of six Dealers. *Id.* ¶ 311. The notes from the meeting state, *inter alia*, that "'banks will oppose moves which move significant volumes to exchanges.'" *Id.* (quoting Playforth Decl. Ex. 38 at 2). Thereafter, the PFAC alleges, Dealers "kept up their engagement with IDCG on the surface," *id.* ¶ 315, but continued to give it limited support until its sale in 2012, *id.* ¶¶ 322–23.

Whether this plausibly pleads a *per se* agreement among the six Dealers thereafter to boycott IDCG presents a close question. On the one hand, the PFAC does not allege that these Dealers changed their behavior towards IDCG: both before and afterwards, as alleged, they gave

---

"prices being quoted for RFQs are very tight," Playforth Decl. Ex. 49 (internal JP Morgan email exchanges) at 2–3, and "most clients like to [RFQ] to find dealer axes that might not be reflected in the firm price," *id.* Ex. 48 (Citigroup chat exchanges) at 6; *see also* PFAC ¶ 570 & n.617 (acknowledging that Bloomberg "does not promote" its CLOB and offers it at least partially because "Dodd-Frank requires that all SEFs operate and offer an order book").

limited support to IDCG. And, as defendants note, the notes from the August 11, 2010 meeting, in the main, address a different matter entirely from IDCG. They describe a meeting between LCH and its board-member banks whose purpose was to consider "how LCH could succeed in the US market." Playforth Decl. Ex. 38 at 1. They mention IDCG solely as one of a number of potential U.S. "partners" for LCH; the notes' reference to opposing "mov[ing] significant volumes to exchanges" appears in a list of general topics as to which "[t]here was broad agreement," *id.* at 2; *see also id.* at 2–3 (stating that the "discussion focused on the need for and attractiveness of US partners" for LCH; listing points of "agreement" among LCH and its board about potential partners; identifying five "potential partners," including IDCG, and indicating that one "[n]ext step[]" was to "investigate" IDCG). No aspect of the meeting notes other than the excerpt quoted in the PFAC supports the PFAC's theory. On the other hand, that excerpt is certainly suggestive. Significant, too, is that IDCG had just provided clearing assistance on a maiden trade the month earlier to *Javelin*. The Court has held, in *IRS I*, that plaintiffs have adequately pled a plot among Dealers to boycott and destroy Javelin's post-Dodd-Frank SEF. The PFAC's claim that certain Dealers exchanged emails about Javelin and IDCG after IDCG assisted with Javelin's starter trade makes more plausible that the Dealers that met thereafter and discussed IDCG agreed to shun it on account of its assistance to Javelin. The Court thus will assume *arguendo* that a plausible agreement has been pled among these Dealers effective August 2010 and lasting until IDCG's purchase in 2012 to continue not to utilize (*i.e.*, to boycott) IDCG's services.[11]

---

[11] The PFAC's allegations as to later events regarding IDCG are of a different nature. It alleges that IDCG later unsuccessfully sought a consortium investment from Dealers and others, but that, because the Dealers insisted on excessive equity and governance rights, no agreement was reached. PFAC ¶ 316. This negotiation does not describe a boycott; any claim as to it would be analyzed, if at all, under the rule of reason. The allegation that, in 2012, IDCG sold itself to the

However, this strand is alone among the many facts that the PFAC pleads as to 2008–2012 in (arguably) plausibly pleading an instance of a *per se* unlawful agreement. No others do so. The IDCG episode as pled involves an agreement among a subset of Dealers from August 2010 until 2012 to continue to make limited use of a single clearinghouse that had theretofore been largely in a state of disuse. It does not and cannot support the sweeping claim of *per se* illegality pursued by the PFAC as to 2008–2012: of a five-year agreement among all Dealer Defendants to boycott a host of concerns with some potential to one day facilitate all-to-all anonymous trading.

The Court, therefore, holds that to the extent that the PFAC claims that defendants' conduct during 2008–2012 was *per se* illegal, it is futile.

### B. Delay, Prejudice, and Absence of Good Cause

The Court next considers the related questions whether granting leave to add the PFAC's claims covering 2008 through 2012 would (1) unduly delay this litigation and (2) cause prejudice to the defense. After considered review, the Court holds yes as to both. The scale of delay and prejudice would far exceed that which permitting the PTAC's claims as to these five years would have caused. The Court further holds that plaintiffs have not shown good cause for pursuing these claims at this late date.

#### 1. Delay

The issue of delay is framed by the chronology of this litigation.

Fact discovery began upon the July 28, 2017 decision in *IRS I*. Today, the deadline for fact discovery is April 10, 2019, some four weeks from now. Dkt. 549.

---

Dealer-controlled clearinghouse LCH.Clearnet, which "neutralize[d] IDCG," *id.* ¶ 322, also does not describe *per se* unlawful conduct.

Throughout, fact discovery has entailed extended negotiations among the parties, and occasionally with third parties, as to scope and parameters. It has entailed resolution by the Court of intermittent disputes regarding such discovery. *See, e.g.*, Dkt. 266 (October 10, 2017 decision); Dkt. 296 (October 24, 2017 decision); Dkt. 322 (January 8, 2018 decision); Dkt. 492 (August 22, 2018 decision); Dkt. 494 (August 22, 2018 decision); Dkt. 550 (September 21, 2018 decision); Dkt. 583 (October 19, 2018 decision); Dkt. 618 (November 13, 2018 decision); Dkt. 686 (January 23, 2019 decision). The Court has held monthly status calls with counsel, beginning in November 2017. Dkt. 268. These have enabled the Court informally to resolve, or guide the resolution of, many other discovery disputes (some concrete and some inchoate). These calls have kept the Court abreast of the discovery process.

Early in the fact discovery process, the Court resolved a dispute particularly important here: as to the start date of document discovery for the surviving (2013–2016) claims. Dkt. 266 (October 10, 2017 decision). Class plaintiffs had sought an order requiring defendants to produce documents created on or after January 1, 2009; defendants had proposed a start date of January 1, 2012. *See* Dkt. 265 (defendants' letter). The Court chose an intermediate start date: July 21, 2010, the date of Dodd-Frank's passage. Dkt. 266 at 2. This date, the Court held, balanced plaintiffs' interest in discovering defendants' "pre-conspiracy dealings" against the burdens of obliging the 11 defendant groups to make pre-conspiracy discovery. *Id.* Explaining why documents created after July 21, 2010 were more likely relevant than those created before, the Court stated: "[A]fter Dodd-Frank was enacted, it became materially more foreseeable that electronic all-to-all trading platforms for IRSs would one day develop." *Id.* The July 21, 2010 start date framed the parties' ensuing negotiations and many ensuing rulings on fact discovery disputes. These included an omnibus ruling on January 8, 2018, which resolved whether, and to

what extent, a host of topics pertinent to events in 2007–2012 that plaintiffs sought to explore were relevant to the surviving claims. Dkt. 322.

Under the court-approved case management plan, the deadline for substantial completion of document discovery, as extended, was June 29, 2018.[12] As of December 2018, the parties and third parties had produced more than four million documents. *See* Brockett Decl. ¶ 6 & n.1. In addition, substantial data compilations, largely capturing the terms of IRS trades between 2013 and 2016, have been produced from multiple sources.

On October 26, 2018, plaintiffs filed the pending motion for leave to file the PFAC. Dkts. 590–92. The motion was filed more than eight months after the February 21, 2018 deadline set for amended pleadings in the case management plan. Briefing on the motion was completed in late December 2018, 10 months after that deadline.

Fact depositions are nearing completion. The Court set by order a cap on each side's fact depositions. The Court, *inter alia*, authorized plaintiffs to take 110 depositions of fact witnesses across the 11 defendant groups and an additional five Rule 30(b)(6) depositions on data issues; and authorized defendants to take 30 depositions of fact witnesses across the three platform plaintiffs. Dkt. 583. As of the parties' February 20, 2019 joint status report, plaintiffs had taken or noticed 86 depositions of witnesses affiliated with defendants, defendants had taken 25 depositions of witnesses affiliated with plaintiffs, and an additional 25 depositions had been taken or noticed of third-party witnesses.

---

[12] Document discovery continued after the substantial completion deadline. Today, as reflected on the Court's most recent status calls with counsel and counsel's submissions in advance of those calls, only discrete areas of document discovery remain incomplete. For example, the parties continue to discuss the adequacy of entries on certain privilege logs. Both sides have also sought—and the Court has authorized—discovery from custodians abroad pursuant to the Hague Convention; this discovery remains outstanding.

Also underway, consistent with the case management plan, is briefing on plaintiffs' motion for class certification. *See* Dkt. 522 (briefing schedule). On February 20, 2019, plaintiffs submitted their opening motion and expert reports. *See* Dkts. 722–25. Defendants are to depose plaintiffs' class certification experts by April 10, 2019; defendants are to submit opposition briefs and supporting expert reports by May 31, 2019; plaintiffs are to depose defendants' experts by June 28, 2019, and to submit replies in support of their motion by August 16, 2019. *See* Dkt. 522.

Particularly viewed in light of the mature stage of this litigation, permitting the PFAC to supplant the current pleadings would upend the schedule and introduce enormous delay. The PFAC would more than double the temporal duration covered by plaintiffs' claims, adding five years to the current four. It would introduce a vast array of events, entities, concepts, witnesses, custodians, trades, and data not presently in the case. Given the nature of the PFAC's claims as to defendants' alleged conduct during 2008–2012, it would also require the testing of a complex and layered theory of § 1 liability that could proceed at most under the rule of reason, markedly different from the far simpler *per se* theory of § 1 liability, involving a boycott of three new trading platforms, that plaintiffs have pursued as to 2013–2016. For these reasons, adding the PFAC would effectively re-start the discovery process in this long-running litigation.

Briefly:

As to topics, the PFAC would inject into this litigation, among others, the following five episodes. The Court has referred to them earlier in the context of analyzing whether a *per se* violation of § 1 has been adequately pled. The following synopses drawn from the PFAC underscore that each is complex, involved numerous participants, including a large number of

non-parties to this lawsuit, played out over years, and transpired largely if not exclusively before the passage of Dodd-Frank:

***Tradeweb/"Project Fusion"***:  The PFAC alleges that, as one part of a "'dealer consortium' strategy," *see, e.g.*, PFAC ¶¶ 8, 144, the Dealers collectively invested in an existing IRS business as part of a joint venture, *see* PFAC ¶¶ 155–57.  They did so with the goal of steering Tradeweb from developing its anticipated click-to-trade platform offering, which the Dealers viewed as "a precursor to all-to-all trading," *id.* ¶ 141, to market, *see id.* ¶¶ 143–44.  The PFAC alleges that the Dealers' scheme to invest in Tradeweb so as to redirect its focus had its roots in memos and communications in 2006–2007, *see, e.g.*, *id.* ¶¶ 145, 154, 157; entailed, post-investment, installing senior personnel of the Dealers on the boards of various Tradeweb business lines, *see, e.g.*, *id.* ¶¶ 161–73 (identifying 23 such personnel); and led to Dealer-influenced decisions by Tradeweb not to launch a click-to-trade platform, *id.* ¶¶ 181–87, due to open in 2013, but instead to devote minimal resources to an inter-Dealer SEF called "Dealerweb," *id.* ¶¶ 188–93, and to develop a central limit order book, or CLOB, that today is "effectively closed off to the buy side," *id.* ¶ 203; *see also id.* ¶¶ 194–95.

***CME/Swapstream/"Project Magellan"***:  The PFAC alleges that, as part of the consortium strategy, the Dealers beginning in 2007 shunned the Swapstream clearing platform that CME had acquired, fearing CME would use that platform as a building block towards developing all-to-all anonymous trading.  *Id.* ¶¶ 205–96.  It alleges that internal memos and communications at one Dealer as to concerns about Swapstream date to 2006–2007.  *Id.* ¶¶ 230–31.  It alleges that CME approached the Dealers' strategic investment groups about supporting the platform; that Dealers' initial responses varied; and that Dealer personnel discussed Swapstream during and around board meetings of a separate entity, OTCDerivNet, and over email.  *Id.* at ¶¶ 231–41.  It alleges that in fall 2008, CME and the Dealers, the latter represented by a partner from the Cleary Gottlieb law firm, began "collective negotiations," *id.* ¶ 249, as to "governance" of, *id.* ¶ 252, and Dealer use of Swapstream, *id.* ¶¶ 249–54.  In the end, the Dealers privately agreed not to support Swapstream during "at least one (and probably more) meetings among themselves."  *Id.* ¶ 255.  CME was left, by early 2009, with "no choice but to abandon Swapstream."  *Id.* ¶ 256.  Later, CME initiated joint negotiations with the Dealers regarding a "clearing-only solution" available only to the buy-side.  *Id.* ¶ 257.  Negotiations regarding this "Project Magellan" involved representatives of each Dealer, *id.* ¶ 260 (listing 14 Dealer personnel, plus the Cleary partner); in the negotiations, the Dealers took common positions and insisted on "'governance' and 'control' over any IRS clearing platform," so as to prevent it from becoming used as the basis for an all-to-all trading platform, *id.* ¶ 273.  The PFAC parses the revenue-sharing agreement to which CME and the Dealers eventually agreed, the terms of which, the PFAC alleges, together "effectively prevent[] CME from launching an IRS trading platform."  *Id.* ¶ 279; *see also id.* ¶¶ 276–82.  Finally, between 2008 and 2012, the Dealers delayed the launch of CME's clearinghouse

via coordinated actions, including through use of a Dealer-controlled trade-processing entity, MarkitSERV, which CME found "impossible to deal with." *Id.* ¶ 291; *see also id.* ¶¶ 283–96. The result was that the Dealers made only limited use of CME to clear inter-dealer trades. *Id.* ¶ 294.

*ICAP/"Project Snowflake"*: The PFAC alleges that, by 2009, ICAP had developed an IRS order book used by the Dealers, but that buy-side customers could not access this platform because ICAP had agreed with the Dealers to block buy-side access as part of a 2009 "détente." *Id.* ¶ 394. The détente arose after Tradeweb (substantially owned by Dealers) launched a trading platform for mortgage bonds called "Dealerweb," which had a "devastating impact" on ICAP's competing mortgage-bond-trading business. *Id.* ¶ 395. ICAP allegedly then threatened, in retaliation, to open an all-to-all electronic trading platform, building on a product ICAP had developed for the European inter-dealer-broker market called iSwap. *Id.* ¶¶ 394–97. In response, in 2009, the PFAC alleges, ICAP and the Dealers agreed that the Dealers would not further expand Dealerweb into the IRS inter-dealer-broker space and ICAP would not establish an all-to-all IRS trading platform *Id.* ¶¶ 398–401. Later, in 2011, three Dealers engaged in a transaction ("Project Snowflake") with ICAP under which, in exchange for an equity interest and these Dealers' agreement to stream prices to ICAP, these Dealers were given seats on ICAP's board and effective control of its platform. *Id.* ¶¶ 402–05. ICAP has since abided by its agreement with the Dealers. *Id.* ¶¶ 409–12.

*IDCG*: The PFAC alleges that IDCG, founded in 2007, developed a promising clearing solution for IRSs which was consistent with exchange-trading and favorably viewed by the buy-side. *Id.* ¶¶ 297–304. But, it alleges, unspecified Dealer-affiliated FCMs refused to clear through IDCG. *Id.* ¶ 307. And after platform plaintiff Javelin cleared its first swap in July 2010, the PFAC alleges, several Dealers communicated by email and, at a meeting including six Dealer personnel, agreed "to oppose moves which move significant volumes to exchanges," including IDCG. *Id.* ¶ 311 (emphases, quotation marks, and citation omitted). The PFAC further alleges that afterwards, although Dealers "kept up their engagement with IDCG on the surface," *id.* ¶ 315, and met with IDCG to discuss doing business together, the Dealers took a "unified position" that they would do so only if granted equity in the platform and, implicitly, "governance and control," *id.* ¶ 316. Later, six Dealers strung along a potential acquirer of IDCG (truClear LLC); the acquisition failed. *Id.* ¶¶ 317–19. Finally, the Dealers "sought to kill IDCG once and for all" by having LCH.Clearnet (which operated SwapClear, a Dealer-controlled clearinghouse) pursue the acquisition of IDCG. *Id.* ¶ 322. After the August 2012 acquisition, LCH.Clearnet "mothballed much of its technology." *Id.* ¶ 323.

*Tradition*: The PFAC alleges that Tradition announced in 2010, consistent with Dodd-Frank, that it would launch a SEF-compliant platform, and that, in October 2010, it approached the Dealers to form an advisory committee as to the SEF's operation. *Id.* ¶ 344. In March 2011, Tradition and the Dealers entered into a joint

contract that provided for liquidity to be given to Tradition's SEF and for dominant Dealer participation on Tradition's "Product [Commit]tee," *id.* ¶ 346, which sets, *inter alia*, trading protocols, *see id.* ¶¶ 346–50. This gave the Dealers, by September 2013, "complete governance" over the SEF, known as Trad-X. *Id.* ¶ 351 (emphasis and citation omitted). However, Dealers remained concerned that Tradition might introduce all-to-all IRS trading with the buy side and used their governance power to limit buy-side access to Trad-X's view-only screens, to control clearing for Trad-X, to set access criteria, and to insist on non-anonymity of trading (*i.e.*, "name give-up"). *Id.* ¶¶ 357–70.

In addition to these episodes,[13] the PFAC's claim of a plot to inhibit, pre-Dodd-Frank, the emergence of anonymous all-to-all electronic trading would inject the following three thematic topics into the case. Each, too, is complex, and implicates a large array of new concepts, events, persons (including third parties, and records).

> ***Status of Market Infrastructure—Adaptability to All-to-All Trading***: The PFAC broadly alleges that by 2007, the market was technologically ready for the introduction of electronic all-to-all trading of IRSs; that the "pillars" of electronic execution, post-trade processing, trade confirmation, order routing, and central clearing were in place and capable of adaptation from the context of inter-Dealer trades context to that of IRS trades made on an anonymous basis on an all-to-all exchange; that—notwithstanding the delays and difficulties that later led regulators to defer the effective date of Dodd-Frank's SEF mandates—clearing infrastructure in particular was readily adaptable to the context of clearing buy-side trades; and that buy-side customers as early as 2007 would have invested as necessary (e.g., in clearing services) to enable them to trade on an electronic all-to-all market. *See id.* ¶¶ 93, 110–21, 440–52.

> ***Steps by Dealers to Limit Buy-Side Clearing***: The PFAC alleges that, years before Dodd-Frank, the Dealers erected artificial barriers to buy-side clearing. *Id.* ¶¶ 414–52. One step included "[t]ak[ing] [c]ontrol of [c]learing [i]nfrastructure." *Id.* ¶ 416. The PFAC alleges that, in 2000, Dealers founded OTCDerivNet, installed their personnel on its board, and used this new entity to secure control of SwapClear, an entity founded in 1999 by LCH.Clearnet to clear IRS trades. *Id.* ¶¶ 416–21. It alleges that the Dealers thereafter operated SwapClear as a utility, not as a profit-maximizing entity, which deterred other entities from opening clearing businesses; and also used OTCDerivNet as a forum to collude about market structure. *Id.* ¶¶ 422–25. After Dodd-Frank, the Dealers continued to impede buy-side clearing, for example by requiring clearing members of SwapClear to make large

---

[13] The Court has not included here the PFAC's allegations about Bloomberg, viewing these as occurring after Dodd-Frank and largely in or after 2013.

contributions of capital, limiting the buy-side's ability to utilize SwapClear. *Id.* ¶¶ 426–27.

**Pre-Dodd-Frank Collaboration Among Dealers**: The PFAC alleges that, in the years before Dodd-Frank, personnel across Dealers communicated about their concerns regarding potential "disintermediation" were electronic all-to-all exchanges to develop. *See id.* ¶¶ 122–32. Further, apparently at all relevant periods, the Dealers communicated about this topic and potential responses to the threat of disintermediation in trade associations, including the International Swaps and Derivatives Association, *id.* ¶¶ 374–75, and the Futures Industry Association, *id.* ¶¶ 376–81.

As the above review makes abundantly clear, adequate exploration of these alleged pre-Dodd-Frank episodes and topics would entail a vast amount of new discovery—documentary, testimonial, and expert. The Court so observed in noting the substantial delay that the PTAC would cause. *See IRS II*, 2018 WL 2332069, at *20–22. The Court's assessment is that the delay the PFAC would occasion would be far greater, given the expanded number of complex episodes and the topics it implicates, and given that more than a year of fact discovery has passed since the decision denying leave to add the PTAC's claims as to 2008–2012.

As to document collection, review, and production, as the Court noted in *IRS II*, "the parties' agreements as to document production parameters in 2013–2016 would not, logically, control discovery relevant to the 2008–2012 claims." *Id.* at *20. Document production in this case is nearly complete. As to document custodians, given the PFAC's new claims, collection of electronic and hard-copy records would need to re-start, and would now need to reach back at least to the start of 2008 (if not earlier: the PFAC contains many allegations as to circumstances in 2006 and 2007, and some as to earlier years). Records retrieval would also assuredly be necessary for a very sizable new group of custodians. That is because, "at particular Dealers, given natural turnover and promotions and reassignments, there were assuredly different personnel responsible for IRS-related matters during the two periods," *id.* at 21, and because the

many issues and incidents novel to the earlier period "likely involved substantially different personnel at particular Dealers from those as to whom discovery has been authorized as to 2013–2016," *id.*

As to the delineation of topics and search terms that would guide document collection and review of materials germane to the new five years of claims, much as the Court noted in *IRS II*:

> [T]he many distinct events, issues, entities, and players at issue in 2008–2012 similarly would require a fresh assessment of these parameters. So would the fact that plaintiffs' claims involve a materially different (pre-Dodd-Frank) regulatory environment than during 2013–2016. It is likely, too, that there would be rounds of discovery disputes requiring judicial intervention, including as to the start date for document review (numerous allegations in the [PFAC] date to 2007 and years before) and as to the permissibility of discovery into particular topics.

*Id.*

As to fact depositions, they too are close to complete. That plaintiffs would seek substantial new and reopened depositions of past and present defense personnel is inevitable, given the multi-chapter, multi-dimensional nature of the § 1 scheme among Dealers that the PFAC postulates, and that the PFAC names many dozens of Dealer personnel, including in connection with the episodes and topic areas synopsized above. Unavoidably, adding claims as to 2008–2012 would occasion, and justify, a new round of depositions. The Court's expectation is that between new and reopened depositions, the PFAC's added claims would credibly support depositions of approximately the same number of defense deponents as has been authorized for the existing claims.

The PFAC's expanded claims also implicate third parties. The Court's description of the PTAC applies: "Those identified on the face of the [PFAC] include numerous clearinghouses, interdealer brokers, other service providers, and industry associations." *Id.* The number of third-

party entities implicated for 2008–2012 is, in fact, greater in the PFAC than the PTAC, given its expanded claims for this period. The number of such third parties vastly outstrips those implicated by plaintiffs' 2013–2016 claims, consistent with plaintiffs' simpler theory of § 1 liability for the later period (a boycott of three existing SEFs). Extensive and protracted third-party discovery—both documentary and deposition—would certainly be sought by both sides were the PFAC's 2008–2012 claims permitted to go forward. There would also assuredly be no shortage of disputes about the scale of such discovery (and how the expense occasioned by it is to be borne). Even as to the 2013–2016 claims, the Court has already been called upon on multiple occasions to resolve or pretermit discovery disputes regarding third-party discovery. *See, e.g.*, Dkts. 456 (Tradition), 550 (Tradition), 609 (ICAP and Tullett).

Finally, as to data, as the Court has previously noted:

> [I]ndependent of electronic and hard-copy document discovery, the 2008–2012 claims would require—as have the 2013–2016 claims—the locating and harvesting of IRS trading data throughout the period. Such data is relevant, *inter alia*, to liability (including the existence of a pricing injury from the alleged conspiracy) and damages. Even assuming that such discovery demands did not give rise to disputes requiring extended negotiation and resolution, identifying and collecting this data, which before Dodd-Frank's SEF mandate took effect was likely held in decentralized locales, would likely take substantial time.

*IRS II*, 2018 WL 2332069, at *21. The same need to identify, harvest, and review these data sets applies to the PFAC.

In *IRS II*, the Court's assessment was that

> an amendment to add the industry-wide, complex, and half-decade-long claims proposed by the PTAC . . . would obliterate the [then] May 21, 2018 deadline for substantial completion of document production. In connection with the 2013–2016 period, it took counsel for the many parties (and third parties) seven months of focused work, beginning from the date of the ruling on the motion to dismiss, to formulate and narrow discovery demands, negotiate discovery parameters including as to custodians and search terms and strings, and to litigate to completion most discovery disputes as to matters pertinent to that period. A similar exercise would now be necessitated as to plaintiffs' new claims.

*Id.* *21 (footnotes omitted). Considering related factors including the need to elongate deposition discovery, the Court's conservative estimate was that permitting the PTAC's 2008–2012 claims to stand would cause a delay of, at the very least, 12 months for the completion of fact discovery. *Id.* ¶ 22.

The Court's assessment here is that, relative to the PTAC, permitting the PFAC's 2008–2012 claims to stand would occasion a materially *longer* delay of the case schedule. Unlike at the time of *IRS II*, fact discovery today is close to complete. Even were fact discovery on the 2008–2012 claims to commence immediately, it would virtually all occur after the current April 10, 2019 deadline for fact discovery. And with document production substantially complete and most depositions taken, there are limited opportunities to achieve efficiencies or economies of scale across discovery for the 2008–2012 and 2013–2016 events.

In effect, adding the 2008–2012 claims would again "allow[] a new MDL-sized lawsuit to be hitched to the existing claims." *Id.* at *20. And with fact discovery all but complete for 2013–2016, the processes of organizing and taking fact discovery for these two lawsuits would effectively proceed *seriatim*, with the 2013–2016 discovery wrapping up shortly after 2008–2012 fact discovery commenced. With limited efficiencies to be gained, fact discovery on the 2008–2012 claims would thus be tantamount to undertaking fact discovery in a new litigation.

In estimating the added length of fact discovery were the PFAC's 2013–2016 claims permitted, a fair starting point is the length of time such discovery will ultimately have taken as to plaintiffs' 2013–2016 claims. From the date of *IRS I* (July 28, 2017) to April 10, 2019 was 20.5 months. To more precisely calibrate the extent of the delay in fact discovery that the PFAC would occasion, certain adjustments would need to be made. On the one hand, two factors would tend to reduce (at the margin) the extent to which the 2008–2012 claims would extend the

45

fact discovery deadline. First, four weeks remain before the current fact discovery deadline. Second, as a result of the initial (2013–2016) round of fact discovery, both sides' counsel are doubtless more familiar with the concepts and terminology in this area, and with one another. This would facilitate discovery requests and negotiations. On the other hand, two factors would significantly elongate 2008–2012 discovery relative to 2013–2016 discovery. First, the PFAC's claims as to 2008–2012 are materially more complex and more difficult to discover than those for 2013–2016. These claims implicate more events, older events, older and harder to secure evidence, and—most importantly—far more varied episodes and third parties than do the 2013–2016 claims. Second, assuming *arguendo* that plaintiffs' § 1 claims as to 2008–2012 were held viable, the Court's assessment is that these claims, which largely involve claims related to the Dealers' "consortium investments," could at most state a claim under the rule of reason, in contrast to plaintiffs' 2013–2016 claims of a *per se* unlawful boycott of the nascent SEF platforms. The issues implicated by a rule of reason claim (e.g., as to the product and geographic markets, as to product substitutes and barriers to entry, and as to the anti-competitive effects versus the pro-competitive benefits of the challenged practices) would complicate and measurably add to the duration of fact discovery. *See* discussion *infra* p. 61.

All in, the Court's best estimate—based on its experience overseeing this litigation to date, its broader experience involving complex civil litigation, and its assessment of the unique features of the 2008–2012 claims—is that fact discovery attributable to the PFAC's 2008–2012 claims would, conservatively, add approximately 18–21 months to the current fact discovery deadline, and quite possibly more. Adding these claims would also further require a re-setting of all ensuing deadlines in the case management plan (e.g., class certification), with these deadlines presumably keyed to the new end dates for fact discovery.

In arriving at this estimate, the Court notes that plaintiffs, strikingly, do not engage at all

with the implications of their claims for relevant fact discovery. They do not argue, for example,

that the discovery addressed above would or could be provided with materially quicker dispatch.

Nor, given the instructive experience of this litigation to date, could they credibly do so. Instead,

plaintiffs declare that—as long as the defendants are ordered to produce to them productions that

they have made to the CFTC in connection with a regulatory investigation—plaintiffs will

"agree[]" not to pursue further document discovery and to a fact discovery extension of just three

months. Pl. Mem. at 6; *see also* Pl. Reply at 6.

For a host of reasons, this bid is a non-starter. The Court has rejected plaintiffs' attempt

to gain defendants' document productions in the CFTC's regulatory investigation (and in another

civil litigation). *See* Dkt. 266. In the interests of all parties, and consistent with the integrity of

the truth-seeking process, the metes and bounds of document production here are to be measured

against the viable claims pursued *in this litigation*. A party's regulatory production may overlap

only slightly with pertinent records in a civil litigation. And it may include materials outside the

proper scope of discovery here, which plaintiffs have no right to access.[14]

Plaintiffs' suggestion that a fact discovery extension for the 2008–2012 claims can be

cabined to three months is also inconsistent with their acknowledgement (in a footnote) that, if

leave to amend is granted, they intend to pursue third-party discovery (and presumably third-

party trading data). *See* Pl. Mem. at 6 n.18. Notably, too, plaintiffs have not foresworn

*deposition* discovery, of defendants or third parties. This, too, makes facetious the estimate that

---

[14] The Court has further recognized the practical reality that "a regulated entity confronted with a regulatory subpoena may be unable or unwilling to resist the subpoena's document production demands, even where those demands, if made in federal civil litigation, would fail the standards of Rule 26." Dkt. 266 at 4.

a bare three-month fact discovery extension would suffice. Plaintiffs' request that they be allowed "full discovery" into the viability of all-to-all IRS trading platforms before 2013, so as to meet the defense that the investor plaintiffs' injuries are too speculative to supply antitrust standing, *id.* at 21, is also inconsistent with the notion of a three-month extension.

Finally, plaintiffs ignore *defendants*' right to discovery. Even if plaintiffs were taken to have unilaterally disarmed from any further fact discovery, defendants would have the right to pursue, presumably via new or amended subpoenas, third-party document discovery, data, and depositions germane to the added claims. And, for the reasons addressed, third-party discovery, by whichever party sought, is apt to be substantial and time-consuming. The Court would expect substantial third-party discovery to be directed by defendants, at a minimum, to the entities above whom the Dealers are alleged to have impaired, pressured, or boycotted; and to the buy-side entities whom the PFAC claims were deprived of an otherwise available and desired opportunity to trade IRSs anonymously on an all-to-all electronic platform.[15] *See, e.g.*, PFAC ¶¶ 220–21, 303–04, 442 (listing such buy-side entities). Finally, to meet plaintiffs' broad claims as to 2008–2012, defendants would be expected to review and harvest their own records, including employee emails, covering the years of the new claims. Production of materials from among these records—e.g., in support of defense motions on summary judgment or opposing class certification or in connection with a joint pretrial order—would assuredly be met with demands for production of a fuller set.

---

[15] Defendants would also have the right to take document and deposition discovery of the class plaintiffs who did not trade IRSs post-2013 and thus have been out of this case since *IRS I*, *i.e.*, for the entire discovery period. This could entail negotiations as to custodians and search terms, production of responsive documents, and depositions of these plaintiffs' employees and investment advisors.

Accordingly, plaintiffs' proposal to forgo certain document discovery is not a credible means of addressing the substantial delay that the PFAC would produce.

Plaintiffs, lastly, ask that, as an alternative to permitting the claims as to 2008–2012, the Court permit plaintiffs to pursue claims from the date of Dodd-Frank's enactment forward. This proposal is, presumably, keyed to the start date of document discovery. But this, too, is not a coherent means of redressing delay. As plaintiffs acknowledge, even if the start date of the class period were moved forward 30 months from January 1, 2008 to July 21, 2010, discovery would still be needed as to "the origins and impact of Defendants' conspiracy in the 2007–2010 period." Pl. Mem. at 6 n.19. That is because the alleged stratagems on which plaintiffs base their claims of a pre-2013 § 1 violation—e.g., Tradeweb /"Project Fusion," CME /"Project Magellan," ICAP /"Project Snowflake," IDCG, and Tradition—predate Dodd-Frank and often 2008. While plaintiffs' proposal would prune temporally the evidence bearing on investor damages, on plaintiffs' theory, substantially the same discovery would be needed to test issues bearing on § 1 liability, including the existence, origins, scope, and participation in the alleged scheme; whether investor plaintiffs' injuries are sufficiently non-speculative to support antitrust standing; and whether the elements of a rule of reason claim are met.

The Court, accordingly, finds that permitting plaintiffs' 2008–2012 claims to proceed would cause substantial delay, realistically 18–21 months or more, to this litigation.

## 2. Prejudice

Drawing on its experience closely supervising pretrial proceedings in this litigation, the Court also finds that the amendment to add the 2008–2012 claims, even more than the proposed amendment in the PTAC, would palpably prejudice the defendants. *Cf. IRS II*, 2018 WL 2332069, at *22–23.

In *IRS II*, the Court noted that as of the date of the PTAC, defendants had for seven months "expended time, money, and energy in the discovery phase of this litigation on the only rational assumption as to this case's temporal scope: that plaintiffs' surviving claims were limited to 2013–2016." *Id.* at *22. The Court noted that, based on that temporal premise, counsel had exchanged hundreds of discovery communications, held dozens of meet-and-confers, and "devoted enormous effort to reaching agreement on matters such as the as scope of discovery, search terms, and custodians." *Id.* (quotation marks and citation omitted). Counsel had also litigated a series of discovery disputes that turned on this time period, including those that involved the document-discovery start date and the proper subjects of document collection and review.

In finding prejudice, the Court noted:

> The Court's resolution of these disputes in turn shaped the time-intensive discovery efforts that followed—including the identification of custodians, the formulation of search terms and search strings, the tabulation of "hit counts" aimed at measuring efficacy and burden and ensuing negotiations, and the collection of millions of documents. It is safe to assume that, on these efforts, each of the 11 defendant groups devoted very substantial time and incurred very substantial legal fees.

*Id.* (internal citation and footnote omitted). However:

> Reviving the 2008–2012 claims would negate this work, waste these efforts, and largely send the parties back to the discovery drawing board. It would effectively overrule the Court's rulings setting the document-discovery start date and excluding (in whole or large part) a host of pre-Dodd Frank topics from the scope of permitted discovery. It would require counsel to start negotiating anew the expanded universe of discovery issues. It would require developing and testing new potential search terms to gauge the utility and burden of each. It would require counsel to revisit prior compromises based on aggregate burdens for each defendant in light of the added burdens presented by the amended allegations and extended time period. It would almost certainly open up new rounds of protracted litigation over discovery disputes. It is safe to say that the duplicative fees (of counsel and litigation support) and costs wasted by the need for this do-over, when measured

> across the 11 defense firms, would extend well into seven figures, to say nothing of the wasted time of client personnel.

*Id.* (footnote omitted).

These considerations apply with even greater force more than a year after *IRS II*. As of February 2018, at least some efficiencies remained achievable via coordinating discovery (document and deposition) on plaintiffs' 2008–2012 claims with as-yet unfinished discovery on the 2013–2016 claims. But today, those efficiencies are realistically all but gone, with document discovery complete save for loose ends, and deposition discovery due to close in under a month.

Were the PFAC's claims to be permitted, the substantial costs and burdens borne by defendants would therefore include ones that would have not existed had plaintiffs filed the PFAC within—or even close to—the February 21, 2018 deadline set in the case management plan. For each of the 11 defendant groups, the cumbersome, time-intensive, and costly processes associated with modern document discovery would need to begin from even closer to a "standing start," *id.* at *20, than in the case of the PTAC.

There would first be the "laborious process of framing the document discovery to be produced for that period . . . ." *Id.* Much time and expense would assuredly be spent on new rounds of negotiating search terms and protocols keyed to the PFAC's new claims, including testing these terms and protocols based on hits yielded by experimental search terms. This process would be all the more involved and time-consuming given the complex, multi-faceted nature of the conduct that the PFAC claims was part of an overall § 1 conspiracy during the years before SEFs took root in 2013 pursuant to Dodd-Frank. Substantial time would inevitably be spent, too, litigating discovery disputes. Once parameters were in place, each defendant would then need to identify, find, and collect millions of electronic (and hard copy) records from or for numerous custodians; retain and train a new set of contract lawyers about this litigation and the

review protocols specific to it; put in place the mechanical apparati for such review; and arrange and train teams for second-tier production tasks (e.g., privilege reviews).

As to depositions, plaintiffs have taken or noticed most allotted for defense personnel. And plaintiffs would undoubtedly demand new and reopened depositions to account for the five years of added claims. The Court would surely permit additional depositions, to allow for fair discovery of areas of conduct newly relevant in light of the PFAC. But the untimely date at which depositions as to events and concepts relevant to pre-2013 claims were decided upon too would prejudice defendants, relative to the scenario in which overall discovery was negotiated more holistically. Addressing all forms of discovery in *IRS II*, the Court noted that:

> Adding five years of claims to the existing four years would not ineluctably entitle plaintiffs to the receipt of 125% more discovery. A nine-year conspiracy claim implicating numerous episodes, issues, and personnel would by its nature require thoughtful application of the proportionality command of Federal Rule of Civil Procedure 26(b)(1). To the extent that defense discovery for 2013–2016 had not already been produced to plaintiffs, a fair question would arise whether to revisit the agreed parameters of that discovery in the interest of keeping the overall discovery burden manageable.

*Id.* at *21. Today, with deposition and document discovery largely complete as to 2013–2016, defendants have lost the ability to negotiate or move, in the wake of the added claims, for a reduced scope of discovery as to 2013–2016 in the interests of keeping manageable the overall discovery burden.

The Court therefore assesses that the tangible prejudice to defendants from plaintiffs' late amendment would substantially exceed the scale of prejudice estimated in *IRS II* from permitting the PTAC's similar amendment.

Plaintiffs, notably, do not challenge the account in *IRS II* as to the costs and burdens that adding the 2008–2012 claims would then have added. Nor do they dispute defendants' statement that adding such claims now would add to these costs and burdens. That is unavoidably correct.

Plaintiffs instead argue that as a matter of law, the "time, effort and money" that a party's late amendment visits on its adversary cannot alone qualify as "prejudice." Pl. Mem. at 23–24 (quotation marks and citation omitted). Plaintiffs claim that only "legal prejudice" is cognizable, and that a defendant cannot show this where "the proposed amendment is simply variations on the original theme." *Id.* at 23 (quotation marks and citations omitted).

Plaintiffs incorrectly portray the law. As the authorities reviewed above recognize, an amendment may be prejudicial when it would require an opponent "'to expend significant additional resources to conduct discovery . . . .'" *AEP Energy Servs.*, 626 F.3d at 725 (quoting *State Teachers Ret. Bd.*, 654 F.2d at 856). One case on which plaintiffs rely says precisely that. *See Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) ("A litigant may be 'prejudiced' within the meaning of [Rule 15(a)] if the new claim would: '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial [or] (ii) significantly delay the resolution of the dispute . . . .'").

To be sure, in the two Second Circuit cases on which plaintiffs rely, leave to amend was held wrongly denied based solely on delay and associated litigation expenses. But these are easily distinguished. *Miller v. Selsky*, 234 F.3d 1262 (2d Cir. 2000), an unpublished opinion, solely involved Rule 15. *Id.* at *2. It did not involve Rule 16. And no discovery had taken place as of the date of the requested amendment. *Id. Pasternack*, too, was resolved only under Rule 15. The Circuit's decision does not address Rule 16. On the contrary, it states: "[I]t does not appear that there is any allegation of untimeliness based on a scheduling order." 863 F.3d at 174. The Circuit held only that the trial court had abused its discretion when it denied leave to amend because the litigation had lasted years and defendants had spent "a vast amount of money litigating the sufficiency of various complaints in this case." *Id.* (quotation marks and citation

omitted). These cases do not bear on the situation here, where—long after the lapse of the amendment deadline and with fact discovery near complete—plaintiffs seek to add claims that would more than double the case's scope, far more than double its complexity, and require the re-starting of discovery at great cost and inefficiency.[16]

In fact, courts in this District have repeatedly found prejudice where motions to amend were filed late and after extensive discovery. *See, e.g., Levy v. Young Adult Inst.*, No. 13 Civ. 2861 (JPO) (SN), 2016 WL 3637109, at *3 (S.D.N.Y. June 29, 2016) (denying leave to amend under Rule 16 when deadline to amend complaint had passed 2 years before); *Eastman Chem. Co. v. Nestlé Waters Mgmt. & Tech.*, No. 11 Civ. 2589 (KPF), 2014 WL 1316772, at *5–10 (S.D.N.Y. Apr. 1, 2014) (finding prejudice in a motion to amend two-and-a-half months after the deadline where amendment would have required, *inter alia*, a whole new area of discovery on "commercial reasonableness"); *Pereira v. Cogan*, No. 00 Civ. 619 (RJS), 2002 WL 31496224, at *3–4 (S.D.N.Y. Nov. 8, 2002) (denying leave to amend after finding prejudice under Rule 15 where the motion to amend was filed 5 days before trial).

### 3. Good Cause

The Court, finally, addresses whether plaintiffs had good cause to move for leave to file the PFAC eight months after the deadline for amended pleadings. As briefed, this question turns on whether new discovery justified plaintiffs' late filing. Plaintiffs argue that the PFAC is based on "newly discovered evidence"—documents produced that revealed a viable § 1 claim. Pl. Mem. at 6; *see also* Pl. Reply at 3–5; Brockett Decl. ¶¶ 2–15 (describing counsels' pre-PFAC

---

[16] Also inapposite is *In re South African Apartheid Litigation*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009), the third case on which plaintiffs rely. It held that under Rule 15, the "practical prejudice" to a defendant "of being subject to greater awards" under the amended pleadings does not qualify as "legal prejudice," *i.e.*, prejudice cognizable under Rule 15. *Id.* at 290 (footnote omitted). The Court here does not find prejudice based on the prospect of a larger award but on the factors addressed above.

review and analysis of defense productions). Defendants counter that the PFAC essentially recycles the PTAC's factual allegations using different phrases and packaging, Def. Mem. at 4–5, and relies largely on public sources available before the PTAC's filing, *id.* at 5 & n.3, on statements of a consultant who has worked with plaintiffs since 2017, *id.* at 5–6, on unattributed assertions, *id.* at 6 & n.4, and on "new" documents mostly produced by the June 29, 2018 deadline for substantial completion of document production, *id.* at 6–7 (claiming over 75% of the documents cited in the PFAC were produced by that deadline). Defendants argue that, far from having good cause to file the PFAC out of time, plaintiffs failed to act with the required diligence.[17]

Were the question of "good cause" to turn on whether newly-found evidence justified the late filing, the Court's assessment is that defendants would have, on balance, the better of this argument. Having examined the series of amended complaints, actual and proposed, and the materials cited therein, the Court's judgment is that, as to the two episodes on which the PFAC overwhelmingly relies in claiming a 2008–2012 conspiracy—involving Tradeweb/"Project Fusion" and CME/Swapstream/"Project Magellan"—the PFAC's allegations are largely recycled from past complaints. These two episodes were the crux of the PTAC's claims as to 2008–2012. *See IRS II*, 2018 WL 2332069, at \*11–13 (Tradeweb), \*13–17 (CME). The Tradeweb episode had also been the crux of the 2008–2012 claims in the SAC, *see IRS I*, 261 F. Supp. 3d at 465–69. The PFAC newly packages these episodes as part of a "consortium strategy" among the Dealers during this period, aimed at investing in or otherwise coopting platforms or clearing

---

[17] Towards the same end, defendants note that, more than three months before filing the PFAC, plaintiffs' counsel had acknowledged that they believed document discovery supported an amendment on the subjects the PFAC addresses. *See* Dkt. 408 (June 19, 2018 status letter); Dkt. 430 (July 17, 2018 status letter); Dkt. 457 (Transcript of July 19, 2018 telephone conference) at 61.

products that had the potential to lead to all-to-all IRS trading. But a close examination reveals that, once such recasting efforts (and the PFAC's resequencing of allegations) are accounted for, the PFAC adds only minor, largely cosmetic details to these two central episodes.

In contrast, as to three secondary episodes alleged in connection with the 2008–2012 conspiracy, the PFAC alleges new facts. These are that Dealers entered into joint ventures with the goal of gaining control over ICAP's i-Swap and Tradition's Trad-X platforms, and denied support to IDCG's startup clearinghouse. On review, it appears that the documents from which plaintiffs derive their claims as to these episodes were largely obtained in discovery. However, the heart of the PFAC's § 1 claims as to 2008–2012 remains the Tradeweb and CME episodes. These are pled in far more detail than any others. And they far more plausibly allege significant collective action by Dealers with the aim of steering the industry's long-term trajectory away from a course leading eventually towards all-to-all anonymous trading. Even putting aside defendants' challenges to the plausibility of the PFAC's pleadings as to ICAP, Tradition, and IDCG, the new allegations regarding them would not provide good cause for such a late, consequential, and disruptive pleading.

There is, however, an additional and more fundamental impediment to finding good cause: plaintiffs' failure, until the PFAC, to seriously pursue a rule of reason theory of § 1 liability. As described further below, the one area in which the PFAC moves plaintiffs' claims materially forward towards viability is in its articulation of a rule of reason theory. As the Court's decisions in *IRS I* and *IRS II* have made clear, given the focus of plaintiffs' 2008–2012 claims on the Tradeweb/"Project Fusion" and CME/"Project Magellan" episodes, this route, while imposing demanding pleading and proof requirements, had more potential to state a § 1

claim than did a theory of *per se* illegal conduct during this period. Yet, until filing the PFAC in late October 2018, plaintiffs all but disdained a rule of reason claim.

In *IRS I*, the Court canvassed the law as to the limited categories of agreements among horizontal competitors that the law treats as *per se* illegal, *i.e.*, "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality . . . ." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). As to these categories of restraints, experience has enabled courts to "predict with confidence that the rule of reason will condemn it," and therefore permits courts to apply "a conclusive presumption that the restraint is unreasonable." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 344 & n.15. Paradigmatic examples, the Court noted, are horizontal agreements among competitors to fix prices or to divide markets, and group boycotts. *See IRS I*, 261 F. Supp. 3d at 467. The Court held plaintiffs' allegations regarding the 2013–2016 group boycott of Javelin, Tera, and trueEX to be of such a nature. *Id.* at 472.

But, as reviewed above, plaintiffs' flagship allegations as to 2008–2012, involving "Project Fusion," in which the Dealers jointly invested alongside Thomson in a controlling stake in Tradeweb, described an arrangement that was not susceptible to *per se* condemnation. The Court explained in detail why the SAC's allegations as to "Project Fusion" did not fit into any category of agreement recognized as *per se* illegal. *See id.* at 467–68. And the SAC had not seriously pursued any rule of reason claim as to "Project Fusion." *See id.* at 468 (outlining pleading requirements for rule of reason claim). It did not contain any section addressed to the rule of reason. And its factual allegations did not fill that void:

> [T]here are no allegations in the SAC defining Tradeweb's product or geographic market, or, within that market, defining its market share or market power. There is, in fact, no allegation that Tradeweb had any presence, let alone power, in *any* market. And, vitally important, there are no allegations as to the pro-competitive

57

benefits and anti-competitive harms of Tradeweb after the joint venture, whether in general or as to Tradeweb's specific choices after 2007 as to which trading platforms and asset classes to pursue and which to forego.

Therefore, even assuming it adequately pled an agreement among Dealers to terminate a Tradeweb plan to open an all-to-all trading platform, the SAC does not plead facts supporting, under the rule of reason, the inference that [that] agreement was anti-competitive so as to violate § 1.

*Id.* at 469 (footnote omitted).

The decision and discussion in *IRS I* was an invitation for plaintiffs to pursue, in a timely amended complaint, a claim under § 1 for 2008–2012 based on the rule of reason, at least as a carefully-pled alternative to a theory of illegality *per se*.

Plaintiffs, however, chose in the PTAC, filed on the final day permitted, again to pursue—almost exclusively—a *per se* theory. That theory remained defective, for the reasons reviewed above. *See IRS II*, 2018 WL 2332069, at *12 (quoting *IRS I*, 261 F. Supp. 3d at 468 n.17). And the PTAC, like the SAC, made only a nominal hat tip towards a rule of reason claim as to Tradeweb:

> The PTAC adds two paragraphs of allegations as to application of the Rule of Reason. *See* PTAC ¶¶ 281–282. These are far too spare and incomplete to close the gaps in the SAC's pleadings on this point. *See* [*IRS I*], 261 F. Supp. 3d at 468–469. Like the SAC, the PTAC lacks allegations defining Tradeweb's product or geographic market, *id.* at 469. It loosely recites that "[t]he relevant market is the market for IRS," PTAC ¶ 281, *compare* SAC ¶¶ 398–400, but that allegation is a mismatch for Tradeweb's function as alleged, which was not as a buyer or seller of (nor a market maker for) ITSs, but as a provider of electronic trading platforms, [*IRS I*], 261 F. Supp. 3d at 468. As to that market, the PTAC does not make any allegations as to Tradeweb's market power, let alone regarding its actual or potential competitors and/or the barriers to other entrants. It is silent as to the market share of Tradeweb's then-competitors (e.g., Bloomberg, the New York Stock Exchange, Nasdaq, CME, or others). The assembled pleadings again do not allege "that Tradeweb had any presence, let alone power, in *any* market." *Id.* at 469.

> The PTAC's failure to situate Tradeweb in any relevant market, as required, again leaves to conjecture the impact of this one market participant's alleged decision not to introduce a novel product (a new IRS trading platform) in favor of other business priorities. *See id.* at 469. And while the PTAC recites that this decision was anti-

competitive because it "reduce[d] output," PTAC ¶ 280, it lacks non-conclusory allegations as to the pro-competitive benefits and anti-competitive harms of the joint venture's decision to focus Tradeweb's offerings (like those of competitor Bloomberg) on other products and platforms. Measured against the standards applicable to Rule of Reason claims, *see [IRS I]*, 261 F. Supp. 3d at 468, the PTAC, like its predecessor, falls well short.

*Id.* at *12–13.

For similar reasons (and others), the Court in *IRS II* held the PTAC's allegations as to CME and "Project Magellan" defective. *See id.* at *13–17. That project also centrally involved joint, counseled business negotiations between CME and the Dealers which could not be condemned as *per se* anti-competitive under § 1. *See, e.g., id.* at *16 & n.11 (reviewing facts inconsistent with *per se* condemnation). The Court then added:

> That leaves the Rule of Reason. Potentially, a viable Rule of Reason claim could have been pled with respect to the Dealers' collective action as to CME, attempting to show overall anti-competitive effect in a defined market. But unlike with respect to Tradeweb, the PTAC does not even gesture in that direction with respect to Swapstream, confining itself to a theory of *per se* illegality.
>
> In any event, the PTAC does not make the requisite pleadings to enable a Rule of Reason claim. It does not define the product or geographic market of the company, CME, whose offerings were allegedly skewed by the defendants' collective refusal to support an al-to-all IRS trading platform. Nor, although touting CME's capabilities, does it allege that CME had power in any market, including that for electronic exchanges with respect to swap trading generally or IRS trading in particular. *See [IRS I]*, 261 F. Supp. 3d at 469. And while the PTAC denounces the Dealers' conduct as anti-competitive, *id.* ¶¶ 193–196, it does not assess these anti-competitive impacts against the potential pro-competitive benefits of the agreement that the collaborating Dealers negotiated towards, and eventually struck, with CME, including those identified above.

*Id.* at *17.

In the PFAC, plaintiffs for the first time make more than a token effort to plead a rule of reason claim, alongside their predominant claim of a *per se* violation of § 1. *See* PFAC ¶¶ 626–72. In contrast to the SAC, which lacked rule of reason allegations, and the PTAC, which contained just two paragraphs as to the rule of reason, the PFAC contains concrete allegations as

to the foundational concepts for a rule of reason claim. It defines the defendants' product market as the IRS market, *id.* ¶¶ 628–38; defines the geographic market as the United States, *id.* ¶¶ 639–41; sets out the Dealers' market shares, individually and in the aggregate, *id.* ¶¶ 642–45; makes allegations as to Dealers' market power in light of the Justice Department's Merger Guidelines, *id.* ¶¶ 646–49; addresses why the alternative market definition (the market for trading platforms) posited by defendants is, ostensibly, not correct, *id.* ¶¶ 650–52; alleges why the "Project Fusion" and "Project Magellan" joint ventures had anti-competitive purposes and effects, *id.* ¶¶ 653–58; and alleges, for each joint venture, why the anti-competitive effects of the venture outweigh the pro-competitive justifications, *id.* ¶¶ 659–72.

However, plaintiffs nowhere explain why it took until October 26, 2018 to first meaningfully pursue a rule of reason claim. The subject is unaddressed in the PFAC and in the plaintiffs' memoranda of law. No valid reason is apparent for plaintiffs' failure to pursue such a claim long ago. Plaintiffs cannot pin the absence of an earlier rule of reason claim on recent discovery. On the contrary, the PFAC's rule of reason allegations center on the very two episodes (Tradeweb and CME) as to which its factual allegations are in substance the same as in the PTAC. Moreover, as pled in the PFAC, plaintiffs' rule of reason claim does not cite, or turn at all on, new document discovery. The same rule of reason claim could equally have been made in (if not before) the PTAC or at any time after *IRS II.* The Court is left to infer that plaintiffs held off until late October 2018 to plead a rule of reason claim not for any reason inherent to that claim. Instead, it appears that plaintiffs deferred pursuing this theory until more than eight months after the deadline for moving to amend had lapsed, in the hope that such would never prove necessary—that the basis for a viable theory of *per se* liability for 2008–2012 would emerge in discovery.

It is far too late for a complex legal claim of this nature to be added, particularly without a convincing justification. A late pleading of this nature is highly disruptive. The addition of a rule of reason claim, by its nature, would inject into the case, on the brink of the fact discovery deadlines, a host of new factual issues. These include issues relating to the definitions of the product and the geographic markets, defendants' market share(s), entry barriers, potential entrants, and potential substitutes. Relevant issues would also be generated based on the parties' articulations of the anti-competitive effects of, and the pro-competitive justifications for, the various agreement(s) alleged among defendants during 2008–2012. Although expert analysis would surely be brought to bear as to these issues, a consequential expansion of fact discovery— above and beyond that which a *per se* claim for these years would necessitate—would be necessary to elicit evidence and to develop the record relating to unique elements of a rule of reason claim. Plaintiffs have not articulated good cause for disrupting the case schedule by first pursuing a rule of reason theory so late in the day. The Court finds none.

In finding an absence of good cause for first pursuing a rule of reason claim so close to the end date for fact discovery, the Court has no occasion to definitively resolve whether the PFAC has adequately pled such a claim. Defendants have chronicled deficiencies in the PFAC's iteration of that claim. *See generally* Def. Mem. 24–34. A number of these critiques appear substantial. These include that because the PFAC tightly focuses its rule of reason allegations on the Dealers' attempts to control Tradeweb and CME through the two joint ventures, a rule of reason claim can lie only if these entities had market power.[18]

---

[18] In its rule of reason allegations, the PFAC alleges that the anti-competitive effects *of the "Project Fusion" and "Project Magellan" joint ventures* outweighed their pro-competitive potential. *See* PFAC ¶¶ 661–65 (Tradeweb); *id.* ¶¶ 666–72 (CME). Its rule of reason pleadings focus on these two initiatives, and are not directed at the Dealers' conduct holistically during 2008–2012. As a result, there is a substantial argument that the proper subject of the market

Notwithstanding the particular manner in which the PFAC is pled, the Court's judgment is that a viable rule of reason claim quite possibly could have been formulated for 2008–2012. Plaintiffs have amassed evidence of statements by officials at various Dealers preferring the traditional model of dealer-to-customer IRS trading and disfavoring the prospect of anonymous trading of IRSs on an exchange. Plaintiffs have also alleged various actions by Dealer personnel, including in connection with Projects "Fusion" and "Magellan," that made it less likely that exchange trading along the lines that plaintiffs preferred would take root. While the Dealers' complex business arrangements in 2008–2012—whether labeled as "consortium investments" or otherwise—do not implicate any category of conduct recognized as *per se* anti-competitive, a viable rule of reason claim potentially could have been pled for this period, alleging an overall agreement among Dealers to steer future IRS trading towards bilateral, party-disclosed trading and against the development of anonymous all-to-all exchange trading. Such a claim would,

---

power inquiry under the rule of reason, as analyzed in *IRS I* and *IRS II*, is the market power of the two entities restrained by the defendants' joint ventures (*i.e.*, Tradeweb and CME). As the Court has noted, these entities were providers of electronic trading platforms, not market makers. *See IRS I*, 261 F. Supp. 3d at 469; *IRS II*, 2018 WL 2332069, at *12–13; *see also* PFAC ¶ 627 (acknowledging that relevant question under the DOJ joint venture guidelines is whether "the joint venture has market power"). Therefore, although the PFAC alleges that the Dealers have a combined 70% market share in the "IRS market," PFAC ¶ 638, that market appears a mismatch for the rule of the reason claim as pled.

As an alternative to its theory of a rule of reason violation affecting the "IRS market," the PFAC does, cursorily, plead for the first time that "[d]efendants' own documents suggest that Tradeweb's share for execution of interest rate swaps with the buy side is at least 60% [and the] only other significant competitor is Bloomberg." *Id.* ¶ 652. But this allegation, too, is problematic. It is not anchored to the 2008–2012 time period. And the PFAC does not attempt to define the electronic trading platform market. It leaves unclear on what basis it claims for Tradeweb a 60% market share of the subset of that market consisting of "execution of interest rate swaps with the buy side," *id.*, or whether such is a viably defined market, *see* Def. Mem. at 25–26. That the PFAC identifies numerous other electronic trading platforms for swaps trading makes the PFAC's passing suggestion that the platforms restrained had market power all the more problematic. *See id.* at 26.

presumably, have alleged that the overall anti-competitive effects of this agreement outweighed the pro-competitive potential of such a course.

Had plaintiffs seriously pursued a rule of reason claim earlier in this litigation rather as an untimely after-thought, there would have been opportunity for considered briefing and decision, and to the extent found necessary, for a potentially curative amended complaint. The iterative process by which claims are assessed on a motion to dismiss and refined through an amended pleading is unusually well-tailored to complex claims such as under the rule of reason, which may require successive iterations to hone to viability. It is, however, far too late to embark on that journey now, with fact discovery due to close in under a month.

For the reasons above, the Court therefore does not find good cause to permit plaintiffs to file the PFAC more than eight months after the deadline for amended pleadings set in the case management plan. The episodes on which the PFAC's § 1 claim predominantly relies are not new. Indeed, they were articulated earlier in the SAC and/or the PTAC and do not substantially turn on new evidence. And plaintiffs failed to pursue earlier the one potentially viable theory of § 1 liability for 2008–2012, under the rule of reason, despite having ample opportunities to do so. Furthermore, that theory appears to require significant modification to approach viability and would significantly disrupt the existing schedule.

### D.     Conclusion

For the above reasons, the Court denies plaintiffs' motion for leave to amend, so as to add claims covering 2008–2012.

## IV.    The PFAC's Claims as to 2013–2016

The PFAC also adds a limited number of allegations bearing on the period 2013–2016.

Most notably, it alleges why two entities—Tradeweb and Bloomberg—that potentially could

have offered all-to-all anonymous trading of IRSs did not do so during this period.

As to Tradeweb, it alleges that Tradeweb could offer "an all-to-all RFQ platform," but

that it chose instead to limit its RFQ "to facilitate dealer-to-client or dealer-to-dealer trading by

allowing only dealers to respond to the quote requests submitted by the platform." PFAC ¶ 204.

This, the PFAC alleges, "is the result of the Dealer Defendants' control of Tradeweb." *Id.*

As to Bloomberg, it alleges that Bloomberg's BSEF received regulatory approval from

the CFTC on July 31, 2013 and was equipped to enable order book trading between any market

participants. *Id.* ¶ 338.   However, it alleges, the Dealers today refuse to provide liquidity to

BSEF's CLOB except "on a name-disclosed basis," such that Bloomberg's CLOB therefore has

"no volume on it." *Id.* ¶ 340 ("As a result of these tactics against Bloomberg's IRS trading

platforms, the Dealer Defendants have succeeded in preventing Bloomberg from offering a

meaningful all-to-all anonymous trading platform and have forced buy-side customers to trade

IRS on Bloomberg via a non-anonymous RFQ protocol.").

The Court will permit the addition of these allegations.  The status during 2013–2016 of

other platforms for the trading of IRSs is, for a variety of reasons, relevant context for plaintiffs'

well-pled claims of a contemporaneous boycott by Dealers of Javelin, Tera, and trueEX.  Among

other things, to the extent that no other platforms permitting the all-to-all anonymous trading of

IRSs are shown to have been operational during this period, plaintiffs' claim that an effective

boycott of Javelin, Tera, and trueEX affected all investors who wished to trade IRSs in such a

manner on such an exchange is strengthened.  Separately, Dealers' actions during this period

towards other platforms that carried the promise of enabling anonymous all-to-all IRS trading

have the potential to bear significantly on the factfinder's determination whether the Dealers did

or did not boycott Javelin, Tera, and trueEX. Consistent with its discovery rulings, the Court has

assumed throughout that the Dealers' conduct towards other platforms during 2013–2016 besides

the three boycott targets is within the scope of matters to be discovered. The Court therefore

authorizes plaintiffs to file a FAC incorporating the PFAC's allegations bearing on the manner in

which IRSs were and were not traded on Tradeweb and Bloomberg during 2013–2016. As these

matters have been within the scope of existing authorized discovery, this amendment will not

result in any change to the existing discovery schedule.

## CONCLUSION

For the reasons stated above, the Court denies plaintiffs' motion for leave to amend to

add allegations regarding 2008–2012 but grants the motion for leave to amend to add allegations

regarding 2013–2016 as described above.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 13, 2019
New York, New York